# <u>EXHIBIT A</u>

Execution Version

# NOTE PURCHASE AGREEMENT

by and among

EARTH ENERGY RENEWABLES LLC,
as the Company

and

ARA EER HOLDINGS, LLC,
as the Purchaser

DATED JANUARY 13, 2020

## SCHEDULES AND EXHIBITS

SCHEDULE A — Defined Terms

SCHEDULE 4.1(a)(v) — Financing Statements to Amend or Terminate

SCHEDULE 5.4 — Litigation

SCHEDULE 5.5(a) — Financial Statements

SCHEDULE 5.5(b) — Indebtedness

EXHIBIT 1 — 8% Note due June 30, 2020

EXHIBIT 2 — Budget for Application of Note Proceeds

EXHIBIT 3 — Summary Term Sheet

8% Note due June 30, 2020

January 13, 2020

ARA EER HOLDINGS, LLC
5300 Memorial Drive, Suite 500
Houston, Texas 70077

Ladies and Gentlemen:

EARTH ENERGY RENEWABLES LLC, a Texas limited liability company (the *"Company"*), agrees with ARA EER HOLDINGS, LLC, a Delaware limited liability company (the *"Purchaser"*) as follows:

SECTION 1.   AUTHORIZATION OF NOTE.

The Company has authorized the issue and sale to Purchaser of an 8% Note due June 30, 2020 (the *"Note"*) in an aggregate principal amount up to (a) $440,000 plus (b) the Purchaser Expense Amount (as defined below) (the *"Principal Amount"*).  The Note shall be substantially in the form set out in Exhibit 1.  Certain capitalized and other terms used in this Agreement are defined in Schedule A.  References to a "Schedule" or an "Exhibit" are references to a Schedule or an Exhibit attached to this Agreement unless otherwise specified.  References to a "Section" are references to a Section of this Agreement unless otherwise specified.

SECTION 2.   SALE AND PURCHASE OF NOTE.

Subject to the terms and conditions of this Agreement, the Company shall issue and sell to the Purchaser and the Purchaser shall purchase from the Company, at the Closing provided for in Section 3, the Note at the purchase price of 100% of the Principal Amount.  Subject to the terms and conditions of this Agreement, the purchase price shall be paid (a) on the Closing Date (i) $110,000 to the Company and (ii) to the Purchaser or the Purchaser's legal and other advisors, an amount equal to the fees and expenses incurred by the Purchaser in connection with the preparation, negotiation and consummation of this Agreement, the Note and the other Loan Documents (the *"Purchaser Expense Amount"*); and (b) on January 24, 2020, at the discretion of the Purchaser, up to $330,000 (each of clause (a) and (b), a *"Purchase Price Installment"*).  The Company shall use the proceeds of the Note exclusively to pay (a) the payroll and other corporate expenses of the Company set forth in the Budget for Application of Note Proceeds set out in Exhibit 2; and (b) such other corporate expenses of the Company as the parties may agree in writing.

SECTION 3.   CLOSING.

The sale and purchase of the Note to be purchased by the Purchaser (the *"Closing"*) shall occur on (a) the later of (i) 10:00 a.m. Central Time, on January 14, 2020 and (ii) the date that is

one Business Day after the satisfaction or waiver of all of the conditions set forth in <u>Section 4</u> (other than conditions that, by their nature, can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at Closing); or (b) such other location, time and date as the parties may agree in writing. At the Closing, the Company will deliver to the Purchaser the Note dated the date of the Closing (the "***Closing Date***") against (A) delivery by the Purchaser of immediately available funds in an amount equal to $110,000 by wire transfer to such account or accounts designated by the Company in writing prior to the Closing and (B) delivery by the Purchaser of immediately available funds in an amount equal to the Purchaser Expense Amount by wire transfer to such account or accounts designated by the recipient in writing prior to the Closing.

SECTION 4. CONDITIONS TO CLOSING.

Section 4.1. *Conditions to Purchaser's Obligations.* The Purchaser's obligation to purchase and pay for the Note to be sold to the Purchaser at the Closing is subject to the fulfillment to the Purchaser's satisfaction, prior to or at the Closing, of the following conditions:

(a) <u>Deliveries</u>. On the Closing Date, the Purchaser shall have received each of the following in form and substance satisfactory to the Purchaser:

(i) A certificate dated the Closing Date signed by an Authorized Officer of the Company certifying that (A) all representations and warranties of the Company set forth in this Agreement and the other Loan Documents are true and correct in all material respects; (B) the Company is in compliance with each applicable covenant hereunder; (C) no Default or Event of Default exists; and (D) no Material Adverse Effect has occurred;

(ii) A certificate dated the Closing Date signed by the Secretary or an Assistant Secretary (or comparable officer) of the Company certifying as appropriate as to: (A) resolutions or other evidence of the authorization of all action taken by the Company in connection with this Agreement and the other Loan Documents; (B) the names of the Authorized Officers of the Company authorized to sign the Loan Documents and their true signatures; and (C) copies of the Company's organizational documents as in effect on the Closing Date certified by an official of the State of Texas, together with a certificate from the appropriate official as to the continued existence and good standing of the Company in the State of Texas;

(iii) This Agreement, the Note, the Security Agreement, each UCC financing statement and IP Filing required to perfect the Purchaser's first priority security interest in the collateral contemplated by the Security Agreement and each of the other Loan Documents signed by an Authorized Officer of the Company (as applicable);

(iv) A certificate dated the Closing Date signed by an Authorized Officer of Company certifying that there are no defaults under, and the issuance of the Note will not result in any defaults under, any existing Indebtedness or material agreements to which the Company is a party;

2

(v)    Payoff and release or amendment documentation (including UCC-3 termination or amendment statements with respect to the financing statements listed on Schedule 4.1(a)(v)) with respect to existing Indebtedness of the Company and/or Liens on assets of the Company (except as to any Indebtedness and/or Liens as to which the Purchaser expressly agrees in writing may remain outstanding); and

(vi)    Such other documents in connection with such transactions as the Purchaser may reasonably request.

Section 4.2.    *Deliveries of the Purchaser.*  On the Closing Date, the Company shall have received all Loan Documents requiring the signature of the Purchaser (if any), each dated as of the Closing Date and signed by an Authorized Officer of the Purchaser.

Section 4.3.    *Conditions to each Purchase Price Installment.*  The Purchaser's obligation to fund any Purchase Price Installment after the Closing Date is subject to the fulfillment to the Purchaser's satisfaction of the following conditions precedent with respect to such Purchase Price Installment:

(a)    No Default; Representations and Warranties.  Immediately prior to and upon giving effect to the funding of such Purchase Price Installment, (i) all representations and warranties of the Company set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects; (ii) the Company shall be in compliance with each applicable covenant hereunder; (iii) no Default or Event of Default shall exist; and (iv) no Material Adverse Effect shall have occurred.

(b)    Deliveries.  On the funding date of such Purchase Price Installment, the Purchaser shall have received each of the following in form and substance satisfactory to the Purchaser:

(i)    A certificate dated such date signed by an Authorized Officer of the Company certifying as to the matters set forth in Section 4.3(a) above; and

(ii)    Such other documents in connection with such funding as the Purchaser may reasonably request.

SECTION 5.  REPRESENTATIONS AND WARRANTIES

The Company represents and warrants to the Purchaser that:

Section 5.1.    *Organization and Qualification; Power and Authority; Compliance With Laws; Title to Properties; Event of Default.*  The Company (a) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas, (b) has the lawful power to own or lease its properties and to engage in the business it presently conducts or proposes to conduct, (c) is duly licensed or qualified and in good standing in each jurisdiction where the property owned or leased by it or the nature of the business transacted by it or both makes such licensing or qualification necessary and where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect, (d) has full power to enter into, execute, deliver and carry out this Agreement and the other Loan Documents to which it is a

party, to incur the Indebtedness and grant the Liens contemplated by the Loan Documents and to perform its obligations under the Loan Documents to which it is a party, and all such actions have been duly authorized by all necessary proceedings on its part, (e) is in compliance in all material respects with all Applicable Laws in all jurisdictions in which the Company is presently or will be doing business except where the failure to do so would not constitute a Material Adverse Effect, and (f) has good and marketable title (except for such defects in title that could not individually or in the aggregate reasonably be expected to result in a Material Adverse Effect) to or valid leasehold interest in all properties, assets and other rights which it purports to own or lease or which are reflected as owned or leased on its books and records. No Default or Event of Default exists or is continuing.

Section 5.2. *Validity and Binding Effect.* This Agreement and each of the other Loan Documents (a) has been duly and validly authorized, executed and delivered by the Company, and (b) constitutes, or will constitute, legal, valid and binding obligations of the Company, enforceable against the Company in accordance with its terms subject to the effect of any applicable bankruptcy, insolvency, fraudulent conveyance or similar law affecting creditors' rights generally and general principles of equity.

Section 5.3. *No Conflict; Material Agreements; Consents.*

(a) Neither the execution and delivery of this Agreement or the other Loan Documents by the Company nor the consummation of the transactions herein or therein contemplated or compliance with the terms and provisions hereof or thereof by the Company will conflict with, constitute a default under or result in any breach of (i) the terms and conditions of the certificate of formation, limited liability company agreement or other organizational documents of the Company or (ii) any Applicable Law or any material agreement or instrument or order, writ, judgment, injunction or decree to which the Company is a party or by which it is bound or to which it is subject, or result in the creation or enforcement of any Lien, charge or encumbrance whatsoever upon any property (now or hereafter acquired) of the Company (other than in favor of the Purchaser). There is no default under any such material agreement (referred to above), nor is the Company bound by any contractual obligation, or subject to any restriction in any organization document, or any requirement of Applicable Law which could, in each case, reasonably be expected to result in a Material Adverse Effect. No consent, approval, exemption, order or authorization of, or registration or filing with, any Governmental Authority or any other Person is required by any Applicable Law or any agreement in connection with the execution, delivery and carrying out of this Agreement and the other Loan Documents, other than those that if not made or obtained would not materially and adversely affect the validity, enforceability, perfection or priority, as applicable, of any Loan Document and/or any Lien purported to be created by any Loan Document or result in any Default or Event of Default.

(b) Without in any way limiting the foregoing Section 5.3(a), the execution and delivery of this Agreement or the other Loan Documents by the Company and the consummation of the transactions herein or therein contemplated will not result in a default under any existing Indebtedness to which the Company is a party.

Section 5.4. *Litigation.* Except as set forth on Schedule 5.4, there are no actions, suits, proceedings or investigations pending or, to the knowledge of the Company, threatened against

the Company at law or in equity before any Governmental Authority which individually or in the aggregate, if determined adversely, could reasonably be expected to result in a Material Adverse Effect. The Company is not in violation of any order, writ, injunction or any decree of any Governmental Authority the violation of which could reasonably be expected to result in a Material Adverse Effect.

Section 5.5. *Financial Statements.*

(a) The Financial Statements, which are attached as <u>Schedule 5.5(a)</u> hereof, present fairly, in all material respects, the financial position of the Company as of the dates thereof and the results of operations and cash flows of the Company for the periods covered thereby. The Financial Statements have been prepared from the books and records of the Company, which have been prepared in the ordinary course of business, and in reasonable detail accurately and fairly reflect, in all material respects, actual, bona fide transactions of the Company. There are no significant deficiencies or material weaknesses in the design or operation of the internal controls over financial reporting of the Company that would reasonably be expected to adversely affect the ability of the Company to record, process, summarize or report financial information. The Company is not and has not been made aware of (i) any illegal act or fraud on the part of the management or other employees of the Company or (ii) any claim or allegation regarding any of the foregoing. The Company hereby covenants and agrees that it shall not sell or otherwise transfer (including by merger or other operation of law) any of its assets (including those included in the Financial Statements) (x) to any other Person outside of the ordinary course of business or (y) to any Affiliate of the Company other than on fair and reasonable terms substantially as favorable to the Company as would be obtainable by the Company at the time in a comparable arm's-length transaction with a Person other than an Affiliate.

(b) <u>Schedule 5.5(b)</u> sets forth, with respect to the Company, an accurate and complete list of (i) all Indebtedness as of the date hereof and (ii) all Liens on the tangible or intangible assets of the Company securing any Indebtedness of the Company as of the date hereof. Except as set forth in <u>Schedule 5.5(b)</u>, the Company has the unrestricted right to pay or pre-pay all such Indebtedness at its par value without material penalty or premium, in part or in full, at any time or from time to time after the date of this Agreement. Except as contemplated by such <u>Schedule 5.5(b)</u>, the Company hereby covenants and agrees that it will not create, incur, assume or suffer to exist any Indebtedness or any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than Indebtedness and/or Liens arising in the ordinary course of business (and, for the avoidance of doubt, the Company shall in no event create, incur, assume or suffer to exist any other Indebtedness for borrowed money or any Lien securing any such Indebtedness).

Section 5.6. *Full Disclosure.* Neither this Agreement nor any other Loan Document, nor any certificate, statement, agreement or other documents furnished to the Purchaser in connection herewith or therewith, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which they were made, not misleading; *provided* that, with respect to any projected financial information, the Company represents only that such

information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 5.7.  *Solvency*.  Before and after giving effect to the transaction contemplated by the Loan Documents, the Company is Solvent.

Section 5.8.  *Private Offering by the Company*.  Neither the Company nor anyone acting on its behalf has offered the Note or any similar securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any Person other than the Purchaser.  Neither the Company nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Note to the registration requirements of Section 5 of the Securities Act or to the registration requirements of any securities or blue sky laws of any applicable jurisdiction.

SECTION 6.  REPRESENTATIONS OF THE PURCHASER.

Section 6.1.  *Purchase for Investment*.  The Purchaser represents and warrants that it is purchasing the Note for its own account and not with a view to the distribution thereof. The Purchaser understands that the Note has not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, and the Company is not required to register the Note under the Securities Act.

SECTION 7.  PAYMENT AND PREPAYMENT OF THE NOTE.

Section 7.1.  *Maturity*.  As provided therein, the entire unpaid principal balance of the Note shall be due and payable in cash on the Maturity Date.

Section 7.2.  *Optional Prepayments with Prepayment Premium*.  The Company may, at its option and upon notice as provided below, prepay at any time all, or from time to time any part of any or all, of the Note at 100% of the principal amount so prepaid, together with all accrued and unpaid interest thereon as contemplated by Section 7.3.  The Company shall give the Purchaser prior written notice of each optional prepayment under this Section 7.2. Each such notice shall specify the date of prepayment (which shall be a Business Day), the aggregate principal amount of the Note to be prepaid on such date, and the interest to be paid on such date with respect to such principal amount being prepaid.

Section 7.3.  *Maturity; Surrender, Etc*.  In the case of each optional prepayment of Note pursuant to this Section 7, the principal amount of the Note to be prepaid shall mature and become due and payable on the date fixed for such prepayment, together with interest on such principal amount accrued to such date, if any.  From and after such date, unless the Company shall fail to pay such principal amount when so due and payable, as aforesaid, interest on such principal amount shall cease to accrue.

Section 7.4.  *Purchase of Note*.  The Company shall not, and shall not permit any Affiliate to, purchase, redeem, prepay or otherwise acquire, directly or indirectly, the Note

except upon the payment or prepayment of the Note in accordance with the terms of this Agreement and the Note.

Section 7.5. *Payments Due on Non-Business Days.* Anything in this Agreement or the Note to the contrary notwithstanding (but without limiting the requirement in Section 7.2 that the notice of any optional prepayment specify a Business Day as the date fixed for such prepayment), any payment of interest on the Note that is due on a date that is not a Business Day shall be made on the next succeeding Business Day without including the additional days elapsed in the computation of the interest payable on such next succeeding Business Day.

SECTION 8. EVENTS OF DEFAULT.

An *"Event of Default"* shall exist if any of the following conditions or events shall occur and be continuing: (a) the Company defaults in the payment of any principal on the Note when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by declaration or otherwise; (b) the Company defaults in the payment of any interest on the Note for more than 15 Business Days after the same becomes due and payable; (c) the Company uses any of the proceeds of the Note in violation of Section 2, breaches Section 12 or Section 13 or sells or otherwise transfers (including by merger or other operation of law) any of its assets in violation of any of the Loan Documents, or any Lien on any assets of the Company shall exist or arise in violation of any of the Loan Documents, or the Purchaser's Liens purported to be created by the Loan Documents shall for any reason cease to be valid and perfected first priority Liens on all or any portion of the collateral contemplated by the Loan Documents, or any representation or warranty of the Company set forth in this Agreement or any other Loan Document shall be inaccurate in any material respect when made or deemed made; (d) the Company defaults in the performance of or compliance with any term contained or incorporated by reference herein or in any other Loan Document (other than those referred to in clause (a), (b) or (c) of this Section 8) and such default is not remedied within 10 days; (e) the Company (i) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction, (ii) makes an assignment for the benefit of its creditors, (iii) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, (iv) is adjudicated as insolvent or to be liquidated or (v) takes action for the purpose of any of the foregoing subclauses (i) through (iv); (f) a court or Governmental Authority of competent jurisdiction enters an order appointing, without consent by the Company, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of the Company, or any such petition shall be filed against the Company and such petition shall not be dismissed within 60 days after filing; or (g) the occurrence of a default under any Indebtedness of the Company.

7

SECTION 9.  REMEDIES ON DEFAULT, ETC.

Section 9.1.  *Acceleration*. If an Event of Default has occurred with respect to the Company as described in clause (e) or (f) of Section 8, the Note shall automatically become immediately due and payable.  If any other Event of Default has occurred and is continuing, the Purchaser may declare the Note then outstanding to be immediately due and payable. Upon the Note becoming due and payable under this Section 9.1, whether automatically or by declaration, the Note shall forthwith mature and the entire unpaid principal amount of the Note, plus all accrued and unpaid interest thereon, shall all be immediately due and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived by the Company.

Section 9.2.  *Other Remedies*.  If any Default or Event of Default has occurred and is continuing, and irrespective of whether the Note has become or has been declared immediately due and payable under Section 9.1, the Purchaser may proceed to protect and enforce its rights hereunder by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in the Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise.  Without limiting the foregoing, the Purchaser shall in all events have the rights and remedies contemplated by the Security Agreement and the rights and remedies of a secured creditor contemplated by applicable law.

Section 9.3.  *No Waivers or Election of Remedies*.  No course of dealing and no delay on the part of the Purchaser in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice the Purchaser's rights, powers or remedies. No right, power or remedy conferred by this Agreement or by the Note upon the Purchaser shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise

SECTION 10. SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.

All representations and warranties contained herein shall survive the execution and delivery of this Agreement and the Note, the purchase or transfer by the Purchaser of the Note or portion thereof or interest therein and the payment of the Note, and may be relied upon by any subsequent holder of the Note, regardless of any investigation made at any time by or on behalf of the Purchaser or any other holder of the Note.  Subject to the preceding sentence, this Agreement, the Note and the other Loan Documents, together with the Binding Provisions set forth in Section II of the Summary Term Sheet (as defined below), embody the entire agreement and understanding between the Purchaser and the Company and supersede all prior agreements and understandings relating to the subject matter hereof.

SECTION 11. SUBSTITUTION OF PURCHASER.

The Purchaser shall have the right to substitute any one of its Affiliates (a *"Substitute Purchaser"*) as the purchaser of the Note that it has agreed to purchase hereunder, by written notice to the Company, which notice shall be signed by both such Purchaser and such Substitute Purchaser, shall contain such Substitute Purchaser's agreement to be bound by this Agreement

4847-8504-7216.5

and shall contain a confirmation by such Substitute Purchaser of the accuracy with respect to it of the representations set forth in Section 6. Upon receipt of such notice, any reference to such Purchaser in this Agreement (other than in this Section 11), shall be deemed to refer to such Substitute Purchaser in lieu of such original Purchaser.

SECTION 12. INVESTMENT TRANSACTION

Section 12.1. *Investment Transaction.* During the period commencing on the Closing Date and ending on the Maturity Date (the "*Investment Period*"), the Purchaser shall have the right (but not the obligation), exercisable by providing written notice to the Company on or prior to the expiration of the Investment Period, to require the Company to issue and sell to the Purchaser, or an Affiliate thereof designated by the Purchaser, Series A Convertible Preferred Units of the Company on terms no less favorable to the Purchaser than those set forth in the Summary of Terms attached hereto as Exhibit 3 (the "*Summary Term Sheet*").

Section 12.2. *No Issuance or Transfer of Membership Interests.* During the period (the "*Exclusivity Period*") commencing on the Closing Date and ending on the later of (a) the expiration of the Investment Period or (b) if the Purchaser exercises its investment option in accordance with Section 12.1, the date on which Transaction Documents (as defined in the Summary Term Sheet) are executed and delivered by the parties thereto, the Company shall not (and shall not permit any other Person to), without the prior written consent of the Purchaser, (i) issue, sell, transfer, pledge, grant, dispose of, encumber or deliver any equity securities of the Company or any securities convertible into or exercisable or exchangeable for voting or equity securities of the Company or (ii) adjust, split, combine, recapitalize or reclassify any equity securities of the Company.

SECTION 13. EXCLUSIVITY; BINDING PROVISIONS

The Binding Provisions included in Section II of the Summary Term Sheet are hereby incorporated into and made part of this Agreement in their entirety and shall apply to this Agreement *mutatis mutandis*, except that (a) the Exclusivity Period (as defined under "Non-Solicitation" in the Summary Term Sheet) for purposes of this Agreement shall be the Exclusivity Period as defined in Section 12.2 hereof and (b) the reference to Vinson & Elkins L.L.P. under "Expenses" in the Summary Term Sheet shall be a reference to Foley & Lardner LLP.

SECTION 14. MISCELLANEOUS.

Section 14.1. *Notices.* Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person or by courier or a courier service, (b) on the date of transmission if sent by confirmed electronic mail transmission, (c) on the next Business Day if sent by an overnight delivery service, or (d) three Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:If to the Company, addressed as follows:

      Earth Energy Renewables LLC
      P.O. Box 2185
      Canyon Lake, Texas  78133

Attention: Jeffrey J. Wooley
Email:  jwooley@austin.rr.com

If to the Purchaser, addressed as follows:

c/o Ara Advisers, LLC
5300 Memorial Drive, Suite 500
Houston, Texas 70007
Attention:  Karthik Narasimhan
Email:  karthik@arapartners.com

with a copy to:

Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:  Spencer T. Moats
Email:  smoats@foley.com

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

Section 14.2.  *Amendments*.  This Agreement and the Note may be amended, and the observance of any term hereof or of the Note may be waived (either retroactively or prospectively), only with the written consent of the Company and the Purchaser.

Section 14.3.  *Binding Effect, etc*.  Any amendment or waiver consented to as provided in this Section 14.3 is binding upon the Purchaser and the Company without regard to whether the Note has been marked to indicate such amendment or waiver.  No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon.  No course of dealing between the Company and the Purchaser and no delay in exercising any rights hereunder or under the Note shall operate as a waiver of any rights of any holder of the Note.

Section 14.4.  *Successors and Assigns*.  All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including any subsequent holder of the Note) whether so expressed or not.  Notwithstanding the foregoing, the Company may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Purchaser, and any other attempted assignment or transfer by the Company shall be null and void.

Section 14.5.  *Severability*.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such

prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

Section 14.6. *Construction, etc.* Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the other Loan Documents: (a) references to the plural include the singular, the plural, the part and the whole and the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (b) the words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or in such other Loan Document refer to this Agreement or such other Loan Document as a whole; (c) the word "or" is not exclusive; (d) article, section, subsection, clause, schedule and exhibit references are to this Agreement or other Loan Documents, as the case may be, unless otherwise specified; (e) reference to any Person includes such Person's successors and assigns (subject to any limitations upon assignment set forth in the Loan Documents); (f) reference to any agreement, including this Agreement and any other Loan Document together with the schedules and exhibits hereto or thereto, document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated; (g) relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; (h) section headings herein and in each other Loan Document are included for convenience and shall not affect the interpretation of this Agreement or such Loan Document; and (i) unless otherwise specified, all references herein to times of day shall be references to Central Time (daylight or standard, as applicable).

Section 14.7. *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 14.8. *Waiver of Jury Trial.* EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) OR THE ACTIONS OF ANY PARTY HERETO IN NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF, INCLUDING ANY LITIGATION INVOLVING THE FINANCING SOURCES. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) EACH PARTY UNDERSTANDS AND HAS

CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 14.8</u>.

*   *   *   *   *

If you are in agreement with the foregoing, please sign this Agreement and return it to the Company, whereupon this Agreement shall become a binding agreement between you and the Company.

Very truly yours,

**EARTH ENERGY RENEWABLES LLC**

**By:** _____
      **Name:**    **John C. Wooley**
      **Title:**     **Manager**

SIGNATURE PAGE
(to Note Purchase Agreement)

This Agreement is hereby
accepted and agreed to as
of the date hereof.

**ARA EER HOLDINGS, LLC**
as Purchaser

By: _____

    Name: Karthik Narasimhan
    Title: Authorized Person

**Schedule A**

**DEFINED TERMS**

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

"*Affiliate*" shall mean, with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person, through one or more intermediaries or otherwise; *provided, however*, that such Person shall be deemed an Affiliate for only so long as such control exists. For purposes of this definition, the term "control" (including the terms "controlling", "under common control with" and "controlled by") means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Applicable Law*" shall mean all applicable laws, statutes, rules, codes, regulations, judgments, rulings, orders, decrees and injunctions of Governmental Authorities.

"*Authorized Officer*" shall mean, with respect to any party hereto, the Chief Executive Officer, President, Chief Financial Officer, Treasurer or Assistant Treasurer of such party or such other individuals, designated by written notice to the Purchaser from the Company, authorized to execute notices, reports and other documents on behalf of the Company required hereunder.

"*Business Day*" shall mean any day other than a Saturday, Sunday or other day on which banking institutions in the State of Texas are authorized or required by Applicable Law or other action of a Governmental Authority to close.

"*Closing*" shall have the meaning specified in Section 3.

"*Closing Date*" shall have the meaning specified in Section 3.

"*Company*" shall have the meaning specified in the preamble to this Agreement.

"*Default*" shall mean any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"*Default Rate*" shall mean that rate of interest that is 10% per annum above the rate of interest stated in the Note.

"*Dollars*" or "*$*" shall mean lawful money of the United States of America.

"*Event of Default*" shall have the meaning specified in Section 8.

"*Exclusivity Period*" shall have the meaning specified in Section 12.2.

"*Financial Statements*" shall mean the following:

SCHEDULE A
(to Note Purchase Agreement)

(a)     the unaudited income statement of the Company for the fiscal year ended December 31, 2018; and

(b)     the unaudited balance sheets of the Company as of December 31, 2017 and December 31, 2018.

"*GAAP*" shall mean U.S. generally accepted accounting principles.

"*Governmental Authority*" shall mean any United States, state, local or foreign governmental, regulatory or administrative body, agency, commission or authority, any court or judicial authority or arbitration tribunal, whether national, federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any Applicable Law.

"*Indebtedness*" shall mean, with respect to a Person, at the time of computation thereof, all of the following (without duplication):

(a)     all obligations of such Person in respect of money borrowed which has been funded at the time of such computation, determined in accordance with GAAP (excluding trade debt incurred in the ordinary course of business);

(b)     all obligations of such Person, whether or not for money borrowed (i) represented by notes payable, or drafts accepted, in each case representing extensions of credit or (ii) evidenced by bonds, debentures, notes or similar instruments, all as determined in accordance with GAAP;

(c)     capitalized lease obligations of such Person recognized as a liability under GAAP;

(d)     all reimbursement obligations of such Person under any letters of credit or acceptances (whether or not the same have been presented for payment);

(f)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interests issued by such Person or any other Person, valued at the greater of its voluntary or involuntary liquidation preference, plus accrued and unpaid dividends;

(g)     all obligations of such Person (i) constituting purchase money indebtedness, conditional sales contracts, title retention debt instruments or other similar instruments, upon which interest charges are customarily paid or that are issued or assumed as full or partial payment for property or services rendered, including obligations for the deferred purchase price of property or services or (ii) in respect of any purchase obligation, repurchase obligation, takeout commitment or forward equity commitment, in each case evidenced by a binding agreement (excluding any such obligation to the extent the obligation can be satisfied by the issuance of equity interests);

(i)     all Indebtedness of other Persons which such Person has guaranteed or is otherwise recourse to such Person (except for guaranties of customary exceptions for fraud,

misapplication of funds, environmental indemnities, voluntary bankruptcy, collusive involuntary bankruptcy and other similar customary exceptions to nonrecourse liability); and

(j)        all Indebtedness of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property or assets owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness or other payment obligation; *provided* that the amount of any Indebtedness under this <u>clause (j)</u> that has not been assumed by such Person shall be equal to the lesser of the stated amount of such Indebtedness or the fair market value of the property securing such Indebtedness,

"*Investment Period*" shall have the meaning specified in <u>Section 12.1</u>.

"*IP Filing*" shall have the meaning set forth in the Security Agreement.

"*Lien*" shall mean any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, whether voluntarily or involuntarily given, including any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security and any filed financing statement or other notice of any of the foregoing (whether or not a lien or other encumbrance is created or exists at the time of the filing).

"*Loan Documents*" shall mean this Agreement, the Note, the Security Agreement, each UCC financing statement and IP Filing relating to the Security Agreement and any other instruments, certificates or documents delivered in connection herewith or therewith from time to time.

"*Material Adverse Effect*" shall mean a material adverse effect on (a) the business, operations, condition (financial or otherwise), assets or liabilities of the Company, (b) the ability of the Company to perform its obligations under this Agreement, the Note and/or any other Loan Document, (c) the validity or enforceability of this Agreement, the Note and/or any other Loan Document and/or (d) the validity, enforceability, perfection or priority of the Liens in favor of the Purchaser contemplated by the Loan Documents.

"*Maturity Date*" shall mean June 30, 2020.

"*Note*" shall have the meaning specified in <u>Section 1</u>.

"*Person*" shall mean an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, Governmental Authority or any other organization of any kind.

"*Principal Amount*" shall have the meaning specified in <u>Section 1</u>.

"*Purchase Price Installment*" shall have the meaning specified in <u>Section 2</u>.

"*Purchaser*" shall have the meaning specified in the preamble to this Agreement.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"*Security Agreement*" means that certain Security Agreement dated as of the date hereof between the Company and the Purchaser.

"*Solvent*" shall mean that, with respect to any Person and as of any date of determination, (a) the amount of the "present fair saleable value of the assets of such Person, will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms are generally determined in accordance with applicable United States federal laws governing determinations of the insolvency of debtors; (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to satisfy the obligations of such Person under its indebtedness as its indebtedness becomes absolute and matured; (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business; and (d) such Person will be able to pay its indebtedness as it matures. For purposes of the foregoing definition only, "indebtedness" means an obligation in connection with another Person's (i) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (ii) right to any equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"*Substitute Purchaser*" shall have the meaning specified in <u>Section 11</u>.

"*Summary Term Sheet*" shall have the meaning specified in <u>Section 12.1</u>.

A-4

**Schedule 4.1(a)(v)**

**FINANCING STATEMENTS TO AMEND OR TERMINATE**

| Secured Party | Filing No. | Jurisdiction | Filing Date |
|---|---|---|---|
| Corporation Service Company, as Representative | 16-0004533799* | Texas | February 11, 2016 |
| John Spencer Cobb | 17-0002626317** | Texas | January 24, 2017 |
| John Spencer Cobb | 17-0002627681** | Texas | January 24, 2017 |
| Alan Nalle | 17-0002628571** | Texas | January 24, 2017 |
| ELF Services 1, LLC | 15-0020490819** | Texas | June 29, 2015 |

\* To be terminated.

\*\* To be amended as agreed between the parties to exclude the Pilot Plant and all intellectual property of the Company.

**Schedule 5.4**

## **LITIGATION**

Cause No. D-1-Gn-19-003707 In The District Court 53rd Judicial District Of Travis County, Texas:        SC Ventures, LLC Plaintiff, V. Earth Energy Renewables LLC, F/K/A EE-Terrabon Biofuels, LLC And John C. Wooley And Jeffrey J. Wooley, Individually And As Managers And Directors Of Earth Energy Renewables, LLC, Defendants.

**Schedule 5.5(a)**

## <u>FINANCIAL STATEMENTS</u>

*See Attached.*

Earth Energy Renewables LLC
Balance Sheet Q2 2019
Period  Ednded

|  | | | 11/30/2019 | 12/31/2018 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| | Current Assets | | | |
| | | Checking/Savings | | |
| | | Petty Cash | $75 | $75 |
| | | ABC Accounts | $(113,779) | $(9,838) |
| | | IBC Accounts | $35,167 | $15,983 |
| | | Total Checking/Savings | $(78,537) | $6,220 |
| | | | | |
| | | Other Current Assets | $42,670 | $39,595 |
| | | | | |
| | Total Current Assets | | $(35,867) | $45,815 |
| | Fixed Assets | | | |
| | | | | |
| | | Land | $268,977 | $268,977 |
| | | Lab Equipment | | |
| | | Lab Equipment Mumford Rd | $516,247 | $508,258 |
| | | Pilot Production Equipment | | |
| | | A D System | $32,113 | $27,423 |
| | | Chemical Clarification | $28,242 | $25,768 |
| | | Infrastructure Upgrade | $25,905 | $25,061 |
| | | KPMS Design Engineering | $92,975 | $92,975 |
| | | KPMS Extract | $1,180,430 | $1,180,430 |
| | | Extraction Installation | $411,418 | $401,217 |
| | | NH3, P & ION Ex | $29,366 | $25,091 |
| | | Site Prep | $11,087 | $11,087 |
| | | POME Processing Equipmet | $18,502 | $-00 |
| | | TCEQ Permitting | $3,750 | $3,750 |
| | | UF & RO | $177,380 | $163,810 |
| | | Total Pilot Production Equipment | $2,011,168 | $1,956,612 |
| | | Accumulated Depreciation | $(1,218,232) | $(606,632) |
| | Total Fixed Assets | | $1,578,160 | $2,127,215 |
| | Other Assets | | | |
| | | Accumulated Amortization | $(301,852) | $(296,000) |
| | | Commercial Plant Design | $186,918 | $175,082 |
| | | Patents | $302,384 | $302,384 |
| | Total Other Assets | | $187,450 | $181,466 |
| **TOTAL ASSETS** | | | $1,729,743 | $2,354,496 |
| **LIABILITIES & EQUITY** | | | | |
| | Liabilities | | | |
| | | Current Liabilities | | |
| | | Accounts Payable | | |
| | | Accounts Payable | $1,362,100 | $906,557 |
| | | Total Accounts Payable | $1,362,100 | $906,557 |
| | | Other Current Liabilities | | |
| | | Accrued Expenses | $238 | $6,000 |
| | | Accrued Interest | $233,617 | $124,112 |
| | | EETDF & CO2 Loans | $62,250 | $-00 |
| | | Robson Bridge Loan | $250,000 | $250,000 |
| | | Allan Nalle Note Payable | $275,000 | $275,000 |
| | | Payroll Liabilities | $220,073 | $12,911 |
| | | Nalle Cobb Note | $207,024 | $275,000 |
| | | Premium Finance | $3,000 | $27,539 |
| | | Sunam Loan | $25,000 | $-00 |
| | | Eedelman Note | $100,000 | $-00 |
| | | Karesa Loan | $198,514 | $-00 |
| | | O'Meara Advance | $75,000 | $-00 |
| | | Wooley Advances | $74,000 | $-00 |
| | | Loan John Spencer Cobb | $250,000 | $250,000 |
| | | Total Other Current Liabilities | $1,973,716 | $1,220,562 |
| | Total Liabilities | | $3,335,816 | $2,127,119 |

| | | |
|---|---:|---:|
| **Equity** | | |
| **Invested Capital** | $12,242,985 | $10,881,807 |
| **Retained Earnings** | $(10,654,450) | $(7,445,514) |
| **Net Income** | $(3,194,608) | $(3,208,916) |
| **Total Equity** | $(1,606,073) | $227,377 |
| **TOTAL LIABILITIES & EQUITY** | **$1,729,743** | **$2,354,496** |

Earth Energy Renewables LLC
Income Statement
Period Ended

**Consulting     Revenue**
**Cost of Revenue**
  **Margin**

**Ordinary Income/Expense**

                                        **Labor Employees and Consutants**
                                        **Demo Plant Operating Expense**
                                        **Lab Expense**
                                        **Office Facility & Administration**
                                        **Legal Fees and Other Profesional**
                                        **Travel Expense**
                        **Total Expense**

                                        **Interest Expense**

**Other Income/Expense**
            **Other Income**
                        **Proceeds Equipment Sales**
                **Total Other Income**
            **Other Expense**
                        **Depreciation Expense**
                        **Amortization Expense**
                **Total Other Expense**
    **Net Other Expense**


**NET LOSS**

Eleven Months
11/30/2019

$89,058
$57,500
$31,558


$1,940,209
$211,040
$64,473
$126,296
$88,113
$3,495
$2,433,626

$175,088


$-00
$-00

$611,600
$5,852
$617,452
$617,452


**$3,194,608**

EARTH ENERGY RENEWABLES LLC
CASH FLOW STATEMENT
PERIODS ENDED

| | Month Ended 11/30/2019 | Month Ended 10/31/2019 | Quarter Ended 9/30/2019 | Month Ended 9/30/2019 | Month Ended 8/31/2019 | Month Ended 7/31/2019 | Quarter Ended 6/30/2019 | Month Ended 6/30/2019 | Month Ended 5/31/2019 | Month Ended 4/30/2019 | Quarter Ended 3/31/2019 | Month Ended 3/31/2019 | Month Ended 2/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATIONS** | | | | | | | | | | | | | |
| Gross Margin | 0 | 0 | -31559 | -30000 | -1559 | | | | | | | | |
| Labor Wages & Payroll Taxes | 186275 | 181354 | 546728 | 174289 | 188955 | 183484 | 522539 | 178726 | 175874 | 167939 | 481864 | 166277 | 156579 |
| Operating Expenses | 43807 | 14513 | 84797 | 38859 | 20203 | 25735 | 55321 | 16552 | 22523 | 16246 | 65055 | 16733 | 29554 |
| Admin Expenses | 15379 | 11754 | 74150 | 42055 | 11460 | 20635 | 95045 | 35434 | 34213 | 20498 | 59794 | 21270 | 24362 |
| Interest Expenses | 13386 | 10241 | 36559 | 11220 | 8805 | 16534 | 63990 | 33598 | 15105 | 15287 | 50877 | 24514 | 14221 |
| Depreciation & Amortization | 56132 | 56132 | 168396 | 56132 | 56132 | 56132 | 168396 | 56132 | 56132 | 56132 | 168396 | 56132 | 56132 |
| Other | | | | | | | | | | | | | |
| Operating Loss | $(314,979) | $(273,994) | $(870,583) | $(292,555) | $(275,508) | $(302,520) | $(900,391) | $(320,442) | $(303,847) | $(276,102) | $(826,198) | $(284,926) | $(280,848) |
| Plus Depreciation & Amortization | $56,132 | $56,132 | $168,396 | $56,132 | $56,132 | $56,132 | $168,396 | $56,132 | $56,132 | $56,132 | $168,396 | $56,132 | $56,132 |
| Adjusted Operating Cash Deficit | $(258,847) | $(217,862) | $(702,187) | $(236,423) | $(219,376) | $(246,388) | $(731,995) | $(264,310) | $(247,715) | $(219,970) | $(657,802) | $(228,794) | $(224,716) |
| **Change In Working Capital** | | | | | | | | | | | | | |
| Other Current Assets | $(30,733) | $9,135 | 13000 | $3,000 | $10,000 | $-00 | 2999 | $-00 | $-00 | $2,999 | $(497) | $(6,477) | $6,000 |
| Accounts Payable (Details Below) | $62,016 | $8,869 | 272833 | $162,661 | $40,011 | $70,161 | 172790 | $92,411 | $72,800 | $7,579 | $(79,623) | $(29,434) | $(10,071) |
| Wooley Deferred Comp Swap for Next BTL | | | | | | | | | | | | | |
| Other Current Liabilities (Detail Below) | $152,089 | $197,759 | 205115 | $110,247 | $38,037 | $56,831 | 223348 | $177,668 | $31,142 | $14,538 | $(22,384) | $(42,526) | $9,021 |
| Total Deficit From Operations | $(75,475) | $(2,099) | $(211,239) | $39,485 | $(131,328) | $(119,396) | $(332,858) | $5,769 | $(143,773) | $(194,854) | $(760,306) | $(307,231) | $(219,766) |
| **INVESTMENTS** | | | | | | | | | | | | | |
| Cash Used for Fixed Assets | $-00 | $-00 | -11470 | $(10,065) | $(1,055) | $(350) | -10081 | $(2,267) | $(1,055) | $(6,759) | $(42,407) | $(15,389) | $(15,289) |
| Equity Raise Costs & Year End Write off | | | | | | | | | | | | | |
| Investment Next BTL Swap for Wooley Payable | | | | | | | | | | | | | |
| Other Assets Write Off/Disposition | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 |
| Total Cash Used for Investments | $-00 | $-00 | $(11,470) | $(10,065) | $(1,055) | $(350) | $(10,081) | $(2,267) | $(1,055) | $(6,759) | $(42,407) | $(15,389) | $(15,289) |
| **FINANCE** | | | | | | | | | | | | | |
| **Cash From Capital Contrbutions** | | | | | | | | | | | | | |
| Charles Rhode | | | $-00 | | | | $-00 | | | | $25,000 | $25,000 | |
| Dharma Susanto | | | $-00 | | | | $-00 | | | | $13,000 | $13,000 | |
| Gale Cook | | | $32,500 | | $32,500 | | $-00 | | | | $32,500 | $32,500 | |
| Gary Edelman | | | $-00 | | | | $52,000 | $52,000 | | | $48,750 | $48,750 | |
| Gorman | | | $-00 | | | | $-00 | | | | $5,000 | $5,000 | |
| Karesa Plantation | | | $-00 | | | | $32,724 | | | $32,724 | $437,500 | $125,500 | $125,000 |
| Kemin Industries | | $67,000 | $60,000 | $60,000 | | | $67,000 | | $67,000 | | $249,256 | $90,923 | $75,000 |
| Larry Ramsey | | | $-00 | | | | $-00 | | | | $650 | $650 | |
| SunNam Development | | | $10,001 | | | $10,001 | $30,000 | | | $30,030 | $30,030 | | $30,030 |
| Randall Reihmann | | | $-00 | | | | $-00 | | | | $50,000 | | |
| Henry Royer | | | | | | | | | | | $-00 | | |
| Paul Fouts | | | | | | $15,000 | | | | | $-00 | | |
| Jack Goralnik | | | | | | | | | | | $-00 | | |
| Gerald Gerstner | | | | | | $13,000 | | | | | $-00 | | |
| Greg Sundberg | | | $-00 | | | | $20,000 | | | $20,000 | $-00 | | |
| James Sauter | | | | | | | | | | | $-00 | | |
| 5 Prices LLC | | | | | | | | | | | $-00 | | |
| Brendan Kuennen | | | | | | | | | | | $-00 | | |
| Curtis Mether | | | | | | | | | | | $-00 | | |
| Guy Wendler | | | | | | | | | | | $-00 | | |
| Iowa Community Capital | | | | | | | | | | | $-00 | | |
| Mark Edelman | | | | | | | | | | | $-00 | | |
| Molly McCracken | | | | | | | | | | | $-00 | | |
| John BF Omeara | | | | | | | | | | | $-00 | | |
| Madeline Omeara | | | | | | | | | | | $-00 | | |
| AG Major | | | | | | | $23,076 | $23,076 | | | | | |
| Mary Zahner | | | | | | | $6,500 | $6,500 | | | | | |
| John Duncan | | | | | | $2,600 | | | | | | | |
| Ted Bauer | | | $10,010 | | | $10,010 | $15,000 | $15,000 | | | $13,051 | | $13,051 |
| Cash From Capital Contributions | $-00 | $67,000 | $143,111 | $60,000 | $32,500 | $50,611 | $246,330 | $96,576 | $99,724 | $50,030 | $904,737 | $341,323 | $243,081 |
| Total Cash From Finance | $-00 | $67,000 | $143,111 | $60,000 | $32,500 | $50,611 | $246,330 | $96,576 | $99,724 | $50,030 | $904,737 | $341,323 | $243,081 |
| **Net Cash Flow for Period** | $(75,475) | $64,901 | $(79,598) | $89,420 | $(99,883) | $(69,135) | $(96,609) | $100,078 | $(45,104) | $(151,583) | $102,024 | $18,703 | $8,026 |
| Beginning Cash Balances | $(3,062) | $(67,963) | $11,635 | $(157,383) | $(57,500) | $11,635 | $108,244 | $(88,443) | $(43,339) | $108,244 | $6,220 | $89,753 | $81,727 |
| Ending Cash Balances | $(78,537) | $(3,062) | $(67,963) | $(67,963) | $(157,383) | $(57,500) | $11,635 | $11,635 | $(88,443) | $(43,339) | $108,244 | $108,456 | $89,753 |

EARTH ENERGY RENEWABLES LLC
CASH FLOW STATEMENT
PERIODS ENDED

| | Month Ended 1/31/2019 | Year Ended 12/31/2018 | KPMS Interest Plus Write off Equity Raise Fees $366,919 Month Ended 12/31/2018 | Month Ended 11/30/2018 | Month Ended 10/31/2018 | Month Ended 9/30/2018 | Month Ended 8/31/2018 | Month Ended 7/31/2018 | Month Ended 6/30/2018 | Month Ended 5/31/2018 | Month Ended 4/30/2018 | Month Ended 3/31/2018 | Month Ended 2/28/2018 | Month Ended 1/31/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 159008 | 1843798 | 165580 | 152417 | 159896 | 156886 | 157569 | 154275 | 154420 | 129463 | 147500 | 149257 | 157438 | 159097 |
| | 18768 | 218043 | 21505 | 34148 | 35287 | 22515 | 10217 | 21086 | 6405 | 25794 | 11352 | 4111 | 13273 | 12350 |
| | 14162 | 711672 | 395568 | 20532 | 16499 | 93768 | 24343 | 39642 | 11856 | 21636 | 20429 | 18614 | 13236 | 35549 |
| | 12142 | 214294 | 92924 | 11255 | 11254 | 10438 | 11009 | 10760 | 13439 | 10810 | 10685 | 10642 | 10438 | 10640 |
| | 56132 | 238002 | 35667 | 35667 | 35667 | 35667 | 35667 | 35667 | 4000 | 4000 | 4000 | 4000 | 4000 | 4000 |
| | | -16872 | | | -15000 | | | | -410 | -1462 | | | | |
| | $(260,212) | $(3,208,916) | $(711,244) | $(254,019) | $(243,603) | $(319,274) | $(238,805) | $(261,430) | $(189,710) | $(190,241) | $(193,966) | $(186,624) | $(198,385) | $(221,636) |
| | $56,132 | $238,002 | $35,667 | $35,667 | $35,667 | $35,667 | $35,667 | $35,667 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 |
| | $(204,080) | $(2,970,914) | $(675,577) | $(218,352) | $(207,936) | $(283,607) | $(203,138) | $(225,763) | $(185,710) | $(186,241) | $(189,966) | $(182,624) | $(194,385) | $(217,636) |
| | $(19) | $600,419 | $69,720 | $(32,054) | $(1,311) | $-00 | $190 | $(67,590) | $6,465 | $150,000 | $100,000 | $375,000 | $-00 | |
| | $(40,117) | $762,963 | $(68,330) | $(386,212) | $(27,127) | $65,697 | $83,423 | $74,413 | $103,390 | $194,601 | $293,044 | $23,266 | $(120,747) | $563,704 |
| | | | $(188,966) | | | | | | | | | | | |
| | $11,120 | $43,385 | $(2,929) | $(46,495) | $(23,443) | $172,272 | $119,218 | $(2,088) | $(25,188) | $30,812 | $3,812 | $(2,388) | $(1,187) | $(26,187) |
| | $(233,096) | $(1,564,147) | $(866,082) | $(683,113) | $(259,817) | $(45,638) | $(307) | $(221,028) | $(101,043) | $189,172 | $206,890 | $213,254 | $(316,319) | $319,881 |
| | $(11,730) | $(1,337,360) | $(14,943) | $(19,426) | $(35,124) | $-00 | $(34,702) | $(6,528) | $(49,705) | $(175,949) | $(275,392) | $(16,466) | $(125,806) | $(583,320) |
| | | | $366,919 | $-00 | $-00 | $(15,481) | $(15,000) | $(30,000) | $(1,978) | $(20,063) | $(24,287) | $(23,286) | $(30,514) | $(20,000) |
| | | | $188,966 | $-00 | $-00 | | | | | $(24,082) | $(29,000) | $(24,000) | | |
| | $-00 | $247,192 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $(41,000) | $-00 | $(10,000) |
| | $(11,730) | $(1,090,168) | $540,942 | $(19,426) | $(35,124) | $(15,481) | $(49,702) | $(36,528) | $(51,683) | $(220,094) | $(328,679) | $(104,752) | $(156,320) | $(613,320) |
| | | | | | | | $4,000 | $4,000 | $4,000 | $4,000 | $4,006 | | $3,840 | |
| | | | | | | | | | $25,600 | | | | $20,480 | |
| | $187,000 | | | $375,000 | $187,500 | | | | | | | | | |
| | $83,333 | | $237,500 | $350,000 | | $87,500 | $75,744 | | | | | | | |
| | | | | $650 | | | | | | | | | | |
| | $50,000 | | | $11,496 | | | | | | | | | | |
| | | | | | | | | | | $2,560 | | | | |
| | | | | | | | | | | $10,002 | | | | |
| | | | | $240 | | | | | | | | $5,120 | $240 | |
| | | | | $13,000 | | | | | $10,240 | | | | | |
| | | | | $49,400 | | | | | $15,360 | | | | | |
| | | | | | $26,000 | | | | | | | | | |
| | | | | | | | | $65,000 | | | | | | |
| | | | | | | | | $25,000 | | | | | | |
| | | | | | | | | | $50,000 | | | | | |
| | | | | | | | | | $76,800 | | | | | |
| | | | | | | | | | $2,560 | | | | | |
| | | | | | | | | | $25,000 | | | | | |
| | | | | | | | | | $10,002 | | | | | |
| | | | | | | | | | $50,002 | | | | | |
| | | | | | | | | | $20,034 | | | | | |
| | | | | | | | | | | $10,000 | | | | |
| | | | | | | | | | | $10,000 | | | | |
| | | | $14,950 | | | | | | $12,000 | | $12,320 | | $7,680 | |
| | $320,333 | $1,918,825 | $252,450 | $799,786 | $213,500 | $87,500 | $79,744 | $94,000 | $301,598 | $36,562 | $16,326 | $5,120 | $32,240 | $-00 |
| | $320,333 | $1,918,825 | $252,450 | $799,786 | $213,500 | $87,500 | $79,744 | $94,000 | $301,598 | $36,562 | $16,326 | $5,120 | $32,240 | $-00 |
| | **$75,507** | **$(735,490)** | **$(72,690)** | **$97,247** | **$(81,441)** | **$26,381** | **$29,735** | **$(163,556)** | **$148,872** | **$5,640** | **$(105,463)** | **$113,622** | **$(440,399)** | **$(293,439)** |
| | $6,220 | $741,710 | $78,910 | $(18,337) | $63,103 | $36,722 | $6,987 | $170,543 | $21,671 | $16,031 | $121,494 | $7,872 | $448,271 | $741,710 |
| | $81,727 | $6,220 | $6,220 | $78,910 | $(18,338) | $63,103 | $36,722 | $6,987 | $170,543 | $21,671 | $16,031 | $121,494 | $7,872 | $448,271 |

KPMS Interest
Plus
Write off
Equity Raise

| | Month Ended 11/30/2019 | Month Ended 10/31/2019 | Quarter Ended 9/30/2019 | Month Ended 9/30/2019 | Month Ended 8/31/2019 | Month Ended 7/31/2019 | Quarter Ended 6/30/2019 | Month Ended 6/30/2019 | Month Ended 5/31/2019 | Month Ended 4/30/2019 | Quarter Ended 3/31/2019 | Month Ended 3/31/2019 | Month Ended 2/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATIONS** | | | | | | | | | | | | | |
| Gross Margin | 0 | 0 | -31559 | -30000 | -1559 | | | | | | | | |
| Labor Wages & Payroll Taxes | 186275 | 181354 | 546728 | 174289 | 188955 | 183484 | 522539 | 178726 | 175874 | 167939 | 481864 | 166277 | 156579 |
| Operating Expenses | 43807 | 14513 | 84797 | 38859 | 20203 | 25735 | 55321 | 16552 | 22523 | 16246 | 65055 | 16733 | 29554 |
| Admin Expenses | 15379 | 11754 | 74150 | 42055 | 11460 | 20635 | 90145 | 35434 | 34213 | 20498 | 59794 | 21270 | 24362 |
| Interest Expenses | -387467.3846 | -336056.6154 | -457235.9 | -359202.2 | 8805 | -106838.7 | -601249.9 | -400410.2 | -107103.5 | -9376.31 | -534876.7912 | -353903.1 | -95749.93 |
| Depreciation & Amortization | -479161.5 | -416111.5 | -649706.7 | -444442.5 | -83505.89 | -121758.3 | -726438.8 | -497462 | -121923.2 | -107053.6 | -646133 | -439646 | -109199.2 |
| Other | -570855.6154 | -496166.3846 | | -529682.8 | -92233.26 | -136077.9 | | -594513.8 | -136743 | -120370.9 | | -525388.9 | -122648.4 |
| | -662549.7308 | -576221.2692 | | -614923.2 | -100960.6 | -151597.5 | | -691565.7 | -151562.7 | -133688.2 | | -611131.8 | -136097.6 |
| Operating Loss | $(754,244) | $(656,276) | $(976,369) | $(700,164) | $(109,688) | $(166,517) | $(900,391) | $(788,618) | $(166,383) | $(147,006) | $(826,198) | $(696,875) | $(147,837) |
| | | | | | $(118,415) | $(181,437) | | | $(181,202) | $(160,323) | | | $(162,996) |
| Plus Depreciation & Amortization | $56,132 | $56,132 | $168,396 | $56,132 | $(127,143) | $(196,356) | $168,396 | $56,132 | $(196,022) | $(173,640) | $168,396 | $56,132 | $(176,445) |
| Adjusted Operating Cash Deficit | $(698,112) | $(600,144) | $(807,973) | $(644,032) | $(236,831) | $(362,873) | $(731,995) | $(732,486) | $(362,405) | $(320,646) | $(657,802) | $(640,743) | $(325,992) |
| | | | | | | | | | | | | | |
| **Change In Working Capital** | | | | | | | | | | | | | |
| Other Current Assets | $(30,733) | $9,135 | 332322 | $322,322 | $10,000 | $-.00 | 295070.57 | $241,632 | $50,440 | $2,999 | $(39,941) | $(6,477) | $7,588 |
| Accounts Payable (Details Below) | $62,016 | $8,869 | 592155 | $481,983 | $40,011 | $70,161 | 362424.79 | $298,484 | $56,362 | $7,579 | $(42,106) | $(29,434) | $9,815 |
| Wooley Deferred Comp Swap for Next BTL | | | | | | | | 355,336 | $62,284 | | $(44,271) | | $12,042 |
| Other Current Liabilities (Detail Below) | $152,089 | $197,759 | 205115 | $110,247 | $38,037 | $56,831 | 494932.21 | $412,188 | $68,206 | $14,538 | $(46,436) | $(42,526) | $14,269 |
| Total Deficit From Operations | $(514,740) | $(384,381) | $321,619 | $270,520 | $(148,783) | $(235,881) | $420,433 | $219,818 | $(187,397) | $(295,530) | $(786,285) | $(719,180) | $(294,320) |
| | | | | | | | | | | | | | |
| **INVESTMENTS** | | | | | | | | | | | | | |
| Cash Used for Fixed Assets | $-.00 | $-.00 | 10770 | $10,065 | $1,055 | $(350) | 10081 | $2,267 | $1,055 | $6,759 | $42,407 | $(15,389) | $15,289 |
| Equity Raise Costs & Year End Write off | | | | | | | | | | | | | |
| Investment Next BTL Swap for Wooley Payable | | | | | | | | | | | | | |
| Other Assets Write Off/Disposition | $-.00 | $-.00 | $-.00 | $20,130 | $2,110 | $-.00 | | $4,534 | $2,110 | $13,518 | $84,814 | $-.00 | $30,578 |
| Total Cash Used for Investments | $-.00 | $-.00 | $10,770 | $10,065 | $1,055 | $(350) | $10,081 | $2,267 | $1,055 | $6,759 | $42,407 | $(15,389) | $15,289 |
| | | | | | | | | | | | | | |
| **FINANCE** | | | | | | | | | | | | | |
| Cash From Capital Contrbutions | | | | | | | | | | | | | |
| Charles Rhode | | | $-.00 | | | | $-.00 | | | | $67,009 | $67,009 | |
| Dharma Susanto | | | $-.00 | | | | $-.00 | | | | $72,419 | $72,419 | |
| Gale Cook | | | $32,501 | | $32,501 | | $-.00 | | | | $77,828 | $77,828 | |
| Gary Edelman | | | $-.00 | | | | $52,000 | $10,604 | | | $83,238 | $83,238 | |
| Gorman | | | $-.00 | | | | $9,011 | $9,011 | | | $88,648 | $88,648 | |
| Karesa Plantation | | | $-.00 | | | | $101,276 | $7,418 | $101,276 | | $108,397 | $94,058 | $3,929 |
| Kemin Industries | | $67,001 | $60,000 | $60,000 | | | $135,552 | | $135,552 | | $81,602 | $99,467 | $634 |
| Larry Ramsey | | | $-.00 | | | | $4,232 | $4,232 | | | $54,806 | $104,877 | $(2,661) |
| SunNam Development | | | $6,308 | | | $6,308 | $30,000 | | | $9,970 | $(82,276) | | $(5,956) |
| Randall Reihmann | | | $5,979 | | | $5,979 | $1,046 | $1,046 | | | $(114,482) | | $(9,251) |
| Henry Royer | | | | | | $5,650 | | $(547) | | | $(12,546) | | $(12,546) |
| Paul Fouts | | | | | | $5,321 | | $(2,140) | | | $(15,841) | | $(15,841) |
| Jack Goralnik | | | | | | $4,992 | | $(3,733) | | | $(19,136) | | $(19,136) |
| Gerald Gerstner | | | | | | $4,664 | | $(5,326) | | | $(22,432) | | $(22,432) |
| Greg Sundberg | | $4,335 | | | | $4,335 | $(6,979) | $(6,919) | | $(60) | $(25,727) | | $(25,727) |
| James Sauter | | | | | | $4,006 | | $(8,512) | | | $(29,022) | | $(29,022) |
| 6 Prices LLC | | | | | | $3,677 | | $(10,105) | | | $(32,317) | | $(32,317) |

Fees $366,920 (above Month Ended 12/31/2018 column)

| Month Ended 1/31/2019 | Year Ended 12/31/2018 | Month Ended 12/31/2018 | Month Ended 11/30/2018 | Month Ended 10/31/2018 | Month Ended 9/30/2018 | Month Ended 8/31/2018 | Month Ended 7/31/2018 | Month Ended 6/30/2018 | Month Ended 5/31/2018 | Month Ended 4/30/2018 | Month Ended 3/31/2018 | Month Ended 2/28/2018 | Month Ended 1/31/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 159008 | 1843798 | 165580 | 152417 | 159896 | 156886 | 157569 | 154275 | 154420 | 129463 | 147500 | 149257 | 157438 | 159097 |
| 18768 | 218043 | 21505 | 34148 | 35287 | 22515 | 10217 | 21086 | 6405 | 25794 | 11352 | 4111 | 13273 | 12350 |
| 14162 | 711672 | 395568 | 20532 | 16499 | 93768 | 24343 | 39642 | 11856 | 21636 | 20429 | 18614 | 13236 | 35549 |
| -85223.78 | -3064056.47 | -901225.6154 | -313358.23 | -275146.77 | -393420.69 | -294557.6 | -322327.2 | -89322.12 | -88889.43 | -93482.9 | -89921.58242 | -99554.41758 | -106849.9341 |
| -97287.85 | -3725932.56 | -1113328 | -386656 | -343524.09 | -484130 | -363712 | -397525 | -101955.3 | -101232.8 | -105168.2 | -101198.3077 | -107452.6923 | -120050.1538 |
| -109351.9 | -4387808.65 | -1325430.385 | -459953.77 | -411901.4 | -574839.31 | -432866.4 | -472722.8 | -114588.4 | -113576.2 | -116853.6 | -112475.033 | -119350.967 | -133250.3736 |
| -121416 | | -1537532.769 | -533251.54 | -480278.71 | -665548.62 | -502020.8 | -547920.7 | -127221.6 | -125919.5 | -128538.9 | -123751.7582 | -131249.2418 | -146450.5934 |
| $(133,480) | $3,684,920 | $(1,749,635) | $(606,549) | $(548,656) | $(756,258) | $(571,175) | $(623,119) | $(139,855) | $(138,263) | $(140,224) | $(135,028) | $(143,148) | $(159,651) |
| $(145,544) | | | | | | | | $(152,488) | $(150,606) | $(151,910) | $(146,305) | $(155,046) | $(172,851) |
| $(157,608) | $7,131,838 | $35,667 | $35,667 | $35,667 | $35,667 | $35,667 | $35,667 | $(165,121) | $(162,950) | $(163,595) | $(157,582) | $(166,944) | $(186,051) |
| $(291,088) | $10,816,758 | $(1,713,968) | $(570,882) | $(512,989) | $(720,591) | $(535,508) | $(587,452) | $(304,976) | $(301,213) | $(303,819) | $(292,610) | $(310,092) | $(345,702) |
| $(19) | $600,419 | $69,720 | $(101,215) | $(52,943) | $230,878 | $165,116 | $(67,590) | $6,465 | $3,130 | $3,907 | $(160,461) | $(18,776) | |
| $(40,117) | $(676,193) | $(68,330) | $(81,076) | $(78,759) | $287,711 | $201,681 | $(78,589) | $(153,766) | $(42,623) | $(44,234) | $(270,118) | $(10,575) | $(616,078) |
| | | $(188,965) | $(60,936) | | $344,544 | $238,246 | | | $(88,376) | $(92,376) | $(379,776) | $(2,374) | |
| $11,120 | $(1,395,771) | $(2,929) | $(40,797) | $(23,443) | $401,377 | $274,811 | $(155,090) | $(282,344) | $(134,129) | $(140,518) | $(489,434) | $5,827 | $(1,205,969) |
| $(320,104) | $9,345,213 | $(1,904,472) | $(854,905) | $(668,134) | $543,919 | $344,346 | $(888,721) | $(734,621) | $(563,211) | $(577,040) | $(1,592,399) | $(335,989) | $(2,167,749) |
| $11,730 | $1,831,744 | $384,223 | $9,713 | $15,053 | $(2,212) | $12,729 | $(1,488) | $21,020 | $75,934 | $123,196 | $(44,767) | $49,558 | $234,280 |
| | | $486,178 | $15,541 | $25,089 | $(1,106) | $23,716 | $2,520 | $35,362 | $128,316 | $205,342 | $(52,199) | $87,682 | $398,800 |
| | | $588,132 | $21,369 | $35,124 | $0 | $34,702 | $6,528 | $49,705 | $180,699 | $287,489 | $(59,630) | $125,806 | $563,320 |
| $23,460 | $3,416,296 | | $27,196 | $45,159 | $1,106 | $45,688 | $10,536 | $64,048 | $233,082 | $369,635 | $(67,062) | $163,930 | $727,840 |
| $11,730 | $5,248,040 | $1,458,533 | $46,622 | $75,266 | $(3,317) | $71,147 | $7,560 | $106,087 | $384,949 | $616,027 | $(223,658) | $426,976 | $1,924,240 |
| | | | | | | $147,488 | $48,748 | $31,441 | $10,582 | $20,634 | | | $5,781 |
| | | | | | | | | $31,911 | | | | | $5,658 |
| | | | | | | | $54,895 | $32,381 | $11,118 | | | | $5,535 |
| $10,410 | | | | | $(135,500) | | $57,968 | $32,851 | $11,386 | | | | $5,412 |
| $(18,500) | | | $(207,600) | $(97,398) | $87,500 | $219,232 | $61,041 | $33,321 | $11,654 | | | | $5,288 |
| $(47,410) | | | | $(143,697) | | | | $33,791 | $11,922 | | | | $5,165 |
| $(76,320) | | | | $(189,996) | | | | $34,261 | $12,190 | | | | $5,042 |
| $(105,231) | | | | $(236,295) | | | $70,261 | $34,731 | $12,458 | | | | $4,919 |
| | | | | $(282,595) | | | | $35,202 | $12,726 | | | | $4,796 |
| | | | | $(328,894) | | | $76,408 | $35,672 | $12,994 | | $5,120 | | $4,673 |
| | | | | $(375,193) | | | $79,481 | $36,142 | $13,262 | | | | $4,549 |
| | | | | $(421,492) | | | $82,554 | $36,612 | $13,530 | | | | $4,426 |
| | | | | $(297,000) | | | $85,627 | $37,082 | $13,798 | | | | $4,303 |
| | | | | | | | $88,701 | $37,552 | $14,065 | | | | $4,180 |
| | | | | | | | | $38,022 | $14,333 | | | | $4,057 |
| | | | | | | | | | | | | | $3,934 |

**Schedule 5.5(b)**

**<u>INDEBTEDNESS</u>**

Indebtedness
| | |
|---|---|
| Accounts Payable | 1,249,247.87 |
| Allan Nalle Note Payable | 275,000.00 |
| Jeff Wooley Trustee Short Term Loan | 77,000.00 |
| Loan John Spencer Cobb | 250,000.00 |
| Nalle - Cobb Note Payable | 207,023.73 |
| O'Meara Short Term Loan | 75,000.00 |
| Premium Finance LLC | 9,134.79 |
| Robson Short term Bridge Loan | 250,000.00 |
| Total | 2,392,406.39 |

Convertible Notes
| | |
|---|---|
| SunAm Development | 25,000.00 |
| Boone Bank & Trust Co., Custodian | 100,000.00 |
| ICC | 40,001.00 |
| Keresa | 240,000.00 |

AP does not include final December
Notes above are principal balance only and do not include accrued interest
Convertible notes can convert to units at final ARA terms.
Keresa Notes are payable from future license fees or royalties

**Exhibit 1**

**FORM OF NOTE**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE.  THIS NOTE MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND REGISTRATION OR QUALIFICATION UNDER APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL THAT THE PROPOSED TRANSACTION DOES NOT VIOLATE THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS.**

EARTH ENERGY RENEWABLES LLC

NOTE

No: 001
ORIGINAL PRINCIPAL AMOUNT:  Up to $440,000, plus the Purchaser Expense Amount
ORIGINAL ISSUE DATE:  January 13, 2020
INTEREST RATE: 8%
FINAL MATURITY DATE:  June 30, 2020

This Note (the "Note") is issued pursuant to a Note Purchase Agreement, dated as of January 13, 2020 (as amended, modified or supplemented from time to time, the "Agreement"), between EARTH ENERGY RENEWABLES LLC, a Texas limited liability company (the "Company"), and ARA EER HOLDINGS, LLC, a Delaware limited liability company (the "Purchaser").  Capitalized terms used and not otherwise defined herein shall have the meanings provided in the Agreement.

FOR VALUE RECEIVED, the Company hereby promise to pay to the Purchaser, or its registered assigns, without setoff, counterclaim or other deduction for any reason, the principal sum of (a) Four Hundred Forty Thousand Dollars ($440,000) plus (b) the Purchaser Expense Amount (or, if less, the aggregate purchase price paid by the Purchaser to the Company for this Note pursuant to the Agreement), plus accrued interest thereon at the Interest Rate per annum specified above (computed on the basis of a 360-day year and the actual number of days elapsed) commencing on the date hereof, on the Final Maturity Date specified above.  Unless theretofore paid, on the first Business Day of each month prior to the Maturity Date, the Company shall capitalize the accrued interest payable on this Note and add such interest to the principal amount of this Note.

EXHIBIT 1
(to Note Purchase Agreement)

4847-8504-7216.5

Payments of principal and interest under this Note are to be made to such place as the holder hereof shall designate to the Company in writing, in lawful money of the United States of America.

This Note is subject to optional prepayment, in whole or from time to time in part, on the terms specified in the Agreement.

This Note is secured by all existing and future security agreements between the Company and the Purchaser, including the Security Agreement, and payment may be accelerated according to any of them.  In addition, the Company hereby grants to the Purchaser a security interest in any money now or hereafter owed to the Company by the Purchaser and agrees that the Purchaser may, at any time and without notice or demand, set off against any such money owed any amount unpaid under this Note, whether or not due.  Without affecting the liability of the Company, the Purchaser may, from time to time and without notice, release or impair any collateral security for payment of this Note.

This Note is a registered Note and, as provided in the Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note for the then outstanding principal amount will be issued to, and registered in the name of, the transferee. Prior to due presentment for registration of transfer, the Company may treat the Person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Company shall not be affected by any notice to the contrary.

In case an Event of Default shall occur and be continuing, the principal of this Note may be declared or otherwise become due and payable in the manner and with the effect provided in the Agreement.

To the extent permitted by Applicable Law, upon written demand by the Purchaser during the occurrence of an Event of Default and until such time such Event of Default shall have been cured or waived, each obligation hereunder if not paid when due shall bear interest at a rate per annum equal to the Default Rate from the time such obligation becomes due and payable and until it is paid in full.  The Company acknowledges that the increase in rates referred to in this paragraph reflects, among other things, the fact that the Note or other amounts have become a substantially greater risk given their default status and that the Purchaser is entitled to additional compensation for such risk; and all such interest shall be payable by the Company upon demand by the Purchaser.

The Company and any and all endorsers, guarantors and sureties severally waive demand, presentment for payment, notice of dishonor or default, notice of intent to accelerate, notice of acceleration, protest and diligence in collecting (in each case to the extent set forth in the Agreement).

Should any debt represented by this Note be collected at law or in equity, or in bankruptcy or other proceedings, or should this Note be placed in the hands of attorneys for collection, the Company agrees to pay, in addition to the principal and interest due and payable hereon, the costs and expenses incurred by the Purchaser in connection with the collection thereof.

**THIS NOTE IS INTENDED TO BE PERFORMED IN THE STATE OF TEXAS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAW OF SUCH STATE. As provided in Section 13 and Section 14.8 of the Agreement, the Company submits to the jurisdiction of the state and federal courts having appropriate jurisdiction situated in the State of Texas in any action or proceeding relating to this Note.**

[*Signature page follows*]

**EARTH ENERGY RENEWABLES LLC**

By: _____
Name: John C. Wooley
Title: Manager

3

**Exhibit 2**

**BUDGET FOR APPLICATION OF NOTE PROCEEDS**

EER Use of Bridge Loan Proceeds

January & February 2020 Operations

| | |
|---|---|
| Personnel & Payroll Taxes | $ 374,142 |
| Operations & Accounts Payable | $ 65,858 |
| Total | $ 440,000 |

**Exhibit 3**

## <u>SUMMARY TERM SHEET</u>

*See Attached*



**EARTH ENERGY RENEWABLES, LLC**
**SUMMARY OF TERMS**
**SERIES A PREFERRED UNITS FINANCING**
**November 18, 2019**

This is a summary, for negotiation purposes only, of certain principal terms of the proposed Series A Preferred Units financing of Earth Energy Renewables, LLC, a Texas limited liability company (the "**Company**") by Ara Partners, LLC or its affiliates ("**Ara**"). This summary of terms represents only the current expectations of the parties with respect to certain of the major issues relating to the proposed financing. In consideration of the time and expense incurred and to be incurred by the parties in connection with the proposed financing, the provisions set forth in part II shall be binding obligations of the Company and Ara upon the execution and delivery of this summary of terms by the parties hereto, whether or not the proposed financing is consummated. No other parts of this summary of terms, including the provisions set forth in part I, are intended to be legally binding on the Company or Ara. This summary of terms is intended as an outline only and does not purport to summarize or contain all the conditions, covenants, representations, warranties and other provisions which would be required to be contained in any definitive agreement. Subject only to the provisions of part II below, the Company and Ara shall each have the right to terminate all negotiations regarding the proposed financing and any related transactions at their sole discretion without liability or obligation. This summary of terms does not create and is not intended to create a duty to negotiate in good faith towards binding documentation and may not be relied upon as the basis for a contract by estoppel or otherwise.

**NON-BINDING SUMMARY OF TERMS OF PROPOSED FINANCING**

| | |
|---|---|
| Target Closing Date: | The initial closing of the financing is targeted to occur on or before January 31, 2020. |
| Amount of Financing: | An aggregate of $45,000,000. |
| Type of Security: | Series A Convertible Preferred Units (the "**Series A Preferred**"). |
| Pre-Money Valuation: | The Original Purchase Price is based upon a fully-diluted pre-money valuation of $17,907,725[1] (including an employee equity pool representing 10.0% of the fully diluted post-money capitalization). |
| Original Purchase Price: | $1.00 per Unit (based upon fully diluted capitalization at closing). |

Investors:

| Name | Amount |
|---|---|
| Ara | $ 45,000,000 |
| Existing Investors | $ 1,582,993[2] |

Should the existing investors choose to not participate in the amount above, Ara is willing to fund the balance.

The existing investors would take all actions required to allow for the allocation of the financing as set forth above.

---

[1] Based on a $1.00 share price, 10% option pool and 1,582,993 of investment converted at Closing. Additional investment will change the valuation slightly.

[2] Based on latest presentation from 11/8/19.



| Tranches | The investment will be made in two stages.  The first tranche will be up to $10MM funded over the course of 2020 based upon an agreed budget.  To the extent the first tranche requires additional capital beyond the allocation, each additional share shall also receive a Series A cashless warrant.  The subsequent financing for up to $35MM will be triggered on the company achieving the Milestones described below.    To the extent the second tranche requires additional capital beyond the allocation, each additional share shall also receive a Series A cashless warrant. |
|---|---|
| Interest | The Series A Preferred shall accrue payment-in-kind interest at a rate of 8% per annum. |
| Milestones | The second tranche of financing will be triggered by the completion of both of the following Milestones, as determined by Ara:<br><br>1.  Completion and operation of the new pilot facility<br>2.  Completion of basic engineering package from a mutually agreed upon third party engineering group for the 5.5KTA facility indicating economic feasibility.<br>3.  Sufficient indications of feedstock supply sources and product off-take customers to support a final investment decision. |
| Capitalization: | The pre-investment and post-investment capitalization of the Company on a fully diluted basis (including all options and warrants and all authorized but unissued options) before and after the Series A Preferred financing will be as set forth in the capitalization table attached as Exhibit A. |
| Use of Proceeds: | Tranche 1: The Company will use the proceeds from Tranche 1 of the Series A Preferred financing to complete the Company's pilot facility and complete the basic engineering package for the 5.5KTA facility.<br><br>Tranche 2:  The Company will use the proceeds from Tranche 2 of the Series A Preferred financing for general working capital purposes. |
| Equity Incentive Plan: | An amendment to the Company's existing Equity Incentive Plan (the "**Equity Plan**") will be adopted as part of this financing for employees, Managers and consultants of the Company.  The total number of Common Units reserved for issuance pursuant to the Equity Plan (including warrants previously issued to employees prior to the date hereof) will be equal to 10.0% of the fully diluted Common Units after giving effect to the proposed financing.  The options will be granted by the Board of Managers of the Company (the "**Board**"), will be subject to vesting over four years, with 25% of the options or Units vesting on the first anniversary of the date of grant and 1/48th of the options or Units vesting each calendar month thereafter, unless otherwise agreed by the Board, including at least one of the Ara Managers (as defined below).  Common Units acquired through the Equity Plan will be subject to (a) the right of the Company to repurchase any unvested Common  Units at the price paid by the optionee upon termination of the optionee's employment with the Company, (b) a right of first refusal in favor of the Company to purchase any vested Common  Units at the price offered by a third party (which right terminates upon the initial public offering of the  Units), and (c) a restriction against transfers of unvested |



Common Units. Any acceleration of vesting of awards granted pursuant to the Equity Plan in connection with a change of control of the Company or otherwise shall be at the sole discretion of, and as approved by, the Board, including at least one of the Ara Managers (as defined below).

Description of Series A Preferred:

<u>Liquidation Preference</u>:  In the event of any liquidation, dissolution or winding up of the Company, holders of the Series A Preferred will be entitled to receive, in preference to the holders of Common Units, an amount for each Unit of Series A Preferred (the "**Liquidation Amount**") equal to the Original Purchase Price plus any accrued or declared and unpaid dividends.  If the assets of the Company are insufficient to permit payment of the full Liquidation Amount to all holders of Series A Preferred, the available assets will be distributed ratably to the holders of the Series A Preferred in proportion to the Liquidation Amount each such holder would otherwise be entitled to receive.  After payment in full of the Liquidation Amount to the Series A Preferred holders, the holders of the Series A Preferred will share ratably with the holders of the Common Units on an as-converted basis in the distribution of the remaining assets and funds of the Company.

<u>Merger, Reorganization or Sale of the Company</u>:  A merger, consolidation or reorganization of the Company in which the holders of the Company's outstanding voting securities immediately prior to such transaction will hold less than a majority of the voting power of the surviving or acquiring company's outstanding securities immediately after such transaction, a sale of all or substantially all of the assets of the Company or the exclusive licensing of all or substantially all of the Company's intellectual property in a single transaction or series of related transactions shall be deemed to be a liquidation of the Company (each, a "**Deemed Liquidation Event**"), thereby triggering payment of the liquidation preferences described above unless otherwise determined by the holders of a majority of the Series A Preferred.  The conversion of Series A Preferred into Common Units shall be permitted at any time up to or simultaneously with the consummation of a Deemed Liquidation Event.

For purposes of determining the amount each holder of Series A Preferred Units  will be entitled to receive in connection with a Deemed Liquidation Event, if the Series A Preferred  Units has not been converted into Common Units, then it will be, upon and after the closing of the Deemed Liquidation Event, treated as either Series A Preferred  Units or converted into Common Units so as to result in the greatest payment to the holder.

<u>Redemption</u>:  Holders of at least a majority of the Series A Preferred may elect to cause the Company to redeem all of the outstanding Series A Preferred either (a) beginning on the fifth anniversary of the closing of the financing in equal annual installments over a three-year period or (b) upon a material default in any of the representations, warranties or covenants of the Company in the Transaction Documents (as defined below), in each case at a redemption price per Unit equal to the greater of (a) the Liquidation Amount or (b) the fair market value (on a going concern basis) of the Series A Preferred.  If, on any redemption date, the number of Units of Series A Preferred that may then be legally redeemed by the Company is less than the number of such Units to be redeemed, then the Units to be redeemed that may not be legally redeemed will be redeemed as soon as the Company has legally available funds therefor.



If the Company fails to pay the full redemption price for the Series A Preferred to be redeemed on a redemption date, then, at the request of the holders of a majority of the Series A Preferred, the number of Managers comprising the Board shall be increased by one.  The holders of the Series A Preferred, voting as a separate series, shall have the right to elect such additional Manager, and such Manager shall have a number of votes on all matters to come before the Board equal to the number of votes the other Managers are entitled to cast, plus one.

<u>Conversion</u>:  Each holder of Series A Preferred will have the right to convert Units of Series A Preferred at any time, at the option of the holder, into Common Units.  The number of Common Units into which each Series A Preferred Unit may be converted will be determined by dividing the Original Purchase Price per Unit by the conversion price per Unit.  The initial conversion price will be the Original Purchase Price.  The conversion price will be subject to adjustment as provided below.

<u>Automatic Conversion</u>:  The Series A Preferred automatically will be converted into Common  Units, at the then applicable conversion rate, upon (a) an underwritten public offering of Common  Units at a public offering price per Unit (before deducting underwriting commissions and expenses) of at least three times the Original Purchase Price in which the gross proceeds to the Company are at least $70,000,000 (a "**Qualified IPO**"), or (b)  the election of the holders of a majority of the outstanding Series A Preferred.

<u>Anti-dilution Protection</u>:  If equity securities are subsequently issued at a price per Unit that is less than the conversion price then in effect, the conversion price of the Series A Preferred will be adjusted using a broad-based weighted average adjustment formula.  The conversion price of the Series A Preferred will also be subject to appropriate adjustment in the event that the Company effects a Unit split, Unit combination, Unit dividend or similar event.  No adjustment in the conversion price will be made for (a) the issuance of options or Units pursuant to the Equity Plan (b) the issuance of securities upon conversion of any of the Series A Preferred, or as a dividend or distribution on the Series A Preferred;  and (c) the issuance of Common  Units upon a unit split, unit dividend or any subdivision of Units of Common  Units.

<u>Protective Provisions; Voting Rights</u>:  So long as at least 50% of the Units of Series A Preferred are outstanding, the Company shall not, either directly or by amendment, merger, consolidation or otherwise, without the approval of the holders of a majority of the Series A Preferred, voting as a separate series, do any of the following:

(a) liquidate, dissolve or wind-up the affairs of the Company, or effect any Deemed Liquidation Event;  (b) liquidate, dissolve or wind-up the affairs of any subsidiary or permit any subsidiary to effect any Deemed Liquidation Event;  (c) amend, alter or repeal any provision of the LLC Agreement or otherwise alter the terms of the Series A Preferred in a manner adverse to the Series A Preferred; (d) issue any Series A Preferred, other than pursuant to the financing proposed in this summary of terms, or increase or decrease the authorized number of Units of Series A Preferred; (e) create any new equity security senior to or on parity with the Series A Preferred (f) reclassify any outstanding Units



of equity security into Units that are senior to or on parity with the Series A Preferred; (g) issue any equity securities (other than options or Units under the Equity Plan) for consideration other than cash; (h) declare or pay any dividend or distribution on any equity securities prior to the Series A Preferred; (i) purchase or redeem any equity securities; (j) permit any subsidiary to declare or pay any dividend or distribution on its equity securities, other than dividends or distributions payable solely to the Company or other wholly owned subsidiaries of the Company; (k) create any new equity incentive plans, or increase the number of Units reserved under the Equity Plan; (l) have any non-wholly owned subsidiaries or spin-out or sell any subsidiary of the Company or any entity created by the Company; (m) make any loan or advance to, or own any Units or other securities of, or guarantee, directly or indirectly, any indebtedness of, any subsidiary or other corporation, partnership, or other entity; (n) make any loan or advance to any person, including any employee or Manager, except advances and similar expenditures in the ordinary course of business or under the terms of the Equity Plan or other equity incentive plan approved by the Board; (o) make any investment inconsistent with any investment policy approved by the Board; (p) make any capital expenditures in excess of $100,000; (e) acquire any business with a value in excess of $100,000; (q) increase or decrease the size of the Board; (r) incur any indebtedness, except for indebtedness not exceeding $100,000 in the aggregate; (s) enter into or be a party to any transaction with any Manager, officer or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Exchange Act) of any such person except transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Board; (t) hire, fire or change the compensation of the executive officers, including approving any option grants; (u) change the principal business of the Company, enter new lines of business or exit any current line of business, or permit any subsidiary to take such action; (v) sell, assign, license, pledge or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business, or permit any subsidiary to take such action; or (w) agree to do any of the foregoing.

On all other matters to come before the equity holders, the Series A Preferred and the Common Units will vote together, and not as separate classes or series, with each Series A Preferred Unit having the number of votes equal to the number of Common Units then issuable upon conversion of such Unit of Series A Preferred, except that, so long as at least 50% of the Series A Preferred Units are outstanding, the Series A Preferred, as a separate class or series, shall be entitled to elect two members of the Board. The Company's LLC Agreement will provide that the number of authorized Common Units may be increased or decreased with the approval of the holders of a majority of the Series A Preferred and Common Units, voting together and not as separate classes or series, and without a separate class vote by the Common Units.

Distributions: There should be no distribution of dividends to the Series A Preferred Holders in preference to Common Unit Holders.

Tax distributions shall be made to all unit holders to the extent they are allocated any taxable income or gain from the Company.



| | |
|---|---|
| Preemptive Rights: | The Major Investors shall have the preemptive right to purchase a pro-rata portion (with a right of oversubscription if any Investor elects not to purchase its full pro-rata portion) of any equity securities offered by the Company in the future on the same terms and conditions as the Company proposes to offer such securities to other parties.  A Major Investor's pro-rata portion will be based on its percentage equity ownership in the Company (assuming the conversion of all outstanding Series A Preferred into Common Units and the exercise of all options outstanding under the Equity Plan.  An Investor will have 15 business days in which to exercise this preemptive right.  Notwithstanding the provisions set forth above, no preemptive right shall apply to securities issued in transactions described in the last sentence of the "Anti-dilution Protection" section of this term sheet.  A Major Investor (as defined below) may assign its rights to purchase Units to its affiliated funds, including funds that are not current equity holders of the Company. |
| Registration Rights: | Investors shall be entitled to customary registration rights, including two demand registrations of their Common Units held at the Company's expense, unlimited piggyback rights on all public offerings of the Company's Units, and the right to require that the Company file an unlimited number of registration statements on Form S-3 or other registration short forms at the expense of the Investors if such forms are available.  Other than piggyback rights that are subordinated to the foregoing registration rights, no future registration rights may be granted without the consent of the holders of at least a majority of the Series A Preferred. |
| Information Rights: | The Company will deliver to each holders of Units of Series A Preferred or Common Units issued upon conversion of the Series A Preferred and all other Common Unit Holders, (a) audited annual financial statements within 90 days after the end of each fiscal year, (b) unaudited quarterly financial statements within 45 days after the end of each fiscal quarter, (c) unaudited monthly financial statements within 30 days after the end of each month, (d) an annual budget as approved by the Board at least 45 days prior to the beginning of each fiscal year and (e) an up-to-date capitalization table of the Company, certified by the principal financial or accounting officer of the Company, within 30 days after the end of each quarter. |
| | In addition, each Major Investor (any owner of at least 300,000 Common or Preferred Units will have inspection and visitation rights.  These provisions will terminate upon a Qualified IPO. |
| Right of First Refusal and Co-Sale Applicable to Common Units: | No holder of Common Units may sell or transfer any Units (other than to immediate family members or in trust for the benefit of such holder or such holder's immediate family members) without offering such Units on a pro-rata basis, first, to the Company, and, then, to the holders of Series A Preferred Units (with a right of over-subscription for Units not purchased by other holders) at the same price and on the same terms as those received in a bona fide third-party offer.  Holders of Series A Preferred Units who decline to purchase such Units shall be entitled to sell into such offer on a pro-rata basis with the selling holder of Common Units.  These rights will terminate upon a Qualified IPO or a sale of the Company. |



| | |
|---|---|
| Drag-Along Applicable to Common Units: | The holders of Common Units shall be required to enter into an agreement with the Investors providing that such holders will vote their Units in favor of and participate in a Deemed Liquidation Event or any other transaction in which 50% or more of the voting power of the Company will be transferred, in each case, that is approved by the Board, and the holders of a majority of the Series A Preferred.  These obligations will terminate upon a Qualified IPO. |
| Board of Managers: | The Board will consist of one nominees of the holders of Common Units, who shall be the person who is appointed as CEO by the Board, two nominees of the holders of Series A Preferred Units (each, an "**Ara Manager**"), both of whom will be designated by Ara so long as it holds any Series A Preferred Units.  Each committee of the Board shall include the Ara Managers.  Meetings of the Board will be held monthly.  Managers will be indemnified by the Company to the fullest extent allowed by law.  The Company will enter into an indemnification agreement with each Manager at the Closing in a form satisfactory to the Investors.  The indemnification agreement with respect to the Ara Manager will also cover Ara and its affiliates.  The Company will reimburse Ara for the Ara Manager's travel expenses associated with Board meetings.  If the Company merges with another entity and is not the surviving entity, or transfers all or substantially all of its assets, proper provisions shall be made so that each successor of the Company assumes the Company's obligations with respect to indemnification of Managers. |
| Terms of the Unit Purchase Agreement: | The purchase of the Series A Preferred will be made pursuant to a Unit Purchase Agreement, Amended and Restated LLC Agreement and related documents (the "**Transaction Documents**") drafted by counsel to Ara and acceptable to the Company, which shall contain, among other things, appropriate representations and warranties of the Company, investor indemnification, covenants of the Company reflecting the provisions set forth herein, other provisions customary for such agreements and appropriate conditions of closing, which will include, among other things (some of which are described below), qualification of the Units under applicable Blue Sky Laws, the execution of an Amended and Restated LLC Agreement establishing the rights and preferences of the Series A Preferred and an opinion of counsel of the Company.  The Transaction Documents will be governed by Texas law and be subject to the exclusive jurisdiction of Texas courts. |
| Proprietary Information Agreements | Prior to closing, the Company will have entered into Proprietary Information Agreements with all employees.  The Proprietary Information Agreements will contain provisions satisfactory to Ara with respect to confidentiality and corporate ownership of inventions and innovations during employment, and covenants with respect to non-competition and non-solicitation of employees and customers during and after employment for one year.  Thereafter, each new employee and officer of the Company will enter into a similar agreement. |
| Insurance: | The Company will maintain casualty and liability insurance with coverage and in amounts as set forth in the LLC Agreement, unless otherwise determined by the unanimous vote of the Board.  Ara will be named as an additional insured and loss payee on such insurance policies, with appropriate notice and cancellation provisions.  The Company will also maintain D&O insurance with coverage and in amounts, including non-rescindable Side A coverage, satisfactory to the Board. |



| | |
|---|---|
| Conditions Precedent: | The closing of the financing will be subject to the following conditions: (i) qualification in any state(s) in which the Company is required to be qualified to conduct business; (ii) the business, assets, financial condition, operations, results of operations and prospects of the Company are substantially as have been represented to Ara and no change shall have occurred that, in Ara's sole judgment, is or may be materially adverse to the Company; (iii) the negotiation and execution of definitive Transaction Documents setting forth representations and warranties of the Company, covenants and other provisions consistent with this summary of terms and customary in transactions of this nature; (iv) the completion of due diligence satisfactory to Ara in its sole discretion; (v) the approval of this investment by the Investment Committee of Ara; (vi)  the agreement by Ara and the holders of Common  Units on a2019 - 2020 business plan including financial plan, marketing and sales strategy, and management recruiting plan; and (vii) the approval of the financing by the current Board and the requisite equity holders of the Company. |

## II.  BINDING PROVISIONS

| | |
|---|---|
| Non-Solicitation: | The Company agrees to work in good faith expeditiously toward a closing.  From the date of acceptance of this summary of terms until the earliest of (a) the consummation of the financing, (b) the agreement of Ara and the Company to terminate negotiations or (c) the expiration of 60 days from the date of acceptance of this summary of terms by the Company (the "Exclusivity Period"), the Company will not directly or indirectly solicit, initiate or participate in any discussions or negotiations with, or encourage or respond to any inquires or proposals by, any person or group other than Investors concerning any financing or the acquisition, sale, lease, license or other disposition of the Company or its subsidiaries or any material part of the equity or assets of the Company or its subsidiaries. |
| | The Company will promptly notify Ara if any person (a) seeks to initiate any discussions or negotiations not contemplated in the immediately preceding paragraph, (b) makes an inquiry or proposal, or (c) requests any information with respect to any proposed financing or the acquisition, sale, lease, license or other disposition of the Company or its subsidiaries or any material part of the equity of the Company or any of its subsidiaries, and the Company will disclose to Ara the terms of any proposal that it may receive in respect of any such proposed financing. |
| Expenses: | The Company and the Investors will each bear their own legal and other expenses with respect to the financing, except that the Company will pay at the closing of the financing the reasonable fees and expenses Vinson & Elkins L.L.P., counsel to Ara. |
| Confidentiality: | The Company shall keep the terms and conditions of this summary of terms, including its existence, confidential and shall not disclose the terms and conditions of this summary of terms, including its existence, to any third party without the consent of Ara, except that the Company may disclose the terms and conditions described in this summary of terms to its officers, Managers, attorneys and other advisers, provided, that such persons agree to the confidentiality restrictions contained herein.  If the Company determines that it is required by law to disclose information regarding this summary of terms, it shall, a reasonable time before making any such disclosure or filing, consult |



with Ara regarding such disclosure or filing and seek confidential treatment for such portions of the disclosure or filing as may be requested by Ara.

**Right to Conduct Activities:**   The Company hereby acknowledges that Ara is a venturing entity in the energy sector, and as such invests in numerous portfolio companies, and conducts substantial business in the energy industry, some of which may be competitive with the Company's business. Ara shall not be liable to the Company for any claim arising solely out of, or based upon, (i) the investment by Ara in any entity competitive to the Company, or (ii) actions taken by Ara, any partner, officer or other representative of Ara (other than a representative of Ara who is a member of the Board) to assist any such competitive company, whether or no such action was taken as a board member of such competitive company, or otherwise, and whether or not such action has a detrimental effect on the Company.

**Governing Law:**   This summary of terms shall be governed by the laws of the State of Texas, and the parties hereto irrevocably submit to the state or federal courts having appropriate jurisdiction situated in the State of Texas, for the resolution of any dispute arising out of or in connection with this Memorandum of Terms.



This summary of terms shall expire unless signed and accepted by the Company and returned to Ara not later than 5:00 p.m., Central Time, on November 22, 2019.

**ARA PARTNERS, LLC**
**By: Ara Partners Group, LLC, its sole member and manager**

Date: November 22, 2019

By: _____
Name:    Cory Steffek
Title:    Managing Director

**EARTH ENERGY REWNEWABLES, LLC**

Date: November 22, 2019

By: _____
Name:    John Wooley
Title:    CEO



**EXHIBIT A**

**PRE-INVESTMENT AND POST-INVESTMENT**

**CAPITALIZATION TABLES**

[See Attached]

## AMENDMENT NO. 1 TO NOTE PURCHASE AGREEMENT AND PROMISSORY NOTE

This Amendment No. 1 to Note Purchase Agreement, dated as of March <u>2</u> , 2020 (this "<u>Amendment</u>"), is entered into by and between Earth Energy Renewables, LLC, a Texas limited liability company (the "<u>Company</u>"), and Ara EER Holdings, LLC, a Delaware limited liability company (the "<u>Purchaser</u>").

RECITALS

A.      Reference is hereby made to (i) that certain Note Purchase Agreement dated as of January 13, 2020, made by and among the Company and the Purchaser (the "<u>Note Purchase Agreement</u>") and (ii) that certain Note, issued pursuant to the Note Purchase Agreement, dated as of January 13, 2020 (the "<u>Note</u>"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Note Purchase Agreement.

B.      Pursuant to this Amendment, the Company and the Purchaser are amending the Note Purchase Agreement and the Note in accordance with Section 14.2 of the Note Purchase Agreement to (i) extend the term of the Note and (ii) to increase the Principal Amount.

C.      For value received, the Purchaser has agreed to amend the Note Purchase Agreement and the Note as provided below.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Purchaser hereby agree as follows:

1.      <u>Amendments to the Note Purchase Agreement and the Note</u>.

1.1.      All references to "June 30, 2020" in the Note Purchase Agreement and the Note is hereby deleted and replaced with "September 30, 2020", including without limitation the definition of "Maturity Date" is hereby deleted in its entirety and amended and restated as follows:

"<u>Maturity Date</u>" shall mean September 30, 2020.

1.2.      The Principal Amount of the Note Purchase Agreement and the Note is hereby amended and restated in its entirety such that it shall equal an aggregate amount equal to (a) $1,640,000 plus (b) the Purchaser Expense Amount.

2.      <u>Effectiveness of Amendment</u>.  Upon the execution and delivery hereof, the Note Purchase Agreement and the Note shall be deemed to be amended and/or restated as hereinabove set forth as fully and with the same effect as if the amendments and/or restatements made hereby were originally set forth in the Note Purchase Agreement and the Note, and this Amendment and each of the Note Purchase Agreement and the Note shall henceforth respectively be read, taken and construed as one and the same instrument, but such amendments and/or restatements shall not operate so as to render invalid or improper any action heretofore taken under the Note Purchase Agreement and the Note.

3.     <u>Authority</u>. The Company and the Purchaser hereby represent and warrant that they have the full power and authority to agree to, enter into, execute and deliver and perform under this Amendment.

4.     <u>General Provisions</u>.

4.1.     Each of the Note Purchase Agreement and the Note, as amended by this Amendment, is hereby ratified and confirmed in all respects and shall continue in full force and effect in accordance with its terms.  Except as specifically provided for in this Amendment, the Note Purchase Agreement and the Note shall remain unmodified and in full force and effect.

4.2.     The Purchaser shall promptly affix this Amendment to the Note.

4.3.     The terms of Section 14 the Note Purchase Agreement shall apply to this Amendment, *mutatis mutandis*, as applicable.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned has executed this Amendment to be effective as of the date first above written.

ARA EER HOLDINGS, LLC

By: _____

Name: Karthik Narasimhan

Title: General Counsel

EARTH ENERGY RENEWABLES, LLC

By: _____
Name: John C. Wooley
Title: Manager

## AMENDMENT NO. 2 TO NOTE PURCHASE AGREEMENT AND PROMISSORY NOTE

This Amendment No. 2 to Note Purchase Agreement, dated as of June 12 , 2020 (this "Amendment"), is entered into by and between Earth Energy Renewables, LLC, a Texas limited liability company (the "Company"), and Ara EER Holdings, LLC, a Delaware limited liability company (the "Purchaser").

## RECITALS

A.       Reference is hereby made to (i) that certain Note Purchase Agreement dated as of January 13, 2020, made by and among the Company and the Purchaser (the "Note Purchase Agreement", as amended), (ii) those certain Note, issued pursuant to the Note Purchase Agreement, dated as of January 13, 2020 (the "Note"), and (iii) Third Amended Company Agreement of EE-Terrabon Biofuels, LLC, dated as of July 31, 2017 (as amended or restated from time to time, the "LLC Agreement").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Note Purchase Agreement.

B.       Pursuant to this Amendment, the Company and the Purchaser are amending the Note Purchase Agreement and the Note in accordance with Section 14.2 of the Note Purchase Agreement to (i) extend the term of the Note and (ii) to increase the Principal Amount.

C.       For value received, the Purchaser has agreed to amend the Note Purchase Agreement and the Note as provided below.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Purchaser hereby agree as follows:

1.       Amendments to the Note Purchase Agreement and the Note.

1.1.       The Principal Amount of the Note Purchase Agreement and the Note is hereby amended and restated in its entirety such that it shall equal an aggregate amount equal to (a) $2,053,000 plus (b) the Purchaser Expense Amount.

1.2.       The Note Purchase Agreement is hereby amended as follows:

(a)       Schedule A to the Note Purchase Agreement is hereby amended by inserting the following definition in the appropriate alphabetical order:

"LLC Agreement" shall mean that certain Third Amended Company Agreement of EE-Terrabon Biofuels, LLC, dated as of July 31, 2017, as amended or restated from time to time.

(b)       Amendment to Section 12:  Section 12 is hereby amended and restated in its entirety to read as follows:

"SECTION 12.  INVESTMENT TRANSACTION

Section 12.1 *Investment Transaction.*  During the period commencing on the Closing Date and ending on the Maturity Date (the "***Investment Period***"), the Purchaser shall have the right (but not the obligation), exercisable by providing written notice to the Company on or prior to the expiration of the Investment Period, to require the Company to issue and sell to the Purchaser, or an Affiliate thereof designated by the Purchaser, Series A Convertible Preferred Units of the Company on terms no less favorable to the Purchaser than those set forth in the Summary of Terms attached hereto as Exhibit 3 (the "***Summary Term Sheet***").

Section 12.2*.  No Issuance or Transfer of Membership Interests.*  During the period (the "***Exclusivity Period***") commencing on the Closing Date and ending on the later of (a) the expiration of the Investment Period, (b) December 31, 2020, or (c) if the Purchaser exercises its investment option in accordance with <u>Section 12.1</u>, the date on which Transaction Documents (as defined in the Summary Term Sheet) are executed and delivered by the parties thereto, the Company shall not (and shall not permit any other Person to), without the prior written consent of the Purchaser, (i) issue, sell, transfer, pledge, grant, dispose of, encumber or deliver any equity securities of the Company or any securities convertible into or exercisable or exchangeable for voting or equity securities of the Company or (ii) adjust, split, combine, recapitalize or reclassify any equity securities of the Company.

Section 12.3.  *Managers of the Company.*  At the election of the Purchaser, the Managers (as defined in the LLC Agreement) shall take such as actions as is necessary or required by the Purchaser (including, without limitation, amending the LLC Agreement, granting a proxy to the Purchaser, voting any Units (as defined in the LLC Agreement) or other ownership and voting interests, in each case both in their capacity as Managers and Members (as defined in the LLC Agreement), in favor of amending the LLC Agreement, signing and delivering any other agreements, or making all necessary filings) in order permit the Purchaser to designate a majority of the Managers of the Company."

2.      <u>Effectiveness of Amendment</u>.  Upon the execution and delivery hereof, the Note Purchase Agreement and the Note shall be deemed to be amended and/or restated as hereinabove set forth as fully and with the same effect as if the amendments and/or restatements made hereby were originally set forth in the Note Purchase Agreement and the Note, and this Amendment and each of the Note Purchase Agreement and the Note shall henceforth respectively be read, taken and construed as one and the same instrument, but such amendments and/or restatements shall not operate so as to render invalid or improper any action heretofore taken under the Note Purchase Agreement and the Note.

     3.     <u>Authority</u>. The Company, the Managers (as defined the LLC Agreement) and the Purchaser hereby represent and warrant that they have the full power and authority to agree to, enter into, execute and deliver and perform under this Amendment.

     4.     <u>General Provisions</u>.

     4.1.     Each of the Note Purchase Agreement and the Note, as amended by this Amendment, is hereby ratified and confirmed in all respects and shall continue in full force and effect in accordance with its terms.  Except as specifically provided for in this Amendment, the Note Purchase Agreement and the Note shall remain unmodified and in full force and effect.

     4.2.     The Purchaser shall promptly affix this Amendment to the Note.

     4.3.     The terms of Section 14 the Note Purchase Agreement shall apply to this Amendment, *mutatis mutandis*, as applicable.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has executed this Amendment to be effective as of the date first above written.

ARA EER HOLDINGS, LLC

By: _____
Name: Karthik Narasimhan
Title: Authorized Person

EARTH ENERGY RENEWABLES, LLC

By: _____
Name: Jeffery J Wooley
Title: Manager


**Managers**:

_____
John C. Wooley


_____
Jeffery J. Wooley

## AMENDMENT NO. 3 TO NOTE PURCHASE AGREEMENT AND PROMISSORY NOTE

This Amendment No. 3 to Note Purchase Agreement, dated as of July <u>13</u>, 2020 (this "<u>Amendment</u>"), is entered into by and between Earth Energy Renewables, LLC, a Texas limited liability company (the "<u>Company</u>"), and Ara EER Holdings, LLC, a Delaware limited liability company (the "<u>Purchaser</u>").

## RECITALS

A.　Reference is hereby made to (i) that certain Note Purchase Agreement dated as of January 13, 2020, made by and among the Company and the Purchaser (the "<u>Note Purchase Agreement</u>", as amended from time to time), (ii) those certain Note, issued pursuant to the Note Purchase Agreement, dated as of January 13, 2020 (the "<u>Note</u>"), and (iii) Third Amended Company Agreement of EE-Terrabon Biofuels, LLC, dated as of July 31, 2017 (as amended or restated from time to time, the "<u>LLC Agreement</u>"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Note Purchase Agreement.

B.　Pursuant to this Amendment, the Company and the Purchaser are amending the Note Purchase Agreement and the Note in accordance with Section 14.2 of the Note Purchase Agreement to (i) extend the term of the Note and (ii) to increase the Principal Amount.

C.　For value received, the Purchaser has agreed to amend the Note Purchase Agreement and the Note as provided below.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Purchaser hereby agree as follows:

1.　<u>Amendments to the Note Purchase Agreement and the Note</u>.

1.1.　The Principal Amount of the Note Purchase Agreement and the Note is hereby amended and restated in its entirety such that it shall equal an aggregate amount equal to (a) $2,406,756 plus (b) the Purchaser Expense Amount.

1.2.　The Note Purchase Agreement is hereby amended as follows:

(a)　The following is inserted in its entirety as Section 12.4:

"Section 12.4. *Material Contracts*. Enter into, amend, modify or terminate any material contract, agreement or understanding (written or oral) (including, without limitation, any license, long term lease, employment contract, term sheet, joint venture or the technology license and Asia joint venture with Keresa)."

2.　<u>Effectiveness of Amendment</u>. Upon the execution and delivery hereof, the Note Purchase Agreement and the Note shall be deemed to be amended and/or restated as hereinabove set forth as fully and with the same effect as if the amendments and/or

restatements made hereby were originally set forth in the Note Purchase Agreement and the Note, and this Amendment and each of the Note Purchase Agreement and the Note shall henceforth respectively be read, taken and construed as one and the same instrument, but such amendments and/or restatements shall not operate so as to render invalid or improper any action heretofore taken under the Note Purchase Agreement and the Note.

3.      Authority. The Company, the Managers (as defined the LLC Agreement) and the Purchaser hereby represent and warrant that they have the full power and authority to agree to, enter into, execute and deliver and perform under this Amendment.

4.      General Provisions.

4.1.      Each of the Note Purchase Agreement and the Note, as amended by this Amendment, is hereby ratified and confirmed in all respects and shall continue in full force and effect in accordance with its terms.  Except as specifically provided for in this Amendment, the Note Purchase Agreement and the Note shall remain unmodified and in full force and effect.

4.2.      The Purchaser shall promptly affix this Amendment to the Note.

4.3.      The terms of Section 14 the Note Purchase Agreement shall apply to this Amendment, *mutatis mutandis*, as applicable.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has executed this Amendment to be effective as of the date first above written.

ARA EER HOLDINGS, LLC

By: _____
Name: Karthik Narasimhan
Title: Authorized Person

EARTH ENERGY RENEWABLES, LLC

By: _____
Name: Jeffrey J Wooley
Title: Manager

**<u>Managers</u>**:

_____
John C. Wooley

_____
Jeffery J. Wooley

## AMENDMENT NO. 4 TO NOTE PURCHASE AGREEMENT AND PROMISSORY NOTE

This Amendment No. 4 to Note Purchase Agreement, dated as of August 21, 2020 (this "Amendment"), is entered into by and between Earth Energy Renewables, LLC, a Texas limited liability company (the "Company"), and Ara EER Holdings, LLC, a Delaware limited liability company (the "Purchaser").

RECITALS

A.      Reference is hereby made to (i) that certain Note Purchase Agreement dated as of January 13, 2020, made by and among the Company and the Purchaser (the "Note Purchase Agreement", as amended from time to time), (ii) that certain Note, issued pursuant to the Note Purchase Agreement, dated as of January 13, 2020 (the "Note"), and (iii) Third Amended Company Agreement of EE-Terrabon Biofuels, LLC, dated as of July 31, 2017 (as amended or restated from time to time, the "LLC Agreement").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Note Purchase Agreement.

B.      Pursuant to this Amendment, the Company and the Purchaser are amending the Note Purchase Agreement and the Note in accordance with Section 14.2 of the Note Purchase Agreement to (i) extend the term of the Note and (ii) to increase the Principal Amount.

C.      For value received, the Purchaser has agreed to amend the Note Purchase Agreement and the Note as provided below.

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Purchaser hereby agree as follows:

1.      Amendments to the Note Purchase Agreement and the Note.

1.1.    The Principal Amount of the Note Purchase Agreement and the Note is hereby amended and restated in its entirety such that it shall equal an aggregate amount equal to (a) $2,852,491 plus (b) the Purchaser Expense Amount.

2.      Effectiveness of Amendment.  Upon the execution and delivery hereof, the Note Purchase Agreement and the Note shall be deemed to be amended and/or restated as hereinabove set forth as fully and with the same effect as if the amendments and/or restatements made hereby were originally set forth in the Note Purchase Agreement and the Note, and this Amendment and each of the Note Purchase Agreement and the Note shall henceforth respectively be read, taken and construed as one and the same instrument, but such amendments and/or restatements shall not operate so as to render invalid or improper any action heretofore taken under the Note Purchase Agreement and the Note.

3.      Authority. The Company, the Managers (as defined the LLC Agreement) and the Purchaser hereby represent and warrant that they have the full power and authority to agree to, enter into, execute and deliver and perform under this Amendment.

4.        General Provisions.

4.1.        Each of the Note Purchase Agreement and the Note, as amended by this Amendment, is hereby ratified and confirmed in all respects and shall continue in full force and effect in accordance with its terms.  Except as specifically provided for in this Amendment, the Note Purchase Agreement and the Note shall remain unmodified and in full force and effect.

4.2.        The Purchaser shall promptly affix this Amendment to the Note.

4.3.        The terms of Section 14 the Note Purchase Agreement shall apply to this Amendment, *mutatis mutandis*, as applicable.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned has executed this Amendment to be effective as of the date first above written.

ARA EER HOLDINGS, LLC

By: _____

Name: Karthik Narasimhan

Title: Authorized Person

EARTH ENERGY RENEWABLES, LLC

By: _____
Name:  Jeffrey J Wooley
Title:  Manager

**Managers**:

_____
John C. Wooley

_____
Jeffery J. Wooley