## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CHAPTER 11** |
| **EARTH ENERGY RENEWABLES, LLC,** | § | |
| | § | **Case No. 20-51780-RBK** |
| **Debtor.** | § | |
| | § | |
| | § | |

## KEMIN INDUSTRIES INC.'S MOTION FOR REMOVAL OF
## THE DEBTOR-IN-POSSESSION

### AN EXPEDITED SETTING IS REQUESTED.

**TO THE HONORABLE CHIEF U.S. BANKRUPTCY JUDGE RONALD B. KING:**

Creditor Kemin Industries, Inc. ("*Kemin*"), by and through its undersigned counsel, hereby files this its *Motion for Removal of the Debtor-in-Possession* (the "*Motion*") and, in support hereof, states as follows:

## I.  RELIEF REQUESTED

1.      By this Motion, Kemin seeks entry of an order removing the Debtor-In-Possession pursuant to 11 U.S.C. § 1185 and transferring control and management of EER to the Subchapter V trustee pursuant to section 1183(b)(5). Cause exists for such removal due to dishonesty, fraud, incompetence and gross mismanagement, both pre- and post-petition, on the part of Debtor's current managers.

## II.  JURISDICTION

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 1183 and 1185.

### III. <u>BACKGROUND</u>

3.      EER (f/k/a EE-Terrabon Biofuels LLC) is a manager-managed Texas limited liability company, governed by its Third Amended Operating Agreement, dated July 31, 2017 (the "***EER Operating Agreement***" attached hereto as **<u>Exhibit A</u>**).

4.      The EER Operating Agreement originally named three managers: (i) John C. Wooley; (ii) Jeffrey J. Wooley (collectively with John Wooley, the "***Wooleys***"); and (iii) Graeme Brown.  Upon information and belief, Graeme Brown resigned as a Manager, leaving only the Wooleys in that role.

5.      Under the EER Operating Agreement, managers have broad power over the management and control of the business and affairs of EER. (Exhibit A at § 6.01.) But those broad management powers are expressly limited by certain restrictions set forth in § 6.02. (*Id*. at §6.02.) And certain additional actions set forth in § 6.03 are prohibited "without the special vote of or written consent by those Members holding a Super Majority of the Units."[1] (*Id*. at § 6.03.) A "Super Majority" means greater than two-thirds (2/3) of the Units. (*Id*. at § 1.01.)

6.      Section 8.1(f) of the EER Operating Agreement specifies the form of notice which must be provided to Members in connection with any meeting.  Section 8.6(b) sets out the requirement for action by unanimous written consent of the Members.

7.      Kemin is a Member of EER and a signatory to the EER Operating Agreement.

8.      Kemin and EER are also parties to a Unit Purchase Agreement, dated October 31, 2018 (the "***Purchase Agreement***" attached hereto as **<u>Exhibit B</u>**), pursuant to which Kemin agreed to invest an additional $1,000,000 to acquire an additional 769,231 EER Units. The Purchase

---

[1] Capitalized terms not otherwise defined herein shall have the definition set forth in the EER Operating Agreement.

Agreement obligated EER to provide certain information and access to Kemin. (Exhibit B at §§ 1.6, 1.8, and 8.1.)

9. EER and each of Kemin and Keresa Plantations Sdn Bhd ("**Keresa**"),[2] are also parties to a License Agreement, dated October 31, 2018 (the "**License Agreement**" attached hereto as **Exhibit C**), pursuant to which Kemin was granted, among other things, certain licenses to use EER's intellectual property, as well as certain purchase rights to products created through the use of that intellectual property.

10. Keresa and Robson are both also Members of EER.

11. Upon information and belief, Kemin, Keresa, and Robson together hold more than one-third (1/3) of the Units of EER. A copy of a chart of EER's ownership units, dated June 30, 2020, is attached as **Exhibit D**.

## IV. APPLICABLE LAW

12. 11 U.S.C. § 1185 provides that:

> On request of a party in interest, and after notice and a hearing, the court shall order that the debtor shall not be a debtor in possession for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the date of commencement of the case, or for failure to perform the obligations of the debtor under a plan confirmed under this subchapter.

11 U.S.C. § 1185.

13. This standard for removal of a debtor in possession in a Subchapter V case is substantially similar to the standard to appoint a trustee in a non-SBRA chapter 11 case, set forth in 11 U.S.C. § 1104(a)(1) (stating "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the

---

[2] Upon information and belief, Steve Robson is a named party but is not a signatory to the License Agreement.

commencement of the case, or similar cause").[3] These grounds are not exhaustive, and courts have found numerous other bases warranting the appointment of a trustee for cause. *See In re Sillerman*, 605 B.R. 631, 641–42 (Bankr. S.D.N.Y. 2019) (collecting cases appointing trustee for various grounds of cause).

14.     Section 1183(b)(5) of the Bankruptcy Code further provides that "if the debtor ceases to be a debtor in possession, [the Subchapter V trustee shall] perform the duties specified in section 704(a)(8) and paragraphs (1), (2), and (6) of section 1106(a) of this title, including operating the business of the debtor." 11 U.S.C. § 1183(b)(5).

15.     In chapter 11 cases, "[w]hile there is a presumption that a debtor should be permitted to remain in possession of its business, that presumption is not absolute" and "is predicated on the assumption that the Debtor will carry out its fiduciary obligations." *Id*. at 640.

16.     And while the burden of proof to demonstrate "cause" to remove a debtor in possession and appoint a trustee "is by clear and convincing evidence, bankruptcy courts have wide discretion in considering the relevant facts and are not required to conduct a full evidentiary hearing in considering a motion for the appointment of a chapter 11 trustee." *Id*. at 641.

## V.  **ARGUMENT**

17.     There is substantial evidence of fraud, dishonesty, incompetence, and gross mismanagement in the Wooleys' conduct, both prepetition and post-petition, providing cause for the removal of the debtor in possession pursuant to section 1185 of the Bankruptcy Code.

---

[3] Given the recent enactment of Subchapter V, published caselaw or opinions addressing removal of a debtor in possession under section 1185 are scarce. Kemin is presently aware of only one such case, *In re Salubrio, LLC*, in which this Court removed the debtor in possession and ordered the Subchapter V Trustee to perform the duties set forth in section 1183(b)(5). *In re Salubrio*, LLC, No. 20-50578 (Bankr. W.D. Tex. June 15, 2020) (Order Granting Emergency Motion for Removal of Debtor in Possession) (Dkt. 151). Given the dearth of section 1185 caselaw, and the similarity of the language of section 1185 to the standard set forth in section 1104(a)(1), Kemin believes that it is appropriate to rely on caselaw appointing trustees under section 1104(a)(1) for guidance.

**A.**     ***The Wooleys' prepetition disregard of corporate requirements is cause for their removal.***

18.     The Purchase Agreement put several specific obligations and restrictions on EER. For example, EER was prohibited from using the additional $1,000,000 from Kemin for anything other than the Monthly Operating Expenses set forth in the Budget Plan. EER was obligated "to provide unrestricted access to all data necessary for the preparation of a Kemin-EER White Paper[.]" EER failed to meet these obligations.

19.     The Wooleys also failed to obtain the requisite "special vote or written consent by those Members holding a Super Majority of the Units" by failing to provide notice to and getting consent from Kemin[4] for multiple important prepetition actions. Without these three Members, even if every other Member had provided consent, there could be no Super Majority of Units.

20.     Section 6.03(c) of the Operating Agreement requires Super Majority consent for EER to "incur or permit the Company to incur any (i) Indebtedness (other than any Indebtedness in the ordinary court of business (including trade payables), or (ii) Indebtedness by means of a Member Loan." The Wooleys failed to get Super Majority consent prior to executing the Note Purchase Agreement (the "***Ara Note***" attached hereto as **Exhibit E**) between EER and Ara EER Holdings, LLC ("***Ara Holdings***") and related loan and security documents (collectively with the Ara Note, the "***Ara Loan Documents***"). Notwithstanding this failure to get consent from (or even provide notice to) Kemin,[5] EER provided representations and warranties to Ara that (i) EER had "full power to enter into execute, deliver and carry out this Agreement and the other Loan Documents" (Exhibit E at §5.1) and (ii) the execution of the Ara Note and Ara Loan Documents would not "conflict with, constitute a default under or result in any breach of . . . the terms and

---

[4] On information and belief, consent was also not obtained from Keresa or Robson.

[5] On information and belief, notice was also not provided to Keresa and Robson.

conditions of the certificate of formation, limited liability company agreement or other organizational documents of [EER.]" And the "Managers Certificate" dated January 14, 2020, and executed by John Wooley, contained a "Managers Certificate of Resolution" that expressly (and, upon information and belief, falsely) certified that "members owning more than 66.667% of the ownership units of [EER] have approved" the Ara loan transaction. (*See* Managers Certificate documents attached hereto as **Exhibit F**.) The Schedules disclose that Ara advanced $2,852,491 on or about January 13, 2020. (Dkt. 42, Schedule D) There has been no explanation for how EER dissipated almost three million dollars in less than 10 months.

21.     Section 6.03(a) of the Operating Agreement requires Super Majority consent for "voluntary (i) filing of bankruptcy proceedings or (ii) commencement of any liquidation, dissolution or winding up of [EER.]" The Wooleys again failed to provide any advance notice of this bankruptcy to Kemin[6], and filed the case without the consent of a Super Majority of the Units. Indeed, the Wooleys provided the Subchapter V trustee with a "Unanimous Written Consent of Managers" purporting to grant corporate authority for the bankruptcy filing. (*See* Unanimous Written Consent of Managers attached hereto as **Exhibit G**.) But the Operating Agreement explicitly provides that Managers simply do not have such authority.

22.     This blatant disregard by the Wooleys of EER's corporate governing document, to the detriment of EER's Members, warrants the appointment of a trustee for cause in this case. *See In re New Orleans Paddlewheels, Inc.*, 350 B.R. 667, 677–80 (Bankr. E.D. La. 2006) (appointing trustee where existing management "lacks the appropriate respect for the lines of authority in any corporate structure"). The defaults in the Operating Agreement are particularly compelling given the stated intent to assume the Operating Agreement. [Dkt. 42 at Schedule G.]

---

[6] On information and belief, notice was also not provided to Keresa or Robson.

**B.** *The Wooleys' post-petition actions only serve to demonstrate further cause for removal.*

23.    This case was filed a month ago.  EER is a debtor which has stated it is dependent on financing from Keresa.  EER began this case with a deliberate failure to disclose to Keresa the fact that EER filed bankruptcy.  Keresa does not appear on the creditor matrix.  It does not appear on any certificate of service—although EER claims to be in constant communication regarding an amended license agreement.  Robson isn't listed on the original matrix – although he is listed on in the schedules.

24.    Aside from the petition, the only substantive documents EER has filed have been two emergency motions seeking to allow EER to enter into unsecured insider loans, purportedly to pay payroll to its employees. It does not appear to have any meaningful or realistic pathway forward, absent significant financial support from Kemin, Keresa and/or Ara.  Kemin is willing to provide such support, but not with the Wooleys in control of EER or its checkbook. The employment of almost twenty people is dependent upon loans from investors and shareholders and the receipt of payments from Keresa pursuant to a contract (or an amended contract) which is not currently in existence and to which Keresa has not agreed. And that shaky foundation is not a basis for confirmation of a plan.

25.    EER's first emergency motion to pay prepetition payroll was filed on October 26, 2020, and stated that "the source of funds for the payroll are contributions from investors in the form of loans, convertible notes and equity infusions." [Dkt. 8, ¶16.] On October 29,2020, EER filed a motion to incur unsecured debt pursuant to 11 U.S.C. § 546. [Dkt. 19.] The order was entered on October 30, 2020, allowing EER to borrow $60,000 from the Wooleys in order to fund the October 31, 2020 payroll (the "*First Allowed Loan*"). [Dkt. 23.]

26.    A second emergency motion was filed on November 15,· 2020 (the "*Second Emergency Motion*"), again requesting an expedited hearing on an emergency basis to take on

two additional insider loans, to pay payroll and other "essential expenses." [Dkt. 39.]  Attached as

Exhibit 1 to the Second Emergency Motion was an "OnGoing Post Petition Chapter V Cash &

Budget" (the "*Emergency Budget*"), which raised a number of questions and red flags:

> (a)     EER was stated to have had a negative cash position at the time of filing, which contradicts the information provided with the petition, conflating an accrual of liabilities with a post-petition cash budget;
>
> (b)     The Emergency Budget has what appeared to be three post-petition loans made on October 21, 2020; however, the Schedules which were dated one day later (11/16/2020) discloses three loans allegedly made by the same entities on 10/15/2020.  These are described as "convertible notes" apparently issued without any notice to Kemin or other compliance with the Operating Agreement;
>
> (c)     EER apparently was seeking to "pay down" EER's overdrawn starting position, through an unauthorized clearance of pre-petition payments, including a payment to one or more of the Wooleys, which the Court did not approve;
>
> (d)     The Wooleys proposed to loan funds to EER in order to pay themselves substantial "consulting" fees, which the Court did not approve;
>
> (e)     The Emergency Budget provided for payment of legal fees that have yet to be requested or allowed, for counsel whose retention has not yet been requested or approved, which the Court did not approve;
>
> (f)     The Emergency Budget sought to pay an affiliate entity (EE-TDF) for reimbursement for the Controller services, which the Court did not approve; and
>
> (g)     The Emergency Budget sought approval for payment of numerous other expenses beyond payroll.

27.     There was a hearing on the Second Emergency Motion on November 16, 2020,

which did little more than highlight the incompetence of management and its willingness to

disregard the rules and procedures that must be followed in bankruptcy. For example, testimony

revealed that (i) certain of the expenses sought to be paid were actually prepetition expenses,

(ii) there were duplicative requests, and (iii) not all of the expenses sought to be paid were

4835-6049-7362.1

"essential" to operations. Kemin was also particularly troubled by EER's unsupported statements made under oath with respect to a purported new license agreement with Keresa.

28.    On November 16, 2020, the Debtor filed its Schedules of Assets and Liabilities (the "Schedules") and its Statement of Financial Affairs [Dkt. 42] (the "SOFA"). The misrepresentations continue in the Schedules and SOFA:

> (a)    On November 16, 2020, Mr. Carl Frampton testified that there was a pre-petition contract with an unidentified person related to Consultant Sales & Marketing which allegedly justified a payment of $2,850 a month.  The list of payments made in the 90 days prior to bankruptcy disclose consulting fees paid to Kenneth C. Rosco (10/18/2020) and Michael Bowers (9/17/2020 and 10/18/2020), and Hamilton Clark Sustainable Cap[7] (7/29/2020).  There are only 7 contracts listed on Schedule G and nothing resembles any consulting agreement;
>
> (b)    EER failed to list the License Agreement with Kemin, alleging at the November 17, 2020 hearing that Kemin is in "default" of its License Agreement. Kemin strongly disputes any default but regardless, an alleged default does not justify a failure to disclose the existence of the License Agreement;
>
> (c)    EER failed to list any contracts with Robson;
>
> (d)    There is no contract listed with EE-TDF Cleveland LLC;
>
> (e)    Beyond failing to disclose the existence of the License Agreement, EER also failed to disclose any causes of action or contingent claims against any third party, including Kemin;
>
> (f)    EER listed a "negative" cash position of $79,893.40 leaving the Court and the creditors to have no information regarding what pre-petition claims are included within this $79,893.40;
>
> (g)    EER asserts in Schedule A/B in one place that its "net book value" of its "intellectual property, including patents and design technology" is $16,000,000 but the "current value" (with absolutely no support) is $50,000,000.  Having failed to disclose one or more licenses as to such technology, it is impossible to determine the accuracy of either of these statements; and
>
> (h)    There is no mention of a claim by or payment with respect to the "Edelman Short Term Note" listed on the Balance Sheet as of September 30, 2020 filed with the Petition [Dkt. 2, p. 3].

---

[7] https://www.hamiltonclark.com/.

29.     All of these things are deeply concerning, and the failure to disclose material information to the Court regarding EER's financial condition, creditors, and contract counterparties is clear cause for removal of the debtor in possession and appointment of the trustee. *Sillerman*, 605 B.R. at 645 ("Noncompliance with court orders is conduct that . . . constitutes cause within the meaning of section 1104(a)(1)."); *see also*, *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D. N.Y. 1989) ("Where, as here, the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required.").

30.     Kemin is also troubled by the lack of information and cooperation received from EER to date. Kemin is aware that the Subchapter V trustee requested certain information and documentation from EER shortly after the October 31, 2020 hearing on EER's first emergency payroll motion. The Wooleys failed to provide any of the requested information until November 12, 2020, and the information that was eventually provided at that time was incomplete and confusing, consisting only of a single Excel file with a handful of sheets purporting to set forth certain financial information (the "***EER Production***" attached hereto as **Exhibit H**).

31.     The EER Production also raises a number of red flags regarding Wooleys' ability to act in a fiduciary capacity in connection with this bankruptcy proceeding:

    (a)     It appears that EER also violated § 6.03(c) of the Operating Agreement as a result of numerous loans it appears to have gotten from various different members, likely also without notice to or consent from a Super Majority of the Units (and certainly without notice to and consent from Kemin) (*See* EER Production at Tab 3.B Sources and Uses Excl ARA.);

    (b)     The Wooleys appear to have a negative balance of $249,531 on their collective equity position (*Id.* at Tab 3.B Sources and Uses Excl ARA, line 88);

    (c)     John Wooley is referred to as CEO and Jeff Wooley as In-House Counsel, which contradicts their "consulting" role as set forth in the Emergency Budget (*Id.* at Tab 3.C 120 Day Budget, lines 62 and 69);

    (d)     The Wooleys assert that they are owed $296,623.18 (*Id.* at Tab 4 AP Jeff and John Wooley) or $287,873.18 (Schedule F).  However, a closer examination of

the alleged debt apparently reveals that the majority of the alleged obligations to the Wooleys were incurred from 7/31/2017 to 10/3/2020 and were characterized as "Business Ops Commercialization" in amounts ranging from $15,000 to $17,500 a month.  It is unclear whether the "Business Ops Commercialization" were in addition to their monthly salaries.  According to EER, these obligations were offset by payments of $992,567.24.  Kemin has no information regarding the legitimacy of the alleged debts to the Wooleys or the authority for almost a million dollars in payments to the Wooleys;

(e)     An unknown, undisclosed entity "EE-TDF Cleveland LLC" is listed as having made an "Interco" loan or transfer and also appears to have transferred certain funds to the Wooleys to pay down certain purported "deferred comp" obligations, and preliminary investigation and testimony from Carl Frampton indicates that this entity is at least in part owned or controlled by one or more of the Wooleys (*Id*. at Tab 3.B Sources and Uses Excl ARA, line 24; Tab 4 EER John Wooley Deferred Comp; Tab 4 Jeff Wooley Deferred Comp). The SOFA discloses payments **to** EE-TDF Cleveland LLC and the Schedules list a debt of $51,586.83 **to** EE-TDF Cleveland LLC.  It appears that EE-TDF Cleveland LLC is loaning money to EER to pay the Wooleys and receiving money from EER;

(f)     The Wooleys appear to have freely transferred funds to and from EER with no oversight and at their sole discretion for the past three years (*Id*. at Tab 4 EER Wooley Advances and Tab 4 Wooley Loans);

(g)     The Wooleys have personally guaranteed $1,166,333.39 of EER's obligations, including a statutory guaranty of $174,309.66 in defaulted IRS payroll trust taxes (*Id*. at Tab 4 Wooley Personal Guarantees);

(h)     On Tab 4, there is a reference to "Investment NextBTL" with a "write-off" of $61,330 on December 31, 2018.  This allegedly reduced the "deferred comp" to John Wooley to zero.  On the same day, there is a similar entry of $91,497 to reduce Jeff Wooley's deferred comp obligations also to zero.  Kemin has no information on NextBTL the legitimacy of any payments, the accuracy of any alleged deferred compensation obligations or the authority to make such payments; and,

(i)     The SOFA at pg. 61 lists transfers within a year of the Petition Date of $461,946.99 to three insiders – Jeffery Wooley, John Wooley and Omeara Consulting LLC.[8]

32.     While difficult to parse through, the information contained in the EER Production

indicates that the Wooleys have been failing to disclose information to Members, causing EER to

---

[8] These transfers appear to violate certain provisions of the Ara Loan Documents that placed restrictions on the use of the loan proceeds.

take *ultra vires* actions, and paying themselves handsome salaries, "consulting" fees and transferring funds to related entities.  Given also the existing personal guarantees, the Wooleys appear to be hopelessly conflicted at this point. All of these factors warrant removal under section 1185. *See New Orleans Paddlewheels*, 350 B.R. at 677–80 (noting self-serving prepetition actions are cause for trustee); *see also In re Cajun Electric Power Coop., Inc.*, 74 F.3d 599, 600 (5th Cir. 1996) (stating conflicts of interest within members of debtor constitutes cause to appoint trustee).

33.     Finally, Kemin believes that it would be difficult or impossible for the Wooleys to get the requisite Super Majority consent of EER's Member Units for an exit to this bankruptcy proceeding, whether through sale or reorganization. (EER Operating Agreement § 6.03(f), requiring Super Majority consent to any Fundamental Business Transaction"), given the high level of acrimony (and pending litigation) between the Wooleys and various of the other Members. This also constitutes cause exists to remove the debtor in possession and authorize the Subchapter V trustee to manage the Debtor. *Cajun Electric*, 74 F.3d at 600; *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 472–73 (3d Cir. 1998) (finding cause to appoint trustee due to conflicts and acrimony between parties in interest).

WHEREFORE, Kemin Industries, Inc. respectfully requests that this Court enter an order (i) immediately removing the debtor in possession pursuant to section 1185, (ii) immediately ordering the Subchapter V trustee to perform the duties set forth in section 1183(b)(5), and (iii) granting such other relief as the Court determines to be necessary and appropriate.

4835-6049-7362.1

Dated:  November 19, 2020

Respectfully submitted,

**LEVENFELD PEARLSTEIN, LLC**
2 N. LaSalle Street, Suite 1300
Chicago, Illinois 60602
(312) 476-7650

By: */s/  Elizabeth B. Vandesteeg*
    Elizabeth B. Vandesteeg
    State Bar No. 6291426
    evandesteeg@lplegal.com

and

**DYKEMA GOSSETT PLLC**

    Deborah D. Williamson
    State Bar No. 21617500
    dwilliamson@dykema.com
    David A. Vanderhider
    State Bar No. 24070787
    dvanderhider@dykema.com
    Danielle N. Rushing
    State Bar No. 24086961
    drushing@dykema.com
    112 East Pecan Street, Suite 1800
    San Antonio, Texas 78205
    Telephone: (210) 554-5500
    Facsimile: (210) 226-8395

**ATTORNEYS FOR**
**KEMIN INDUSTRIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of November, 2020, a true and correct copy of the foregoing has been served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system and via first-class U.S. mail on the following:

**Counsel for the Debtor and Debtor in Possession**
Frank B. Lyon
Two Far West Plaza, Ste. 170
Austin, TX 78731

**Office of the U.S. Trustee for the Western District of Texas**
James Rose
615 E. Houston St., Rm. 533
San Antonio, TX 78205

**Subchapter V Trustee**
Eric Terry
Eric Terry Law, PLLC
3511 Broadway
San Antonio, TX 78209

**Counsel for Ara EER Holdings, LLC**
John Melko
Foley & Lardner, LLP
1000 Louisiana, Ste. 2000
Houston, TX 77002

**Counsel for SC Ventures, LLC**
Michael Shaunessy
McGinnis Lochridge LLP
600 Congress Ave., Ste. 2100
Austin, TX 78701

*/s/ Danielle N. Rushing*
Danielle N. Rushing

# EXHIBIT A

## THIRD AMENDED COMPANY AGREEMENT OF
## EE-TERRABON BIOFUELS, LLC,
### a Texas Limited Liability Company

This Third Amended Company Agreement (as may be amended, the "Agreement") of EE-Terrabon Biofuels LLC is made and entered into effective as of the _____31st_____ day of _____July_____, 2017 (the "Effective Date"), by and among the undersigned as listed on Exhibit A as the members (collectively, the "Members" and individually, a "Member"). When fully executed, this Agreement shall be substituted for and replace the Second Amended Company Agreement executed November 14, 2016.

### ARTICLE I
### DEFINITIONS

1.01  **Definitions.**  As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Third Amended Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or any Units of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent a Simple Majority consents otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Summary Business Plan and Budget" means the summary plan and budget for operating the Company during the 2-year period immediately following the Effective Date copy of which is attached hereto as Exhibit "B."

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Units" means those Units of membership interest in the Company.

"Company" means EE-Terrabon Biofuels, LLC, a Texas limited liability company.

"Convertible Securities" means any obligations, evidences of indebtedness or other securities or interests (other than Options) directly or indirectly convertible or exchangeable into Units or other Equity Securities in the Company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Equity Security" means (i) Units or other equity interests in the Company (including other classes or groups thereof having such relative rights, powers and duties as may from time to time be established by the Company in accordance with this Agreement, including rights, powers and/or duties junior, pari passu or senior to existing classes and groups of Units and other equity interests of the Company), (ii) stock appreciation rights, phantom stock rights or other rights with equity features, (iii) Options or warrants to acquire Units or other equity interests in the Company, and (d) Convertible Securities.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however,

this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's assets (with or without good will), other than in the usual and regular course of the Company's business including, but not limited to, either (i) the sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the business or assets of the Company or (ii) a transaction or series of transactions (including by way of merger, consolidation, recapitalization, reorganization or transfer or issuance of stock, and including but not limited to via an initial public offering), the result of which is that the Members immediately prior to such transaction (or their affiliates or ancestors, descendants, siblings or spouses or trusts for the benefit of any of such members and/or any of the foregoing) are, after giving effect to such transaction, no longer, in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d 3 and Rule 13d 5 promulgated under the Securities Exchange Act of 1934, as amended), directly or indirectly through one or more intermediaries, of more than fifty percent (50%) of the voting power of the units or other voting securities of the surviving entity of such transaction.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Indebtedness" means at a particular time, without duplication, (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than retainages, trade payables and other current liabilities incurred in the ordinary course of business), (iv) any commitment by which a Person assures a creditor against loss (including contingent reimbursement obligations with respect to letters of credit) and (v) any guarantee of any of the foregoing obligations owed by another Person (other than a wholly-owned subsidiary of the Company).

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, and any successor statute, as amended from time to time.

"Key Holder" shall mean any Member (and not a transferee or other Assignee) holding Units in excess of 500,000 Units.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company

3

as provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Member Loan" means the loan by a Member of funds to the Company.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any Indebtedness to which the asset is subject when contributed.

"Option" means any warrant, option or other right to subscribe for or purchase or acquire Units or other Equity Securities in the Company.

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Substituted Member" means a Person approved to become a Member of the Company in accordance with all of the requirements of Section 13.04 hereof.

"Simple Majority" means greater than one-half (1/2) of the Units.

"Super Majority" means greater than two-thirds (2/3) of the Units.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of any Units, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01 **Formation.** The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

2.02 **Name.** The name of the Company is "EE-Terrabon Biofuels, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

2.03 **Registered Office and Registered Agent**. The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04 **Principal Office and Other Offices.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas. The Company may have such other offices as the Managers may designate from time to time.

2.05 **Purposes.** The primary purposes of the Company shall be any lawful purpose which may be undertaken by the company in accordance with the applicable provisions of the Texas Business Organizations Code.

2.06 **Powers.** The Company shall, subject at all times to the terms of this Agreement, have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08 **Term.** The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09 **Mergers and Exchanges.** The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

5

2.10 **No State-Law Partnership.** The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

2.11 **Summary Business Plan and Budget.** The Company has adopted a Summary Business Plan and Budget and each Member hereby acknowledges that a Material Change to the same is controlled by this Agreement.

## ARTICLE III
## MEMBERSHIP

3.01 **Initial Members, Capital Commitments, and Units.** The membership interests in the Company shall be represented by Units, which shall have the rights, preferences, powers, qualifications, limitations and restrictions set forth in this Agreement and, subject to the restrictions set forth in Article VI and elsewhere in this Agreement. The persons listed on Exhibit A have each been admitted to the Company as a Member, effective as of or prior to the Effective Date of this Agreement. Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Contribution and/or outstanding Capital Commitment, as well as the number of Units, held by such Member. Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company in accordance with the requirements of this Agreement. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company. Each Member represents that the Member has acquired and/or is acquiring such Member's Units of the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws. No Member will transfer any Units or any interest therein in contravention of that act or any applicable state or federal securities laws.

3.02 **Additional Members.** Additional persons may be admitted to the Company as Additional Members only on such terms and conditions as shall be determined and consented to in writing by those Members holding a Simple Majority of the Units. The terms of admission or issuance must specify the Units and the Capital Commitments applicable thereto. The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties, if and to the extent consented to in writing by those Members holding a Simple Majority of the Units.

3.03 **Member Rights Specified in Agreement.** Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04 **No Authority.** Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

6

3.05 **Liability to Third Parties.** No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.06 **No Right to Withdraw.** No Member is entitled to withdraw from the Company prior to the Company's dissolution pursuant to Article XVI of this Agreement. Without limiting the generality of the foregoing, prior to the Company's dissolution pursuant to Article XVI of this Agreement, no Member shall be entitled to: (i) withdraw any part of the amounts in its Capital Account from the Company; (ii) demand a return of the amounts in its Capital Account; or (iii) receive property other than cash in return for the amounts in its Capital Account.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.01 **Initial Contributions.** Prior to or contemporaneously with the execution of this Agreement, each Member has made the Capital Contributions set forth such Member's name on Exhibit A to this Agreement.

4.02 **No Further Contributions.** No Member shall be required to make any additional Capital Contributions other than those specifically described by this Agreement (to restore a negative Capital Account balance or otherwise), unless agreed to in writing by the contributing Member or required by the TBOC.

4.03 **Return of Contributions.** No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unpaid Capital Contribution is not a liability of the Company or of any Member.

4.04 **Members Loans.** Member Loans shall not be considered Capital Contributions and if any Member shall make a Member Loan pursuant to this Agreement, the making of such loan shall not result in any increase in the amount of the Capital Account of such Member. The amount of any Member Loan shall be a debt of the Company to the Member making such Member Loan and shall be payable or collectible in accordance with such commercially reasonable terms and conditions as agreed to by the Member making the Member Loan and the Company. Any Member Loan bears interest at the General Interest Rate from the date of the advance until the date of payment.

4.05 **Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in

7

Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one membership interest (including Units of multiple classes) shall have a single Capital Account that reflects all its membership interests, regardless of the class of membership interests owned by that Member and regardless of the time or manner in which those membership interests were acquired. On the transfer of all or part of a membership interest, the Capital Account of the transferor Member that is attributable to the transferred membership interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

4.06 **Preemptive Rights**.

(a)       Except for Excluded Issuances (as defined below), if the issuance of any Equity Securities is authorized pursuant to the terms of this Agreement following the Effective Date, the Company shall, not less than twenty (20) days prior to any issuance, offer, by written notice (an "Issuance Proposal Notice"), to sell to each Member, a portion of such Equity Securities equal to the quotient determined by dividing (i) the number of Units then held by such Member by (ii) the number of all issued and outstanding Units (the "Ratable Portion"). The Issuance Proposal Notice shall describe the terms of the offering in reasonable detail, including the Equity Securities offered, the price and other terms of sale, the identity of the proposed purchasers, and such Member's Ratable Portion. Each Member shall be entitled to purchase such Equity Securities at the price and on the terms set forth on the Issuance Proposal Notice.

(b)       In order to exercise its purchase rights hereunder, a Member must deliver a written notice to the Company (which notice the Company shall promptly deliver to each other Members) describing its irrevocable election hereunder within thirty (30) days after receipt of the Issuance Proposal Notice from the Company; *provided, however*, that any such election may be subject to the consummation of the sale of the Equity Securities described in the Issuance Proposal Notice on the terms set forth therein.

        (c)     Upon the expiration of the offering period described above, the Company shall be entitled to sell such Equity Securities which the Members have not elected to purchase during the one hundred eighty (180) calendar days following such expiration at a price not less and on other terms and conditions no more favorable to the purchasers thereof than that offered to the Members. Any Equity Securities offered or sold by the Company after such 180-day period must be reoffered to the Members pursuant to the terms of this Section 4.06.

        (d)     For purposes of this Section 4.06, "Excluded Issuances" means (i) issuances of Equity Securities pursuant to an acquisition of another corporation or business (whether by merger, purchase of assets or equity, recapitalization or reorganization) approved pursuant to Article VI, and (ii) Equity Securities issued in connection with any split, unit dividend, or reclassification of Units; (iii) each authorized or planned issuance of Equity Securities described in Exhibit B "Summary Business Plan and Budget" attached hereto and in Article VI.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

     5.01A  **Allocations of Profits and Losses**. Profits and losses of the Company shall be determined annually. Except as otherwise expressly provided herein, profits and losses of the Company shall be allocated and shared between or among the Members and transferees in accordance with their relative Units.

     5.01  **Allocations.**

        (a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Units.

        (b) All items of income, gain, loss, deduction, and credit allocable to any Units that are transferred during a calendar year shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning those Units, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

        (c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this Section 5.01(c) were not in this Agreement.

## 5.02 **Distributions.**

(a)     **Tax Distributions**. To the extent cash flow permits and as permitted under any contracts in respect of Indebtedness to which the Company is a party, and as reasonably determined by the Managers, the Company shall make annual cash distributions to Members, on a pro rata basis in accordance with their Units, in amounts no less than the approximate federal and state income tax liability attributable to the Company's taxable income for the subject tax year. Notwithstanding the foregoing, Member distributions shall only be paid to the extent allowed by law. Distributions required to be made under this Section 5.02(a) shall be made prior to, and irrespective of whether, any distributions under Section 5.02(b) and/or 5.02(c) are made. Notwithstanding anything else in this Section 5.02, no distributions under this Section 5.02(a) are required to be made to any Member with respect to any allocated or allocable taxable income or gain (including for this purpose any guaranteed payments on capital not treated as an allocated item of income or gain) arising in connection with a Fundamental Business Transaction or a Sale of the Company.

(b) **Distribution of Excess Cash**. From time to time (but at least once a year) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve. If such an excess exists, the Managers shall cause the Company to distribute to the Members, in accordance with their Units, an amount in cash equal to that excess.

(c) **Other Distributions**. From time to time the Managers also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Units and may be made subject to existing liabilities and obligations. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

## 5.03 Distributions on Liquidation or Fundamental Business Transaction.

With respect to any distribution in connection with or following an event resulting in the liquidation and winding up of the Company pursuant to Article XVI or a Fundamental Business Transaction, or any distribution of cash, securities or other assets pursuant to a Fundamental Business Transaction (whether pursuant to the terms of a merger or consolidation, unit purchase or otherwise), such distribution shall be made in the following order of priority:

(a)     To Company creditors, including Members, transferees and Managers who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company, whether by payment or by the making of reasonable provision for payment, other than liabilities to Members for distributions under Section 101.207 of the TBOC;

(b)     To Members, transferees and former Members in satisfaction of liabilities for distributions under Section 101.207 of the TBOC;

(c)    Between or among the Members and transferees in accordance with the relative balances of their positive Capital Accounts until the Capital Accounts of all of the Members and transferees have been reduced to zero; and

(d)    Any remaining distributions, if any, between or among the Members and transferees in accordance with their relative Units.

Notwithstanding the foregoing sentence, such distributions shall in all events be made in accordance with Treasury Regulations § 1.704-1(b)(2)(ii)(b)(2). For purposes of this Section 6.2, the Capital Accounts shall be determined after allocating all profits and losses under this Agreement through the date of the distribution. Furthermore, notwithstanding the foregoing, in no event shall any distributions (other than distributions pursuant to 5.02(a)) be made to any unvested Units or other unvested Equity Securities of the Company pursuant to this Section 5.03. Whenever a distribution provided for in Sections 5.02 or 5.03 shall be payable in property other than cash, the value of such property shall be deemed to be the fair market value of such property.

## ARTICLE VI
## MANAGEMENT

6.01 **Management by Managers.** Except for situations in which the approval of the Members is required by this Agreement or by nonwaivable provisions of applicable law, and subject to the provisions of Sections 6.02, 6.03, and 6.04 of this Agreement and other provisions hereof providing for approval rights of the Members, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

(b) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(c) maintaining the assets of the Company in good order;

(d) collecting sums due the Company;

(e) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f) acquiring, utilizing for Company purposes, and disposing of any asset of the

Company;

11

(g) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(h) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(i) obtaining insurance for the Company;

(j) determining distributions of Company cash and other property as provided in Section 5.02 of this Agreement;

(k) establishing a seal for the Company; and

(l) designating one or more committees, each of which shall be comprised of one or more Managers, to exercise any authority of the Managers in the management, business and affairs of the Company.

6.02 **Certain Restrictions.** Notwithstanding the provisions of Section 6.01 of this Agreement, the Managers may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

(a) enter into a Fundamental Business Transaction, without complying with the applicable procedures set forth in the TBOC regarding approval by the Members (unless such provision is rendered inapplicable by another provision of applicable law);

(b) do any act in violation of this Agreement;

(c) admit a Member, except as expressly permitted by this Agreement;

(d) do any act which requires the prior approval of the Members;

(e) possess Company property or assign rights in Company property, other than for a Company purpose; or

(f) amend this Agreement, except as expressly permitted by this Agreement.

6.03 **Matters Requiring Consent of Super Majority of Units**. Notwithstanding anything contained herein to the contrary, the Company shall not undertake any of the following actions, or commit to undertake any of the following actions (directly or indirectly, including by operation of merger), without the special vote of or written consent by those Members holding a Super Majority of the Units:

(a)     voluntary (i) filing of bankruptcy proceedings or (ii) commencement of any liquidation, dissolution or winding up of the Company;

(b)     amend any provision of this Agreement;

12

(c)     incur or permit the Company to incur any (i) Indebtedness (other than any Indebtedness incurred in the ordinary course of business (including trade payables), or (ii) Indebtedness by means of a Member Loan;

(d)     authorize or create or issue or obligate itself to issue any securities or rights to participate in the equity or ownership of the Company (other than the Units issued and outstanding as of the Effective Date of this Agreement plus additional units at $2.56 or more per unit to complete the Summary Business Plan and other issuances identified in 3.3 (a) of the Schedule of Exception and for purposes described in section 3.3 (a) of the Schedule of Exceptions);

(e)     issuance of any distributions to any Members of the Company, other than distributions pursuant to Section 5.02(a);

(f)     approve or consummate or otherwise undertake or obligate the Company to undertake a Fundamental Business Transaction;

(g)     approve or consummate any sale or exclusive license of a material portion of the Company's assets;

(h)     acquire or agree to acquire any material business, whether by purchase of assets, merger, consolidation or otherwise; or

(i)     modify the number of Managers of the Company.

**6.04 Matters Requiring Unanimous Consent of the Key Holders; 80 Percent of the Key Holders.** Notwithstanding Section 6.03 or any other provision contained herein to the contrary, the Company shall not undertake or commit to undertake any of the following actions without: (i) on or before the first anniversary of the Effective Date, the unanimous affirmative vote of or written consent of the Key Holders; or (ii) following the first anniversary and on or before the second anniversary of the Effective Date, the unanimous affirmative vote of or written consent of 80 percent of the Key Holders:

a. A Material Change to the Summary Business Plan and Budget. A "Material Change" shall mean any change, action or development that, individually or together with any other event change, development, or occurrence, could result in an additional financial outlay or other commitment of the Company equal to 10% of the total of all budgetary items identified on the Summary Business Plan and Budget (attached hereto) as of the Effective Date. For the avoidance of doubt, if the Company approves or consummates any sale or exclusive license of a material portion of the Company or the Intellectual Property, it will be considered a Material Change. The parties agree that if

13

b.  Voluntary (i) filing of bankruptcy proceedings or (ii) commencement of any liquidation, dissolution or winding up of the Company; or

c.  Approve or consummate or otherwise undertake or obligate the Company to undertake a Fundamental Business Transaction

d.  Issuance of warrants at strike prices of less than $2.56 per unit in excess of the number indicated in section 3.3 (a) of the Schedule of Exceptions.

e.  Sell or license a material part of the business assets of intellectual property.

6.05 **Conflicts of Interest**. Each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member, Manager or officer the right to participate therein. The Company may transact business with any Manager, Member, officer or Affiliate thereof, provided the contract or transaction is fair to the Company as of the time it is authorized or ratified by Managers or Members, as the case may be.

6.06 **Number of Managers and Term of Office.** The number of Managers of the Company as of the Effective Date of this Agreement shall be three (3) subject to change from time to time by resolution of the Managers with the prior written consent of those Members holding a Super Majority of the Units; provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers. Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal. Managers need not be Members or residents of the State of Texas. The names of the Managers as of the Effective Date of this Agreement are set forth on Exhibit C attached hereto.

The Managers shall be elected by cumulative voting as follows: each Member shall have a number of votes equal to their Units multiplied by the number of Managers to be elected at the meeting; each Member shall be entitled to cumulate his votes and give all thereof to one nominee or to distribute his votes in such a manner as the Member determines among any or all of the nominees. The nominees receiving the highest number of votes, up to the total number of Managers to be elected at the meeting shall be the successful nominees.

6.07 **Vacancies; Removal; Resignation.** Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled by election at an annual or special meeting of Members called for that purpose. A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office. At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by a Super Majority of the Units. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the

remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.08 **Compensation**. For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to time by a Simple Majority of the Members

6.09 **Reimbursement**. The Managers are not required to advance any funds to pay costs and expenses of the Company. However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities.

6.10 **Meetings.**

(a) Unless otherwise required by law or this Agreement, two Managers shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. The Company shall allow a designated representative of a Member that holds in excess of 500,000 Units (a Key Holder) to attend meetings of the Managers in a nonvoting capacity and, in connection therewith, to receive notices of the same (the "Observer's Right"); provided, however, the Company reserves the right to exclude each such representative from access to any material or meeting or portion thereof if the Company believes upon advice of counsel that such exclusion is reasonably necessary to preserve the attorney-client privilege, to protect highly confidential information or for similar confidentiality or strategic purposes. The decision of the Managers with respect to the privileged or confidential nature of such information shall be final and binding.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

15

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 48 hours' notice to each other Manager and the Members. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.11 **Approval or Ratification of Acts or Contracts by Members.** The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.12 **Action Without Meeting**. Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this Section. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.13 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 **Confidential Information**. Each Member acknowledges that its right to access information and records of the Company shall be limited to the extent required pursuant to Sections 101.501 or 101.502 of the TBOC. Each Member further acknowledges and agrees that the Company holds trade secrets, intellectual property, business plans, design plans, financial information, and other information that is highly confidential ("Confidential Information"), the release of which may be damaging to the Company or a person with which it does business. The Managers may from time to time elect to disclose Confidential Information to the Members and each Member agrees that its receipt of Confidential Information (including any information reasonably understood to be proprietary, confidential or designated as such or that has been identified as being proprietary and/or confidential or that by the nature of the circumstances surrounding the disclosure or receipt ought to be treated as confidential), if any, shall be held in strict confidence and each Member further covenants that he, she or it shall not disclose the Confidential Information to any person, except for disclosures (i) compelled by law, but the Member must notify the Managers in advance of such disclosure so as to provide the Company adequate opportunity to review and contest and otherwise seek protective order of the same in connection therewith, (ii) to professional advisors of the Member but only if the recipients have agreed to be bound by the provisions of this Section and only for the limited purpose of providing tax planning or legal advice to the Member, or (iii) of information that has become generally available to the public through no act or omission of the Member. Managers may condition any disclosure of Confidential Information to a Member on the Member's execution and delivery to the Company of a commercially reasonable non-disclosure agreement and otherwise establish protocols on a case by case basis with respect to disclosing Confidential Information. For the avoidance of doubt, the Confidential Information shall at all times remain the sole and exclusive property of the Company.

7.02. **Specific Performance**. The Members acknowledge that breach of the provisions of Section 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of Section 7.01 of this Agreement may be enforced by specific performance.

## ARTICLE VIII
## MEETING OF MEMBERS

8.01 **Meetings.**

(a) A quorum shall be present at a meeting of Members of the holders of a Simple Majority of the Units; are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Units is required by the TBOC or this Agreement, the affirmative vote of the holders of a Simple Majority of the Units at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to Section 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority of the Units shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority of the Units. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Units of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in Section 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

8.02 **Voting List**. The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Units held by each. For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or

principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

8.03 **Voting Power**. For purposes of any votes and/or consents of the holders of the Units required pursuant to this Agreement, the TBOC or other applicable law, each Unit shall be entitled to one (1) vote; provided, however, that a transferee shall have no voting interest whatsoever in the Company (unless and until such transferee is duly admitted as a Substituted Member pursuant to this Agreement).

8.03 **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.

8.05 **Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Manager (or representative thereof) designated by those Members holding a Simple Majority of the Units represented at the meeting. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.06 **Action by Unanimous Written Consent Without Meeting**.

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of the Members or committee members, as the case may be, setting

19

forth the action so taken. No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, the signed consent or consents are delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers. Every written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

8.07 **Action by Telephone Conference or Other Remote Communications Technology**. Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE IX
## OFFICERS

9.01 **Qualification**. The Managers may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Texas, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular officers. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific

2-2-17                                                                Updated for Closing 6-22-17

delegation of authority and duties made to such officer by the Managers pursuant to this Section. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers. Any number of offices may be held by the one person.

9.02. **Compensation**. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers. However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03. **Resignation**. Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04. **Removal**. Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

## ARTICLE X
## INDEMNIFICATION

10.01 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

21

10.02 **Advance Payment.** The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under Section 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that s/he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03 **Indemnification of Officers, Employees and Agents.** The Company, by adoption of a resolution of the Managers, may indemnify and advance expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

10.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05 **Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to Section 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

10.06 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

10.07 **Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08 **Savings Clause.** If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

11.01 **Tax Returns.** The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section 11.02 of this Agreement. Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02 **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and

records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of Units as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

Neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

11.03 **"Tax Matters Partner."** By the consent of the holders of a Simple Majority of the Units, the Members shall designate a "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Sections 6222 through 6232 of the Internal Revenue Code without the consent of a Simple Majority, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company.

12.02 **Accounts.** The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

## ARTICLE XIII
## TRANSFERS

13.01 **Limited Right to Transfer.** No Member or Assignee shall make any Transfer of all or any of its Units, whether now owned or hereafter acquired, except (a) with the consent of the holders of a Simple Majority of the Units; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by Subsection 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by Section 16.03 of this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company

other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*. Notwithstanding the foregoing, a Member may collaterally assign any or all of the Member's rights and interests under this Operating Agreement to one or more lenders (or to an agent on behalf of such lenders) of the Member or any of its affiliates without the prior written consent of the Company or its Mangers or Members; provided, however, that any such Member that collaterally assigns its rights and interests under this Operating Agreement shall remain liable for the performance of all of the Members' obligations under this Operating Agreement.

(a) For the avoidance of doubt, in no event shall the pledgee or other Assignee of Units have access to the Confidential Information;

(b) Each Member shall at all times: keep the Confidential Information in its possession (or provided to the Member), if any, in an isolated and secure location and immediately notify the Company of any default of the obligations collateralized by the Units or exercise by the Member's pledgee or any other secured lender of foreclosure or other remedies against collateral; keep written record of and, upon demand by Company, identify for the Company the location of the Confidential Information; and, upon demand, immediately deliver to the Company all Confidential Information in its possession (or provided to the Member) and cooperate in all respects with the Company in protecting the Confidential Information from any unauthorized disclosure, access to, transfer or use of, and return to the Company of, the Confidential Information.

13.02 **Rights of an Assignee**.

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company. The Units of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that a Member has an outstanding but unpaid Capital Commitment and such Member's Units become held by an Assignee, the assignor-Member and its Assignee shall be jointly and severally liable for the outstanding but unpaid Capital Commitment (together with interest accrued thereon) in connection with the Units held by Assignee. If the assignor-Member or Assignee does not make such the Capital Contribution to satisfy such Capital Commitment in accordance with the provisions of this Agreement, then the assignor-Member and Assignee shall be treated as being in Default. In the event that one or more new Members are admitted into the Company, or one or more existing Members receive additional Units, no consent or other action on the part of such Assignee shall be required, except that admissions of new Members and issuances of additional Units shall nonetheless remain subject to the approval rights of the holders of a Super Majority of the Units as set forth in Section 6.03 of this Agreement.

13.03 **Legal Opinion**. For the right of a Member to transfer any Units or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must

receive an opinion from legal counsel acceptable to a majority of the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations. The Managers, by majority consent, however, may waive the requirements of this Section.

13.04  **Admission as Substituted Member**.  An Assignee has the right to be admitted to the Company as a Substituted Member with the Units and the Capital Commitment so transferred to such person, in the event that:

(a)      the Member making such Transfer grants the Assignee the right to be so admitted;

(b)      such Transfer is consented to by the holders of a Simple Majority of the Units; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Units and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Units of part thereof is transferred (which together must total the Units and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05  **Transfer to Existing Member**.  In the event of a Transfer to an existing Member that is approved pursuant to the Terms of this Article XIII, the existing Member shall be automatically deemed to be a Substituted Member with respect to the Units (and associated Capital Commitments) acquired pursuant to such Transfer.

13.06  **Third Party Offer**.  In the event a Member desires to sell all or any portion of its Units to another Person (including but not limited to another existing Member), the selling Member shall first offer to sell the Units to the other existing Members. Upon the receipt of an offer from a Third Party to purchase such Units, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members. Each Member will have thirty (30) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Units upon the terms and conditions of the Third Party offer. If more than one other Member desires to purchase the Units, each of the purchasing Members shall purchase a portion of the Units that is proportional to such purchasing Member's Units as compared to the aggregate Units held by all purchasing Members. If none of the other Members give notification within thirty (30) days of an intention to purchase the Units, then the selling Member shall be

permitted to sell the Units to the Third Party upon the terms and conditions of the Third Party offer.

13.07 **Reasonable Expenses**. The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in Section 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

## ARTICLE XIV
## BUYOUT OF A MEMBER'S UNITS

14.01 **Termination of Marital Relationship**.

(a) If the marital relationship of a Member who is a natural person is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Units (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Units or as a trustee of a trust holding such Units, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Units to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of the Member or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Units at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Units of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Units at Fair Value held in such trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Units for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02 **Death of Member**. Commencing upon the death of a Member that is a natural person, the surviving Members shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Units at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of the holders of a Simple Majority of the Units. Upon the expiration of ninety (90) days after the death of a Member, the Company shall be obligated to purchase all, and not less than all, of the deceased Member's Units at Fair Value which the surviving Members do not elect to purchase pursuant to the option granted in the preceding sentence. The Assignee (which may include spouse

and executors or administrators of the deceased Member) shall sell all of the deceased Member's Units to the Company and/or the other Members in accordance with the option or obligation established by this Section.

14.03 **Bankruptcy of Member.** If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Units at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the holders of a Simple Majority of the Units. In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its Units to the Company as provided by this Article.

14.04 **Insufficient Surplus.** If the Company shall not have sufficient surplus to permit it lawfully to purchase the Units under Sections 14.01, 14.02 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Units to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Units.

14.05 **Option by Other Members**. If the Company fails or declines to exercise an option to purchase Units of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Units in such proportions as they mutually agree or in proportion to their respective Units as compared to the Units held by all Members for the same price and upon the same terms available to the Company.

14.06 **Exercise of Option**. Any option to purchase Units as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07 **Determination of Fair Value**. For purposes of this Article XIV, the "Fair Value" of Units shall be the amount that would be distributable to the Member holding such Units in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Units pursuant to this Agreement. In the event that the Fair Value of any Units is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of Units.

14.08 **Fees and Expenses of Appraiser**. In the case of a purchase and sale of Units under Section 14.01 or 14.02 of this Agreement (in the event of death or divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company. In the case of a purchase and sale of Units under Section 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09 **Right to Withdraw Option**. In the event that a Member has exercised an election to purchase Units under this Agreement and Fair Value has been determined as provided by Section 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee. In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Units (or portion thereof) in such proportions as they mutually agree or in proportion to their Units as compared to the total number of Units held by all such Members.

14.10 **Terms of Purchase**.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Units.

(b) Payment of the purchase price for the Units may be made by the Company and/or the other Members as follows: (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Units will transfer the Units free and clear of any liens or encumbrances, other than those which may have been created to secure any Indebtedness or obligations of the Company.

(d) In each event that Units of the Company are purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Units of the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without

limitation, any Units, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members. The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this Section.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.** If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies, with the exercise of any particular remedy subject to the prior written approval of the holders of a Simple Majority of the Units (provided that if a Member is the Defaulting Member, the Units shall not be considered in the numerator of the denominator of the calculation for determining whether approval of the holders of a Simple Majority of Units has been reached):

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members on a pro rata basis in proportion to each such Member's Units as compared to the aggregate Units held by all such Members or in such other percentages as they may agree (the "Lending Member", whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Units, as more fully set forth in Section 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas; in this regard, each Member grants to the Company a valid security interest upon such Member's Units (whether now or hereafter acquired) and all proceeds therefrom to secure performance of payment of all Capital Contributions due the Company from the Member;

(d) a forced sale of the Defaulting Member's Units at Fair Value and upon the terms of purchase as provided in Article XIV; or

(e) exercising any other rights and remedies available at law or in equity.

15.02 **Compromise or Release.** The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the holders of a Simple Majority of the Units. Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.03 **Expulsion.** A Member may be expelled from the Company, via forced sale of such Members Units at Fair Value, by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01 **Event Requiring Termination.** The Company shall begin to wind up its affairs upon the first of the following to occur:

31

(a) the execution of an instrument approving the termination of the Company by the holders of a Super Majority of the Units;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member, or the legal representative or successor's designee, agrees to continue the Company and to become a Member as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company; or

(d) the occurrence of a nonwaivable event under the terms of the TBOC which requires the Company to be terminated.

16.02 **Business May Be Continued.** Except as provided in Section 16.01(b) of this Agreement, any event that terminates the Company, shall not terminate the Company if the holders of a Simple Majority of the Units agree to continue the business of the Company, within ninety (90) days after the date of termination. If ninety (90) days have expired, the Members must amend the Certificate of Formation during the three (3) year period following the event of termination, to exclude the event of termination, as applicable.

16.03 **Purchase of Former Member's Units.** Upon an event requiring winding up as provided in Section 16.01 of this Agreement where a Simple Majority of the Units agrees to continue the business of the Company pursuant to Section 16.02, the Company's books shall be closed upon the date of such event, so as to determine the value of each Former Member's Units on the date on which each Former Member's financial interest in the Company was terminated. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Units at Fair Value (as determined by Section 14.07 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement. For purposes of this Section 16.03, "Former Member" shall mean any Member that seeks a judicial dissolution of the Company and prevails in receiving a final, binding judicial order of dissolution.

16.04 **Liquidation.** As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in Section 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed to the Members as follows:

(i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii) Company property shall be distributed among the Members in accordance with Section 5.03(a).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

16.05 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members on a pro rata basis in proportion to their respective Units as compared to all outstanding Units, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

16.06 **Certificate of Termination.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons

as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

17.01  **Amendment or Modification.**  Subject to Section 17.02 below, this Agreement may be amended or modified from time to time only with a written instrument executed by the holders of a Super Majority of the Units.

17.02  **Special Provisions for Certain Amendments or Modifications.**

(a) An amendment or modification increasing a Member's Capital Commitment is effective only with that Member's consent.

(b) An amendment or modification reducing the required percentage of Units or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the percentage of Units or other measure theretofore required.

(c) An amendment or modification made solely to reflect the admission or withdrawal of a Member (such as to Exhibit A) need not be approved by any Member if the requirements set forth in this Agreement with respect to the admission or withdrawal of the Member are otherwise satisfied.

(d) An amendment or modification of the Observer's Right set forth at Section 6.10(b) shall be effective only with the consent or vote of the Members entitled to such right.

## ARTICLE XVIII
## GENERAL PROVISIONS

18.01  **Construction.**  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Managers in the plural should also be construed as singular.

18.02  **Offset.**  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03  **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other

34

Members. Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

> Box 2185
> Canyon Lake, TX 78133

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

18.04  **Entire Agreement; Supersedes Other Agreements.**  This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

18.05  **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

18.06  **Binding Effect.**  Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns. However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

18.07  **Governing Law.**  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

18.08  **Severability.**  If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

18.09  **Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

18.10 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11 **Indemnification.** To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) that may incur on account of any breach by that Member of this Agreement.

18.12 **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

18.13 **Waiver of Jury Trial Rights**.
EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY AND ANY LEGAL PRODCEEDING (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01 **Compliance with Regulation D of the Securities Act of 1933**. THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS. THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02 **Notice to Members.** By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Units set forth in this Agreement, and all of the provisions of the Certificate of Formation. Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03 **Limitation of Liability**. Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer,

accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services.  By executing this Agreement, each Member hereby acknowledges the disclosure contained in this Section.

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**

KEMIN INDUSTRIES, INC.

Printed Name:

**MEMBER:**

Printed Name:

CHRISTOPHER E. NELSON

38

2-2-17                                           Updated for Closing 6-22-17

IN WITNESS HEREOF, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                              **MANAGER:**

_____                   _____
John C. Wooley                            Jeffrey J. Wooley

**MANAGER:**


_____
Graeme Brown

**MEMBER:**                               **MEMBER:**

_____                   _____
Printed Name:                             Printed Name:

Jeffrey J. Wooley, Trustee                John C. Wooley, Trustee

38

Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**

Printed Name:

David C Craig

**MEMBER:**

Printed Name:

LINDA B. CRAIG

38

4835-6049-7362.1

2-2-17                                                    Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                              **MANAGER:**

_____                   _____

John C. Wooley                            Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                               **MEMBER:**

_____                   _____

Printed Name:                             Printed Name:

Steve Robison                             _____

38

**IN WITNESS HEREOF,** the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                          **MANAGER:**

_____              _____

John C. Wooley                        Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                           **MEMBER:**

_____              _____

Printed Name:                         Printed Name:

Steve Robson                          _____

38

2-2-17                                                    Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                **MANAGER:**

_____                    _____

John C. Wooley                             Jeffrey J Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                 **MEMBER:**

_____                    _____

Printed Name:                              Printed Name:

  Phyllis Findley, Trustee                 _____

38

4835-6049-7362.1

2-2-17                                                              Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                    **MANAGER:**

_____                _____

John C. Wooley                                  Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                     **MEMBER:**

_____                _____

Printed Name:                                   Printed Name:

Wesley P. Graff                                 _____
PENSCO Trust Company
Custodian FBO
Wesley P. Graff, IRA

38

4835-6049-7362.1

2-2-17                                                      Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                      **MANAGER:**

_____                  _____
John C. Wooley                                    Jeffrey J. Wooley

**MANAGER:**

_____
Graeme Brown

**MEMBER:**                                       **MEMBER:**

_____                  _____
Printed Name:                                     Printed Name:

KEPLER PLANTATIONS SDN BHD        Waddell Holding Ltd

38

2-2-17                                                      Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                    **MANAGER:**

_____                _____

John C. Wooley                                 Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                     **MEMBER:**

CHANG CHIH KUANG                               _____

Printed Name:                                  Printed Name:

CHANG CHIH KUANG                               _____

5QCLEAN TECHNOLOGY
GG PTE LTD

38

2-2-17                                                          Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                              **MANAGER:**

John C. Wooley                            Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                               **MEMBER:**

*matt o'meara*

_____            _____

Printed Name:                            Printed Name:

   Matt O'Meara 8-22-17                   _____

38

4835-6049-7362.1

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                          **MANAGER:**

_____              _____

John C. Wooley                        Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                           **MEMBER:**

_____              _____

Printed Name:                         Printed Name:

Madeleine O'Meara                     _____

38

     **IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                      **MANAGER:**

_____                  _____

John C. Wooley                                    Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                       **MEMBER:**

_____                  _____

Printed Name:                                     Printed Name:

John O'Meara                                      _____

38

2-2-17                                                                   Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                    **MANAGER:**

_____                       _____

John C. Wooley                                  Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                     **MEMBER:**

_____                       _____

Printed Name:                                   Printed Name:

_____                       J. Tim O'Meara

38

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                               **MANAGER:**

_____            _____

John C. Wooley                            Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                **MEMBER:**

_____            _____

Printed Name:                             Printed Name:

_____            _____

**17/08/17**

38

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                **MANAGER:**

_____                     _____

John C. Wooley                              Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                 **MEMBER:**

_____                     _____

Printed Name:                               Printed Name:

Dowitt H. Cilleaoa                          _____

2-2-17                                                    Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                              **MANAGER:**

_____                   _____
John C. Wooley                            Jeffrey J. Wooley

**MANAGER:**

_____
Graeme Brown

**MEMBER:**                               **MEMBER:**

DWIGHT HUGHES                             _____
Printed Name:                             Printed Name:

_____                   _____

38

2-2-17                                                Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                              **MANAGER:**


_____               _____
John C. Wooley                            Jeffrey J. Wooley

**MANAGER:**


_____
Graeme Brown

**MEMBER:**                               **MEMBER:**


_____               _____
Printed Name:                             Printed Name:

Gary J. Streit                            _____

38

4835-6049-7362.1

**IN WITNESS HEREOF,** the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                    **MANAGER:**

_____                         _____

John C. Wooley                                  Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                     **MEMBER:**

_____                         _____

Printed Name:                                   Printed Name:

_____                         Charles A. Rohde,

38

2-2-17

Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**

Printed Name:

**MANAGER:**

Jeffrey J. Wooley

**MEMBER:**

HENRY ROYER

Printed Name:

38

**IN WITNESS HEREOF,** the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                    **MANAGER:**

_____          _____

John C. Wooley                                  Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                     **MEMBER:**

_____          _____

Printed Name:                                   Printed Name:

GUY H. WENDLER                           THERESA H. WENDLER

38

2-2-17

Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**

Printed Name: _SCOTT G. BYERS_

**MEMBER:**

Printed Name:

4835-6049-7362.1

2-2-17                                                    Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                          **MANAGER:**

_____              _____

John C. Wooley                        Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                           **MEMBER:**

_____              _____

Printed Name:                         Printed Name:

Stephanie S. Ballard                  _____

38

Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**

Printed Name:

Craig M Byers

**MEMBER:**

Printed Name:

38

4835-6049-7362.1

2-2-17                                          Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                             **MANAGER:**

_____                 _____

John C. Wooley                          Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                              **MEMBER:**

_____                 _____

Printed Name:                           Printed Name:

COLBY FLP- MICHAEL COLBERT

4835-6049-7362.1

2-2-17

Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**

Printed Name:

JAMES V. SAUTER

**MEMBER:**

Printed Name:

38

2-2-17                                                                                    Updated for Closing 6-22-17


**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                              **MANAGER:**


_____                          _____

John C. Wooley                                           Jeffrey J. Wooley

**MANAGER:**


_____

Graeme Brown

**MEMBER:**                                               **MEMBER:**


_____                          _____

Printed Name:                                            Printed Name:

Michael Odell                                            _____

38

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

_____

John C. Wooley

**MANAGER:**

_____

Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**

_____

Printed Name:

Maureen M. Sheehy

**MEMBER:**

_____

Printed Name:

_____

38

2-2-17

**IN WITNESS HEREOF,** the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**

Printed Name:

Peter C. Hemken, Trustee

Peter C. Hemken Living Trust
dated 07-22-2010

**MEMBER:**

Printed Name:

38

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**

Printed Name:

RANDALL L. REHMANN, TRUSTEE

**MEMBER:**

Printed Name:

38

Updated for Closing 11/17

5.17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**
SUNAM DEVELOPMENT LC
by Mgr Neechi A Selman

Printed Name:
SUN AM DEVELOPMENT LC

**MEMBER:**
AGG LLC
by Mark A. Selman, Mgr

Printed Name:
AMERICAN GREEN GASOLINE LLC
(AGG LLC)

4835-6049-7362.1

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

MANAGER:

_____
John C. Wooley

MANAGER:

_____
Jeffrey J. Wooley

MANAGER:

_____
Graeme Brown

MEMBER:

_____
Printed Name:

Gale Cook

MEMBER:

_____
Printed Name:

Kendra K. Cook

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

**MANAGER:**

Jeffrey J. Wooley

Graeme Brown

**MEMBER:**

Printed Name:

Gary Edelman

**MEMBER:**

Printed Name:

4835-6049-7362.1

2-2-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

MANAGER:

_____

John C. Wooley

MANAGER:

MANAGER:

_____

Jeffrey J. Wooley

_____

Graeme Brown

MEMBER:

_____

Printed Name:

Gary Edelman

Gary & Marilyn Edelman Trust

MEMBER:

_____

Printed Name:

Marilyn Edelman

38

4835-6049-7362.1

2-2-17                                                     Updated for Closing 6-22-17


**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                              **MANAGER:**


_____                   _____

John C. Wooley                            Jeffrey J. Wooley

**MANAGER:**


_____

Graeme Brown

**MEMBER:**                               **MEMBER:**


_____                   _____

Printed Name:                             Printed Name:

Gerald Gerstner Trust                     _____


38

4835-6049-7362.1

2-2-17

Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:**

Printed Name:

Gary Rich

**MEMBER:**

Printed Name:

Karen Rich

4835-6049-7362.1

2-2-17                                                    Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                **MANAGER:**

_____                     _____

John C. Wooley                              Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                 **MEMBER:**

_____                     _____

Printed Name:                               Printed Name:

Rich Ryan Rich, president                   _____
Rich Ag Inc.

38

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                    **MANAGER:**

_____                 _____

John C. Wooley                                   Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                      **MEMBER:**

_____                 _____

Printed Name:                                    Printed Name:

Ted Bauer                                        Donna Bauer

38

2017-7-31
Rev 8-23

**Exhibit A**
**To Third Amended Company Agreement**
**Of**
**EE-Terrabon Biofuels LLC**

| Member | Address | Ownership Units |
|---|---|---|
| John C. Wooley, Trustee | Box 684707, Austin, TX 78768 | 1,970,970 |
| Jeffrey J. Wooley, Trustee | Box 2185, Canyon Lake, TX 78133 | 1,970,970 |
| David C. Craig and Linda B Craig Joint Tenants with right of survivorship | 2905 Sylvania Dr West Des Moines IA 50266 | 100,000 |
| SC Ventures LLC | 9532 East Riggs Rd Sun Lakes, AZ 85248 | 97,656 |
| Steve S Robson | 9532 East Riggs Rd Sun Lakes, AZ 85248 | 250,000 |
| Phyllis Findley, Trustee | Box 2185, Canyon Lake, TX 78133 | 146,484 |
| PENSCO Trust Company Custodian FBO Wesley P. Graff, IRA | 1560 Broadway, Suite 400 Denver, CO 80202-3331 | 126,250 |
| Keresa Plantations Sdn Bhd | Level 5 Tun Jugah Tower , No 18 Jalan Tunku Abdul Rahman Kuching 93100 Sarwawak, Malaysia | 1,085,937 |
| Waddell Holding Ltd | C/O 202 Kim Seng Rd, 08#07 . Singapore 239496 | 50,000 |
| 59 Clean Technology SG PTE LTD | 61 UBI ROAD 1 #01-19G OXLEY BIZHUB SINGAPORE (408727) | 250,000 |
| Matt O'Meara | 8453 SE 63rd Street Mercer Is, WA 98040 | 150,000 |
| Madeleine C. O'Meara | 8453 SE 63rd Street Mercer Is, WA 98040 | 10,000 |
| John B. F. O'Meara | 8453 SE 63rd Street Mercer Is, WA 98040 | 10,000 |

1

2017-7-31
Rev 8-23

| | | |
|---|---|---|
| J. Tim O'Meara | 407 Sinclair Ave SE<br>Cedar Rapids, IA 52403 | 200,000 |
| Molly O. McCracken | 2391 Sunny Ridge Dr<br>Pinckney, MI 48169 | 10,000 |
| Daniel H O'Meara | P.O. Box 1319<br>Summerland, CA 93067 | 25,000 |
| Dwight Hughes | 5205 Nursery Rd<br>Cedar Rapids, IA 52404 | 50,000 |
| Gary Streit | 1646 Timberlake Dr<br>Cedar Rapids, IA 52403 | 50,000 |
| Charles A. Rohde | 2813 Indian Hill Rd<br>Cedar Rapids, IA 52403 | 75,000 |
| Henry Royer | 330 Rosedale Rd SE<br>Cedar Rapids, IA 52403 | 20,000 |
| Guy H. Wendler | 3850 Cottage Grove Ave SE<br>Cedar Rapids, IA 52403 | 50,000 |
| Scott Byers | 3501 Elwinn Lane SE<br>Cedar Rapids, IA 52403 | 25,000 |
| Stephanie S Ballard<br>Wisconsin Revocable Trust | 2175 Cottage Grove Ln PL SE<br>Cedar Rapids IA 52403 | 50,000 |
| Craig M Byers | 1022 44th St SE<br>Cedar Rapids IA 52403 | 35,000 |
| Colby Holding Family<br>Limited Partnership (Michael<br>Colbert) | 10182 Lancaster LN<br>Maple Grove MN 55369 | 40,000 |
| James V. Sauter | 2401 White Eagle Tr SE<br>Cedar Rapids IA 52403 | 50,000 |
| Michael L Odell | 1833 Bloomington Rd<br>Marion IA 52302 | 10,000 |
| Maureen M. Sheehy<br>Revocable Trust dtd 4-10-08 | 1958 Common Way Rd<br>Orlando, FL 32814 | 50,000 |
| Peter C. Hemken Living Trust<br>dtd 07-22-2010 (Peter<br>Hemken) | 1512 South 45th Street<br>Des Moines, IA 50265 | 50,000 |
| Randall L. Reihmann Trustee<br>for Randall L. Reihmann<br>Revocable Trust u/d/o<br>8/14/2014 | 6261 Tidewater Island Cir<br>Fort Meyers FL 33908 | 50,000 |
| American Green Gasoline<br>LLC | 111 S Story Street<br>Boone, IA 50036 | 15,000 |

2

2017-7-31
Rev 8-23

| | | |
|---|---|---|
| Gale Cook | 1315 Meadowlark Ln Sabetha, KS. 66534 | 20,000 |
| Gary D Edelman and Marilyn Edelman Trust | 2324 T Road Sabetha, KS 66534 | 30,000 |
| Gerald Lloyd Gerstner Trust 12-19-2011 | 300 East 10th Street Frankfort, KS 66427-1243 | 30,000 |
| Gary Rich | 65182 730th St Massena IA 50853 | 12,500 |
| Karen S. Rich | 65182 730th St Massena IA 50853 | 12,500 |
| Rich AG Inc | 60628 750th St Anita IA 50020 | 50,000 |
| SUNAM Development LLC | 111 S Story Street Boone, IA 50036 | 30,000 |
| Ted or Donna Bauer | 1667 Hwy 71 Audubon, IA 50025 | 25,000 |
| | | |
| Kemin Industries Inc | 2100 Maury Street Des Moines IA 50317 | 585,937 |

4835-6049-7362.1

2-2-17                                                                           Updated for Closing 6-22-17

**Exhibit B**

**Summary Business Plan & Budget**

1-31-17

## EE-Terrabon Bio-Fuels LLC (EETB)
## 24-Month Business Plan Summary

**Overview:** The 24-month period following closing the current investment round, EETB will focus on refinement and commercialization of its carboxylate platform technology for conversion of bio-mass to carboxylic acids C-2 through C-8 using its proprietary, methane-inhibited anaerobic digestion, extraction and distillation technologies. Operations will consist of the following major activities: a) development of a fully integrated 30 Kg/day pilot plant, b) continuous operation of the pilot plant, c) process refinement, d) front-end engineering design to support a first commercial carboxylate acid (C-3 through C-8 only) production facility with a 30 short ton per day (TPD) scale (the "first commercial facility"), e) feedstock research & procurement, f) carboxylate acid marketing and sales, g) site selection for the first commercial facility (with a 30 TPD scale), h) organization of all commercial relationships, contracts and financing necessary to support construction of the first commercial facility and i) construction and commissioning of the first commercial facility (with a 30 TPD scale).

**Year One –Fully Integrated Pilot Demonstration Plant & Engineering in Bryan, Texas:** During approximately the first twelve months after closing the current investment round, EETB will build a newer advanced 30 Kg/day version of its current pilot plant that will be a fully integrated, continuous facility with all of the necessary recycle loops included. After the facility is completed through the acid extraction and solvent recovery steps, it will be operated on a continuous basis for at least 500 hours for data collection and design refinement. The fractionation distillation system will be preliminarily studied with early stage design, but will not be constructed as a component of the pilot.

During this period EETB will also work on all of the business, financial and project development activities necessary to support the development of the first commercial facility. [N.B. J and J—I think it's cleaner to provide a definition of the "first commercial facility" once and then refer to it as that throughout the plan. Let me know if you disagree or have any modifications to the definition.]

**Year Two – Design, Construct & Commission a Full Scale 30 TPD Carboxylic Acid Facility:** During approximately the second successive twelve month period after closing the current investment round, EETB will design and construct the first commercial facility. In addition to site selection, design and construction, EETB will organize supply contracts and off-take contracts for product sales and the necessary funding for its affiliated Special Purpose Entity (SPE) which will own the first commercial facility and receive a license of the subject technology pursuant and subject to the terms and conditions of that certain Terms Sheet dated [**to be filled**

I

1-31-17

**in at closing**], by and between EETB and Kemin Industries, Inc. and its subsidiaries and the final definitive license agreement between EETB and the SPE.

The major components of the 24-monthplan are as follows:

| Fully Integrated Pilot Development/Operations |
| --- |
| Pilot Plant Site Preparation |
| Anaerobic Digestion |
| Chemical Clarification |
| Membrane Clarification |
| Reverse Osmosis |
| Ammonia/Phosphate Removal |
| KMPS Engineering Extraction Design |
| Acidification/Extraction |
| Solvent Recovery |
| |
| **Koch Fractionation Train Design** |
| |
| **Select EPC & EPCM Firms** |
| |
| **EPC Engineering Data Assessment** |
| |
| **Full Pilot Operations** |
| |
| **Sample Production, Marketing & Sales** |
| |
| **Pilot Plant Final Report** |
| |
| **Commercialization & Financing Activities** |
| |
| **Commercial Scale Design Engineering 30 TPD** |
| |
| **30 TPD Construction** |
| |
| **30 TPD Start-Up** |

2

1-31-17

The Operations Budget Estimate (excluding the capital costs of the first commercial plant) with respect to Year 1 and Year 2 is as follows:

| 24 Month Plan (revised) | | | | |
|---|---|---|---|---|
| Uses of Funds | | Pilot & Engineering Year 1 | | Design & Construction Year 2 |
| Refine Capex Analysis for 30 TPD Facility | | In House | | |
| Engineering Review of Pilot Plant Program | | In House | | |
| Fully Integrated Pilot Plant | | | | |
| Upstream Fermentation, Filtration & RO | $ | 190,000 | | |
| Downstream Extraction Pilot Design & Pilot System | $ | 93,000 | | |
| Downstream Extraction Pilot Design & Pilot System | $ | 667,000 | | |
| Pilot Plant Final Report | | In House | | |
| Commercial Fractionation System Design | | | $ | 80,000 |
| Lab Building - Bryan, Texas Location | | | $ | 250,000 |
| Lab Equipment - Bryan, Texas Location | $ | 25,000 | $ | 25,000 |
| Land Loan, Bridge Loan, Deposits | $ | - | $ | 800,000 |
| 30 TPD Plant Front End Engineering | | | Paid by SPE Licensee | |
| 30 TPD Commercial Plant | | | Paid by SPE Licensee | |
| Staffing & Operations | | | | |
| Lab Expenses | $ | 60,000 | $ | 75,000 |
| Pilot Plant Expenses | $ | 15,920 | $ | 25,000 |
| R&D Team | $ | 378,713 | $ | 425,000 |
| Bryan Facility & Pilot Plant Staff | $ | 297,117 | $ | 315,000 |
| Engineering | $ | 290,900 | $ | 450,000 |
| Technology Commercialization | $ | 1,038,066 | $ | 1,200,000 |
| Office & Admin | $ | 252,553 | $ | 350,000 |
| Travel | $ | 96,000 | $ | 160,000 |
| FDA - GRAS, AAFCO, Kosher & Halal Approvals | $ | 25,000 | $ | 175,000 |
| Legal & Intellectual Property | $ | 50,000 | $ | 150,000 |
| Contingency | $ | 119,481 | $ | 295,000 |
| Interest Reserve | $ | 120,000 | $ | - |
| Legal & Other Transaction Fees | | | | |
| Legal | $ | 25,000 | $ | 25,000 |
| Expenses | $ | 25,000 | $ | 25,000 |
| Deferred Compensation Make-Up | $ | 56,250 | $ | - |
| Transaction Fees - Brokers | $ | 175,000 | $ | 175,000 |
| Sub-Total | $ | 4,000,000 | $ | 5,000,000 |
| Less: License Fee | | | $ | (1,500,000) |
| Various Grants | | TBD | | TBD |
| **Total** | $ | **4,000,000** | $ | **3,500,000** |

3

2-2-17                                                    Updated for Closing 6-22-17

**Exhibit C**

**To Third Amended Company Agreement**

**Of**

**EE-Terrabon Biofuels LLC**

| Manager |
| --- |
| John C. Wooley |
| Jeffrey J. Wooley |
| Graeme Brown |

43

# EXHIBIT B

Earth Energy Renewables LLC

UNIT PURCHASE AGREEMENT

as of October 31, 2018

# TABLE OF CONTENTS

**Page**

**ARTICLE 1 Authorization, Sale and Issuance of Additional Units** ...........................1

1.1   Authorization of Additional Units ...............................................1
1.2   Sale and Issuance of Purchased Units to Kemin.............................1
1.3   EER Budget Plan for Additional Investment and Monthly Operating Expense Budget ...............................................................1
1.4   Bridge Financing.........................................................................2
1.5   Sale and Issuance of Purchased Units to Third Parties.................2
1.6   Pilot Plant Operation...................................................................3
1.7   Opt-Out Right .............................................................................3
1.8   Freedom to Operate Review .........................................................3

**ARTICLE 2 Closing and Delivery** ...........................................................3

2.1   Closing ........................................................................................3
2.2   Delivery.......................................................................................4

**ARTICLE 3 Representations and Warranties of the Company** .......................4

3.1   Organization, Good Standing and Qualification..........................4
3.2   Subsidiaries.................................................................................4
3.3   Capitalization ..............................................................................4
3.4   Authorization ..............................................................................4
3.5   Financial Statements ...................................................................6
3.6   Changes.......................................................................................7
3.7   Material Contracts.......................................................................8
3.8   Intellectual Property..................................................................10
3.9   Title to Properties and Assets; Liens ........................................11
3.10  Compliance with Other Instruments .........................................11
3.11  Litigation...................................................................................12
3.12  Governmental Consent..............................................................12
3.13  Permits ......................................................................................12
3.14  Offering.....................................................................................13
3.15  Registration and Voting Rights.................................................13
3.16  Brokers or Finders....................................................................13
3.17  Tax Returns and Payments........................................................13
3.18  Employees.................................................................................14
3.19  Obligations to Related Parties...................................................15
3.20  Obligations of Management and Key Employees ......................16
3.21  Insurance ...................................................................................16
3.22  Environmental Safety Laws......................................................16
3.23  Anti-Bribery and Anti-Corruption. ...........................................16
3.24  Export Controls.........................................................................16
3.25  [Intentionally omitted] ..............................................................17
3.26  Status of Commercial Relationships.........................................17
3.27  Disclosure .................................................................................17

-i-

**TABLE OF CONTENTS**
**(continued)**

Page

**ARTICLE 4 Representations and Warranties of the Investor** .....................................17

| | | |
|---|---|---|
| 4.1 | Organization, Good Standing and Qualification | 17 |
| 4.2 | No Registration | 18 |
| 4.3 | Investment Intent | 18 |
| 4.4 | Accredited Investor | 18 |
| 4.5 | Residency | 18 |
| 4.6 | No Public Market | 18 |
| 4.7 | Authorization | 18 |
| 4.8 | Brokers or Finders | 19 |
| 4.9 | Acknowledgment | 19 |

**ARTICLE 5 Conditions to Investor's Obligations at Closing** .........................................19

| | | |
|---|---|---|
| 5.1 | Representations and Warranties | 19 |
| 5.2 | Covenants | 19 |
| 5.3 | Blue Sky | 19 |
| 5.4 | Compliance with Securities Laws | 19 |
| 5.5 | Restated Operating Agreement | 19 |
| 5.6 | Other Deliverables | 20 |
| 5.7 | Proceedings and Documents | 20 |
| 5.8 | Technology License | 20 |
| 5.9 | Closing of Sale of Third Party Units | 20 |
| 5.10 | Dual Signatures on EER Checks or Disbursements | 21 |
| 5.11 | Transparency | 21 |

**ARTICLE 6 Conditions to Company's Obligations at Closing** .....................................21

| | | |
|---|---|---|
| 6.1 | Representations and Warranties | 21 |
| 6.2 | Covenants | 21 |
| 6.3 | Compliance with Securities Laws | 21 |
| 6.4 | Restated Operating Agreement | 22 |
| 6.5 | Proceedings and Documents | 22 |
| 6.6 | Payment of Purchase Price | 22 |
| 6.7 | Technology License | 22 |
| 6.8 | Closing of Sale of Third Party Units | 22 |

**ARTICLE 7 Termination** ..........................................................................................22

| | | |
|---|---|---|
| 7.1 | Termination | 22 |
| 7.2 | Effect of Termination | 23 |

**ARTICLE 8 Post-closing Inspection Rights; Miscellaneous** ........................................23

| | | |
|---|---|---|
| 8.1 | | 23 |
| 8.2 | Definitions | 23 |
| 8.3 | Amendment | 25 |
| 8.4 | Notices | 25 |
| 8.5 | Governing Law | 25 |
| 8.6 | Indemnification | 25 |
| 8.7 | Survival; Deductible; Cap | 26 |

-ii-

## TABLE OF CONTENTS
### (continued)

**Page**

8.8 Successors and Assigns...........................................................................27
8.9 Entire Agreement..................................................................................27
8.10 Efforts to Consummate ..........................................................................27
8.11 Delays or Omissions ..............................................................................27
8.12 Severability ...........................................................................................28
8.13 Counterparts ..........................................................................................28
8.14 Telecopy Execution and Delivery...........................................................28
8.15 Further Assurances................................................................................28
8.16 Waiver of Jury Trial Rights. ...................................................................28
8.17 Nondisclosure ........................................................................................28
8.18 Independent Legal Counsel.....................................................................28

4835-6049-7362.1

## EXHIBITS

Exhibit A ..........................................................................................Installment Payment Schedule

Exhibit B ........................................................................................................ EER Budget Plan

Exhibit C .....................................................Fourth Amended and Restated Operating Agreement

Exhibit D...........................................................................................................Schedule of Exceptions

Exhibit E ................................................................................. Form of Compliance Certificate

Exhibit F...........................................................................................................Technology License

4835-6049-7362.1

## EARTH ENERGY RENEWABLES, LLC

## UNIT PURCHASE AGREEMENT

This Unit Purchase Agreement (this "**Agreement**") is made as of October 31, 2018, by and among Earth Energy Renewables LLC, a Texas limited liability company (the "**Company**") and Kemin Industries, Inc. ("**Investor**").

## RECITALS

WHEREAS, the Company desires to sell to the Investor, and the Investor desires to purchase from the Company, Units, on the terms and conditions set forth in this Agreement (collectively, the "**Purchase**").

WHEREAS, concurrently with the execution of this Agreement, the Company shall amend and restate the operating agreement of the Company to be in the form set forth in Exhibit C (the "**Restated Operating Agreement**").

## ARTICLE 1

### Authorization, Sale and Issuance of Additional Units

1.1 *Authorization of Additional Units.* The Company has authorized the sale and issuance of an amount up to 1,923,077 of the Company's Units for $2,500,000 (approximately $1.30 per Unit), to have the rights, privileges, preferences and restrictions of Units set forth in the Restated Operating Agreement ("**Authorized Additional Units**").

1.2 *Sale and Issuance of Purchased Units to Kemin.* Subject to the terms and conditions of this Agreement, Investor agrees to purchase at the Closing, and the Company agrees to sell and issue to Investor at the Closing, 769,231 of the Authorized Additional Units at a cash purchase price of $1,000,000.00 (approximately $1.30 per Unit). Investor's payment of the cash purchase price for the subject Additional Units shall be due and payable in installments in accordance with the schedule set forth on Exhibit A (each, an "Installment Payment"). The Installment Payment schedule (described on Exhibit A) is based on the forecasted timing of funding budget items of the Company over the course of the subject Installment Payment period. The Company agrees to provide to Investor, as soon as reasonably practicable following written request, reasonable evidence substantiating the execution of various actions underlying the budget items and corresponding payment of actual costs thereof. Such reasonable evidence may include applicable purchase orders, vendor contracts, invoices, payment stubs and receipts.

1.3 *EER Budget Plan for Additional Investment and Monthly Operating Expense Budget.* EER has provided the Investor with the EER Budget Plan for the Additional Investment which has been accepted by the Investors. The EER Budget Plan for the Additional Investment is contained in an excel spreadsheet attached as Exhibit B. The Installment Payment Schedule set forth on Exhibit A for the additional $2,500,000 are consistent with the "Total Use of Funds" indicated on line ____ in tab ____ of the EER Budget Plan. The funding tranches will be committed in tranches in advance of spending commitments until a total of $2,500,000 has been funded for the specific

-1-

items indicated in the EER Budget Plan (see example of funding schedule on line ___ of Exhibit B).

     (a)    **EER Monthly Operating Expenses.** The commitment of the Investor to invest an additional $1,000,000 in EER Units is conditioned on the requirement that these funds are not used to fund Monthly Operating Expenses in excess of the monthly expenditures indicated in the attached EER Budget Plan. Any additional operating expenses planned by EER in its comprehensive budget will need to be funded by other sources of equity contribution arranged by EER separate from this specific $2,250,000 funding by Investor and the sale of Third Party Units to Keresa Plantations Sdn Bhd and Steve Robson as outlined in Section 1.5 below. The Investor does not intend to provide any new funding that would be used to cover operating expenses in excess of the approved amount. It is noted, however, that the EER Budget Plan attached as **Exhibit B** provides for significant other categories of disbursement of funds for Pilot Plant Accounts Payable, Capital Expenditures and 30 TPD Commercial Plant expenditures which are contained in other categories separate from "Monthly Operating Expenses."

     (b)    **Other EER Funding.** Any additional operating expenses or additional capital expenditures that are not specifically provided for in the EER Budget Plan attached as **Exhibit B** will need to be accomplished from additional funding sources other than the Investors' investment commitment described herein. Any such alternative funding must be obtained in a manner that complies with EER's Fourth Amended Company Agreement and on reasonable market terms to be approved by the board. It is anticipated that additional rounds of capital at $1.30 per unit may be necessary. It is also specifically acknowledged that EER intends to immediately continue to pursue substantial additional funding for its comprehensive plan as previously presented Hamilton Clark and further contained in the existing two year business plan.

1.4 *Bridge Financing.* It is also understood that EER may require bridge financing to provide operating funds required before all conditions to the $2,250,000 additional investment in EER Units contemplated by this Agreement and the Third Party Offering documents have been satisfied. Any such bridge financing must be obtained in a manner that complies with EER's Third Amended Company Agreement and must also be acceptable to the Investor as a condition precedent to the Investor additional investment in EER Units. Bridge financing may take the form of an advance against an Investor's funding commitment under this Agreement. It is expected that prior to Closing Investor may have advanced some bridge financing to EER and that this bridge financing will be converted to membership units at $1.30 per units.

1.5 *Sale and Issuance of Purchased Units to Third Parties.* A minimum of 961,539 Authorized Additional Units shall be sold to third parties ("**Sale of Third Party Units**") pursuant to the terms of a subscription agreement and private placement memorandum (the "**Third Party Offering Documents**") for a purchase price of $1.30 per Unit which shall occur prior to or simultaneous with the Closing of Investor's purchase of 769,231 Units pursuant to this Agreement (as defined herein), for an aggregate minimum of $2,250,000.00 of capital contributions for 1,730,769 Units. The Authorized Additional Units purchased by Investor together with all Authorized Additional Units sold to a third party prior to or simultaneous with the Closing shall hereinafter collectively be referred to as, the "**Purchased Units**". Investor acknowledges and agrees that additional Authorized Additional Units may be sold to third parties following Closing

-2-

at a cash purchase price not less than $1.30 per Unit with no further authorization of the same required under this Agreement or the Restated Operating Agreement.

1.6 *Pilot Plant Operation.* Effective immediately, EER will begin the development of fermentation medium using oat flour as the base for the feedstock for EER's pilot plant operation. No later than November 1, 2018, EER will switch the feedstock used to operate the existing EER pilot plant to the oat flour base as the steady state production feedstock for the EER pilot plant. EER will also commit to provide unrestricted access to all data necessary for the preparation of a Kemin-EER authored White Paper that will be written following up to 500 hours of steady state production at the EER pilot plant facility using oat flour as the steady state production feedstock. A key condition for the funding tranches for the contemplated $2,500,000 additional investment is operating the pilot plant with the oat flour feedstock and making steady practice toward a White Paper following up to 500 hours of steady state operation. Further, starting December 1, 2018, EER will add another fermenter to bring POME online as a feedstock for the pilot plant as soon as the oat flour trial is complete, provided that funds are available in the budget to purchase the fermenter and/or supplemental funds are made available by Keresa.

1.7 *Opt-Out Right.* Investor will not be obligated to provide additional investment tranches if, at any time, based on Investor's review of information provided to Investor pursuant to the provisions of Section 5.11 of this Agreement, Investor, in Investor's sole discretion, concludes that either (a) Company has failed to comply with the EER Budget Plan; or (b) the Pilot Plant data no longer supports the commercial viability of a commercial scale production facility; provided, however, that the total new Units issued to the Investor will be based on the actual dollars funded by the Investor at the time the opt-out right is exercised by the Investor based on the $1.30 per Unit price.

1.8 *Freedom to Operate Review.* Company will provide Investor with additional material and information required for Investor to conduct an additional Freedom to Operate review of Company's patents and other intellectual property rights. Investor and Company agree that much of this material has been provided to Investor as of the date of this Agreement. Investor's commitment to make future capital contributions pursuant to the schedule set forth in this Agreement is contingent on Investor obtaining a Freedom to Operate review that is satisfactory to Investor in Investor's sole discretion. In this regard, it is anticipated that Investor's counsel will work with Company counsel on the Freedom to Operate review, with each party bearing their own legal costs, and that the progress of the Freedom to Operate review will not hold up future capital contributions by the Investor pursuant to the schedule set forth in this Agreement as long as Company and Investor are working collaboratively on the Freedom to Operate review. However, if Investor ever determines that Company and Investor are not able to continue to work collaboratively on the review or if Investor is not able to obtain a satisfactory Freedom to Operate review, Investor may opt out of making any further capital contributions pursuant to the payment schedule set forth in this Agreement.

## ARTICLE 2

### Closing and Delivery

2.1 *Closing.* The closing of the Purchase shall take place at the offices of Belin McCormick, P.C. in Des Moines, Iowa, as of the date that each of the Closing Conditions set forth

in Articles 5 and 6 have been satisfied (the "**Closing**"). At the Closing, Investor shall purchase, and the Company shall sell and issue to Investor, the number of Additional Authorized Units described above.

2.2 *Delivery*. At the Closing, the Company will deliver to Investor a copy of the Restated Operating Agreement reflecting the issuance of the number of Authorized Additional Units that Investor is purchasing against payment by wire transfer in accordance with Exhibit A of the purchase price therefor as set forth therein.

## ARTICLE 3

### Representations and Warranties of the Company

A Schedule of Exceptions, attached hereto as **Exhibit D** (the "**Schedule of Exceptions**"), shall be delivered by the Company to the Investor in connection with the execution of this Agreement and as updated following execution of this Agreement and prior to Closing. Except as set forth on the Schedule of Exceptions delivered to the Investor on the date of this Agreement (as hereafter duly updated), the Company hereby represents and warrants to the Investor as follows as of the date of this Agreement and as of the Closing:

3.1 *Organization, Good Standing and Qualification*. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. The Company has the requisite power and authority to own and operate its properties and assets, to carry on its business as presently conducted, to execute and deliver this Agreement, to issue and sell the Purchased Units and to perform its obligations pursuant to this Agreement and the Restated Operating Agreement. The Company has made available to the Investor the Third Amended and Restated Limited Liability Company Agreement of the Company, dated as of July 31, 2017 (the "**Existing Operating Agreement**"), which is the current version of the Company's operating agreement as of immediately prior to the date of this Agreement.

3.2 *Subsidiaries*. Except as set forth in the Schedule of Exceptions, the Company does not have a Subsidiary or own or control, directly or indirectly, any interest in any corporation, partnership, limited liability company, association or other business entity.

3.3 *Capitalization*.

(a) As of the date of this Agreement, and without giving effect to the adoption of the Restated Operating Agreement or the Purchase the equity capital of the Company consists of 8,049,831 Common Units with an aggregate capital contribution of $9,616,071.84 and 1,069,844 warrants with right to have 1,069,844 Common Units issued for $0.01 per unit (the "Warrants"). The holders of such interests and the amount and class of equity securities held by each of them are specified in **Section 3.3(a)** of the Schedule of Exceptions, which may be updated at Closing to give effect for any changes thereto (occurring between the date of this Agreement and Closing). Furthermore, as of the date of this Agreement:

(i) The capital of the Company includes convertible debt in the principal amount of **$800,000** as listed in Section 3.3(a) of the Schedule of Exceptions, which debt

-4-

may be converted to units at the option of the holder, at fair market value to be determined at the time of exercise.

(ii)     There are stock warrants issued to certain Company creditors with right to have **200,000** Units issued for $0.01 per Unit, as more particularly described in Section 3.3(a) of the Schedule of Exceptions. The Company has plans to issue up to 250,000 additional warrants to certain key employees of the Company, subject to Board approval and compliance with the Company Agreement.

(iii)     Certain Members of the Company have special profits interests and investment rights for Company projects in Iowa as set forth in that certain Iowa Group Incentive Agreement as has been disclosed and delivered to Investor.

(iv)     All Units (inclusive of the Purchased Units as of Closing) shall have the rights, preferences, privileges and restrictions set forth in the Restated Operating Agreement.

(b)     Except as set forth in **Section 3.3(a)** of the Schedule of Exceptions or as otherwise disclosed in Section 3.3(a) of the Schedule of Exceptions (ii) the conversion privileges of the Warrants and (iii) the rights provided in the Restated Operating Agreement, there are no outstanding or authorized options, profits interests, phantom stock, phantom units, phantom interests, equity or unit appreciation rights, profit participation rights, restricted units, warrants, calls, rights, convertible securities, commitments or agreements of any character, written or oral, to which the Company is a party or by which the Company is bound obligating the Company to issue, deliver, sell, repurchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed, any equity of the Company or obligating the Company to grant, extend, accelerate the vesting of, change the price of, otherwise amend or enter into any such option, warrant, call, right, commitment or agreement.

(c)     The Company agrees that it shall not issue further warrants at strike prices of less than the current offering price of this offering (approximately $1.30 per unit) without approval of 90% of the Member Unit Owners beyond the beyond the number of units described in section 3.3 (a) of the Schedule of Exceptions.

(d)     The Purchased Units, when issued, delivered and paid for in compliance with the provisions of this Agreement and the Third Party Offering Documents, as applicable, will be validly issued, fully paid and nonassessable. The Purchased Units, when issued, will be free of any liens or encumbrances, other than any liens or encumbrances created by the Investor or imposed upon such units by the actions of the Investor or a third party investor of the Purchased Units; *provided, however*, that the Purchased Units shall be subject to (i) restrictions on transfer under U.S. state and/or federal securities laws and (ii) restrictions on transfer and a repurchase right in certain circumstances as provided in the Restated Operating Agreement. Based in part on the accuracy of the representations of the Investor in ARTICLE 4 of this Agreement and accuracy of the representations of third parties with respect to the Sale of Third Party Units, the offer, sale and issuance of the Purchased Units will be in compliance with all applicable federal and state securities laws and the Restated Operating Agreement. The issuance of the Purchased Units are not subject to any preemptive rights or rights of first refusal in favor of the Company or any other person, subject in each case to the terms of the Restated Operating Agreement.

-5-

(e)      As of the date of this Agreement, all outstanding units of the Company are subject to restrictions on transferability and a repurchase right in favor of the Company in certain circumstances as provided under Article XIV of the Existing Operating Agreement. Except as provided in the Existing Operating Agreement or the Restated Operating Agreement, no person (i) has been granted full ratchet, formula adjustment, or any other type of, protection against dilution of their ownership interest in the Company, (ii) has been granted rights to require the Company to repurchase any of the Company's securities, (iii) has been granted rights to receive the same or better rights in connection with any ownership interest in the Company as any other person or entity may receive either pursuant to this Agreement or at any time hereafter or (iv) have been granted rights of redemption by the Company. No full ratchet, formula adjustment, or any other type of, protection against dilution of any ownership interest in the Company has been triggered, nor will be triggered, by the transactions provided for in this Agreement.

(f)      The offer and sale of all of the Company's outstanding units and warrants have been qualified or exempt from registration or qualification under all applicable federal, state and foreign securities laws and regulations (including receipt by the Company of all necessary blue sky law permits and qualifications that have been required by any state) and the Companny's past offerings of units and warrants, and the manner in which such offerings have been conducted, have not in any way violated any applicable federal, state or foreign securities laws and regulations.

3.4 *Authorization.* The Company has all requisite power and authority to enter into this Agreement and the Ancillary Agreements and to consummate the transactions contemplated by this Agreement. All limited liability company action on the part of the Company and its managers, officers and members necessary for the authorization, execution and delivery of this Agreement and the Ancillary Agreements by the Company, the authorization, sale, issuance and delivery of the Purchased Units, and the performance of all of the Company's obligations under this Agreement, including the adoption of the Restated Operating Agreement, has been taken prior to the execution of this Agreement or prior to Closing. This Agreement and the Ancillary Agreements, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with its terms, except (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity.

3.5 *Financial Statements.*

(a)      The Company has delivered to the Investor (i) the unaudited balance sheet and income statement of the Company, as of and for the twelve-month periods ended December 31, 2017, December 31, 2016 and December 31, 2015 and (ii) the unaudited balance sheet and income statement of the Company as of and for the nine (9) months period ended September 30, 2018 (such date, the "**Balance Sheet Date**" and, such statements collectively, the "**Financial Statements**"). The Financial Statements present fairly in all material respects the financial condition and operating results of the Company as of the date(s) and during the period(s) indicated therein. The Financial Statement are not prepared for financial reporting purposes, are only prepared for filing federal income tax returns, and are not prepared in accordance with Generally Accepted Accounting Principles (GAAP). After January 1, 2017, the parties agree that all

-6-

financial statements, balance sheets, and income statements shall be prepared in accordance with GAAP. For the avoidance of doubt, the parties agree that this requirement does not impose an audit requirement on the Company, until such time as the Company reasonably determines the need for an annual audit or lenders or others require audited financial statements.

(b)     The Company (including any employee thereof or of any ERISA Affiliate) has not identified or been made aware of any fraud, whether or not material, that involves the Company's any ERISA Affiliate's management or other employees who have a role in the preparation of financial statements or any claim or allegation regarding any of the foregoing.

3.6 *Changes*. Except as set forth in the applicable subsection of **Section 3.6** of the Schedule of Exceptions, since the Balance Sheet Date, the Company has conducted its business in the ordinary course of business and there has not been:

(a)     any Material Adverse Effect;

(b)     any damage, destruction or loss of the Company, whether or not covered by insurance, that is material to the business, properties, or financial condition of the Company (as such business is presently conducted or proposed to be conducted);

(c)     any material acquisition or disposition of any assets (including any patents, trademarks, copyrights, trade secrets or other intangible assets), business enterprise or division thereof outside the ordinary course of the business;

(d)     any change, amendment to, or termination of, a Material Contract;

(e)     any loans made by the Company or any of its ERISA Affiliates to or for the benefit of their employees, officers or managers, or members, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(f)     any sale, assignment or exclusive license of any patents, trademarks, copyrights, trade secrets or material tangible assets of the Company;

(g)     any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and that is not material to the business, properties, prospects or financial condition of the Company (as such business is presently conducted or proposed to be conducted);

(h)     any declaration, setting aside or payment or other distribution in respect of any of the Company's equity, or any direct or indirect redemption, purchase or other acquisition of any of such equity by the Company;

(i)     any hiring or termination of any employee or natural person serving as a consultant or independent contractor of the Company or any of its ERISA Affiliates, promotion, demotion or other change to the employment status or title of any employee of the Company;

-7-

(j)      any material increase in or other material change to the salary, employment status, or other compensation (including equity based compensation) payable or to become payable by the Company or any of its ERISA Affiliates to any of their respective officers, managers, employees or any natural person serving as a consultant or independent contractor;

(k)      any debt, obligation or liability incurred or assumed by the Company, except those for immaterial amounts and for current liabilities incurred in the ordinary course of business

(l)      any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise by operation of law (such as tax liens and mechanics liens) in the ordinary course of business and do not materially impair the Company's ownership or use of such properties or assets;

(m)      except for leases for the premises set forth on **Section 3.9(a)** of the Schedule of Exceptions, any new lease, license, sublease or other occupancy of any real property by the Company;

(n)      any guarantee by the Company of any debt, obligation or liability of any other person;

(o)      any receipt of notice that there has been a loss of, or material order cancellation by, any major customer, distributor or supplier of the Company;

(p)      any adoption or changes in accounting methods or practices;

(q)      any adoption or change in tax elections of the Company;

(r)      any settlement or compromise of any material tax liability, any filing of an amended tax return, any entering into a closing agreement (as described in Section 7121 of the Code or any corresponding provision of applicable law), any consent to any extension or waiver of the limitation period applicable to any material tax claim or assessment or any other similar action relating to the filing of any tax return or the payment or refund of any tax, in each case, with respect to the Company;

(s)      except for the transactions contemplated by this Agreement and the Ancillary Agreements, any proposal or adoption of a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization; or

(t)      except for the transactions contemplated by this Agreement and the Ancillary Agreements, any arrangement or commitment by the Company to do any of the actions described in this Section 3.6.

3.7 *Material Contracts*.

(a)      Except as set forth in Section 3.7 of the Schedule of Exceptions and for agreements explicitly contemplated by this Agreement and the Ancillary Agreements, there are

-8-

no agreements, understandings or proposed transactions between the Company and any of its or its ERISA Affiliates' respective officers, managers, members, affiliates or any affiliate thereof.

(b)     Other than this Agreement and the Ancillary Agreements and the contracts and agreements set forth on **Section 3.7(b)** of the Schedule of Exceptions (the Contracts and agreements set forth on such schedule, the "**Material Contracts**"), there are no material agreements, understandings, instruments, contracts or proposed transactions, to which the Company is a party, which may involve:

(i)     obligations (contingent or otherwise) of, or payments, to or by, the Company in excess of $100,000 per year;

(ii)    material IP Licenses;

(iii)   materially restricting or affecting the development, provision or distribution of the Company's products and services (including, without limitation, the grant of exclusive rights, rights of first refusal, rights of first negotiation, or limitations on the freedom of the Company to engage in any line of business, market or geographic area, or to compete with any person),

(iv)    any indebtedness for money borrowed (other than trade debt), or

(v)     any employment, contractor or consulting agreement, contract or commitment with an employee or individual consultant, or contractor of the Company or any of its ERISA Affiliates, other than any at-will employment or services agreement or offer letter providing no severance or other post-termination benefits.

(vi)    any consideration that may be paid by the Company to any brokers, finders or agents involved with the distribution and sale of Company's Authorized Additional Units.

All indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same third party (including persons that, to the Knowledge of the Company, affiliated with such third party) shall be aggregated for the purpose of meeting the individual minimum dollar amounts in this subsection (b).

(c)     All of the Material Contracts are valid, binding and in full force and effect in all material respects, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies and to general principles of equity.  The Company is not, and to the Company's Knowledge, no other party to any contract or agreement to which the Company is a party is, in default under any such contract or agreement and the Company has not received any written or to the Company's Knowledge oral notice of claim that the Company is or may be in breach of any contract or agreement.

3.8 *Intellectual Property.*

(a)    **Section 3.8(a)** of the Schedule of Exceptions sets forth a complete list of all patents and patent applications and any registered trademarks, copyright registrations and material unregistered trademarks owned by, or filed in the name of, the Company (the "**Company Registered IP**") and all such Company Registered IP is owned exclusively by the Company. To the Knowledge of the Company (and except for applications), none of the Company Registered IP is invalid or unenforceable. The Company has not transferred or exclusively licensed any material IPR to any third party.

(b)    Neither the operations of the Company nor any product or service marketed or sold (or currently proposed to be marketed or sold) by the Company infringes or misappropriates, or, to the Knowledge of the Company, will infringe or misappropriate, any patent, copyright, trade secret, trademark or similar intellectual property right ("**IPR**") of any third party and, except as set forth in **Section 3.8(b)** of the Schedule of Exceptions, the Company has not received any written notice alleging any such infringement or misappropriation.

(c)    Section 3.8(c) of the Schedule of Exceptions list all outstanding options, licenses or agreements of any kind:

(i)    under which any third party has licensed, or granted the Company any rights to, content, software, technology or IPR that is material to the business of the Company other than standard non-exclusive licenses to commercially available software or technology used in the general operation of the Company's business involving payments by the Company of less than $25,000, or

(ii)    under which the Company has granted a third party any rights or licenses to or under, or assigned, any material Company IPR, other than non-exclusive licenses entered into in the ordinary course in connection with the sale or distribution of Company products or services (the form of which has been delivered to counsel to the Investor) involving payments to the Company of less than $25,000 ((i) and (ii), collectively, the "**IP Licenses**").

The Company is not, and to the Company's Knowledge, no other party to any IP License is, in default under any of such IP License and the Company has not received any oral or written notice of claim that the Company is or may be in breach of any IP License. Copies of the Company's current and prior forms of terms of use and terms of service agreements have been delivered to counsel to the Investor, and, to the Company's Knowledge, none of such agreements are illegal or unenforceable under applicable laws. The Company is not a party to any contract (including licenses, covenants or commitments of any nature) or other agreement that would restrict or conflict with the Company's business as conducted or as currently proposed to be conducted.

(d)    The Company has taken commercially reasonable security measures to protect the secrecy, confidentiality, and value of all trade secrets, know-how, inventions, designs, processes and technical data required to conduct the Company's business, including having each employee or consultant engaged in the development or creation of any content, software, technology or IPR for or in connection with any operations of the Company sign the Company's standard employee confidentiality and invention assignment agreement, or consulting agreement,

-10-

as the case may be (in the form disclosed by Company to counsel to the Investor) or, in the case of consultants, a consulting agreement with confidentiality provisions no less restrictive than those contained in the Company's standard form. To the Knowledge of the Company, no employee or consultant is in breach of his, her or its agreement with the Company or any of its ERISA Affiliates or of any of the Company's or its ERISA Affiliates' policies related to confidentiality or IPR, or his or her agreements with any former or concurrent employer.

        (e)    [Intentionally omitted]

        (f)    [Intentionally omitted]

        (g)    **Section 3.8(g)** of the Schedule of Exceptions lists all agreements pursuant to which any Member or any other party that is material to the operation of the Company's business has granted a license to the Company that permits termination by such party in the event of a change of control or sale of the Company or that prohibits assignment in the event of a change of control or sale of the Company.

### 3.9 *Title to Properties and Assets; Liens.*

        (a)    Except as set forth in Section 3.9(a) of the Schedule of Exceptions: Company has good and marketable title to its material properties and material assets, and, has good title to all its leasehold interests, in each case subject to no material mortgage, pledge, lien, lease, encumbrance or charge, other than (i) liens for current taxes and utilities not yet due and payable, (ii) liens imposed by law and incurred in the ordinary course of business for obligations not past due, (iii) liens in respect of pledges or deposits under workers' compensation laws or similar legislation, (iv) liens in respect of carriers, warehousemen, mechanics, materialmen and repairmen for amounts not yet due and payable, and (v) title of a lessor under a capital or operating lease. With respect to the property and assets it leases, the Company is in compliance with such leases in all material respects and, to its Knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances, other than liens of the type described in clauses (i)-(iii) above. For purposes of this **Section 3.9(a)**, properties and assets shall not include any Company IPR unless expressly specified in Section 3.9(a) of the Schedule of Exceptions.

        (b)    Except as set forth on **Section 3.9(b)** of the Schedule of Exceptions, the Company does not own or lease any real property (the **"Company Facilities"**) and identifies all of the leases with respect to the Company Facilities (**"Company Leases"**) and any amendments or modifications to the Company Leases. Except as set forth in **Section 3.9(b)** of the Schedule of Exceptions, no party other than the Company has the right to occupy any of the Company Facilities. Each Company Lease is in full force and effect, and neither the Company nor, to the Company's Knowledge, any other party thereto, are in breach or default of any Company Lease, nor has any event or condition occurred (including the consummation of the Purchase) which could (with the giving of notice or the passage of time or both) constitute a breach or default by the Company or, to the Company's Knowledge, any other party thereto, under any Company Lease.

     3.10    *Compliance with Other Instruments.* The Company is not in violation, in any material respect, of any of the provisions of the Restated Operating Agreement. The Company is

-11-

not and has never been in violation in any material respect of any law, legal requirement, order, judgment, statute, rule or regulation applicable to the Company. The execution and delivery of this Agreement by the Company, the performance by the Company of its obligations pursuant to this Agreement, and the issuance of the Purchased Units will not (A) result in any violation of, or conflict with, or constitute a default under, (i) the Company's Restated Operating Agreement, or (ii) any of its Material Contracts, nor, (B) result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company or the suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties.

3.11    *Litigation.*

(a)    Except as set forth on Section 3.9(a) of the Schedule of Exceptions, there are no, and have not been in the past three years, any actions, suits, arbitrations, proceedings or investigations pending, or to the Company's Knowledge, threatened, against the Company or any of its properties (nor has the Company received written notice of any threat thereof) before any court or governmental agency.    The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened involving the prior employment of any of the Company's or any of its ERISA Affiliates' employees, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers.

(b)    Except as set forth on Section 3.9(a) of the Schedule of Exceptions, neither the Company, its ERISA Affiliates, nor, to the Company's Knowledge, any of the officers of the Company, is a party or subject to the provisions of any order writ, injunction, judgment or decree of any court or government agency or instrumentality specifically directed at the Company, its ERISA Affiliates, or any of their respective officers (in the case of such officers or managers, in a manner which is directly related to the Company's business and operations).

(c)    There is no action, suit, proceeding or investigation by the Company currently pending or to the Company's Knowledge that the Company intends to initiate.

3.12    *Governmental Consent.* No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Purchased Units, or the consummation of any other transaction contemplated by this Agreement, except filings pursuant to Regulation D of the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws, which have been made or will be made in a timely manner; provided, however, the foregoing representation and warranty is subject to and assumes the accuracy of the Investor's representations and warranties in Article 4 and representations and warranties of the Third Party purchasers of Additional Units under the Third Party Offering Documents.

3.13    *Permits.* The Company has all material franchises, material permits, material licenses, and any similar authority necessary for the conduct of its business as now being conducted. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

-12-

3.14 *Offering.* Subject to the accuracy of the Investor's representations and warranties in Article 4 and representations and warranties of the third party purchasers of Authorized Additional Units under the Third Party Offering Documents, the offer, sale and issuance of the Purchased Units to be issued in conformity with the terms of this Agreement, constitute transactions exempt from the registration requirements of Section 5 of the Securities Act and from the registration or qualification requirements of applicable state securities laws.

3.15 *Registration and Voting Rights.* The Company is presently not under any obligation and has not granted any rights to register under the Securities Act any of its presently outstanding securities or any of its securities that may hereafter be issued. Except for the Existing Operating Agreement or Restated Operating Agreement, no member of the Company has entered into any agreements with respect to the voting of membership units of the Company.

3.16 *Brokers or Finders.* Except as set forth on Schedule 3.16 of the Schedule of Exceptions, the Company has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Company, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or any of the transactions contemplated hereby.

3.17 *Tax Returns and Payments.*

(a) The Company has timely filed, or caused to be timely filed all income and other material tax returns required to be filed by the Company and/or its Subsidiaries with appropriate federal, state, local and foreign governmental agencies. These returns and reports are true and correct in all material respects, except as described on Schedule 3.17(a) of the Schedule of Exceptions. All taxes shown to be due and payable on such returns, any assessments imposed, and all other taxes due and payable by the Company and/or its Subsidiaries have been paid prior to the time they become delinquent. Except as set forth on **Schedule 3.17(a)** of the Schedule of Exceptions, none of the Company or its Subsidiaries have been advised in writing (i) that any of the returns of the Company and/or its Subsidiaries have been or are being audited, or (ii) of any deficiency in assessment or proposed judgment with respect to its federal, state, local or foreign taxes.

(b) The Company has made available to the Investor complete and accurate copies of all federal, state, local and foreign income, franchise and other material tax returns and reports filed by or on behalf of the Company and/or its Subsidiaries, examination reports, and statements of deficiency filed by, assessed against, or agreed to by the Company and/or its Subsidiaries for any tax period ending after December 31, 2013.

(c) Each of the Company, its Subsidiaries, and its ERISA Affiliates has withheld each material tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, equity holder or other party, and complied with all information reporting and backup withholding provisions of applicable law.

-13-

(d) The Company is not and has never been treated as an association taxed as a corporation for federal income tax purposes since inception, and no election has been filed to make any change as to the foregoing.

(e) The Company would not be a "United States real property holding corporation" as that term is defined in Section 897(c)(2) of the Code were it taxed as a corporation.

3.18 *Employees.*

(a) There are no strikes, labor disputes or union organization activities pending or to the Company's Knowledge threatened between the Company or any of its ERISA Affiliates and their respective employees. Neither the Company nor any of its ERISA Affiliates has engaged in any unfair labor practices within the meaning of the National Labor Relations Act. Neither the Company nor any of its ERISA Affiliates is presently, nor has it been in the past, a party to, or bound by, any collective bargaining agreement or union contract with respect to employees and no collective bargaining agreement is being negotiated by the Company or any of its ERISA Affiliates. Neither the Company nor any of its ERISA Affiliates has taken any action which would constitute a "plant closing" or "mass layoff" within the meaning of the WARN Act or similar state or local law, issued any notification of a plant closing or mass layoff required by the WARN Act or similar state or local law, or incurred any liability or obligation under WARN or any similar state or local law that remains unsatisfied. Neither the Company nor any of its ERISA Affiliates is aware that any officer or key employee of the Company or any of its ERISA Affiliates intends to terminate his employment with the Company or such ERISA Affiliate, nor does the Company or any of its ERISA Affiliates have a present intention to terminate the employment of any officer or key employee.

(b) Except as provided in Section 3.18(b) of the Schedule of Exceptions, the employment of each employee of the Company or any of its ERISA Affiliates is terminable at the will of the Company or its ERISA Affiliates. The Company and its ERISA Affiliates have complied in all material respects with all applicable foreign, federal, state and local laws, rules and regulations respecting employment, employment practices, terms and conditions of employment, worker classification, tax withholding, prohibited discrimination, equal employment, fair employment practices, meal and rest periods, immigration status, employee safety and health, wages (including overtime wages), compensation, and hours of work. Neither the Company nor any of its ERISA Affiliates has any material liability with respect to any misclassification of: (i) any Person as an independent contractor rather than as an employee, (ii) any employee leased from another employer, or (iii) any employee currently or formerly classified as exempt from overtime wages.

(c) Section 3.18(c) of the Schedule of Exceptions sets forth a complete and accurate list of each plan, program, policy, practice, contract, agreement, letter, or other arrangement providing for retirement, stock, stock option, unit option, restricted unit, equity or unit appreciation right, profits interest, phantom unit, phantom interest, bonus, severance, change of control, retention, notice pay, termination, material fringe benefit, commission, deferred compensation, severance, sabbatical pay and/or benefits, including, without limitation, each employee benefit plan within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and any other person that could be deemed to be a

-14-

"single employer" with the Company within the meaning of Sections 414(b), (c), (m) or (o) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations issued thereunder (an "**ERISA Affiliate**") that is sponsored, maintained, contributed to, or required to be contributed to by the Company for the benefit of any current employee, manager or consultant of the Company or any of its ERISA Affiliates, or with respect to which the Company or any ERISA Affiliate could reasonably be expected to have any material liability (each, an "**Employee Benefit Plan**" and collectively, the "**Employee Benefit Plans**"). None of the Employee Benefit Plans (i) is a pension plan that is subject to Title IV of ERISA or Section 412 of the Code, (ii) promises or otherwise provides retiree medical or other retiree welfare benefits to any person or group of persons, except as required by applicable law, or (iii) is a "multiemployer plan" as defined in Section 3(37) of ERISA. Each Employee Benefit Plan has been administered in all material respects in accordance with its terms and is in material compliance with the requirements prescribed by any and all statutes, rules and regulations (including without limitation ERISA and the Code).

(d)     Any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Code and the guidance thereunder) of the Company and its ERISA Affiliates (each, a "**409A Plan**") complies, in both form and operation, with the requirements of Section 409A of the Code and the regulations and Internal Revenue Service guidance thereunder.

(e)     To the Company's Knowledge, within ten (10) years prior to the date hereof, none of the officers or directors of the Company has been (i) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his business or property; (ii) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (iii) subject to any order, judgment, or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him from engaging, or otherwise imposing limits or conditions on his engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (iv) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures Trading Commission to have violated any federal or state securities, commodities, or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

3.19     *Obligations to Related Parties.*  Except as set forth on Schedule 3.19 of the Schedule of Exceptions, no employee, officer, manager or, to the Company's Knowledge, member of the Company or member of his or her immediate family or Affiliate thereof is indebted to the Company, nor is the Company indebted (or committed to make loans or extend or guarantee credit) to any of them. Except as set forth on Schedule 3.19 of the Schedule of Exceptions, to the Company's Knowledge, none of such persons or any member of his or her immediate family has any direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation that competes with the Company, except in connection with the ownership of stock in publicly traded companies. Except as set forth on Schedule 3.19 of the Schedule of Exceptions, to the Company's Knowledge, no employee, officer, manager or member of the Company, nor any member of their

-15-

immediate families or Affiliate thereof, is, directly or indirectly, interested in any material contract with the Company (other than such contracts as relate to any such person's ownership of equity securities of the Company). The Company is not a guarantor or indemnitor of any indebtedness of any other person, firm or corporation.

3.20 *Obligations of Management and Key Employees.* Except as described at Section 3.20 of the Schedule of Exceptions, each officer and key employee of the Company is currently devoting substantially all of his or her business time to the conduct of the business of the Company. No officer or key employee of the Company is currently working or, to the Company's Knowledge, plans to work for a competitive enterprise, whether or not such officer or key employee is or will be compensated by such enterprise.

3.21 *Insurance.* The Company has in full force and effect insurance policies described and in amounts described at Section 3.21) of the Schedule of Exceptions.

3.22 *Environmental Safety Laws.* To the Company's Knowledge, it is not in violation in any material respect of any applicable statute, law or regulation relating to the environment or occupational health and safety, and no material expenditures are or will be required in order to comply with any such existing statute, law or regulation.

3.23 *Anti-Bribery and Anti-Corruption.* The Company (together with any of the Company's and its ERISA Affiliate's respective managers) has not, directly or indirectly, taken any action which would cause it to be in violation of the Foreign Corrupt Practices Act of 1977 ("**FCPA**"), as amended, or any rules or regulations thereunder, the United Kingdom Bribery Act of 2010, Organization of Economic Cooperation and Development (OECD) Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, or any similar anti-corruption or anti-bribery laws applicable to the Company or its Subsidiaries or ERISA Affiliates (hereinafter collectively referred to as the "**Anti-Corruption Laws**"); used any Company funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; made, offered, promised, or authorized any unlawful payment or other thing of value to foreign or domestic government officials or employees, employees or officials of public international organizations, or members or candidates of any foreign political party, whether directly or indirectly; or made, offered, promised or authorized any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment to any person, whether directly or indirectly. Neither the Company nor other entities under the control of the Company have conducted an internal investigation, or been informally or formally investigated, charged, or prosecuted, for conduct related to applicable Anti-Corruption Laws. All allegations of potential violations of applicable Anti-Corruption Laws have been reported to Investor. The Company has established sufficient internal controls and procedures to ensure compliance with applicable Anti-Corruption Laws, accurately accounted for all payments to third parties, disclosed all payments or provisions to foreign officials (as defined by the FCPA), and delivered all of such documentation to Investor or its counsel.

3.24 *Export Controls.* The Company has complied in all material respects with all applicable export and reexport control laws and regulations, including the Export Administration Regulations ("**EAR**") maintained by the U.S. Department of Commerce, trade and economic sanctions maintained by the Treasury Department's Office of Foreign Assets Control ("**OFAC**"),

-16-

and the International Traffic in Arms Regulations ("**ITAR**") maintained by the Department of State. Specifically, the Company represents that it has not, directly or indirectly, sold, exported, reexported, transferred, diverted, or otherwise disposed of any products, services, software, or technology (including products derived from or based on such products, services, software or technology) to any destination, entity, or person prohibited by the laws or regulations of the United States, without obtaining prior authorization from the competent government authorities as required by those laws and regulations.

3.25    [Intentionally omitted]

3.26    *Status of Commercial Relationships.* The Company has not received written notice of any material dispute concerning products and/or services with any licensor, customer, distributor, service provider or supplier. The Company has not had any of its customers terminate the Company's service for default or breach by the Company. The Company has no Knowledge of any material dissatisfaction on the part of any licensor, distributor, service provider or supplier with respect to their business relationship with the Company or the products or services delivered, distributed or sold by the Company, including without limitation any content licensor's material dissatisfaction with the Company's use of such content. The Company has not received written notice from any licensor, distributor, service provider or supplier material to the Company's business that any such person intends to terminate or materially modify existing contracts or relationships with the Company.

3.27    *Disclosure.* The Company has provided Investor with all the information regarding the Company that Investor has requested in writing for deciding whether to purchase the Purchased Units. No representation or warranty of the Company contained in this Agreement, as qualified by the Schedule of Exceptions, and no certificate furnished or to be furnished to the Investor at the date of this Agreement contains any untrue statement of a material fact or, omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

3.28    *Secured Debt; Exclusion of Pilot Plant or Intellectual Property as Collateral.* The Company has negotiated and/or renewed the terms governing the indebtedness due its secured lenders as more particularly described on Section 3.27 of the Schedule of Exceptions attached hereto. The secured lenders have no security interest in the Company's Intellectual Property or the future pilot plant described in the Summary Business Plan and Budget (incorporated by reference into the Restated Operating Agreement) of the Company by virtue of a partial release or the otherwise limited scope of the applicable security interest.

## ARTICLE 4

## Representations and Warranties of the Investor

Investor hereby represents and warrants to the Company as follows as of the date of this Agreement and as of the Closing:

4.1    *Organization, Good Standing and Qualification.* Investor is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation or incorporation. Investor has the requisite power and authority to own and operate its properties and assets, to carry

-17-

on its business as presently conducted, to execute and deliver this Agreement and to perform its obligations pursuant to this Agreement and the Restated Operating Agreement.

4.2 *No Registration.* Investor understands that the Purchased Units have not been, and will not be (except as provided in the Registration Rights Agreement), registered under the Securities Act or applicable state securities laws ("**Blue Sky Laws**") by reason of exemptions from the registration provisions of the Securities Act and Blue Sky Laws and any applicable regulations promulgated thereunder or interpretations thereof, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

4.3 *Investment Intent.* Investor is acquiring the Purchased Units for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof, and such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor further represents that it does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or entity or to any third person or entity with respect to any of the Purchased Units. Investor acknowledges that it is able to bear the economic risk of investment in the Purchased Units for an indefinite period of time.

4.4 *Accredited Investor.* Investor is an "accredited Investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company.

4.5 *Residency.* The residency of Investor (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the Schedule of Investor.

4.6 *No Public Market.* Investor understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

4.7 *Authorization.*

(a) Investor has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements, to purchase the Purchased Units hereunder and to carry out and perform its obligations under the terms of this Agreement and the Ancillary Agreements. All action on the part of such Investor necessary for the authorization, execution, delivery and performance of this Agreement and the Ancillary Agreements has been taken prior to the date of this Agreement.

(b) This Agreement and the Ancillary Agreements, when executed and delivered by such Investor, will constitute valid and legally binding obligations of such Investor, enforceable in accordance with their terms except (i) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

-18-

4.8 *Brokers or Finders*. Investor has not engaged any brokers, finders or agents, and neither the Company nor any other Investor has, nor will, incur, directly or indirectly, as a result of any action taken by such Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement and the Ancillary Agreements.

4.9 *Acknowledgment*.  As of the date of this Agreement and Closing, Investor acknowledges: (a) receipt of all of the items listed on the attached Confidential Information Certificate dated November 10, 2016 and all other information requested by the Investor has been received by Investor, and that it has carefully reviewed them and understands the information contained therein; (b) it has had reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of the Company concerning the offering of the Units and the business and financial condition of the Company, and all such questions have been answered to the full satisfaction of the Investor; (c) it is aware that an investment in the Units involves a number of very significant risks, the nature of which the Investor is a fully capable of assessing (d) as a result of the risks associated with an investment in the Units the Investor may lose its entire investment. Notwithstanding all of the foregoing, Investor may fully rely on all of the Company's representations and warranties contained in this Agreement.

## ARTICLE 5

## Conditions to Investor's Obligations at Closing

Investor's obligation to purchase the applicable Purchased Units at the Closing is subject to the fulfillment on or before the Closing of each of the following conditions in Investor's reasonable determination, unless waived in writing by the Investor before the Closing:

5.1 *Representations and Warranties*. The representations and warranties made by the Company in Article 3 shall be true and correct in all material respects as of the date of this Agreement and, if for any reason the Closing does not occur on the date of this Agreement, as of the date of the Closing with the same effect as though such representations and warranties had been made on and as of the date of this Agreement.

5.2 *Covenants*. All covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the Closing shall have been performed or complied with in all material respects as of the Closing.

5.3 *Blue Sky*. The Company shall have obtained all necessary Blue Sky law permits and qualifications, or have the availability of the exemptions therefrom, required by any state for the offer and sale of the Purchased Units.

5.4 *Compliance with Securities Laws*. The offer and sale of the Purchased Units shall be qualified or exempt from registration or qualification under all applicable federal and state securities laws (including receipt by the Company of all necessary blue sky law permits and qualifications required by any state, if any).

5.5 *Restated Operating Agreement*. The Restated Operating Agreement shall have been duly authorized and executed and in full force and effect as of Closing and signed by the

Company's current members, the Investor and by each purchaser of Third Party Units. The Restated Operating Agreement shall contain or incorporate by reference the EER Budget Plan attached as Exhibit B. The Restated Operating Agreement (which shall be the Company's Fourth Amended and Restated Limited Liability Company Agreement) shall also amend subparagraph 6.03(d) and 6.04(d) in order to provide that the issuance of Units at a purchase price of less than $1.30 per Unit requires a two-thirds super-majority vote of Units and approval by 80% or more of Company's Key Holders (those members holding 500,000 or more Company Units). The Restated Operating Agreement will also expand the Company's Board of Managers from a three (3) person board to a five (5) person board, and the Restated Operating Agreement will provide that the five (5) managers will be determined as follows:

(a) The first two managers shall be appointed by John Wooley and Jeff Wooley;

(b) The third manager shall be appointed by Keresa Plantations Sdn Bhd;

(c) The fourth manager shall be appointed by Tim O'Meara;

(d) The fifth manager will be appointed by Steve Robson.

Within 90 days of Closing, Investor shall have the right to appoint one (1) manager at its election with Company having the ability to appoint an additional manager as well. In such instance the board size shall be increased from five (5) to seven (7).

5.6 *Other Deliverables.* The Company shall have delivered to counsel to the Investor a certificate executed by an officer of the Company as of the Closing, in substantially the form attached hereto as **Exhibit E**, certifying the satisfaction of the conditions listed in **Sections 5.1** and **5.2** and attaching and certifying to the truth and correctness the Board and member resolutions adopted in connection with the transactions contemplated by this Agreement.

5.7 *Proceedings and Documents.* All limited liability company and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Investor, and the Investor shall have been furnished with such instruments and documents as it shall have reasonably requested.

5.8 *Technology License.* The Company shall have executed and delivered a Technology License Agreement in the form set forth in **Exhibit F** (the "**Technology License**").

5.9 *Closing of Sale of Third Party Units.* The Company shall provide proof to Investor that the Company has closed and received funding for a minimum balance of 961,539 Authorized Additional Units through the Sale of Third Party Units at approximately $1.30 per Unit for a minimum total of $1,250,000 including the delivery of all fully executed Third Party Offering Documents and proof of payment of the proceeds due at closing of the Sale of the Third Party Units. The payment for the Sale of Third Party Units may be made pursuant to the same installment payments schedule that applies to Investor per Section 1.2 and Exhibit A of this Agreement.

-20-

5.10 *EER Checks or Disbursements*. Company will have taken all actions necessary to require the dual signature of all Company checks or disbursements over $100.00. All checks over $100.00 will be required to be (i) signed by a Company officer and one other Company employee with signatory authority over Company's bank account; and (ii) be pre-approved by either Mark Scantlin or Graham Brown provided that they shall provide their authorization in a timely basis and will not unreasonably withhold or delay their authorization for expenditures that are in compliance with the EER Budget Plan. Company shall provide a copy of all such checks to Investor upon issuing.

5.11 *Transparency*. Company shall have also taken such actions as are necessary in order to implement the following transparency actions, each of which shall, in addition to being a closing condition, constitute a post-closing covenant:

(a) *Monthly Disbursement Reports*. Investor shall be provided with a monthly report of all check or other disbursements made by the Company so that the Investor may review the amount and purpose of each Company check or other disbursement in compliance with the EER Budget Plan.

(b) *Review Rights*. All bids, purchase orders, contracts and accounts payable listings over $100.00 will be provided to a designated representative of the Investor prior to issuance, acceptance or payment in order to allow Investor to provide input and recommendations regarding such items, with the expectation that such input and recommendations will be provided by the Investor within 24 hours.

## ARTICLE 6
## Conditions to Company's Obligations at Closing

The Company's obligation to sell the applicable Purchased Units to Investor at the Closing is subject to the fulfillment, on or before the Closing, of the following conditions, unless waived in writing by the Company before the Closing:

6.1 *Representations and Warranties*. The representations and warranties made by the Investor in Article 4 shall be true and correct when made and shall be true and correct as of the date of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing, subject to the Company's update of the Disclosure Schedule at Closing.

6.2 *Covenants*. All covenants, agreements and conditions contained in this Agreement to be performed by Investor on or prior to the date of the Closing shall have been performed or complied with as of the date of the Closing.

6.3 *Compliance with Securities Laws*. The offer and sale of the Purchased Units shall be qualified or exempt from registration or qualification under all applicable federal and state securities laws (including receipt by the Company of all necessary blue sky law permits and qualifications required by any state, if any).

-21-

6.4 *Restated Operating Agreement*. The Restated Operating Agreement, including the two-year Summary Business Plan and Budget, shall have been duly authorized by the Investor and executed by the Investor.

6.5 *Proceedings and Documents*. All limited liability company and other proceedings required to carry out the transactions contemplated by this Agreement, and all instruments and other documents relating to such transactions, shall be reasonably satisfactory in form and substance to the Company, and the Company shall have been furnished with such instruments and documents as it shall have reasonably requested.

6.6 *Payment of Purchase Price*. Investor shall have delivered to Company cash in an amount equal to the portion of the "**Amount Paid in Cash at Closing**" set forth on Exhibit A by wire transfer in immediately available funds, to an account or accounts designated prior to the Closing by Company in a written notice to the Investor.

6.7 *Technology License*. The Investor shall have executed and delivered a Technology License.

6.8 *Closing of Sale of Third Party Units*. The Company shall have closed and received timely funding of closing proceeds for the sale of a minimum of 961,539 Third Party Units at approximately $1.30 per Unit for a minimum of $1,250,000 (or up to an additional 1,153,846 Units for an additional maximum of $1,500,000) including the delivery of all fully executed Third Party Offering Documents and proof of timely payment closing proceeds (subject to each Third Party investor's ability to pay in accordance with the same equal installment payment schedule as Investor per Section 1.2).

## ARTICLE 7

### Termination

7.1 *Termination*. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of the Company and Investor;

(b)     by Investor by written notice to the Company if:

(i)     If Investor is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by the Company pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article V** and such breach, inaccuracy or failure has not been cured by the Company within ten Business Days of the receipt of written notice of such breach from Investor; or

(ii)     any of the conditions set forth in **Article V** shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by November 30, 2018, unless such failure shall be due to the failure of Investor to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing.

-22-

(c)     by the Company by written notice to Investor if:

(i)     the Company is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Investor pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach, inaccuracy or failure has not been cured by Investor within ten Business Days of receipt of written notice of such breach from the Company; or

(ii)     any of the conditions set forth in Article VI shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by November 30, 2018, unless such failure shall be due to the failure of the Company to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing.

(d)     by Investor or the Company if there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or any governmental entity shall have issued an order restraining or enjoining the transactions contemplated by this Agreement, and such order shall have become final and non-appealable.

7.2 *Effect of Termination.* In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto.

## ARTICLE 8

### Post-closing Inspection Rights; Miscellaneous

8.1     *Post-closing Inspection Rights.* During construction and testing of the pilot plant described in the Summary Business Plan (incorporated by reference into the Restated Operating Agreement), a designated representative of Investor will be given reasonable access to inspect such pilot plant and will have the opportunity to meet via voice or in person with Company management not less frequently than once per month to discuss the progress related to the pilot plant; provided, however, such designated representative shall execute and deliver to Company a form of commercially reasonable non-disclosure agreement.

8.2 *Definitions.* Terms used but not defined in this Agreement have the meanings ascribed to such terms below:

(a)     "**Affiliate**" means with respect to a person or entity, any other person or entity that, directly or indirectly, controls or is controlled by or is under common control with the first person or entity.

(b)     "**Ancillary Agreements**" means this Agreement, the Restated Operating Agreement, the SPEL Product Facility Term Sheet and Off-Take Agreement Term Sheet.

(c)     "**Board**" means the Managers of the Company.

-23-

(d)     "**Business day**" means a day, other than Saturday, Sunday or any other day on which commercial banks in Des Moines, Iowa are authorized or required by law to close.

(e)     "**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations thereunder.

(f)     "**Knowledge**" with respect to the Company shall mean the actual knowledge of the chief executive officer or acting chief executive officer of the Company.

(g)     A "**Material Adverse Effect**" means any change, event, circumstance or effect that has, or would reasonably be expected to have, a materially adverse effect on to the financial condition, business, assets, liabilities or results of operations of the Company; provided, however, in no event shall any of the following constitute a Material Adverse Effect: (i) any change resulting from conditions affecting the industry in which Company operates or from changes in general business or economic conditions; or (ii) any change resulting from compliance by Company with the terms of, or the taking of any action contemplated or permitted by, this Agreement or the Ancillary Agreements.

(h)     "**Subsidiary**" means, with respect to any person or entity, each corporation, limited liability company, partnership, association, joint venture or other business entity of which such person or entity owns or has owned, directly or indirectly, more than fifty percent (50%) of the stock or other equity interest entitled to vote on the election of the members of the board of directors or similar governing body.

(i)     "**Third Party**" means any person or entity other than Investor.

(j)     "**Units**" shall mean those Units of membership interest in the Company.

(k)     "**White Paper**" shall mean a document or series of documents that contain(s) the data necessary to calculate the mass balance for the molecules of interest, the efficiency of each of the required processing steps, and all of the information required to prepare a complete conceptual design package, which includes:

1. Preliminary process flow diagram with mass and energy balance

2. Preliminary cycle time analysis (batch processes)

3. Equipment list with preliminary equipment sizing

4. Preliminary hazard analysis completed

5. Preliminary equipment layout/material flows

6. Process description/operating protocol

7. Capital cost estimate

8. Preliminary financial analysis

-24-

8.3 *Amendment*. Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and Investor. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities have been converted or exchanged or for which such securities have been exercised) and each future holder of all such securities.

8.4 *Notices*. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand or by messenger addressed:

> (a)     if to Investor, at the Investor's address, facsimile number or electronic mail address as shown in the Company's records, as may be updated in accordance with the provisions hereof;

> (b)     if to any other holder of any Purchased Units, at such address, facsimile number or electronic mail address as shown in the Company's records, or, until any such holder so furnishes an address, facsimile number or electronic mail address to the Company, then to and at the address of the last holder of such Purchased Units for which the Company has contact information in its records; or

> (c)     if to the Company, one copy should be sent to Jeffrey J Wooley_____; email: jwooley1@austin.rr.com Attn: Jeffrey J Wooley_____ or at such other address as the Company shall have furnished to the Investor, with a copy to John C Wooley jwooley@austin.rr.com phone: _512-422-2374_ , fax: _NA_____.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) when delivered if delivered personally, (ii) if sent by mail, at the earlier of its receipt or 72 hours after the same has been deposited in a regularly maintained receptacle for the deposit of the U.S. mail, (iii) one (1) business day after being deposited with an overnight courier service of recognized standing, properly addressed and with shipping fees prepaid (a "**Courier Service**") if mailed to Investor in the United States or three (3) business days after being deposited with a Courier Service if mailed to Investor outside the United States (provided that such notice or communication to be sent to Investor whose principal office is located outside of the United States of America may only be mailed by deposit with a Courier Service) or (iv) if sent by facsimile, upon confirmation of facsimile transfer or, if sent by electronic mail.

8.5 *Governing Law*. All questions concerning the construction, validity, and interpretation of this Agreement and the performance of obligations imposed by this Agreement (whether in contract or in tort) shall be governed in all respects by the internal laws of the State of Texas as applied to agreements entered into among Texas residents to be performed entirely within Texas, without regard to principles of conflicts of law.

8.6 *Indemnification – the Company*. The Company shall indemnify, defend and hold harmless the Investor and its affiliated entities and the respective shareholders, directors,

-25-

managers, officers, employees, agents and other representatives (collectively, the "**Investor Indemnified Parties**"), from and against any and all Claims, asserted against, resulting to, imposing upon or incurred by any Investor Indemnified Party, by reason of, arising out of or resulting from any of the following:

(a)     Any inaccuracy or breach of any representation and warranty of the Company contained in or made pursuant to this Agreement;

(b)     Any breach of any covenant of the Company contained in or made pursuant to this Agreement; and/or

(c)     Any liability for any commission or compensation in nature of a broker or finder's fee or agent's commission for which Company is responsible.

For purposes of this Article 8, "**Claim**" means and includes: (i) all liabilities; (ii) all losses, damages, judgments, awards, penalties and settlements; (iii) all demands, claims, suits, actions, cause of actions, proceedings and assessments, whether or not ultimately determined to be valid; and (iv) all costs and expenses (including pre-judgment interest in any litigated or arbitrated matter and other interests, court costs and fees and expenses of the attorneys, consultants and expert witnesses) of investigating, defending or asserting any of the foregoing of enforcing this Agreement.

8.6A    *Indemnification – Investor*. Investor shall indemnify, defend and hold harmless the Company and its affiliated entities and the respective shareholders, directors, managers, officers, employees, agents and other representatives (collectively, the "**Company Indemnified Parties**"), from and against any and all Claims, asserted against, resulting to, imposing upon or incurred by any Company Indemnified Party, by reason of, arising out of or resulting from any of the following:

(a)     Any inaccuracy or breach of any representation and warranty of the Investor contained in or made pursuant to this Agreement;

(b)     Any breach of any covenant of the Investor contained in or made pursuant to this Agreement; and/or

(c)     Any liability for any commission or compensation in nature of a broker or finder's fee or agent's commission for which Investor is responsible.

8.7 *Survival; Deductible; Cap*. The representations, warranties, covenants and agreements made in this Agreement shall survive any investigation made by any party hereto and the closing of the transactions contemplated hereby; provided that (i) the representations and warranties (other than those set forth in clause (ii) below) shall survive only until the 24 month anniversary of the Closing and (ii) that the representations and warranties in each of Sections 3.1 (Organization, Good Standing and Qualification), 3.3 (Capitalization), 3.4 (Authorization), 3.16 (Brokers or Finders), 4.1 (Organization, Good Standing and Qualification), 4.4 (Accredited Investor), 4.3 (Investment Intent), 4.7 (Authorization) and 4.8 (Brokers or Finders), 4.9 (Acknowledgement) (collectively, the "**Fundamental Representations**") shall survive the Closing indefinitely. Notwithstanding anything to the contrary in this Agreement, except in the case of fraud, in no event shall any party

-26-

hereto be liable for losses or damages incurred resulting from any breach of any representation or warranty contained in this Agreement (i) unless and until the aggregate amount of all such losses incurred by such party and/or its affiliates exceeds 1% of the aggregate Purchase Price paid by all Investors (the **"Deductible"**), in which case, such party shall be entitled to recover all losses incurred, including the Deductible and (ii) in an amount in excess of the aggregate Purchase Price paid by Investor.

8.7A  *Sole Recourse.* After Closing, the sole and exclusive monetary recourse of Company Indemnified Parties, on the one hand, and the Investor Indemnified Parties, on the other, against the other for any Claims under this Agreement shall be the indemnity set forth in this Article 8, other than in respect of causes of action based on theories of fraud, intentional misrepresentation, or seeking specific performance or other equitable remedies.

8.8 *Successors and Assigns.* This Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any party without the prior written consent of the other parties; however, notwithstanding the foregoing or the sentence immediately following this sentence, Investor may provide to Investor's primary lending institute a blanket lien including the rights under this Agreement. Any attempt by Investor or Company in contravention of the foregoing to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Subject to the foregoing and except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

8.9 *Entire Agreement.* This Agreement and the Ancillary Agreements including the exhibits attached hereto and thereto, constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and thereof. No party shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein or therein.

8.10  *Efforts to Consummate.* Subject to the terms and conditions of this Agreement, each party to this Agreement shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action, and do, or cause to be done, all things necessary, proper or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by this Agreement and fulfill all conditions to the parties' obligations under this Agreement.

8.11  *Delays or Omissions.* Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either

-27-

under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

8.12 *Severability.* If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

8.13 *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

8.14 *Telecopy Execution and Delivery.* A facsimile, telecopy, portable document format (.PDF) or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

8.15 *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to more fully effectuate this Agreement.

8.16 *Waiver of Jury Trial Rights.*
EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY AND ANY LEGAL PROCEEDING (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT.

8.17 *Nondisclosure.* Company shall not identify Kemin Industries in its future investor solicitation efforts or marketing, nor will the Company issue press releases or participate in media interviews identifying Kemin Industries as an investor in the Company, without prior written approval of Kemin Industries. Independent Legal Counsel. Each of the Parties has been represented by independent legal counsel, or has been advised to retain independent legal counsel and has had an opportunity to retain independent legal counsel, with respect to the negotiation and signing and delivery of this Agreement and all ancillary documents related to this Agreement. It is further acknowledged and agreed that:

(a) Kemin has been represented by Belin McCormick, P.C. of Des Moines, Iowa and Belin McCormick, P.C. has not represented or provided any legal services to any other Party to this Agreement;

-28-

(b)     EER   has not been   represented   by   _counsel_____   of _____, _____ and ___EER_____ has not represented or provided any legal services to any other Party to this Agreement.


*(The remainder of this page is left intentionally blank.)*

4835-6049-7362.1

IN WITNESS WHEREOF, this Unit Purchase Agreement is executed as of the date first written above.

**Earth Energy Renewables LLC**
**a Texas limited liability company**

By: _____

Name: __Jeffrey J Wooley_____

Title: __Manager_____

*(Signature Page to Unit Purchase Agreement)*

IN WITNESS WHEREOF, this Unit Purchase Agreement is executed as of the date first written above.

INVESTOR:

**KEMIN INDUSTRIES, INC.**

By: _Marc Scanlin_

Name: _MARC SCANLIN_

Title: _Presiden KFT Americas_

## EXHIBIT A

### SCHEDULE OF PAYMENTS

**[To be completed]**

## EXHIBIT B

### EER BUDGET PLAN

**See attached.**

## EXHIBIT C

### FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

## EXHIBIT D

### SCHEDULE OF EXCEPTIONS

**EXHIBIT E**

**COMPLIANCE CERTIFICATE**

Pursuant to Section 5.6 of the Unit Purchase Agreement, dated _____, 2016 by and among Earth Energy Renewables LLC, a _____ limited liability company (the "Company"), and the Investor listed on <u>Exhibit A</u> thereto (the "Agreement"), the undersigned, in his capacity as Chief Executive Officer of the Company, certifies on behalf of the Company as follows:

1. He is the Chief Executive Officer of the Company;

2. The Company has performed or complied with all covenants, agreements and conditions contained in the Agreement to be performed by the Company on or prior to the Closing in all material respects;

3. The representations and warranties made by the Company in Article 3 (as modified by the disclosures on the Schedule of Exceptions) are true and correct in all material respects as of the date hereof;

4. Attached hereto as <u>Exhibit A</u> is a true and complete copy of the resolutions duly adopted by the members of the Company on _____ authorizing the transactions contemplated by the Agreement;

5. Attached hereto as <u>Exhibit B</u> is a true and complete copy of the resolutions duly adopted by the Board of Managers of the Company on _____ authorizing the transactions contemplated by the Agreement;

6. Attached hereto as <u>Exhibit C</u> is a true and complete copy of the Third Amended and Restated Limited Liability Company Agreement of the Company, (the "Operating Agreement"), as amended to date; and

7. The resolutions referred to in paragraphs 4 and 5 above are in full force and effect as of the date hereof and have not been amended, modified or rescinded.

Capitalized terms used but not defined herein have the meanings ascribed to them in the Agreement.

*(The remainder of this page is left intentionally blank.)*

## EXHIBIT F

### TECHNOLOGY LICENSE

# EXHIBIT C

## LICENSE AGREEMENT

This License Agreement (the "**Agreement**") is made and entered into as of October 31, 2018 (the "**Effective Date**"), by and between Kemin Industries, Inc., an Iowa corporation ("**Kemin**"), Keresa Plantations Sdn Bhd, a company formed under the laws of the country of Malaysia ("**Keresa**"), Steve Robson, an individual and resident of the State of Arizona ("**Robson**") (Kemin, Keresa and Robson each a "**Licensee**" and together the "**Licensees**") and Earth Energy Renewables, LLC, a Texas limited liability company ("**EER**"). Kemin, Keresa, Robson, and EER may be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

### RECITALS

**WHEREAS**, EER has developed and owns or otherwise has rights to use the EER Technology (as defined herein);

**WHEREAS**, the Licensees intend to build the Facilities (as defined herein) and to operate the Facilities to produce and sell the Products (as defined herein); and

**WHEREAS**, the Facilities that are the subject of this Agreement are the contemplated first three (3) production facilities that will use EER Technology (as defined herein) to produce Products (as defined herein) and that it is contemplated that other production facilities will be constructed in the future pursuant to the SPEL Agreement (as defined herein) and other agreements entered into by EER which do not conflict with the SPEL Agreement.

**WHEREAS**, in all cases on the terms and conditions of this Agreement, EER desires to grant a license to Licensees, and Licensees desire to accept a license from EER, to use the EER Technology in connection with the development, construction and operation of the Facilities and the manufacture, distribution and sale of the Products.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties intending to be legally bound agree as follows:

### AGREEMENT

### ARTICLE 1.
### DEFINITIONS

Unless otherwise defined in this Agreement, all capitalized terms shall have the meaning ascribed to them in this Article 1. Except where the context expressly requires otherwise, (a) the use of any gender herein will be deemed to encompass references to either or both genders, and the use of the singular will be deemed to include the plural (and vice versa), (b) the words "include," "includes," and "including" will be deemed to be followed by the phrase "without limitation," (c) the word "will" will be construed to have the same meaning and effect as the word "shall," (d) any reference herein to any Person will be construed to include the Person's successors and assigns, (e) the words "herein," "hereof," and "hereunder," and words of similar

4835-6049-7362.1

import, will be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (f) all references herein to Sections will be construed to refer to Sections of this Agreement, (g) references to any specific law, rule or regulation, or article, section or other division thereof, will be deemed to include the then-current amendments thereto or any replacement or successor law, rule or regulation thereof and (h) the term "or" will be interpreted in the inclusive sense commonly associated with the term "and/or."

1.1.   **"Affiliate"** means, as of any point in time and for so long as such relationship continues to exist with respect to any Person, any other Person that controls, is controlled by or is under common control with such Person. A Person will be regarded as in control of another Person if it (a) owns or controls, directly or indirectly, more than 50% of the equity securities of the subject Person entitled to vote in the election of directors (or, in the case of a Person that is not a corporation, for the election of the corresponding managing authority) or (b) possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of any such Person (whether through ownership of securities or other ownership interests, by contract or otherwise).

1.2.   **"Applicable Law"** means all applicable laws, statutes, rules, regulations and other pronouncements having the effect of law of any federal, national, multinational, state, provincial, county, city or other political subdivision, agency or other body, domestic or foreign, including any applicable rules, regulations, guidelines or other requirements of the Regulatory Authorities that may be in effect from time to time.

1.3.   **"Background EER Intellectual Property"** means the Patents, Know-How, and other intellectual property rights owned by, or licensed by any Third Party to EER or its Affiliates, whether as of the Effective Date or thereafter.

1.4.   **"Dollar(s)"** means United States Dollars.

1.5.   **"EER Improvements"** means all Improvements made, developed, conceived or reduced to practice during the Term of this Agreement by EER or any Third Party controlled by EER or acting on behalf of EER.

1.6.   **"EER Know-How"** means Know-How, including without limitation manufacturing information and data related to the production of Products and the commercialization of the EER Technology, whether now existing or coming into existence after the Effective Date.

1.7.   **"EER Technology"** means all materials, technology, and intellectual property of any nature whatsoever owned or controlled by EER or its Affiliates, whether as of the Effective Date or thereafter, including but not limited to all EER Know-How, Background EER Intellectual Property, Trade Secrets and Improvements. EER Technology shall also include the engineering designs and plans for each production facility contemplated by this Agreement, as well as any modifications to the EER designs and plans made by the Licensee to produce a production facility contemplated by this Agreement.

1.8.    **"EER Trade Secrets"** means Trade Secrets of EER and/or related to the EER Technology.

1.9.    **"Facilities"** means the Kemin Facility, Keresa Facility and Robson Facility, collectively, and **"Facility"** refers to either the Kemin Facility, Keresa Facility or the Robson Facility, individually.

1.10.   **"Governmental Authority"** means any domestic or foreign supranational, national, state, municipal or local government, political subdivision or other governmental department, court, commission, board, bureau, agency, instrumentality, or other authority thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

1.11.   **"Improvements"** means all ideas, concepts, discoveries, inventions, developments, Know-How, trade secrets, techniques, processes, methodologies, modifications, innovations, improvements, materials, products, derivatives, information, writings, documentation, data, and rights (whether or not protectable under state, federal or foreign patent, trademark, copyright or similar laws) that are conceived, discovered, developed, created or reduced to practice.

1.12.   **"Kemin End Products"** means products or other articles of commerce manufactured or marketed and distributed by Kemin that contain or utilize as part of the manufacturing process C-3 or C-4 carboxylic acids manufactured by a Licensee pursuant to EER Technology license rights granted by EER to a Licensee.

1.13.   **"Kemin Facility"** means the up to 60 ton per day singular production facility (or equivalent scale) for production of the Products, currently contemplated to be majority owned by Kemin or an Affiliate of Kemin and constructed in either Iowa or Texas in the United States of America. Keresa shall have a right to own 10% of the Kemin Facility.

1.14.   **"Keresa Facility"** means the up to 60 ton per day singular production facility (or equivalent scale) for production of the Products, currently contemplated to be majority owned by Keresa or an Affiliate of Keresa and constructed in the country of Malaysia. Kemin shall have a right to own 10% of the Keresa Facility.

1.15.   **"Keresa Territories"** means Singapore, Malaysia, Indonesia, Philippines, Vietnam, Thailand, Cambodia, Laos, Brunei, Myanmar, China, Taiwan, South Korea, Japan, India, New Zealand, Australia and Papua New Guinea.

1.16.   **"Know-How"** means intellectual property, data, results, unregulated and regulated animal studies, chemical structures, chemical sequences, biological structures, nucleic acid sequences, amino acid sequences, information, materials, inventions, know-how, formulas, Trade Secrets, techniques, methods, processes, procedures and developments, whether or not patentable.

1.17.   **"Net Cash Flow"** means earnings before interest, taxes, depreciation and amortization ("EBITDA") as determined in accordance with United States Generally Accepted Accounting Principles ("GAAP") as consistently applied.

1.18. **"Net Income"** means net income after interest, taxes, depreciation and amortization as determined in accordance with GAAP as consistently applied.

1.19. **"Patents"** means the rights and interests in and to issued patents and pending patent applications in any country, jurisdiction or region in the Territory (including inventor's certificates and utility models), including all provisionals, non-provisionals, substitutions, continuations, continuations-in-part, divisionals, renewals and all patents granted thereon, and all reissues, reexaminations, extensions, confirmations, revalidations, registrations and patents of addition thereof, including patent term extensions and supplementary protection certificates, international patent applications filed under the Patent Cooperation Treaty (PCT) and any foreign equivalents to any of the foregoing.

1.20. **"Person"** means an individual, sole proprietorship, partnership, limited partnership, limited liability partnership, corporation, limited liability company, business trust, joint stock company, trust, incorporated association, joint venture or similar entity or organization, including a government or political subdivision or department or agency of a government.

1.21. **"Production Agreement"** means the Chemical Product Purchase and Supply Agreement Term Sheet between EER and Kemin dated August 28, 2017 attached hereto as <u>Exhibit B</u>.

1.22. **"Products"** means Carboxylic acids (C-3 through C-8) produced using the EER Technology, including but not limited to EER's proprietary anaerobic fermentation and extraction of bio-degradable materials, provided that the term "Products" shall not include output from the utilization of carboxylic acids to generate chemical derivatives products of C-3 through C-8 acids to generate for sale in markets other than the acid market such as esters, polyol esters, alcohols, secondary alcohols, ketones, aldehydes, triglycerides, di-carboxylic acids, olefins, hydrocarbon fuels, fuel additives and other end products made from the foregoing chemical compounds.

1.23. **"Regulatory Approval"** means the permits, licenses, registrations, authorizations, and approvals (including labeling approvals) of any Regulatory Authority, necessary for the research, development, animal testing, commercial manufacture, distribution, marketing, promotion, offer for sale, use, import, export or sale of a Product containing the EER Technology a regulatory jurisdiction.

1.24. **"Regulatory Authority"** means, with respect to a country in the Territory, any national (*e.g.*, the USDA), supra-national (*e.g.*, the European Commission, the Council of the European Union or the EMA), regional, state or local regulatory agency, department, bureau, commission, council or other Governmental Authority involved in the granting of Regulatory Approvals for products containing EER Technology in such country.

1.25. **"Robson Facility"** means the up to 60 ton per day singular production facility (or equivalent scale) for production of the Products, currently contemplated to be wholly owned by Robson or an Affiliate of Robson and constructed in Oregon in the United States of America. The Robson Facility that is the subject of this Agreement is one (1) of

the two (2) production facilities contemplated by a July 25, 2018 Agreement by and between EER and SC Ventures, LLC, a Nevada limited liability company which is an Affiliate of Robson.

1.26. **"SPEL Agreement"** means the Term Sheet for Special Purpose Entity and Exclusive License between Kemin and EER, attached hereto as Exhibit A.

1.27. **"Territory"** means worldwide.

1.28. **"Third Party"** means any entity other than the Parties hereto or any of their respective Affiliates.

1.29. **"Trade Secret"** means that information which is not generally known in the industry, has independent economic value in substantial part by reason of not being generally known in the industry, and is the subject of reasonable efforts to maintain its secrecy by a Party.

### ARTICLE 2.
### LICENSE RIGHTS

2.1. **License Grant**. Subject to the terms and conditions of this Agreement, EER hereby grants to the Licensees a non-exclusive, irrevocable, perpetual, world-wide, transferrable, sub licensable right to use, reproduce, copy and otherwise exploit the EER Technology in connection with: (a) the development, construction and operation of the Facilities; (b) the development, production, manufacture, marketing, sale, distribution and other commercialization of the Products; and (c) any activities and uses that are reasonably ancillary or attendant to the foregoing.

EER is granting a separate license to each of Kemin, Keresa and Robson pursuant to this Agreement. Any breach of this Agreement by any one of the Licensees will not constitute a breach by any of the other Licensees with respect to the license rights granted to the other Licensees.

2.2. **Diligence Obligations**. During the Term, the Licensees shall use commercially reasonable efforts to bring one or more Products to market, however, nothing in this Agreement obligates or requires the Licensees to commercialize or exploit the EER Technology in any particular manner.

2.3. **Technology Transfer Assistance**. Subject to the terms and conditions of this Agreement, EER shall provide reasonable technical assistance to Licensees and Sublicensees, as reasonably requested by Licensees during the Term, with respect to the transfer and use of the EER Technology. Such technology transfer assistance shall be provided by EER at no charge other than the requirement that the Licensee receiving any such technology transfer assistance reimburse EER for all reasonable out-of-pocket costs and expenses incurred by EER to provide technical assistance requested by the Licensee.

2.4. **Other Services**. The Licensees and their Affiliates are not required to retain or engaged EER to provide operational or management personnel or to enter into any other form of services agreement with EER with respect to the construction and operation of the

Facilities. However, the Licensees or their Affiliates may retain EER to provide operational and management services pursuant to the terms (including but not limited to the cost pass-through provisions) of the existing SPEL Agreement. EER agrees to make EER's employees available for this purpose upon reasonable notice by a Licensee.

2.5.    **Exclusive Purchase Right Keresa Facility**. Kemin will be provided with the exclusive right to purchase C-3 and C-4 acids produced by the Keresa Facility pursuant to terms set forth in the Production Agreement.

2.6.    **Consideration**. The full and complete consideration payable by the Licensees for the licenses in the EER Technology granted by EER hereunder shall be the Kemin End Products Royalties and Ancillary Royalties further described in Article 3 below. In no event shall any Licensee required to make any fixed or upfront payment to EER in consideration of such licenses. Further, nothing in this Agreement shall operate to give EER any ownership or equity interest, or any right to acquire any such ownership or equity interest, in any of the Facilities (or any entity that has an ownership or equity interest in any of the Facilities). The Licensees shall have sole control over the construction and design of the Facilities.

2.7.    **Robson Facility Restrictions and Exclusive Purchase Right**.

       i.     Robson's right to construct the Robson Facility will terminate if Robson has not completed and commissioned the facility in the State of Oregon by September 30, 2021. In this case, the Robson Facility license shall convert to a license for a second Kemin Facility at no additional cost to Kemin or Keresa, with Keresa having the same right to 10 percent ownership as in the first Kemin Facility.

      ii.     Kemin will be provided with the exclusive right to purchase C-3 and C-4 acids produced by the Robson Facility pursuant to terms set forth in the Production Agreement.

     iii.     Robson will have no right to sell the Products in the Keresa Territories.

### ARTICLE 3.
### FINANCIAL PROVISIONS

3.1.    **Payment Obligations**. In full and complete consideration of the licenses granted by EER under this Agreement and of EER's entry into and performance of its obligations under this Agreement, EER shall be eligible to receive compensation as described in this Article 3.

    3.1.1.    **Kemin End Products Royalties**. If and to the extent that a Facility sells Products to Kemin for use by Kemin to produce and sell other goods and products ("**Kemin End Products**"), EER shall receive a royalty equal to one and one half percent (1.5%) of the Net Income realized by Kemin during the Term for sales of such Kemin End Products (the "**Kemin End Products Royalties**"). In no event shall Kemin End Products Royalties become payable with respect to Kemin Net

Income from any sale of Kemin End Products unless and until the applicable Kemin customer has made payment in full to Kemin of Kemin's invoices giving rise to such Net Income.

3.1.2. **Ancillary Royalties**. EER shall also receive a royalty equal to twenty-five percent (25%) of the Net Cash Flow realized by the Licensees during the Term from the sale of acids not included in Kemin End Products (the "**Ancillary Royalties**"). In no event shall Ancillary Royalties become payable with respect to Net Cash Flow of the Licensees from the sale of acids not included in Kemin End Products unless and until the applicable customer has made payment in full to the applicable Licensee of the invoices or other obligations giving rise to such Net Cash Flow.

3.2. **Payment Terms**.

3.2.1. **Payment Terms – Kemin End Products Royalties**. Kemin shall remit Kemin End Products Royalties to EER on a quarterly basis. Within sixty (60) days following the end of each Kemin calendar quarter, Kemin shall provide EER with a calculation of the Kemin End Products Royalties due to EER for the prior calendar quarter along with remitting a payment of the calculated Kemin End Products Royalties for the prior calendar quarter.

3.2.2. **Payment Terms – Ancillary Royalties**. Each Licensee shall remit Ancillary Royalties to EER on a quarterly basis. Within sixty (60) days following the end of a Licensee's calendar quarter, the Licensee shall provide EER with a calculation of the Ancillary Royalties due to EER for the prior calendar quarter along with remitting a payment of the calculated Ancillary Royalties for the prior calendar quarter.

3.2.3. **Currency; Payment Method**. All payments under this Agreement will be paid in U.S. Dollars, by wire transfer to an account designated by EER.

3.2.4. **Exchange**. If any amounts that are relevant to the determination of amounts to be paid under this Agreement or any calculations to be performed under this Agreement are denoted in a currency other than U.S. Dollars, then such amounts will be converted to their U.S. Dollar equivalent using Kemin's then-current standard procedures and methodology, including its then-current standard exchange rate methodology for the translation of foreign currency expenses into U.S. Dollars.

3.3. **Withholding Tax**. The Licensee obligated to make payment to EER may pay withholding or similar tax applicable to such payment to the appropriate Governmental Authority and deduct the amount paid from the amount then due EER. The Parties will cooperate with each other and use reasonable efforts to reduce or eliminate tax withholding or similar obligations in respect of royalties and other payments made to EER under this Agreement. Payment of taxes due by EER shall remain EER's

responsibility and EER will indemnify the Licensees for any payment made on EER's behalf.

3.4. **Inspection Rights**. Licensor shall have the right to perform reasonable inspections of a Licensee's operations and book and records in order to review quality assurance and other aspects of the Licensee's manufacturing processes using the EER Technology. Licensor must provide advanced notice of any such inspection and all such inspections must be made during Licensee's regular business hours and in a manner that does not disrupt Licensee's operations.

### ARTICLE 4.
### CONFIDENTIALITY

4.1. **In General**. During the Term and for a period of five (5) years thereafter, each Party shall maintain in confidence all information and materials of the other Parties disclosed or provided to it by or on behalf of the other Parties including the terms and conditions (but not the existence) of this Agreement; provided, however, that the non-disclosure period for Confidential Information (as defined below) qualifying as a trade secret under state or federal law shall endure until such time as the trade secret is no longer confidential. Confidential Information shall include information identified as confidential in writing or, if disclosed verbally or by observation, summarized in writing and submitted to Recipient within thirty (30) days of the oral or visual disclosure thereof and shall also include information that (even if not marked or identified as confidential) should be reasonably considered confidential given all of the circumstances surrounding its disclosure (together with all embodiments thereof, the "**Confidential Information**"). The Party that discloses or makes available its Confidential Information to any of the other Parties is the "**Disclosing Party**", and any Party that receives or is exposed to the Confidential Information of the Disclosing Party is a "**Recipient**". Confidential Information of the Disclosing Party also includes information regarding intellectual property and confidential or proprietary information of the Disclosing Party's Affiliates and Third Parties with whom the Disclosing Party has a relationship. The terms and conditions of this Agreement shall be deemed the Confidential Information of all Parties.

4.2. Notwithstanding the foregoing, Confidential Information shall not include that portion of information or materials that the Recipient can demonstrate by clear and convincing evidence, including without limitation contemporaneous written records, was:

4.2.1. known to the general public at the time of its disclosure to the Recipient, or thereafter became generally known to the general public, other than as a result of actions or omissions of the Recipient in breach of this Agreement;

4.2.2. disclosed to the Recipient on an unrestricted basis from a source unrelated to the Disclosing Party and not known by the Recipient to be under a duty of confidentiality to the Disclosing Party; or

4.2.3. independently developed by the Recipient, or known by the Recipient prior to the date of disclosure by the Recipient, without the use of Confidential Information of the Disclosing Party.

4.3. **Additional Protections**. Each Recipient shall take all reasonable steps to maintain the confidentiality of the Confidential Information of the Disclosing Party, which steps shall be no less protective than those that such Recipient takes to protect its own information and materials of a similar nature, but in no event less than a reasonable degree of care. The Recipient shall not use or permit the use of any Confidential Information of the Disclosing Party except for the purposes of carrying out its obligations or exercising its rights under this Agreement. All Confidential Information of the Disclosing Party, including all copies and derivations thereof, is and shall remain the sole and exclusive property of the Disclosing Party and subject to the restrictions provided for herein. The Recipient shall not disclose any Confidential Information of the Disclosing Party other than to those of its directors, members, shareholders, officers, Affiliates, employees, independent contractors, assignees, Sublicensees, agents, lenders, investors, bona fide potential investors, consultants, and external advisors ("**Representatives**"), in each case on a "need to know" basis and only if such persons have executed a reasonably restrictive nondisclosure agreement or have an ethical duty to keep such Confidential Information confidential.

4.4. **Permitted Disclosures**. The obligations set forth in this Article 4 shall not apply to the extent that Recipient is required to disclose information under Applicable Law, judicial order by a court of competent jurisdiction, or the rules of a securities exchange or requirement of a Governmental Authority; provided, however, that the Recipient shall, to the extent practicable, provide prior written notice thereof to the Disclosing Party and sufficient opportunity for the Disclosing Party to review and comment on such required disclosure and request confidential treatment thereof or a protective order therefor. Each Party shall be responsible for any breaches of this Section 4.4 with respect to the other Party's Confidential Information committed by any of such Party's Affiliates or its or their Representatives.

4.5. **Return of Confidential Information**. Upon request after termination of this Agreement, each Party agrees to promptly return or destroy, as directed by the Disclosing Party, all Confidential Information in the possession or under the control of such Party or one or more of its Affiliates to the Disclosing Party. Notwithstanding the foregoing obligation, the Recipient's legal counsel may keep in its legal files one copy of any document or material containing Confidential Information that is requested to be returned or destroyed. Furthermore, Recipient is not required to purge electronic copies from its backup system inconsistent with its data retention policies. Any Confidential Information so retained shall remain subject to the non-disclosure provisions of this Article 4.

4.6. **Unauthorized Transfers or Misappropriation**. Upon discovery of any unauthorized disclosure, use, access, or misappropriation, or attempt thereof, of Confidential Information, the Party who discovers such unauthorized disclosure, use, access, or misappropriation, or attempt thereof, will: (i) inform the owner of such Confidential Information of the known details thereof, (ii) give best effort and assistance in the

recovery and return and/or prevention of such unauthorized disclosure, use, access, or misappropriation, or attempt thereof, of such Confidential Information, (iii) provide all reasonable assistance in the enforcement of the aggrieved Party's rights against any Third Party involved in such unauthorized disclosure, use, access, or misappropriation, or attempt thereof, of such Confidential Information, and (iv) use best efforts to prevent further unauthorized disclosure, use, access, or misappropriation, or attempt thereof, of such Confidential Information.

## ARTICLE 5.
## INTELLECTUAL PROPERTY

5.1.    **Ownership of EER Technology**.  As between the Parties hereto, EER owns and shall continue to own the EER Technology.

5.2.    **Improvements**.

   5.2.1.  **Disclosure**.  Each Party shall disclose to the other Parties (with full details) any and all Improvements to the EER Technology developed pursuant to the activities undertaken relating to this Agreement within thirty (30) days of the development of such Improvements.

   5.2.2.  **EER Improvements**.  The entire right, title, and interest in and to all EER Improvements related to the production of Products, and any intellectual property rights in and to any EER Improvements related to the production of Products, shall be owned solely by EER, provided that all EER Improvements, whenever arising, will be included among the EER Technology and licensed and made available to the Licensees at no additional charge.

   5.2.3.  **Licensee Improvements**.  With respect to any Improvements to the EER Technology developed by a Licensee, or by a Third Party acting on behalf of a Licensee ("**Licensee Improvements**"), if such Licensee Improvements are related to the production of Products, then such Licensee Improvements shall be owned by EER, but if such Licensee Improvements are related to the development or use of the Licensee's end products using the Products and/or are in the fields of practice of the Licensees, then such Licensee Improvements shall be owned by the Licensee.  For the avoidance of doubt, when a Licensee develops intellectual property that uses the Products or develops independent inventions, materials or other intellectual property (and Improvements related to any of the foregoing), all such intellectual property shall not be deemed to be an expansion or improvement of the Technology and shall be the sole property of the Licensee.

## ARTICLE 6.
## INFRINGEMENT ALLEGATIONS; ENFORCEMENT

6.1.    **Notification of Infringement Allegations**.  If any Party after the Effective Date is warned or sued by a Third Party alleging or charging infringement of any Third Party intellectual property claiming infringement thereof by the EER Technology or the use thereof by either Party (collectively, "**Infringement Allegations**"), the Party that is

warned or sued shall notify the other Parties within 10 days of becoming aware of such warning or resulting legal proceeding and shall keep the other Parties duly informed of the status of such warning or resulting legal proceeding. EER and the Party that is warned or sued shall each have the right, but not the obligation, to take the necessary steps to defend against such Infringement Allegations at its own expense. The Parties shall reasonably cooperate with each other in all such actions or proceedings regarding the Infringement Allegations. Each Party will be entitled to be represented by independent counsel of its own choice and at its own expense.

6.2. **Enforcement of Intellectual Property Rights**. If any Party becomes aware of activity on the part of any Third Party that may constitute infringement of the EER Technology, then such Party shall notify the other Parties in writing within 10 days of becoming aware of such infringement or misappropriation. Each Licensee and EER shall each have the right, but not the obligation, to prosecute at their own expense all infringements of the EER Technology. The Parties shall reasonably cooperate with each other in any such action or proceeding. EER will be entitled to be represented by independent counsel of its own choice and at its own expense. The Parties shall reasonably cooperate with each other in all such actions or proceedings regarding the Infringement Allegations. Each Party will be entitled to be represented by independent counsel of its own choice and at its own expense.

6.3. **Restrictions on Settlement**. No Party shall enter into any settlement that admits or concedes that any aspect of any EER Technology is invalid or unenforceable in any way, without the prior written consent of the other Parties hereto, such consent not to be unreasonably withheld or delayed.

## ARTICLE 7.
## REPRESENTATIONS & WARRANTIES

7.1. **EER Representations and Warranties**. EER represents and warrants to the Licensees that:

7.1.1. **Organization and Good Standing**. EER has been duly organized and is validly existing as a limited liability company under the laws of the State of Texas with full power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.

7.1.2. **Execution and Delivery**. All consents, approvals, authorizations, and orders necessary for the execution, delivery, and performance by EER of its obligations have been obtained. This Agreement has been duly authorized by all necessary corporate action on the part of EER, has been duly executed and delivered by EER, and constitutes the legal, valid, and binding obligation of EER enforceable against EER in accordance with its terms.

7.1.3. **No Conflicts**. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) violate any provision of the articles of organization or operating agreement or similar

constitutional documents of EER or (ii) conflict with, or result (immediately or upon the giving of notice or the passage of time or both) in a breach or any violation of or any default under, or give rise to a right of modification, termination, cancellation or acceleration of any obligation or to a loss of a benefit under, any agreement, mortgage, indenture, lease, instrument, permit, concession, franchise, license or other agreement, or any statute, or any order, writ, injunction or decree of any Governmental Authority, or any arbitrator having jurisdiction over EER or any of its assets, to which EER is a party or to which its properties or assets may be bound, other than such conflicts, violations or defaults or possible modifications, terminations, cancellations or accelerations which individually or in the aggregate do not and will not have a material adverse effect on EER or its ability to consummate the transactions contemplated hereby.

7.1.4. **Litigation**. There is no legal action, suit, arbitration or other legal, administrative or Governmental Authority investigation, inquiry or proceeding (whether local or foreign) pending or, to the knowledge of EER, threatened against or affecting EER or its properties, assets or businesses, nor, to the knowledge of EER, does any basis therefor exist and EER is not in default with respect to any order, writ, judgment, injunction, decree, determination or award of any court or of any Governmental Authority which, in each case, would materially impact upon EER's obligations hereunder or EER's ability to perform its obligations hereunder.

7.1.5. **Non-Infringement**. The EER Technology, and the use thereof by the Licensees as contemplated by this Agreement does not and shall not infringe upon any intellectual property right or other right of any third party and does not and shall not violate any applicable national, international, federal, state or local law or regulation. EER has all right and authority necessary to grant to the Licensees the licenses to the EER Technology set forth in this Agreement.

7.2. **Licensee Representations and Warranties**. Each Licensee, severally on its own behalf and not jointly, hereby represents and warrants to EER and the other Licensees that:

7.2.1. **Organization and Good Standing**. Such Licensee (if an entity) has been duly organized and is existing in good standing under the laws of the state of its formation. Such Licensee has full power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.

7.2.2. **Execution and Delivery**. All consents, approvals, authorizations and orders necessary for the execution, delivery and performance by such Licensee of its obligations hereunder have been obtained. This Agreement has been duly authorized by all necessary action on the part of such Licensee, has been duly executed and delivered by such Licensee and constitutes the legal, valid and binding obligation of such Licensee enforceable against such Licensee in accordance with its terms.

7.2.3. **No Conflicts**. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) if such Licensee is an entity, violate any provision of the articles of organization, operating agreement or similar constitution documents of such Licensee or (ii) conflict with, or result (immediately or upon the giving of notice or the passage of time or both) in a breach or any violation of or any default under, or give rise to a right of modification, termination, cancellation or acceleration of any obligation or to a loss of a benefit under, any agreement, mortgage, indenture, lease, instrument, permit, concession, franchise, license or other agreement, or any statute, or any order, writ, injunction or decree of any Governmental Authority having jurisdiction over such Licensee or any of its assets, to which such Licensee is a party or by which its properties or assets may be bound, other than such conflicts, violations or defaults or possible modifications, terminations, cancellations or accelerations which individually or in the aggregate do not and will not have a material adverse effect on such Licensee or its ability to consummate the transactions contemplated hereby.

## ARTICLE 8.
## INSURANCE; INDEMNIFICATION;
## LIMITATION OF LIABILITY

8.1. **Insurance**. Upon the Effective Date and for a period of three (3) years after the expiration or termination of this Agreement, each Party shall, at its own expense, (and shall ensure that its Sublicensees) maintain comprehensive commercial general liability insurance including product liability insurance (and recall coverage), in the minimum amount of Five Million Dollars ($5,000,000) per occurrence and Fifteen Million Dollars ($15,000,000) in the aggregate, which coverage shall be placed with a reputable independent insurance carrier that is A-, VII or better by A.M. Best and is licensed to do business in the United States. It is agreed that EER shall have up to 30 days from the Effective Date to secure such insurance or, if the premium is cost prohibitive, seek a modification of this requirement from the Licensees, which will not be unreasonably withheld. With respect to the insurance to be maintained by EER, the insurance policy shall include the Licensees as additional insureds. Each Party shall, within thirty (30) days of the Effective Date, provide to the other Parties copies of the insurance coverage documents and a certificate confirming such insurance.

8.2. **Indemnification**. Each Party ("**Indemnifying Party**") will at all times indemnify, defend and hold harmless the other Parties and each of their Affiliates and their respective directors, officers, members, employees, agents, and representatives ("**Indemnitees**") from and against any and all damages, losses, liabilities, judgments, costs and expenses arising out of any Third Party claim resulting from a breach by the Indemnifying Party of its representations, warranties or covenants contained in this Agreement; and/or any breach or failure by the Indemnifying Party to perform or comply with any of its obligations hereunder.

8.3. **Indemnification Procedures**. If any Third Party claim, litigation, or legal proceeding covered by Section 8.2 is brought, then:

8.3.1. the Indemnitees shall promptly notify the Indemnifying Party in writing of such claim, litigation, or legal proceeding; provided, however, the failure to provide such notice within a reasonable period of time shall not relieve the Indemnifying Party of any of its obligations hereunder except to the extent the Indemnifying Party is actually prejudiced by such failure or delay;

8.3.2. the Indemnifying Party shall assume, at its cost and expense, the sole defense of such claim, litigation, or legal proceeding through counsel selected by the Indemnifying Party, except that the Indemnitees may at the Indemnitees' option and the Indemnitee's own expense select and be represented by separate counsel;

8.3.3. the Indemnifying Party shall maintain control of such defense and/or the settlement of such claim, litigation, or legal proceeding;

8.3.4. the Indemnifying Party shall not have the authority to consent to the entry of any judgment or to enter into any settlement or otherwise to dispose of such claim, litigation, or legal proceeding without the prior written consent of the Indemnitee, such consent not to be unreasonably withheld or delayed; and

8.3.5. the Indemnifying Party shall pay the full amount of any judgment, award or settlement with respect to such claim, litigation, or legal proceeding and all other costs, fees and expenses related to the resolution thereof.

8.4. **Limitation of Liability**. EXCEPT WITH RESPECT TO (A) A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER ARTICLE 4 OR (C) CLAIMS ARISING FROM A PARTY'S WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR INDIRECT DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT ON ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES, AND ALL REMEDIES OF THE PARTIES SHALL BE LIMITED TO ACTUAL DIRECT AND IMMEDIATE DAMAGES UP TO A MAXIMUM AMOUNT OF $5,000,000.

## ARTICLE 9.
## TERM AND TERMINATION

9.1. **Term**. The term of this Agreement (the "**Term**") shall commence on the Effective Date and shall continue in full force and effect until the later to occur of: (a) the thirtieth (30th) anniversary of the Effective Date; or (b) the date of expiration of the last relevant issued patent related to the EER Technology which contains valid claims anywhere in the world, unless earlier terminated in accordance with Section 9.2.

9.2. **Effect of Termination or Expiration**.

9.2.1. **Accrued Obligations**. Termination of this Agreement, in whole or in part, shall be without prejudice to: (i) any right or obligation having accrued or arisen on or before the effective date of such termination, including the right of a Party to receive all payments accrued and unpaid as of the effective date of such termination; (ii) the remedy of any Party in respect to any previous breach of this Agreement; and/or (iii) any other provisions hereof which expressly or necessarily call for performance after such termination.

9.2.2. **Confidential Information**. Upon termination, the Recipient shall return to the Disclosing Party, such Disclosing Party's Confidential Information, subject to the exceptions for certain permitted retention of Confidential Information set forth in Article 4.

9.2.3. **Survival**. The licenses granted to the Licensees pursuant to Section 2.1 hereof shall survive any termination or expiration of this Agreement. Articles 1 and 4-10 of this Agreement shall survive and continue in full force and effect notwithstanding any termination or expiration of this Agreement.

## ARTICLE 10.
## MISCELLANEOUS

10.1. **Assignment**. Neither this Agreement nor any right or obligation hereunder may be assigned or otherwise directly or indirectly transferred by EER (whether voluntarily, by operation of law or otherwise) ("**Transfer**"), without the prior express written consent of the Licensees, which consent shall not be unreasonably withheld. Any attempt by EER to Transfer this Agreement in violation of this Section 10.1 shall be void and have no effect. The Licensees may assign or otherwise transfer their rights in this Agreement, in each Licensee's discretion so long as the assignee is neither a competitor of Company nor is associated with a jurisdiction which EER considers to be unsatisfactory for the adequate protection of the Technology; provided, however, that the Licensee shall continue to be responsible for the Licensee's obligations under this Agreement unless EER releases the Licensee from further liability for any obligations a Licensee assigns to an assignee. For avoidance of doubt, this provision shall not be interpreted to restrict EER from raising capital so long as this Agreement, or any right or obligation hereunder, is not pledged as collateral by EER.

10.2. **Notices**. All notices, consents or approvals of a Party with respect to this Agreement shall be in writing and given or sent to the Party to be notified at its respective address set forth below either (a) personally and thereby deemed to be given on that day, (b) by a reputable U.S. overnight courier service (e.g., Federal Express) and thereby deemed to be given on the third business day following dispatch, or (c) by registered letter and thereby deemed to be given on the third business day following the day of posting. Either Party may change its address and related information by giving notice to the other Party in the manner set forth in this Section 10.2.

If to EER, addressed to:

Jeffrey J Wooley

Box 2185

Canyon Lake TX 78133

Attention: _____

If to Kemin, addressed to:

Kemin Industries, Inc.
1900 Scott Avenue
Des Moines, IA 50317
Attention: Elizabeth A. Nelson

With a copy (which shall not constitute notice) to:

Belin, McCormick PC

666 Walnut St #2000
Des Moines, IA 50309
Attention: Chris Nelson

If to Keresa, addressed to:

Attention: _____

If to Robson, addressed to:

Attention: _____

10.3. **Severability**. If any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid or unenforceable, it is the intention of the Parties that the other provisions of this Agreement shall continue in full force and effect.

10.4. **No Third Party Beneficiary**. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Third Party other than the Parties hereto and their permitted successors or assigns.

10.5. **Use of Names**. Except as specifically set forth herein, no Party may, at any time, use the name, trademark, insignia, symbol, logo or other identifying information of any other

Party hereto in any advertising, press release, promotional materials or otherwise without the prior written consent of such other Party, except as required by law.

10.6. **Records**. Licensee shall keep complete and accurate records in sufficient detail to confirm compliance with the payment provisions of this Agreement and to verify any amounts payable hereunder during the Term and for a period of six (6) years after termination of this Agreement.

10.7. **Audits**. Upon ten (10) days' prior written notice from EER, the Licensees will permit EER or one or more representatives or designees of the Auditing Party, to examine the relevant books and records of the Licensees, as may be reasonably necessary to verify compliance with the payment provisions of this Agreement and any amounts payable hereunder. EER (or its representatives or designees) will be provided access to such books and records at the Licensee's facility or facilities where such books and records are normally kept and such examination will be conducted during the Licensee's normal business hours. The Licensee(s) may require EER or its representatives or designees to sign a customary non-disclosure agreement before providing access to its facilities or records. If such audit reveals an underpayment by the Licensee(s), then the Licensee(s) shall remit any underpayment to EER immediately.

10.8. **Amendment**. This Agreement may not be amended, varied or modified in any manner except by an instrument in writing signed by a duly authorized officer or representative of each Party.

10.9. **No Waiver**. Any waiver by any Party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of that provision or of any breach of any other provision of this Agreement. The failure of any Party to insist upon strict adherence to any term of this Agreement on one or more occasions will not be considered a waiver or deprive that Party of the right to thereafter insist upon strict adherence to that term or any other term of this Agreement. Any waiver must be in writing and signed by the Party against whom enforcement is sought.

10.10. **Relationship of the Parties**. The Parties hereto are each independent contractors. Nothing in this Agreement shall be construed to place any Parties hereto in the relationship of principal and agent or master and servant, and neither Party shall have, expressly or by implication, the power to represent itself as having any authority to make contracts in the name of or binding upon any other Party, or to obligate or bind any other Party in any manner whatsoever.

10.11. **Headings**. The headings contained in this Agreement are for convenience of reference only and are not considered a part of this Agreement and shall in no way affect or alter the meaning or effect of any of the provisions of this Agreement.

10.12. **Entire Agreement**. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereto and supersedes any prior or contemporaneous written or oral understanding, negotiations or agreements between and among them relating to the subject matter of this Agreement. This Agreement shall be binding upon,

and inure to the benefit of, the Parties and their respective successors and permitted assigns.

10.13. **Governing Law; Forum**. This Agreement and the rights of the Parties under this Agreement shall be governed by, and interpreted and enforced in accordance with, the laws of the State of Texas. The Parties to this Agreement hereby irrevocably agree and consent to the exclusive jurisdiction of the courts of the State of Texas and the federal courts of the United States sitting in Texas, for the adjudication of any matters arising under or in connection with this Agreement. The Parties to this Agreement hereby irrevocably waive, to the fullest extent they may effectively do so under applicable law, any objection which they may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in any such court, and any claim that such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

10.14. **Publicity**. No Party shall make any public announcement or statement concerning this Agreement, its terms or its existence, without the prior written consent of the other Parties, such consent not to be unreasonably withheld or delay; provided, however, that any Party shall be entitled to disclose the existence of this Agreement without the prior written consent from the other Parties.

10.15. **Remedies Cumulative**. The remedies provided under this Agreement shall be deemed to be cumulative, and no remedy shall be deemed the exclusive remedy for actual or threatened breaches of this Agreement, and shall be in addition to all other remedies available at law or in equity.

10.16. **Further Assurances**. Upon the request of any Licensee, EER shall execute and deliver such additional documents and perform such other acts as a Licensee may reasonably request as may be necessary to effect the purposes and intent of this Agreement.

10.17. **Expenses**. Each Party shall bear its own expenses in connection with the negotiation and execution of this Agreement.

10.18. **Joint Drafting**. This Agreement shall be deemed to have been drafted jointly by the Parties, and, in the event of an ambiguity in this Agreement, this Agreement shall not be construed against any Party as a result of the drafting hereof.

10.19. **Independent Legal Counsel**. Each of the Parties has been represented by independent legal counsel, or has been advised to retain independent legal counsel and has had an opportunity to retain independent legal counsel, with respect to the negotiation and signing and delivery of this Agreement and all ancillary documents related to this Agreement. It is further acknowledged and agreed that:

    a.    Kemin has been represented by Belin McCormick, P.C. of Des Moines, Iowa and Belin McCormick, P.C. has not represented or provided any legal services to any other Party to this Agreement;

b.   Keresa has been represented by _____ of _____, _____ and _____ has not represented or provided any legal services to any other Party to this Agreement;

c.   Robson has been represented by _____ of _____, _____ and _____ has not represented or provided any legal services to any other Party to this Agreement; and

d.   EER has <sup>not</sup> been represented by \_\_\_Counsel_____ . of _____, _____ and \_\_\_EER_____ has not represented or provided any legal services to any other Party to this Agreement

10.20. **Counterparts; Facsimile**. This Agreement may be executed in more than one counterpart, each of which constitutes an original and all of which together shall constitute one enforceable agreement. For purposes of this Agreement and any other document required to be delivered pursuant to this Agreement, facsimiles of signatures shall be deemed to be original signatures. In addition, if any of the Parties sign facsimile copies of this Agreement, such copies shall be deemed originals.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties hereto have caused their authorized representatives to execute this Agreement as of the Effective Date.

**EARTH ENERGY RENEWABLES, LLC**

By: _____

Name: Jeffrey J Wooley

Title: Manager

**KERESA PLANTATIONS SDN BHD**

By: _____

Name: _____

Title: _____

**KEMIN INDUSTRIES, INC.**

By: _____

Name: MARC SCANTLIN

Title: President KFT America

_____

Steve Robson

Belin\K0012\1000\agr-license (eer)-mjw.006 (3122044.1).DOC

# EXHIBIT D

4835-6049-7362.1

| Earth Energy Renewables LLC Ownership Units 6.30.20 | |
| --- | --- |
| Members | Units |
| | |
| Edelman Group | 843,302 |
| Graff-Chang Group | 376,250 |
| Kemin Industries | 1,504,399 |
| Keresa Plantations | 1,930,341 |
| O"Meara Group | 1,525,362 |
| SCV Group | 347,656 |
| Wooley Group | 4,041,251 |
| | |
| Total Issued Units | 10,568,561 |
| | |
| Unexercised  Warrants | |
| | |
| Kemin Industries | 76,172 |
| Other | 1,631,126 |
| | |
| Total Unexercised | 1,707,344 |
| | |
| Convertible Notes | 1,182,024 |
| | |
| Fully Diluted Units | 13,457,929 |

# EXHIBIT E

Execution Version

# NOTE PURCHASE AGREEMENT

by and among

EARTH ENERGY RENEWABLES LLC,
as the Company

and

ARA EER HOLDINGS, LLC,
as the Purchaser

DATED JANUARY 13, 2020

## SCHEDULES AND EXHIBITS

SCHEDULE A — Defined Terms

SCHEDULE 4.1(a)(v) — Financing Statements to Amend or Terminate

SCHEDULE 5.4 — Litigation

SCHEDULE 5.5(a) — Financial Statements

SCHEDULE 5.5(b) — Indebtedness

EXHIBIT 1 — 8% Note due June 30, 2020

EXHIBIT 2 — Budget for Application of Note Proceeds

EXHIBIT 3 — Summary Term Sheet

4847-8504-7216.5
4835-6049-7362.1

8% Note due June 30, 2020

January 13, 2020

ARA EER HOLDINGS, LLC
5300 Memorial Drive, Suite 500
Houston, Texas 70077

Ladies and Gentlemen:

EARTH ENERGY RENEWABLES LLC, a Texas limited liability company (the *"Company"*), agrees with ARA EER HOLDINGS, LLC, a Delaware limited liability company (the *"Purchaser"*) as follows:

SECTION 1.  AUTHORIZATION OF NOTE.

The Company has authorized the issue and sale to Purchaser of an 8% Note due June 30, 2020 (the *"Note"*) in an aggregate principal amount up to (a) $440,000 plus (b) the Purchaser Expense Amount (as defined below) (the *"Principal Amount"*).  The Note shall be substantially in the form set out in Exhibit 1.  Certain capitalized and other terms used in this Agreement are defined in Schedule A.  References to a "Schedule" or an "Exhibit" are references to a Schedule or an Exhibit attached to this Agreement unless otherwise specified.  References to a "Section" are references to a Section of this Agreement unless otherwise specified.

SECTION 2.  SALE AND PURCHASE OF NOTE.

Subject to the terms and conditions of this Agreement, the Company shall issue and sell to the Purchaser and the Purchaser shall purchase from the Company, at the Closing provided for in Section 3, the Note at the purchase price of 100% of the Principal Amount.  Subject to the terms and conditions of this Agreement, the purchase price shall be paid (a) on the Closing Date (i) $110,000 to the Company and (ii) to the Purchaser or the Purchaser's legal and other advisors, an amount equal to the fees and expenses incurred by the Purchaser in connection with the preparation, negotiation and consummation of this Agreement, the Note and the other Loan Documents (the *"Purchaser Expense Amount"*); and (b) on January 24, 2020, at the discretion of the Purchaser, up to $330,000 (each of clause (a) and (b), a *"Purchase Price Installment"*).  The Company shall use the proceeds of the Note exclusively to pay (a) the payroll and other corporate expenses of the Company set forth in the Budget for Application of Note Proceeds set out in Exhibit 2; and (b) such other corporate expenses of the Company as the parties may agree in writing.

SECTION 3.  CLOSING.

The sale and purchase of the Note to be purchased by the Purchaser (the *"Closing"*) shall occur on (a) the later of (i) 10:00 a.m. Central Time, on January 14, 2020 and (ii) the date that is

one Business Day after the satisfaction or waiver of all of the conditions set forth in <u>Section 4</u> (other than conditions that, by their nature, can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at Closing); or (b) such other location, time and date as the parties may agree in writing. At the Closing, the Company will deliver to the Purchaser the Note dated the date of the Closing (the "***Closing Date***") against (A) delivery by the Purchaser of immediately available funds in an amount equal to $110,000 by wire transfer to such account or accounts designated by the Company in writing prior to the Closing and (B) delivery by the Purchaser of immediately available funds in an amount equal to the Purchaser Expense Amount by wire transfer to such account or accounts designated by the recipient in writing prior to the Closing.

SECTION 4. CONDITIONS TO CLOSING.

Section 4.1. *Conditions to Purchaser's Obligations*. The Purchaser's obligation to purchase and pay for the Note to be sold to the Purchaser at the Closing is subject to the fulfillment to the Purchaser's satisfaction, prior to or at the Closing, of the following conditions:

(a) <u>Deliveries</u>. On the Closing Date, the Purchaser shall have received each of the following in form and substance satisfactory to the Purchaser:

(i) A certificate dated the Closing Date signed by an Authorized Officer of the Company certifying that (A) all representations and warranties of the Company set forth in this Agreement and the other Loan Documents are true and correct in all material respects; (B) the Company is in compliance with each applicable covenant hereunder; (C) no Default or Event of Default exists; and (D) no Material Adverse Effect has occurred;

(ii) A certificate dated the Closing Date signed by the Secretary or an Assistant Secretary (or comparable officer) of the Company certifying as appropriate as to: (A) resolutions or other evidence of the authorization of all action taken by the Company in connection with this Agreement and the other Loan Documents; (B) the names of the Authorized Officers of the Company authorized to sign the Loan Documents and their true signatures; and (C) copies of the Company's organizational documents as in effect on the Closing Date certified by an official of the State of Texas, together with a certificate from the appropriate official as to the continued existence and good standing of the Company in the State of Texas;

(iii) This Agreement, the Note, the Security Agreement, each UCC financing statement and IP Filing required to perfect the Purchaser's first priority security interest in the collateral contemplated by the Security Agreement and each of the other Loan Documents signed by an Authorized Officer of the Company (as applicable);

(iv) A certificate dated the Closing Date signed by an Authorized Officer of Company certifying that there are no defaults under, and the issuance of the Note will not result in any defaults under, any existing Indebtedness or material agreements to which the Company is a party;

2

(v)    Payoff and release or amendment documentation (including UCC-3 termination or amendment statements with respect to the financing statements listed on Schedule 4.1(a)(v)) with respect to existing Indebtedness of the Company and/or Liens on assets of the Company (except as to any Indebtedness and/or Liens as to which the Purchaser expressly agrees in writing may remain outstanding); and

(vi)    Such other documents in connection with such transactions as the Purchaser may reasonably request.

Section 4.2.    *Deliveries of the Purchaser.*    On the Closing Date, the Company shall have received all Loan Documents requiring the signature of the Purchaser (if any), each dated as of the Closing Date and signed by an Authorized Officer of the Purchaser.

Section 4.3.    *Conditions to each Purchase Price Installment.* The Purchaser's obligation to fund any Purchase Price Installment after the Closing Date is subject to the fulfillment to the Purchaser's satisfaction of the following conditions precedent with respect to such Purchase Price Installment:

(a)    No Default; Representations and Warranties.    Immediately prior to and upon giving effect to the funding of such Purchase Price Installment, (i) all representations and warranties of the Company set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects; (ii) the Company shall be in compliance with each applicable covenant hereunder; (iii) no Default or Event of Default shall exist; and (iv) no Material Adverse Effect shall have occurred.

(b)    Deliveries.    On the funding date of such Purchase Price Installment, the Purchaser shall have received each of the following in form and substance satisfactory to the Purchaser:

(i)    A certificate dated such date signed by an Authorized Officer of the Company certifying as to the matters set forth in Section 4.3(a) above; and

(ii)    Such other documents in connection with such funding as the Purchaser may reasonably request.

SECTION 5.  REPRESENTATIONS AND WARRANTIES

The Company represents and warrants to the Purchaser that:

Section 5.1.    *Organization and Qualification; Power and Authority; Compliance With Laws; Title to Properties; Event of Default.*    The Company (a) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas, (b) has the lawful power to own or lease its properties and to engage in the business it presently conducts or proposes to conduct, (c) is duly licensed or qualified and in good standing in each jurisdiction where the property owned or leased by it or the nature of the business transacted by it or both makes such licensing or qualification necessary and where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect, (d) has full power to enter into, execute, deliver and carry out this Agreement and the other Loan Documents to which it is a

3

party, to incur the Indebtedness and grant the Liens contemplated by the Loan Documents and to perform its obligations under the Loan Documents to which it is a party, and all such actions have been duly authorized by all necessary proceedings on its part, (e) is in compliance in all material respects with all Applicable Laws in all jurisdictions in which the Company is presently or will be doing business except where the failure to do so would not constitute a Material Adverse Effect, and (f) has good and marketable title (except for such defects in title that could not individually or in the aggregate reasonably be expected to result in a Material Adverse Effect) to or valid leasehold interest in all properties, assets and other rights which it purports to own or lease or which are reflected as owned or leased on its books and records.  No Default or Event of Default exists or is continuing.

Section 5.2.  *Validity and Binding Effect.*  This Agreement and each of the other Loan Documents (a) has been duly and validly authorized, executed and delivered by the Company, and (b) constitutes, or will constitute, legal, valid and binding obligations of the Company, enforceable against the Company in accordance with its terms subject to the effect of any applicable bankruptcy, insolvency, fraudulent conveyance or similar law affecting creditors' rights generally and general principles of equity.

Section 5.3.  *No Conflict; Material Agreements; Consents.*

(a)  Neither the execution and delivery of this Agreement or the other Loan Documents by the Company nor the consummation of the transactions herein or therein contemplated or compliance with the terms and provisions hereof or thereof by the Company will conflict with, constitute a default under or result in any breach of (i) the terms and conditions of the certificate of formation, limited liability company agreement or other organizational documents of the Company or (ii) any Applicable Law or any material agreement or instrument or order, writ, judgment, injunction or decree to which the Company is a party or by which it is bound or to which it is subject, or result in the creation or enforcement of any Lien, charge or encumbrance whatsoever upon any property (now or hereafter acquired) of the Company (other than in favor of the Purchaser).  There is no default under any such material agreement (referred to above), nor is the Company bound by any contractual obligation, or subject to any restriction in any organization document, or any requirement of Applicable Law which could, in each case, reasonably be expected to result in a Material Adverse Effect. No consent, approval, exemption, order or authorization of, or registration or filing with, any Governmental Authority or any other Person is required by any Applicable Law or any agreement in connection with the execution, delivery and carrying out of this Agreement and the other Loan Documents, other than those that if not made or obtained would not materially and adversely affect the validity, enforceability, perfection or priority, as applicable, of any Loan Document and/or any Lien purported to be created by any Loan Document or result in any Default or Event of Default.

(b)  Without in any way limiting the foregoing Section 5.3(a), the execution and delivery of this Agreement or the other Loan Documents by the Company and the consummation of the transactions herein or therein contemplated will not result in a default under any existing Indebtedness to which the Company is a party.

Section 5.4.  *Litigation.*  Except as set forth on Schedule 5.4, there are no actions, suits, proceedings or investigations pending or, to the knowledge of the Company, threatened against

the Company at law or in equity before any Governmental Authority which individually or in the aggregate, if determined adversely, could reasonably be expected to result in a Material Adverse Effect. The Company is not in violation of any order, writ, injunction or any decree of any Governmental Authority the violation of which could reasonably be expected to result in a Material Adverse Effect.

Section 5.5. *Financial Statements*.

(a)     The Financial Statements, which are attached as Schedule 5.5(a) hereof, present fairly, in all material respects, the financial position of the Company as of the dates thereof and the results of operations and cash flows of the Company for the periods covered thereby. The Financial Statements have been prepared from the books and records of the Company, which have been prepared in the ordinary course of business, and in reasonable detail accurately and fairly reflect, in all material respects, actual, bona fide transactions of the Company. There are no significant deficiencies or material weaknesses in the design or operation of the internal controls over financial reporting of the Company that would reasonably be expected to adversely affect the ability of the Company to record, process, summarize or report financial information. The Company is not and has not been made aware of (i) any illegal act or fraud on the part of the management or other employees of the Company or (ii) any claim or allegation regarding any of the foregoing. The Company hereby covenants and agrees that it shall not sell or otherwise transfer (including by merger or other operation of law) any of its assets (including those included in the Financial Statements) (x) to any other Person outside of the ordinary course of business or (y) to any Affiliate of the Company other than on fair and reasonable terms substantially as favorable to the Company as would be obtainable by the Company at the time in a comparable arm's-length transaction with a Person other than an Affiliate.

(b)     Schedule 5.5(b) sets forth, with respect to the Company, an accurate and complete list of (i) all Indebtedness as of the date hereof and (ii) all Liens on the tangible or intangible assets of the Company securing any Indebtedness of the Company as of the date hereof. Except as set forth in Schedule 5.5(b), the Company has the unrestricted right to pay or pre-pay all such Indebtedness at its par value without material penalty or premium, in part or in full, at any time or from time to time after the date of this Agreement. Except as contemplated by such Schedule 5.5(b), the Company hereby covenants and agrees that it will not create, incur, assume or suffer to exist any Indebtedness or any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than Indebtedness and/or Liens arising in the ordinary course of business (and, for the avoidance of doubt, the Company shall in no event create, incur, assume or suffer to exist any other Indebtedness for borrowed money or any Lien securing any such Indebtedness).

Section 5.6. *Full Disclosure*. Neither this Agreement nor any other Loan Document, nor any certificate, statement, agreement or other documents furnished to the Purchaser in connection herewith or therewith, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which they were made, not misleading; *provided* that, with respect to any projected financial information, the Company represents only that such

information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 5.7.  *Solvency*.  Before and after giving effect to the transaction contemplated by the Loan Documents, the Company is Solvent.

Section 5.8.  *Private Offering by the Company*.  Neither the Company nor anyone acting on its behalf has offered the Note or any similar securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any Person other than the Purchaser.  Neither the Company nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Note to the registration requirements of Section 5 of the Securities Act or to the registration requirements of any securities or blue sky laws of any applicable jurisdiction.

SECTION 6.  REPRESENTATIONS OF THE PURCHASER.

Section 6.1.  *Purchase for Investment*.  The Purchaser represents and warrants that it is purchasing the Note for its own account and not with a view to the distribution thereof. The Purchaser understands that the Note has not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, and the Company is not required to register the Note under the Securities Act.

SECTION 7.  PAYMENT AND PREPAYMENT OF THE NOTE.

Section 7.1.  *Maturity*.  As provided therein, the entire unpaid principal balance of the Note shall be due and payable in cash on the Maturity Date.

Section 7.2.  *Optional Prepayments with Prepayment Premium*.  The Company may, at its option and upon notice as provided below, prepay at any time all, or from time to time any part of any or all, of the Note at 100% of the principal amount so prepaid, together with all accrued and unpaid interest thereon as contemplated by Section 7.3.  The Company shall give the Purchaser prior written notice of each optional prepayment under this Section 7.2. Each such notice shall specify the date of prepayment (which shall be a Business Day), the aggregate principal amount of the Note to be prepaid on such date, and the interest to be paid on such date with respect to such principal amount being prepaid.

Section 7.3.  *Maturity; Surrender, Etc*.  In the case of each optional prepayment of Note pursuant to this Section 7, the principal amount of the Note to be prepaid shall mature and become due and payable on the date fixed for such prepayment, together with interest on such principal amount accrued to such date, if any.  From and after such date, unless the Company shall fail to pay such principal amount when so due and payable, as aforesaid, interest on such principal amount shall cease to accrue.

Section 7.4.  *Purchase of Note*.  The Company shall not, and shall not permit any Affiliate to, purchase, redeem, prepay or otherwise acquire, directly or indirectly, the Note

6

except upon the payment or prepayment of the Note in accordance with the terms of this Agreement and the Note.

Section 7.5.    *Payments Due on Non-Business Days.*  Anything in this Agreement or the Note to the contrary notwithstanding (but without limiting the requirement in Section 7.2 that the notice of any optional prepayment specify a Business Day as the date fixed for such prepayment), any payment of interest on the Note that is due on a date that is not a Business Day shall be made on the next succeeding Business Day without including the additional days elapsed in the computation of the interest payable on such next succeeding Business Day.

SECTION 8.  EVENTS OF DEFAULT.

An *"Event of Default"* shall exist if any of the following conditions or events shall occur and be continuing: (a) the Company defaults in the payment of any principal on the Note when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by declaration or otherwise; (b) the Company defaults in the payment of any interest on the Note for more than 15 Business Days after the same becomes due and payable; (c) the Company uses any of the proceeds of the Note in violation of Section 2, breaches Section 12 or Section 13 or sells or otherwise transfers (including by merger or other operation of law) any of its assets in violation of any of the Loan Documents, or any Lien on any assets of the Company shall exist or arise in violation of any of the Loan Documents, or the Purchaser's Liens purported to be created by the Loan Documents shall for any reason cease to be valid and perfected first priority Liens on all or any portion of the collateral contemplated by the Loan Documents, or any representation or warranty of the Company set forth in this Agreement or any other Loan Document shall be inaccurate in any material respect when made or deemed made; (d) the Company defaults in the performance of or compliance with any term contained or incorporated by reference herein or in any other Loan Document (other than those referred to in clause (a), (b) or (c) of this Section 8) and such default is not remedied within 10 days; (e) the Company (i) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction, (ii) makes an assignment for the benefit of its creditors, (iii) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, (iv) is adjudicated as insolvent or to be liquidated or (v) takes action for the purpose of any of the foregoing subclauses (i) through (iv); (f) a court or Governmental Authority of competent jurisdiction enters an order appointing, without consent by the Company, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of the Company, or any such petition shall be filed against the Company and such petition shall not be dismissed within 60 days after filing; or (g) the occurrence of a default under any Indebtedness of the Company.

4847-8504-7216.5
4835-6049-7362.1

SECTION 9.   REMEDIES ON DEFAULT, ETC.

Section 9.1.   *Acceleration*. If an Event of Default has occurred with respect to the Company as described in clause (e) or (f) of Section 8, the Note shall automatically become immediately due and payable. If any other Event of Default has occurred and is continuing, the Purchaser may declare the Note then outstanding to be immediately due and payable. Upon the Note becoming due and payable under this Section 9.1, whether automatically or by declaration, the Note shall forthwith mature and the entire unpaid principal amount of the Note, plus all accrued and unpaid interest thereon, shall all be immediately due and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived by the Company.

Section 9.2.   *Other Remedies*. If any Default or Event of Default has occurred and is continuing, and irrespective of whether the Note has become or has been declared immediately due and payable under Section 9.1, the Purchaser may proceed to protect and enforce its rights hereunder by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in the Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise. Without limiting the foregoing, the Purchaser shall in all events have the rights and remedies contemplated by the Security Agreement and the rights and remedies of a secured creditor contemplated by applicable law.

Section 9.3.   *No Waivers or Election of Remedies*. No course of dealing and no delay on the part of the Purchaser in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice the Purchaser's rights, powers or remedies. No right, power or remedy conferred by this Agreement or by the Note upon the Purchaser shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise

SECTION 10. SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.

All representations and warranties contained herein shall survive the execution and delivery of this Agreement and the Note, the purchase or transfer by the Purchaser of the Note or portion thereof or interest therein and the payment of the Note, and may be relied upon by any subsequent holder of the Note, regardless of any investigation made at any time by or on behalf of the Purchaser or any other holder of the Note. Subject to the preceding sentence, this Agreement, the Note and the other Loan Documents, together with the Binding Provisions set forth in Section II of the Summary Term Sheet (as defined below), embody the entire agreement and understanding between the Purchaser and the Company and supersede all prior agreements and understandings relating to the subject matter hereof.

SECTION 11. SUBSTITUTION OF PURCHASER.

The Purchaser shall have the right to substitute any one of its Affiliates (a *"Substitute Purchaser"*) as the purchaser of the Note that it has agreed to purchase hereunder, by written notice to the Company, which notice shall be signed by both such Purchaser and such Substitute Purchaser, shall contain such Substitute Purchaser's agreement to be bound by this Agreement

and shall contain a confirmation by such Substitute Purchaser of the accuracy with respect to it of the representations set forth in Section 6. Upon receipt of such notice, any reference to such Purchaser in this Agreement (other than in this Section 11), shall be deemed to refer to such Substitute Purchaser in lieu of such original Purchaser.

SECTION 12. INVESTMENT TRANSACTION

Section 12.1. *Investment Transaction.* During the period commencing on the Closing Date and ending on the Maturity Date (the "*Investment Period*"), the Purchaser shall have the right (but not the obligation), exercisable by providing written notice to the Company on or prior to the expiration of the Investment Period, to require the Company to issue and sell to the Purchaser, or an Affiliate thereof designated by the Purchaser, Series A Convertible Preferred Units of the Company on terms no less favorable to the Purchaser than those set forth in the Summary of Terms attached hereto as Exhibit 3 (the "*Summary Term Sheet*").

Section 12.2. *No Issuance or Transfer of Membership Interests.* During the period (the "*Exclusivity Period*") commencing on the Closing Date and ending on the later of (a) the expiration of the Investment Period or (b) if the Purchaser exercises its investment option in accordance with Section 12.1, the date on which Transaction Documents (as defined in the Summary Term Sheet) are executed and delivered by the parties thereto, the Company shall not (and shall not permit any other Person to), without the prior written consent of the Purchaser, (i) issue, sell, transfer, pledge, grant, dispose of, encumber or deliver any equity securities of the Company or any securities convertible into or exercisable or exchangeable for voting or equity securities of the Company or (ii) adjust, split, combine, recapitalize or reclassify any equity securities of the Company.

SECTION 13. EXCLUSIVITY; BINDING PROVISIONS

The Binding Provisions included in Section II of the Summary Term Sheet are hereby incorporated into and made part of this Agreement in their entirety and shall apply to this Agreement *mutatis mutandis*, except that (a) the Exclusivity Period (as defined under "Non-Solicitation" in the Summary Term Sheet) for purposes of this Agreement shall be the Exclusivity Period as defined in Section 12.2 hereof and (b) the reference to Vinson & Elkins L.L.P. under "Expenses" in the Summary Term Sheet shall be a reference to Foley & Lardner LLP.

SECTION 14. MISCELLANEOUS.

Section 14.1. *Notices.* Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (a) when received if given in person or by courier or a courier service, (b) on the date of transmission if sent by confirmed electronic mail transmission, (c) on the next Business Day if sent by an overnight delivery service, or (d) three Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:If to the Company, addressed as follows:

      Earth Energy Renewables LLC
      P.O. Box 2185
      Canyon Lake, Texas  78133

9

Attention: Jeffrey J. Wooley
Email:  jwooley@austin.rr.com

If to the Purchaser, addressed as follows:

c/o Ara Advisers, LLC
5300 Memorial Drive, Suite 500
Houston, Texas 70007
Attention:  Karthik Narasimhan
Email:  karthik@arapartners.com

with a copy to:

Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention:  Spencer T. Moats
Email:  smoats@foley.com

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

Section 14.2.  *Amendments*. This Agreement and the Note may be amended, and the observance of any term hereof or of the Note may be waived (either retroactively or prospectively), only with the written consent of the Company and the Purchaser.

Section 14.3.  *Binding Effect, etc*.  Any amendment or waiver consented to as provided in this Section 14.3 is binding upon the Purchaser and the Company without regard to whether the Note has been marked to indicate such amendment or waiver.  No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon.  No course of dealing between the Company and the Purchaser and no delay in exercising any rights hereunder or under the Note shall operate as a waiver of any rights of any holder of the Note.

Section 14.4.  *Successors and Assigns*.  All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including any subsequent holder of the Note) whether so expressed or not.  Notwithstanding the foregoing, the Company may not assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Purchaser, and any other attempted assignment or transfer by the Company shall be null and void.

Section 14.5.  *Severability*.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such

4847-8504-7216.5
4835-6049-7362.1

prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

Section 14.6. *Construction, etc.* Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the other Loan Documents: (a) references to the plural include the singular, the plural, the part and the whole and the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (b) the words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or in such other Loan Document refer to this Agreement or such other Loan Document as a whole; (c) the word "or" is not exclusive; (d) article, section, subsection, clause, schedule and exhibit references are to this Agreement or other Loan Documents, as the case may be, unless otherwise specified; (e) reference to any Person includes such Person's successors and assigns (subject to any limitations upon assignment set forth in the Loan Documents); (f) reference to any agreement, including this Agreement and any other Loan Document together with the schedules and exhibits hereto or thereto, document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated; (g) relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; (h) section headings herein and in each other Loan Document are included for convenience and shall not affect the interpretation of this Agreement or such Loan Document; and (i) unless otherwise specified, all references herein to times of day shall be references to Central Time (daylight or standard, as applicable).

Section 14.7. *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 14.8. *Waiver of Jury Trial.* EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) OR THE ACTIONS OF ANY PARTY HERETO IN NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF, INCLUDING ANY LITIGATION INVOLVING THE FINANCING SOURCES. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; (II) EACH PARTY UNDERSTANDS AND HAS

11

CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 14.8</u>.

*   *   *   *   *

12

If you are in agreement with the foregoing, please sign this Agreement and return it to the Company, whereupon this Agreement shall become a binding agreement between you and the Company.

Very truly yours,

**EARTH ENERGY RENEWABLES LLC**

**By:** _____

    **Name:**    **John C. Wooley**

    **Title:**    **Manager**

This Agreement is hereby
accepted and agreed to as
of the date hereof.

**ARA EER HOLDINGS, LLC**
as Purchaser

By: _____
    Name:
    Title:

SIGNATURE PAGE
(to Note Purchase Agreement)

**Schedule A**

**DEFINED TERMS**

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

*"Affiliate"* shall mean, with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person, through one or more intermediaries or otherwise; *provided, however*, that such Person shall be deemed an Affiliate for only so long as such control exists. For purposes of this definition, the term "control" (including the terms "controlling", "under common control with" and "controlled by") means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

*"Applicable Law"* shall mean all applicable laws, statutes, rules, codes, regulations, judgments, rulings, orders, decrees and injunctions of Governmental Authorities.

*"Authorized Officer"* shall mean, with respect to any party hereto, the Chief Executive Officer, President, Chief Financial Officer, Treasurer or Assistant Treasurer of such party or such other individuals, designated by written notice to the Purchaser from the Company, authorized to execute notices, reports and other documents on behalf of the Company required hereunder.

*"Business Day"* shall mean any day other than a Saturday, Sunday or other day on which banking institutions in the State of Texas are authorized or required by Applicable Law or other action of a Governmental Authority to close.

*"Closing"* shall have the meaning specified in <u>Section 3</u>.

*"Closing Date"* shall have the meaning specified in <u>Section 3</u>.

*"Company"* shall have the meaning specified in the preamble to this Agreement.

*"Default"* shall mean any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

*"Default Rate"* shall mean that rate of interest that is 10% per annum above the rate of interest stated in the Note.

*"Dollars"* or "*$*" shall mean lawful money of the United States of America.

*"Event of Default"* shall have the meaning specified in <u>Section 8</u>.

*"Exclusivity Period"* shall have the meaning specified in <u>Section 12.2</u>.

*"Financial Statements"* shall mean the following:

(a)     the unaudited income statement of the Company for the fiscal year ended December 31, 2018; and

(b)     the unaudited balance sheets of the Company as of December 31, 2017 and December 31, 2018.

*"GAAP"* shall mean U.S. generally accepted accounting principles.

*"Governmental Authority"* shall mean any United States, state, local or foreign governmental, regulatory or administrative body, agency, commission or authority, any court or judicial authority or arbitration tribunal, whether national, federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any Applicable Law.

*"Indebtedness"* shall mean, with respect to a Person, at the time of computation thereof, all of the following (without duplication):

(a)     all obligations of such Person in respect of money borrowed which has been funded at the time of such computation, determined in accordance with GAAP (excluding trade debt incurred in the ordinary course of business);

(b)     all obligations of such Person, whether or not for money borrowed (i) represented by notes payable, or drafts accepted, in each case representing extensions of credit or (ii) evidenced by bonds, debentures, notes or similar instruments, all as determined in accordance with GAAP;

(c)     capitalized lease obligations of such Person recognized as a liability under GAAP;

(d)     all reimbursement obligations of such Person under any letters of credit or acceptances (whether or not the same have been presented for payment);

(f)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interests issued by such Person or any other Person, valued at the greater of its voluntary or involuntary liquidation preference, plus accrued and unpaid dividends;

(g)     all obligations of such Person (i) constituting purchase money indebtedness, conditional sales contracts, title retention debt instruments or other similar instruments, upon which interest charges are customarily paid or that are issued or assumed as full or partial payment for property or services rendered, including obligations for the deferred purchase price of property or services or (ii) in respect of any purchase obligation, repurchase obligation, takeout commitment or forward equity commitment, in each case evidenced by a binding agreement (excluding any such obligation to the extent the obligation can be satisfied by the issuance of equity interests);

(i)     all Indebtedness of other Persons which such Person has guaranteed or is otherwise recourse to such Person (except for guaranties of customary exceptions for fraud,

A-2

misapplication of funds, environmental indemnities, voluntary bankruptcy, collusive involuntary bankruptcy and other similar customary exceptions to nonrecourse liability); and

(j)       all Indebtedness of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property or assets owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness or other payment obligation; *provided* that the amount of any Indebtedness under this <u>clause (j)</u> that has not been assumed by such Person shall be equal to the lesser of the stated amount of such Indebtedness or the fair market value of the property securing such Indebtedness,

"***Investment Period***" shall have the meaning specified in <u>Section 12.1</u>.

"***IP Filing***" shall have the meaning set forth in the Security Agreement.

"***Lien***" shall mean any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, whether voluntarily or involuntarily given, including any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security and any filed financing statement or other notice of any of the foregoing (whether or not a lien or other encumbrance is created or exists at the time of the filing).

"***Loan Documents***" shall mean this Agreement, the Note, the Security Agreement, each UCC financing statement and IP Filing relating to the Security Agreement and any other instruments, certificates or documents delivered in connection herewith or therewith from time to time.

"***Material Adverse Effect***" shall mean a material adverse effect on (a) the business, operations, condition (financial or otherwise), assets or liabilities of the Company, (b) the ability of the Company to perform its obligations under this Agreement, the Note and/or any other Loan Document, (c) the validity or enforceability of this Agreement, the Note and/or any other Loan Document and/or (d) the validity, enforceability, perfection or priority of the Liens in favor of the Purchaser contemplated by the Loan Documents.

"***Maturity Date***" shall mean June 30, 2020.

"***Note***" shall have the meaning specified in <u>Section 1</u>.

"***Person***" shall mean an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, Governmental Authority or any other organization of any kind.

"***Principal Amount***" shall have the meaning specified in <u>Section 1</u>.

"***Purchase Price Installment***" shall have the meaning specified in <u>Section 2</u>.

"***Purchaser***" shall have the meaning specified in the preamble to this Agreement.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"*Security Agreement*" means that certain Security Agreement dated as of the date hereof between the Company and the Purchaser.

"*Solvent*" shall mean that, with respect to any Person and as of any date of determination, (a) the amount of the "present fair saleable value of the assets of such Person, will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms are generally determined in accordance with applicable United States federal laws governing determinations of the insolvency of debtors; (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to satisfy the obligations of such Person under its indebtedness as its indebtedness becomes absolute and matured; (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business; and (d) such Person will be able to pay its indebtedness as it matures.  For purposes of the foregoing definition only, "indebtedness" means an obligation in connection with another Person's (i) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (ii) right to any equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"*Substitute Purchaser*" shall have the meaning specified in <u>Section 11</u>.

"*Summary Term Sheet*" shall have the meaning specified in <u>Section 12.1</u>.

A-4

**Schedule 4.1(a)(v)**

**FINANCING STATEMENTS TO AMEND OR TERMINATE**

| Secured Party | Filing No. | Jurisdiction | Filing Date |
|---|---|---|---|
| Corporation Service Company, as Representative | 16-0004533799* | Texas | February 11, 2016 |
| John Spencer Cobb | 17-0002626317** | Texas | January 24, 2017 |
| John Spencer Cobb | 17-0002627681** | Texas | January 24, 2017 |
| Alan Nalle | 17-0002628571** | Texas | January 24, 2017 |
| ELF Services 1, LLC | 15-0020490819** | Texas | June 29, 2015 |

\*        To be terminated.

\*\*      To be amended as agreed between the parties to exclude the Pilot Plant and all intellectual property of the Company.

**Schedule 5.4**

## LITIGATION

Cause No. D-1-Gn-19-003707 In The District Court 53rd Judicial District Of Travis County, Texas:      SC Ventures, LLC Plaintiff, V. Earth Energy Renewables LLC, F/K/A EE-Terrabon Biofuels, LLC And John C. Wooley And Jeffrey J. Wooley, Individually And As Managers And Directors Of Earth Energy Renewables, LLC, Defendants.

**Schedule 5.5(a)**

## FINANCIAL STATEMENTS

*See Attached.*

Earth Energy Renewables LLC
Balance Sheet Q2 2019
Period  Ednded

|  | | | 11/30/2019 | 12/31/2018 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| | **Current Assets** | | | |
| | | **Checking/Savings** | | |
| | | Petty Cash | $75 | $75 |
| | | ABC Accounts | $(113,779) | $(9,838) |
| | | IBC Accounts | $35,167 | $15,983 |
| | **Total Checking/Savings** | | $(78,537) | $6,220 |
| | | | | |
| | **Other Current Assets** | | $42,670 | $39,595 |
| | | | | |
| **Total Current Assets** | | | $(35,867) | $45,815 |
| | **Fixed Assets** | | | |
| | | | | |
| | Land | | $268,977 | $268,977 |
| | **Lab Equipment** | | | |
| | | Lab Equipment Mumford Rd | $516,247 | $508,258 |
| | **Pilot Production Equipment** | | | |
| | | A D System | $32,113 | $27,423 |
| | | Chemical Clarification | $28,242 | $25,768 |
| | | Infrastructure Upgrade | $25,905 | $25,061 |
| | | KPMS Design Engineering | $92,975 | $92,975 |
| | | KPMS Extract | $1,180,430 | $1,180,430 |
| | | Extraction Installation | $411,418 | $401,217 |
| | | NH3, P & ION Ex | $29,366 | $25,091 |
| | | Site Prep | $11,087 | $11,087 |
| | | POME Processing Equipmet | $18,502 | $-00 |
| | | TCEQ Permitting | $3,750 | $3,750 |
| | | UF & RO | $177,380 | $163,810 |
| | **Total Pilot Production Equipment** | | $2,011,168 | $1,956,612 |
| | Accumulated Depreciation | | $(1,218,232) | $(606,632) |
| | **Total Fixed Assets** | | $1,578,160 | $2,127,215 |
| | **Other Assets** | | | |
| | | Accumulated Amortization | $(301,852) | $(296,000) |
| | | Commercial Plant Design | $186,918 | $175,082 |
| | | Patents | $302,384 | $302,384 |
| | **Total Other Assets** | | $187,450 | $181,466 |
| **TOTAL ASSETS** | | | $1,729,743 | $2,354,496 |
| **LIABILITIES & EQUITY** | | | | |
| | **Liabilities** | | | |
| | | **Current Liabilities** | | |
| | | Accounts Payable | | |
| | | Accounts Payable | $1,362,100 | $906,557 |
| | | **Total Accounts Payable** | $1,362,100 | $906,557 |
| | | Other Current Liabilities | | |
| | | Accrued Expenses | $238 | $6,000 |
| | | Accrued Interest | $233,617 | $124,112 |
| | | EETDF & CO2 Loans | $62,250 | $-00 |
| | | Robson Bridge Loan | $250,000 | $250,000 |
| | | Allan Nalle Note Payable | $275,000 | $275,000 |
| | | Payroll Liabilities | $220,073 | $12,911 |
| | | Nalle Cobb Note | $207,024 | $275,000 |
| | | Premium Finance | $3,000 | $27,539 |
| | | Sunam Loan | $25,000 | $-00 |
| | | Eedelman Note | $100,000 | $-00 |
| | | Karesa Loan | $198,514 | $-00 |
| | | O'Meara Advance | $75,000 | $-00 |
| | | Wooley Advances | $74,000 | $-00 |
| | | Loan John Spencer Cobb | $250,000 | $250,000 |
| | | **Total Other Current Liabilities** | $1,973,716 | $1,220,562 |
| | **Total Liabilities** | | $3,335,816 | $2,127,119 |

| | | |
|---|---|---|
| **Equity** | | |
| **Invested Capital** | $12,242,985 | $10,881,807 |
| **Retained Earnings** | $(10,654,450) | $(7,445,514) |
| **Net Income** | $(3,194,608) | $(3,208,916) |
| **Total Equity** | $(1,606,073) | $227,377 |
| **TOTAL LIABILITIES & EQUITY** | **$1,729,743** | **$2,354,496** |

Earth Energy Renewables LLC
Income Statement
Period Ended

**Consulting     Revenue**
**Cost of Revenue**
   **Margin**

**Ordinary Income/Expense**

               **Labor Employees and Consutants**
               **Demo Plant Operating Expense**
               **Lab Expense**
               **Office Facility & Administration**
               **Legal Fees and Other Profesional**
               **Travel Expense**
        **Total Expense**

               **Interest Expense**

**Other Income/Expense**
      **Other Income**
           **Proceeds Equipment Sales**
      **Total Other Income**
      **Other Expense**
          **Depreciation Expense**
          **Amortization Expense**
    **Total Other Expense**
**Net Other Expense**

**NET LOSS**

Eleven Months
11/30/2019

$89,058
$57,500
$31,558

$1,940,209
$211,040
$64,473
$126,296
$88,113
$3,495
$2,433,626

$175,088

$-00
$-00

$611,600
$5,852
$617,452
$617,452

**$3,194,608**

EARTH ENERGY RENEWABLES LLC
CASH FLOW STATEMENT
PERIODS ENDED

| | Month Ended 11/30/2019 | Month Ended 10/31/2019 | Quarter Ended 9/30/2019 | Month Ended 9/30/2019 | Month Ended 8/31/2019 | Month Ended 7/31/2019 | Quarter Ended 6/30/2019 | Month Ended 6/30/2019 | Month Ended 5/31/2019 | Month Ended 4/30/2019 | Quarter Ended 3/31/2019 | Month Ended 3/31/2019 | Month Ended 2/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATIONS** | | | | | | | | | | | | | |
| Gross Margin | 0 | 0 | -31559 | -30000 | -1559 | | | | | | | | |
| Labor Wages & Payroll Taxes | 186275 | 181354 | 546728 | 174289 | 188955 | 183484 | 522539 | 178726 | 175874 | 167939 | 481864 | 166277 | 156579 |
| Operating Expenses | 43807 | 14513 | 84797 | 38859 | 20203 | 25735 | 55321 | 16552 | 22523 | 16246 | 65055 | 16733 | 29554 |
| Admin Expenses | 15379 | 11754 | 74150 | 42055 | 11460 | 20635 | 90145 | 35434 | 34213 | 20498 | 59794 | 21270 | 24362 |
| Interest Expenses | 13386 | 10241 | 36559 | 11220 | 8805 | 16534 | 63990 | 33598 | 15105 | 15287 | 50877 | 24514 | 14221 |
| Depreciation & Amortization | 56132 | 56132 | 168396 | 56132 | 56132 | 56132 | 168396 | 56132 | 56132 | 56132 | 168396 | 56132 | 56132 |
| Other | | | | | | | | | | | | | |
| Operating Loss | $(314,979) | $(273,994) | $(870,583) | $(292,555) | $(275,508) | $(302,520) | $(900,391) | $(320,442) | $(303,847) | $(276,102) | $(826,198) | $(284,926) | $(280,848) |
| Plus Depreciation & Amortization | $56,132 | $56,132 | $168,396 | $56,132 | $56,132 | $56,132 | $168,396 | $56,132 | $56,132 | $56,132 | $168,396 | $56,132 | $56,132 |
| Adjusted Operating Cash Deficit | $(258,847) | $(217,862) | $(702,187) | $(236,423) | $(219,376) | $(246,388) | $(731,995) | $(264,310) | $(247,715) | $(219,970) | $(657,802) | $(228,794) | $(224,716) |
| **Change In Working Capital** | | | | | | | | | | | | | |
| Other Current Assets | $(30,733) | $9,135 | 13000 | $3,000 | $10,000 | $-00 | 2999 | $-00 | $-00 | $2,999 | $(497) | $(6,477) | $6,000 |
| Accounts Payable (Details Below) | $62,016 | $8,869 | 272833 | $162,661 | $40,011 | $70,161 | 172790 | $92,411 | $72,800 | $7,579 | $(79,623) | $(29,434) | $(10,071) |
| Wooley Deferred Comp Swap for Next BTL | | | | | | | | | | | | | |
| Other Current Liabilities (Detail Below) | $152,089 | $197,759 | 205115 | $110,247 | $38,037 | $56,831 | 223348 | $177,668 | $31,142 | $14,538 | $(22,384) | $(42,526) | $9,021 |
| Total Deficit From Operations | $(75,475) | $(2,099) | $(211,239) | $39,485 | $(131,328) | $(119,396) | $(332,858) | $5,769 | $(143,773) | $(194,854) | $(760,306) | $(307,231) | $(219,766) |
| **INVESTMENTS** | | | | | | | | | | | | | |
| Cash Used for Fixed Assets | $-00 | $-00 | -11470 | $(10,065) | $(1,055) | $(350) | -10081 | $(2,267) | $(1,055) | $(6,759) | $(42,407) | $(15,389) | $(15,289) |
| Equity Raise Costs & Year End Write off | | | | | | | | | | | | | |
| Investment Next BTL Swap for Wooley Payable | | | | | | | | | | | | | |
| Other Assets Write Off/Disposition | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 |
| Total Cash Used for Investments | $-00 | $-00 | $(11,470) | $(10,065) | $(1,055) | $(350) | $(10,081) | $(2,267) | $(1,055) | $(6,759) | $(42,407) | $(15,389) | $(15,289) |
| **FINANCE** | | | | | | | | | | | | | |
| Cash From Capital Contrbutions | | | | | | | | | | | | | |
| Charles Rhode | | | $-00 | | | | $-00 | | | | $25,000 | $25,000 | |
| Dharma Susanto | | | $-00 | | | | $-00 | | | | $13,000 | $13,000 | |
| Gale Cook | | | $32,500 | | $32,500 | | $-00 | | | | $32,500 | $32,500 | |
| Gary Edelman | | | $-00 | | | | $52,000 | $52,000 | | | $48,750 | $48,750 | |
| Gorman | | | $-00 | | | | $-00 | | | | $5,000 | $5,000 | |
| Karesa Plantation | | | $-00 | | | | $32,724 | | $32,724 | | $437,500 | $125,500 | $125,000 |
| Kemin Industries | | $67,000 | $60,000 | $60,000 | | | $67,000 | | $67,000 | | $249,256 | $90,923 | $75,000 |
| Larry Ramsey | | | $-00 | | | | $-00 | | | | $650 | $650 | |
| SunNam Development | | | $10,001 | | | $10,001 | $30,000 | | | $30,030 | $30,030 | | $30,030 |
| Randall Reihmann | | | $-00 | | | | $-00 | | | | $50,000 | | |
| Henry Royer | | | | | | | | | | | $-00 | | |
| Paul Fouts | | | | | | $15,000 | | | | | $-00 | | |
| Jack Goralnik | | | | | | | | | | | $-00 | | |
| Gerald Gerstner | | | | | | $13,000 | | | | | $-00 | | |
| Greg Sundberg | | | $-00 | | | | $20,000 | | | $20,000 | $-00 | | |
| James Sauter | | | | | | | | | | | $-00 | | |
| 5 Prices LLC | | | | | | | | | | | $-00 | | |
| Brendan Kuennen | | | | | | | | | | | $-00 | | |
| Curtis Mether | | | | | | | | | | | $-00 | | |
| Guy Wendler | | | | | | | | | | | $-00 | | |
| Iowa Community Capital | | | | | | | | | | | $-00 | | |
| Mark Edelman | | | | | | | | | | | $-00 | | |
| Molly McCracken | | | | | | | | | | | $-00 | | |
| John  BF Omeara | | | | | | | | | | | $-00 | | |
| Madeline Omeara | | | | | | | | | | | $-00 | | |
| AG Major | | | | | | | $23,076 | $23,076 | | | | | |
| Mary Zahner | | | | | | | $6,500 | $6,500 | | | | | |
| John Duncan | | | | | | $2,600 | | | | | | | |
| Ted Bauer | | | $10,010 | | | $10,010 | $15,000 | $15,000 | | | $13,051 | | $13,051 |
| Cash From Capital Contributions | $-00 | $67,000 | $143,111 | $60,000 | $32,500 | $50,611 | $246,330 | $96,576 | $99,724 | $50,030 | $904,737 | $341,323 | $243,081 |
| Total Cash From Finance | $-00 | $67,000 | $143,111 | $60,000 | $32,500 | $50,611 | $246,330 | $96,576 | $99,724 | $50,030 | $904,737 | $341,323 | $243,081 |
| **Net Cash Flow for Period** | $(75,475) | $64,901 | $(79,598) | $89,420 | $(99,883) | $(69,135) | $(96,609) | $100,078 | $(45,104) | $(151,583) | $102,024 | $18,703 | $8,026 |
| Beginning Cash Balances | $(3,062) | $(67,963) | $11,635 | $(157,383) | $(57,500) | $11,635 | $108,244 | $(88,443) | $(43,339) | $108,244 | $6,220 | $89,753 | $81,727 |
| Ending Cash Balances | $(78,537) | $(3,062) | $(67,963) | $(67,963) | $(157,383) | $(57,500) | $11,635 | $11,635 | $(88,443) | $(43,339) | $108,244 | $108,456 | $89,753 |

EARTH ENERGY RENEWABLES LLC
CASH FLOW STATEMENT
PERIODS ENDED

| Month Ended 1/31/2019 | Year Ended 12/31/2018 | KPMS Interest Plus Write off Equity Raise Fees $366,919 Month Ended 12/31/2018 | Month Ended 11/30/2018 | Month Ended 10/31/2018 | Month Ended 9/30/2018 | Month Ended 8/31/2018 | Month Ended 7/31/2018 | Month Ended 6/30/2018 | Month Ended 5/31/2018 | Month Ended 4/30/2018 | Month Ended 3/31/2018 | Month Ended 2/28/2018 | Month Ended 1/31/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 159008 | 1843798 | 165580 | 152417 | 159896 | 156886 | 157569 | 154275 | 154420 | 129463 | 147500 | 149257 | 157438 | 159097 |
| 18768 | 218043 | 21505 | 34148 | 35287 | 22515 | 10217 | 21086 | 6405 | 25794 | 11352 | 4111 | 13273 | 12350 |
| 14162 | 711672 | 395568 | 20532 | 16499 | 93768 | 24343 | 39642 | 11856 | 21636 | 20429 | 18614 | 13236 | 35549 |
| 12142 | 214294 | 92924 | 11255 | 11254 | 10438 | 11009 | 10760 | 13439 | 10810 | 10685 | 10642 | 10438 | 10640 |
| 56132 | 238002 | 35667 | 35667 | 35667 | 35667 | 35667 | 35667 | 4000 | 4000 | 4000 | 4000 | 4000 | 4000 |
| | -16872 | | | -15000 | | | | -410 | -1462 | | | | |
| $(260,212) | $(3,208,916) | $(711,244) | $(254,019) | $(243,603) | $(319,274) | $(238,805) | $(261,430) | $(189,710) | $(190,241) | $(193,966) | $(186,624) | $(198,385) | $(221,636) |
| $56,132 | $238,002 | $35,667 | $35,667 | $35,667 | $35,667 | $35,667 | $35,667 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 |
| $(204,080) | $(2,970,914) | $(675,577) | $(218,352) | $(207,936) | $(283,607) | $(203,138) | $(225,763) | $(185,710) | $(186,241) | $(189,966) | $(182,624) | $(194,385) | $(217,636) |
| $(19) | $600,419 | $69,720 | $(32,054) | $(1,311) | $-00 | $190 | $(67,590) | $6,465 | $150,000 | $100,000 | $375,000 | $-00 | |
| $(40,117) | $762,963 | $(68,330) | $(386,212) | $(27,127) | $65,697 | $83,423 | $74,413 | $103,390 | $194,601 | $293,044 | $23,266 | $(120,747) | $563,704 |
| | | $188,966 | | | | | | | | | | | |
| $11,120 | $43,385 | $(2,929) | $(46,495) | $(23,443) | $172,272 | $119,218 | $(2,088) | $(25,188) | $30,812 | $3,812 | $(2,388) | $(1,187) | $(26,187) |
| $(233,096) | $(1,564,147) | $(866,082) | $(683,113) | $(259,817) | $(45,638) | $(307) | $(221,028) | $(101,043) | $189,172 | $206,890 | $213,254 | $(316,319) | $319,881 |
| $(11,730) | $(1,337,360) | $(14,943) | $(19,426) | $(35,124) | $-00 | $(34,702) | $(6,528) | $(49,705) | $(175,945) | $(25,392) | $(16,466) | $(125,806) | $(583,320) |
| | | $366,919 | $-00 | $-00 | $(15,481) | $(15,000) | $(30,000) | $(1,978) | $(20,063) | $(24,287) | $(23,286) | $(30,514) | $20,000 |
| | | $188,966 | $-00 | | | | | | $(24,082) | $(29,000) | $(24,000) | | |
| $-00 | $247,192 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $-00 | $(41,000) | $-00 | $(10,000) |
| $(11,730) | $(1,090,168) | $540,942 | $(19,426) | $(35,124) | $(15,481) | $(49,702) | $(36,528) | $(51,683) | $(220,094) | $(328,679) | $(104,752) | $(156,320) | $(613,320) |
| | | | | | $4,000 | $4,000 | $4,000 | $4,000 | $4,006 | | | $3,840 | |
| | | | | | | | $25,600 | | | | | $20,480 | |
| $187,000 | | | | $375,000 | $187,500 | | | | | | | | |
| $83,333 | | $237,500 | | $350,000 | | $87,500 | $75,744 | | | | | | |
| | | | | $650 | | | | | $2,560 | | | | |
| | | | | $11,496 | | | | | $10,002 | | | | |
| $50,000 | | | | | | | | | | | | | |
| | | | | $240 | | | | | $10,240 | | $5,120 | $240 | |
| | | | | $13,000 | | | | | $15,360 | | | | |
| | | | | $49,400 | | | | | | | | | |
| | | | | | $26,000 | | | | | | | | |
| | | | | | | | $65,000 | | | | | | |
| | | | | | | | $25,000 | | | | | | |
| | | | | | | | | $50,000 | | | | | |
| | | | | | | | | $76,800 | | | | | |
| | | | | | | | | $2,560 | | | | | |
| | | | | | | | | $25,000 | | | | | |
| | | | | | | | | $10,002 | | | | | |
| | | | | | | | | $50,002 | | | | | |
| | | | | | | | | $20,034 | | | | | |
| | | | | | | | | | $10,000 | | | | |
| | | | | | | | | | $10,000 | | | | |
| | | $14,950 | | | | | | $12,000 | | $12,320 | | $7,680 | |
| $320,333 | $1,918,825 | $252,450 | $799,786 | $213,500 | $87,500 | $79,744 | $94,000 | $301,598 | $36,562 | $16,326 | $5,120 | $32,240 | $-00 |
| $320,333 | $1,918,825 | $252,450 | $799,786 | $213,500 | $87,500 | $79,744 | $94,000 | $301,598 | $36,562 | $16,326 | $5,120 | $32,240 | $-00 |
| **$75,507** | **$(735,490)** | **$(72,690)** | **$97,247** | **$(81,441)** | **$26,381** | **$29,735** | **$(163,556)** | **$148,872** | **$5,640** | **$(105,463)** | **$113,622** | **$(440,399)** | **$(293,439)** |
| $6,220 | $741,710 | $78,910 | $(18,337) | $63,103 | $36,722 | $6,987 | $170,543 | $21,671 | $16,031 | $121,494 | $7,872 | $448,271 | $741,710 |
| $81,727 | $6,220 | $6,220 | $78,910 | $(18,338) | $63,103 | $36,722 | $6,987 | $170,543 | $21,671 | $16,031 | $121,494 | $7,872 | $448,271 |

KPMS Interest Plus Write off Equity Raise

| | Month Ended 11/30/2019 | Month Ended 10/31/2019 | Quarter Ended 9/30/2019 | Month Ended 9/30/2019 | Month Ended 8/31/2019 | Month Ended 7/31/2019 | Quarter Ended 6/30/2019 | Month Ended 6/30/2019 | Month Ended 5/31/2019 | Month Ended 4/30/2019 | Quarter Ended 3/31/2019 | Month Ended 3/31/2019 | Month Ended 2/28/2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATIONS** | | | | | | | | | | | | | |
| Gross Margin | 0 | 0 | -31559 | -30000 | -1559 | | | | | | | | |
| Labor Wages & Payroll Taxes | 186275 | 181354 | 546728 | 174289 | 188955 | 183484 | 522539 | 178726 | 175874 | 167939 | 481864 | 166277 | 156579 |
| Operating Expenses | 43807 | 14513 | 84797 | 38859 | 20203 | 25735 | 55321 | 16552 | 22523 | 16246 | 65055 | 16733 | 29554 |
| Admin Expenses | 15379 | 11754 | 74150 | 42055 | 11460 | 20635 | 90145 | 35434 | 34213 | 20498 | 59794 | 21270 | 24362 |
| Interest Expenses | -387467.3846 | -336056.6154 | -457235.9 | -359202.2 | 8805 | -106838.7 | -601249.9 | -400410.2 | -107103.5 | -9376.31 | -534876.7912 | -353903.1 | -95749.93 |
| Depreciation & Amortization | -479161.5 | -416111.5 | -649706.7 | -444442.5 | -83505.89 | -121758.3 | -726438.8 | -497462 | -121923.2 | -107053.6 | -646133 | -439646 | -109199.2 |
| Other | -570855.6154 | -496166.3846 | | -529682.8 | -92233.26 | -136677.9 | | -594513.8 | -136743 | -120370.9 | | -525388.9 | -122648.4 |
| | -662549.7308 | -576221.2692 | | -614923.2 | -100960.6 | -151597.5 | | -691565.7 | -151562.7 | -133688.2 | | -611131.8 | -136097.6 |
| Operating Loss | $(754,244) | $(656,276) | $(976,369) | $(700,164) | $(109,688) | $(166,517) | $(900,391) | $(788,618) | $(166,383) | $(147,006) | $(826,198) | $(696,875) | $(149,547) |
| | | | | | $(118,415) | $(181,437) | | | $(181,202) | $(160,323) | | | $(162,996) |
| Plus Depreciation & Amortization | $56,132 | $56,132 | $168,396 | $56,132 | $(127,143) | $(196,356) | $168,396 | $56,132 | $(196,022) | $(173,640) | $168,396 | $56,132 | $(176,445) |
| Adjusted Operating Cash Deficit | $(698,112) | $(600,144) | $(807,973) | $(644,032) | $(236,831) | $(362,873) | $(731,995) | $(732,486) | $(362,405) | $(320,646) | $(657,802) | $(640,743) | $(325,992) |
| **Change In Working Capital** | | | | | | | | | | | | | |
| Other Current Assets | $(30,733) | $9,135 | 332322 | $322,322 | $10,000 | $-.00 | 295070.57 | $241,632 | $50,440 | $2,999 | $(39,941) | $(6,477) | $7,588 |
| Accounts Payable (Details Below) | $62,016 | $8,869 | 592155 | $481,983 | $40,011 | $70,161 | 362424.79 | $298,484 | $56,362 | $7,579 | $(42,106) | $(29,434) | $9,815 |
| Wooley Deferred Comp Swap for Next BTL | | | | | | | | $355,336 | $62,284 | | $(44,271) | | $12,042 |
| Other Current Liabilities (Detail Below) | $152,089 | $197,759 | 205115 | $110,247 | $38,037 | $56,831 | 494932.21 | $412,188 | $68,206 | $14,538 | $(46,436) | $(42,526) | $14,269 |
| Total Deficit From Operations | $(514,740) | $(384,381) | 321619 | 270520 | $(148,783) | $(235,881) | $420,433 | $219,818 | $(187,397) | $(295,530) | $(786,285) | $(719,180) | $(294,320) |
| **INVESTMENTS** | | | | | | | | | | | | | |
| Cash Used for Fixed Assets | $-.00 | $-.00 | 10770 | $10,065 | $1,055 | $(350) | 10081 | $2,267 | $1,055 | $6,759 | $42,407 | $(15,389) | $15,289 |
| Equity Raise Costs & Year End Write off | | | | | | | | | | | | | |
| Investment Next BTL Swap for Wooley Payable | | | | | | | | | | | | | |
| Other Assets Write Off/Disposition | $-.00 | $-.00 | $-.00 | $20,130 | $2,110 | $-.00 | | $4,534 | $2,110 | $13,518 | $84,814 | $-.00 | $30,578 |
| Total Cash Used for Investments | $-.00 | $-.00 | $10,770 | $10,065 | $1,055 | $(350) | $10,081 | $2,267 | $1,055 | $6,759 | $42,407 | $(15,389) | $15,289 |
| **FINANCE** | | | | | | | | | | | | | |
| Cash From Capital Contrbutions | | | | | | | | | | | | | |
| Charles Rhode | | | $-.00 | | | | $-.00 | | | | $67,009 | $67,009 | |
| Dharma Susanto | | | $-.00 | | | | | | | | $72,419 | $72,419 | |
| Gale Cook | | | $32,501 | | $32,501 | | $-.00 | | | | $77,828 | $77,828 | |
| Gary Edelman | | | $-.00 | | | | $52,000 | $10,604 | | | $83,238 | $83,238 | |
| Gorman | | | $-.00 | | | | $9,011 | $9,011 | | | $88,648 | $88,648 | |
| Karesa Plantation | | | $-.00 | | | | $101,276 | $7,418 | $101,276 | | $108,397 | $94,058 | $3,929 |
| Kemin Industries | | $67,001 | $60,000 | $60,000 | | | $135,552 | | $135,552 | | $81,602 | $99,467 | $634 |
| Larry Ramsey | | | $-.00 | | | | $4,232 | $4,232 | | | $54,806 | $104,877 | $(2,661) |
| SunNam Development | | | $6,308 | | | $6,308 | $30,000 | | | $9,970 | $(82,276) | | $(5,956) |
| Randall Reihmann | | | $5,979 | | | $5,979 | $1,046 | $1,046 | | | $(114,482) | | $(9,251) |
| Henry Royer | | | | | | $5,650 | | $(547) | | | $(12,546) | | $(12,546) |
| Paul Fouts | | | | | | $5,321 | | $(2,140) | | | $(15,841) | | $(15,841) |
| Jack Goralnik | | | | | | $4,992 | | $(3,733) | | | $(19,136) | | $(19,136) |
| Gerald Gerstner | | | | | | $4,664 | | $(5,326) | | | $(22,432) | | $(22,432) |
| Greg Sundberg | | $4,335 | | | | $4,335 | $(6,979) | $(6,919) | | $(60) | $(25,727) | | $(25,727) |
| James Sauter | | | | | | $4,006 | | $(8,512) | | | $(29,022) | | $(29,022) |
| 6 Prices LLC | | | | | | $3,677 | | $(10,105) | | | $(32,317) | | $(32,317) |

Fees
$366,920

| Month Ended 1/31/2019 | Year Ended 12/31/2018 | Month Ended 12/31/2018 | Month Ended 11/30/2018 | Month Ended 10/31/2018 | Month Ended 9/30/2018 | Month Ended 8/31/2018 | Month Ended 7/31/2018 | Month Ended 6/30/2018 | Month Ended 5/31/2018 | Month Ended 4/30/2018 | Month Ended 3/31/2018 | Month Ended 2/28/2018 | Month Ended 1/31/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 159008 | 1843798 | 165580 | 152417 | 159896 | 156886 | 157569 | 154275 | 154420 | 129463 | 147500 | 149257 | 157438 | 159097 |
| 18768 | 218043 | 21505 | 34148 | 35287 | 22515 | 10217 | 21086 | 6405 | 25794 | 11352 | 4111 | 13273 | 12350 |
| 14162 | 711672 | 395568 | 20532 | 16499 | 93768 | 39642 | 11856 | | 25325 | 20429 | 18614 | 13236 | 35549 |
| -85223.78 | -3064056.47 | -901225.6154 | -313358.23 | -275146.77 | -393420.69 | -294557.6 | -322327.2 | -89322.12 | -88889.43 | -93482.9 | -89921.58242 | -95554.41758 | -106849.9341 |
| -97287.85 | -3725932.56 | -1113328 | -386656 | -343524.09 | -484130 | -363712 | -397525 | -10195.3 | -101232.8 | -105168.2 | -101198.3077 | -107452.6923 | -120050.1538 |
| -109351.9 | -4387808.65 | -1325430.385 | -459953.77 | -411901.4 | -574839.31 | -432866.4 | -472722.8 | -114588.4 | -113576.2 | -116853.6 | -112475.033 | -119350.967 | -133250.3736 |
| -121416 | -1537532.769 | -533251.54 | -480278.71 | -665548.62 | -502020.8 | -547920.7 | -129919.5 | -127221.6 | -125919.5 | -128538.9 | -123751.7582 | -131249.2418 | -146450.5934 |
| $(133,480) | $3,684,920 | $(1,749,635) | $(606,549) | $(548,656) | $(756,258) | $(571,175) | $(623,119) | $(139,855) | $(138,263) | $(140,224) | $(135,028) | $(143,148) | $(159,651) |
| $(145,544) | | | | | | | | $(152,488) | $(150,606) | $(151,910) | $(146,305) | $(155,046) | $(172,851) |
| $(157,608) | $7,131,838 | $35,667 | $35,667 | $35,667 | $35,667 | $35,667 | $35,667 | $(165,121) | $(162,950) | $(163,595) | $(157,582) | $(166,944) | $(186,051) |
| $(291,088) | $10,816,758 | $(1,713,968) | $(570,882) | $(512,989) | $(720,591) | $(535,508) | $(587,452) | $(304,976) | $(301,213) | $(303,819) | $(292,610) | $(310,092) | $(345,702) |
| $(19) | $600,419 | $69,720 | $(101,215) | $(52,943) | $230,878 | $165,116 | $(67,590) | $6,465 | $3,130 | $3,907 | $(160,461) | $(18,776) | |
| $(40,117) | $(676,193) | $(68,330) | $(81,076) | $(78,759) | $287,711 | $201,681 | $(78,589) | $(153,766) | $(42,623) | $(44,234) | $(270,118) | $(10,575) | $(616,078) |
| | | $(188,965) | $(60,936) | | $344,544 | $238,246 | | $(88,376) | $(92,376) | $(379,776) | $(2,374) | | |
| $11,120 | $(1,395,771) | $(2,929) | $(40,797) | $(23,443) | $401,377 | $274,811 | $(155,090) | $(282,344) | $(134,129) | $(140,518) | $(489,434) | $5,827 | $(1,205,969) |
| $(320,104) | $9,345,213 | $(1,904,472) | $(854,905) | $(668,134) | $543,919 | $344,346 | $(888,721) | $(734,621) | $(563,211) | $(577,040) | $(1,592,399) | $(335,989) | $(2,167,749) |
| $11,730 | $1,831,744 | $384,223 | $9,713 | $15,053 | $(2,212) | $12,729 | $(1,488) | $21,020 | $75,934 | $123,196 | $(44,767) | $49,558 | $234,280 |
| | | $486,178 | $15,541 | $25,089 | $(1,106) | $23,716 | $2,520 | $35,362 | $128,316 | $205,342 | $(52,199) | $87,682 | $398,800 |
| | | $588,132 | $21,369 | $35,124 | $0 | $34,702 | $6,528 | $49,705 | $180,699 | $287,489 | $(59,630) | $125,806 | $563,320 |
| $23,460 | $3,416,296 | $27,196 | $45,159 | $1,106 | $45,688 | $10,536 | $64,048 | $233,082 | $369,635 | $(67,062) | $163,930 | $727,840 |
| $11,730 | $5,248,040 | $1,458,533 | $46,622 | $75,266 | $(3,317) | $71,147 | $7,560 | $106,087 | $384,949 | $616,027 | $(223,658) | $426,976 | $1,924,240 |

| Month Ended 1/31/2019 | Year Ended 12/31/2018 | Month Ended 12/31/2018 | Month Ended 11/30/2018 | Month Ended 10/31/2018 | Month Ended 9/30/2018 | Month Ended 8/31/2018 | Month Ended 7/31/2018 | Month Ended 6/30/2018 | Month Ended 5/31/2018 | Month Ended 4/30/2018 | Month Ended 3/31/2018 | Month Ended 2/28/2018 | Month Ended 1/31/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 147,488 | 48,748 | 31,441 | 10,582 | 20,634 | | 5,781 | |
| | | | | | | | | 31,911 | | | | 5,658 | |
| | | | | | | | | | | | | 5,535 | |
| | | | | | | | 54,895 | 32,381 | 11,118 | | | 5,412 | |
| 10,410 | | | | | | | 57,968 | 32,851 | 11,386 | | | 5,288 | |
| $(18,500) | | $(207,600) | $(97,398) | $(135,500) | 87,500 | 219,232 | 61,041 | 33,321 | 11,654 | | | 5,165 | |
| $(47,410) | | | $(143,697) | | | | | 33,791 | 11,922 | | | 5,042 | |
| $(76,320) | | | $(189,996) | | | | | 34,261 | 12,190 | | | 4,919 | |
| $(105,231) | | | $(236,295) | | | | 70,261 | 34,731 | 12,458 | | | 4,796 | |
| | | | $(282,595) | | | | | 35,202 | 12,726 | | 5,120 | 4,673 | |
| | | | $(328,894) | | | | | 35,672 | 12,994 | | | 4,549 | |
| | | | $(375,193) | | | | 76,408 | 36,142 | 13,262 | | | 4,426 | |
| | | | $(421,492) | | | | 79,481 | 36,612 | 13,530 | | | 4,303 | |
| | | | | $(297,000) | | | 82,554 | 37,082 | 13,798 | | | 4,180 | |
| | | | | | | | 85,627 | 37,552 | 14,065 | | | 4,057 | |
| | | | | | | | 88,701 | 38,022 | 14,333 | | | 3,934 | |

4835-6049-7362.1

**Schedule 5.5(b)**

**<u>INDEBTEDNESS</u>**

Indebtedness
    Accounts Payable                        1,249,247.87
    Allan Nalle Note Payable           275,000.00
    Jeff Wooley Trustee Short Term Loan  77,000.00
    Loan John Spencer Cobb            250,000.00
    Nalle - Cobb Note Payable         207,023.73
    O'Meara Short Term Loan          75,000.00
    Premium Finance LLC             9,134.79
    Robson Short term Bridge Loan    250,000.00
Total           2,392,406.39

Convertible Notes
    SunAm Development             25,000.00
    Boone Bank & Trust Co., Custodian 100,000.00
    ICC                            40,001.00
    Keresa                  240,000.00

AP does not include final December
Notes above are principal balance only and do not include accrued interest
Convertible notes can convert to units at final ARA terms.
Keresa Notes are payable from future license fees or royalties

**Exhibit 1**

**FORM OF NOTE**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE. THIS NOTE MAY NOT BE SOLD OR OFFERED FOR SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND REGISTRATION OR QUALIFICATION UNDER APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL THAT THE PROPOSED TRANSACTION DOES NOT VIOLATE THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS.**

EARTH ENERGY RENEWABLES LLC

NOTE

No: 001
ORIGINAL PRINCIPAL AMOUNT: Up to $440,000, plus the Purchaser Expense Amount
ORIGINAL ISSUE DATE: January 13, 2020
INTEREST RATE: 8%
FINAL MATURITY DATE: June 30, 2020

This Note (the "Note") is issued pursuant to a Note Purchase Agreement, dated as of January 13, 2020 (as amended, modified or supplemented from time to time, the "Agreement"), between EARTH ENERGY RENEWABLES LLC, a Texas limited liability company (the "Company"), and ARA EER HOLDINGS, LLC, a Delaware limited liability company (the "Purchaser"). Capitalized terms used and not otherwise defined herein shall have the meanings provided in the Agreement.

FOR VALUE RECEIVED, the Company hereby promise to pay to the Purchaser, or its registered assigns, without setoff, counterclaim or other deduction for any reason, the principal sum of (a) Four Hundred Forty Thousand Dollars ($440,000) plus (b) the Purchaser Expense Amount (or, if less, the aggregate purchase price paid by the Purchaser to the Company for this Note pursuant to the Agreement), plus accrued interest thereon at the Interest Rate per annum specified above (computed on the basis of a 360-day year and the actual number of days elapsed) commencing on the date hereof, on the Final Maturity Date specified above. Unless theretofore paid, on the first Business Day of each month prior to the Maturity Date, the Company shall capitalize the accrued interest payable on this Note and add such interest to the principal amount of this Note.

EXHIBIT 1
(to Note Purchase Agreement)

Payments of principal and interest under this Note are to be made to such place as the holder hereof shall designate to the Company in writing, in lawful money of the United States of America.

This Note is subject to optional prepayment, in whole or from time to time in part, on the terms specified in the Agreement.

This Note is secured by all existing and future security agreements between the Company and the Purchaser, including the Security Agreement, and payment may be accelerated according to any of them. In addition, the Company hereby grants to the Purchaser a security interest in any money now or hereafter owed to the Company by the Purchaser and agrees that the Purchaser may, at any time and without notice or demand, set off against any such money owed any amount unpaid under this Note, whether or not due. Without affecting the liability of the Company, the Purchaser may, from time to time and without notice, release or impair any collateral security for payment of this Note.

This Note is a registered Note and, as provided in the Agreement, upon surrender of this Note for registration of transfer, duly endorsed, or accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note for the then outstanding principal amount will be issued to, and registered in the name of, the transferee. Prior to due presentment for registration of transfer, the Company may treat the Person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Company shall not be affected by any notice to the contrary.

In case an Event of Default shall occur and be continuing, the principal of this Note may be declared or otherwise become due and payable in the manner and with the effect provided in the Agreement.

To the extent permitted by Applicable Law, upon written demand by the Purchaser during the occurrence of an Event of Default and until such time such Event of Default shall have been cured or waived, each obligation hereunder if not paid when due shall bear interest at a rate per annum equal to the Default Rate from the time such obligation becomes due and payable and until it is paid in full. The Company acknowledges that the increase in rates referred to in this paragraph reflects, among other things, the fact that the Note or other amounts have become a substantially greater risk given their default status and that the Purchaser is entitled to additional compensation for such risk; and all such interest shall be payable by the Company upon demand by the Purchaser.

The Company and any and all endorsers, guarantors and sureties severally waive demand, presentment for payment, notice of dishonor or default, notice of intent to accelerate, notice of acceleration, protest and diligence in collecting (in each case to the extent set forth in the Agreement).

4847-8504-7216.5
4835-6049-7362.1

Should any debt represented by this Note be collected at law or in equity, or in bankruptcy or other proceedings, or should this Note be placed in the hands of attorneys for collection, the Company agrees to pay, in addition to the principal and interest due and payable hereon, the costs and expenses incurred by the Purchaser in connection with the collection thereof.

**THIS NOTE IS INTENDED TO BE PERFORMED IN THE STATE OF TEXAS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAW OF SUCH STATE.  As provided in Section 13 and Section 14.8 of the Agreement, the Company submits to the jurisdiction of the state and federal courts having appropriate jurisdiction situated in the State of Texas in any action or proceeding relating to this Note.**

[*Signature page follows*]

**EARTH ENERGY RENEWABLES LLC**

By: _____
Name: John C. Wooley
Title: Manager

3

**Exhibit 2**

## BUDGET FOR APPLICATION OF NOTE PROCEEDS

EER Use of Bridge Loan Proceeds

January & February 2020 Operations

| | | |
|---|---|---|
| Personnel & Payroll Taxes | | $ 374,142 |
| Operations & Accounts Payable | $ | 65,858 |
| Total | | $ 440,000 |

**Exhibit 3**

## SUMMARY TERM SHEET

*See Attached*

Ara Partners

**EARTH ENERGY RENEWABLES, LLC**
**SUMMARY OF TERMS**
**SERIES A PREFERRED UNITS FINANCING**
**November 18, 2019**

This is a summary, for negotiation purposes only, of certain principal terms of the proposed Series A Preferred Units financing of Earth Energy Renewables, LLC, a Texas limited liability company (the "**Company**") by Ara Partners, LLC or its affiliates ("**Ara**"). This summary of terms represents only the current expectations of the parties with respect to certain of the major issues relating to the proposed financing. In consideration of the time and expense incurred and to be incurred by the parties in connection with the proposed financing, the provisions set forth in part II shall be binding obligations of the Company and Ara upon the execution and delivery of this summary of terms by the parties hereto, whether or not the proposed financing is consummated. No other parts of this summary of terms, including the provisions set forth in part I, are intended to be legally binding on the Company or Ara. This summary of terms is intended as an outline only and does not purport to summarize or contain all the conditions, covenants, representations, warranties and other provisions which would be required to be contained in any definitive agreement. Subject only to the provisions of part II below, the Company and Ara shall each have the right to terminate all negotiations regarding the proposed financing and any related transactions at their sole discretion without liability or obligation. This summary of terms does not create and is not intended to create a duty to negotiate in good faith towards binding documentation and may not be relied upon as the basis for a contract by estoppel or otherwise.

**NON-BINDING SUMMARY OF TERMS OF PROPOSED FINANCING**

| | |
|---|---|
| Target Closing Date: | The initial closing of the financing is targeted to occur on or before January 31, 2020. |
| Amount of Financing: | An aggregate of $45,000,000. |
| Type of Security: | Series A Convertible Preferred Units (the "**Series A Preferred**"). |
| Pre-Money Valuation: | The Original Purchase Price is based upon a fully-diluted pre-money valuation of $17,907,725[1] (including an employee equity pool representing 10.0% of the fully diluted post-money capitalization). |
| Original Purchase Price: | $1.00 per Unit (based upon fully diluted capitalization at closing). |

Investors:

| Name | Amount |
|---|---|
| Ara | $ 45,000,000 |
| Existing Investors | $ 1,582,993[2] |

Should the existing investors choose to not participate in the amount above, Ara is willing to fund the balance.

The existing investors would take all actions required to allow for the allocation of the financing as set forth above.

---

[1] Based on a $1.00 share price, 10% option pool and 1,582,993 of investment converted at Closing. Additional investment will change the valuation slightly.

[2] Based on latest presentation from 11/8/19.

Ara Partners

| | |
|---|---|
| Tranches | The investment will be made in two stages.  The first tranche will be up to $10MM funded over the course of 2020 based upon an agreed budget.  To the extent the first tranche requires additional capital beyond the allocation, each additional share shall also receive a Series A cashless warrant.  The subsequent financing for up to $35MM will be triggered on the company achieving the Milestones described below.    To the extent the second tranche requires additional capital beyond the allocation, each additional share shall also receive a Series A cashless warrant. |
| Interest | The Series A Preferred shall accrue payment-in-kind interest at a rate of 8% per annum. |
| Milestones | The second tranche of financing will be triggered by the completion of both of the following Milestones, as determined by Ara: |

1.  Completion and operation of the new pilot facility
2.  Completion of basic engineering package from a mutually agreed upon third party engineering group for the 5.5KTA facility indicating economic feasibility.
3.  Sufficient indications of feedstock supply sources and product off-take customers to support a final investment decision.

| | |
|---|---|
| Capitalization: | The pre-investment and post-investment capitalization of the Company on a fully diluted basis (including all options and warrants and all authorized but unissued options) before and after the Series A Preferred financing will be as set forth in the capitalization table attached as <u>Exhibit A</u>. |
| Use of Proceeds: | Tranche 1: The Company will use the proceeds from Tranche 1 of the Series A Preferred financing to complete the Company's pilot facility and complete the basic engineering package for the 5.5KTA facility. |
| | Tranche 2:  The Company will use the proceeds from Tranche 2 of the Series A Preferred financing for general working capital purposes. |
| Equity Incentive Plan: | An amendment to the Company's existing Equity Incentive Plan (the "**Equity Plan**") will be adopted as part of this financing for employees, Managers and consultants of the Company.  The total number of Common Units reserved for issuance pursuant to the Equity Plan (including warrants previously issued to employees prior to the date hereof) will be equal to 10.0% of the fully diluted Common Units after giving effect to the proposed financing.  The options will be granted by the Board of Managers of the Company (the "**Board**"), will be subject to vesting over four years, with 25% of the options or Units vesting on the first anniversary of the date of grant and 1/48th of the options or Units vesting each calendar month thereafter, unless otherwise agreed by the Board, including at least one of the Ara Managers (as defined below).  Common Units acquired through the Equity Plan will be subject to (a) the right of the Company to repurchase any unvested Common  Units at the price paid by the optionee upon termination of the optionee's employment with the Company, (b) a right of first refusal in favor of the Company to purchase any vested Common  Units at the price offered by a third party (which right terminates upon the initial public offering of the  Units), and (c) a restriction against transfers of unvested |

2

Ara Partners

|  | Common Units.  Any acceleration of vesting of awards granted pursuant to the Equity Plan in connection with a change of control of the Company or otherwise shall be at the sole discretion of, and as approved by, the Board, including at least one of the Ara Managers (as defined below). |
|---|---|
| Description of Series A Preferred: | **Liquidation Preference**:  In the event of any liquidation, dissolution or winding up of the Company, holders of the Series A Preferred will be entitled to receive, in preference to the holders of Common Units, an amount for each Unit of Series A Preferred (the "**Liquidation Amount**") equal to the Original Purchase Price plus any accrued or declared and unpaid dividends.  If the assets of the Company are insufficient to permit payment of the full Liquidation Amount to all holders of Series A Preferred, the available assets will be distributed ratably to the holders of the Series A Preferred in proportion to the Liquidation Amount each such holder would otherwise be entitled to receive.  After payment in full of the Liquidation Amount to the Series A Preferred holders, the holders of the Series A Preferred will share ratably with the holders of the Common Units on an as-converted basis in the distribution of the remaining assets and funds of the Company. |

**Merger, Reorganization or Sale of the Company**:  A merger, consolidation or reorganization of the Company in which the holders of the Company's outstanding voting securities immediately prior to such transaction will hold less than a majority of the voting power of the surviving or acquiring company's outstanding securities immediately after such transaction, a sale of all or substantially all of the assets of the Company or the exclusive licensing of all or substantially all of the Company's intellectual property in a single transaction or series of related transactions shall be deemed to be a liquidation of the Company (each, a "**Deemed Liquidation Event**"), thereby triggering payment of the liquidation preferences described above unless otherwise determined by the holders of a majority of the Series A Preferred.  The conversion of Series A Preferred into Common Units shall be permitted at any time up to or simultaneously with the consummation of a Deemed Liquidation Event.

For purposes of determining the amount each holder of Series A Preferred Units will be entitled to receive in connection with a Deemed Liquidation Event, if the Series A Preferred Units has not been converted into Common Units, then it will be, upon and after the closing of the Deemed Liquidation Event, treated as either Series A Preferred Units or converted into Common Units so as to result in the greatest payment to the holder.

**Redemption**:  Holders of at least a majority of the Series A Preferred may elect to cause the Company to redeem all of the outstanding Series A Preferred either (a) beginning on the fifth anniversary of the closing of the financing in equal annual installments over a three-year period or (b) upon a material default in any of the representations, warranties or covenants of the Company in the Transaction Documents (as defined below), in each case at a redemption price per Unit equal to the greater of (a) the Liquidation Amount or (b) the fair market value (on a going concern basis) of the Series A Preferred.  If, on any redemption date, the number of Units of Series A Preferred that may then be legally redeemed by the Company is less than the number of such Units to be redeemed, then the Units to be redeemed that may not be legally redeemed will be redeemed as soon as the Company has legally available funds therefor.

3

**Ara Partners**

If the Company fails to pay the full redemption price for the Series A Preferred to be redeemed on a redemption date, then, at the request of the holders of a majority of the Series A Preferred, the number of Managers comprising the Board shall be increased by one. The holders of the Series A Preferred, voting as a separate series, shall have the right to elect such additional Manager, and such Manager shall have a number of votes on all matters to come before the Board equal to the number of votes the other Managers are entitled to cast, plus one.

<u>Conversion</u>: Each holder of Series A Preferred will have the right to convert Units of Series A Preferred at any time, at the option of the holder, into Common Units. The number of Common Units into which each Series A Preferred Unit may be converted will be determined by dividing the Original Purchase Price per Unit by the conversion price per Unit. The initial conversion price will be the Original Purchase Price. The conversion price will be subject to adjustment as provided below.

<u>Automatic Conversion</u>: The Series A Preferred automatically will be converted into Common Units, at the then applicable conversion rate, upon (a) an underwritten public offering of Common Units at a public offering price per Unit (before deducting underwriting commissions and expenses) of at least three times the Original Purchase Price in which the gross proceeds to the Company are at least $70,000,000 (a "**Qualified IPO**"), or (b) the election of the holders of a majority of the outstanding Series A Preferred.

<u>Anti-dilution Protection</u>: If equity securities are subsequently issued at a price per Unit that is less than the conversion price then in effect, the conversion price of the Series A Preferred will be adjusted using a broad-based weighted average adjustment formula. The conversion price of the Series A Preferred will also be subject to appropriate adjustment in the event that the Company effects a Unit split, Unit combination, Unit dividend or similar event. No adjustment in the conversion price will be made for (a) the issuance of options or Units pursuant to the Equity Plan (b) the issuance of securities upon conversion of any of the Series A Preferred, or as a dividend or distribution on the Series A Preferred; and (c) the issuance of Common Units upon a unit split, unit dividend or any subdivision of Units of Common Units.

<u>Protective Provisions; Voting Rights</u>: So long as at least 50% of the Units of Series A Preferred are outstanding, the Company shall not, either directly or by amendment, merger, consolidation or otherwise, without the approval of the holders of a majority of the Series A Preferred, voting as a separate series, do any of the following:

(a) liquidate, dissolve or wind-up the affairs of the Company, or effect any Deemed Liquidation Event; (b) liquidate, dissolve or wind-up the affairs of any subsidiary or permit any subsidiary to effect any Deemed Liquidation Event; (c) amend, alter or repeal any provision of the LLC Agreement or otherwise alter the terms of the Series A Preferred in a manner adverse to the Series A Preferred; (d) issue any Series A Preferred, other than pursuant to the financing proposed in this summary of terms, or increase or decrease the authorized number of Units of Series A Preferred; (e) create any new equity security senior to or on parity with the Series A Preferred (f) reclassify any outstanding Units

4

Ara Partners

of equity security into Units that are senior to or on parity with the Series A Preferred; (g) issue any equity securities (other than options or Units under the Equity Plan) for consideration other than cash; (h) declare or pay any dividend or distribution on any equity securities prior to the Series A Preferred; (i) purchase or redeem any equity securities;  (j) permit any subsidiary to declare or pay any dividend or distribution on its equity securities, other than dividends or distributions payable solely to the Company or other wholly owned subsidiaries of the Company; (k) create any new equity incentive plans, or increase the number of Units reserved under the Equity Plan; (l) have any non-wholly owned subsidiaries or spin-out or sell any subsidiary of the Company or any entity created by the Company; (m) make any loan or advance to, or own any Units or other securities of, or guarantee, directly or indirectly, any indebtedness of, any subsidiary or other corporation, partnership, or other entity; (n) make any loan or advance to any person, including any employee or Manager, except advances and similar expenditures in the ordinary course of business or under the terms of the Equity Plan or other equity incentive plan approved by the Board; (o) make any investment inconsistent with any investment policy approved by the Board; (p) make any capital expenditures in excess of $100,000; (e) acquire any business with a value in excess of $100,000; (q) increase or decrease the size of the Board; (r) incur any indebtedness, except for indebtedness not exceeding $100,000 in the aggregate; (s) enter into or be a party to any transaction with any Manager, officer or employee of the Company or any "associate" (as defined in Rule 12b-2 promulgated under the Exchange Act) of any such person except transactions made in the ordinary course of business and pursuant to reasonable requirements of the Company's business and upon fair and reasonable terms that are approved by a majority of the Board; (t) hire, fire or change the compensation of the executive officers, including approving any option grants; (u) change the principal business of the Company, enter new lines of business or exit any current line of business, or permit any subsidiary to take such action; (v) sell, assign, license, pledge or encumber material technology or intellectual property, other than licenses granted in the ordinary course of business, or permit any subsidiary to take such action; or (w) agree to do any of the foregoing.

On all other matters to come before the equity holders, the Series A Preferred and the Common Units will vote together, and not as separate classes or series, with each Series A Preferred Unit having the number of votes equal to the number of Common Units then issuable upon conversion of such Unit of Series A Preferred, except that, so long as at least 50% of the Series A Preferred Units are outstanding, the Series A Preferred, as a separate class or series, shall be entitled to elect two members of the Board.  The Company's LLC Agreement will provide that the number of authorized Common Units may be increased or decreased with the approval of the holders of a majority of the Series A Preferred and Common Units, voting together and not as separate classes or series, and without a separate class vote by the Common Units.

Distributions: There should be no distribution of dividends to the Series A Preferred Holders in preference to Common Unit Holders.

Tax distributions shall be made to all unit holders to the extent they are allocated any taxable income or gain from the Company.

4835-6049-7362.1



| | |
|---|---|
| Preemptive Rights: | The Major Investors shall have the preemptive right to purchase a pro-rata portion (with a right of oversubscription if any Investor elects not to purchase its full pro-rata portion) of any equity securities offered by the Company in the future on the same terms and conditions as the Company proposes to offer such securities to other parties.  A Major Investor's pro-rata portion will be based on its percentage equity ownership in the Company (assuming the conversion of all outstanding Series A Preferred into Common Units and the exercise of all options outstanding under the Equity Plan.  An Investor will have 15 business days in which to exercise this preemptive right.  Notwithstanding the provisions set forth above, no preemptive right shall apply to securities issued in transactions described in the last sentence of the "Anti-dilution Protection" section of this term sheet.  A Major Investor (as defined below) may assign its rights to purchase Units to its affiliated funds, including funds that are not current equity holders of the Company. |
| Registration Rights: | Investors shall be entitled to customary registration rights, including two demand registrations of their Common Units held at the Company's expense, unlimited piggyback rights on all public offerings of the Company's Units, and the right to require that the Company file an unlimited number of registration statements on Form S-3 or other registration short forms at the expense of the Investors if such forms are available.  Other than piggyback rights that are subordinated to the foregoing registration rights, no future registration rights may be granted without the consent of the holders of at least a majority of the Series A Preferred. |
| Information Rights: | The Company will deliver to each holders of Units of Series A Preferred or Common Units issued upon conversion of the Series A Preferred and all other Common Unit Holders, (a) audited annual financial statements within 90 days after the end of each fiscal year, (b) unaudited quarterly financial statements within 45 days after the end of each fiscal quarter, (c) unaudited monthly financial statements within 30 days after the end of each month, (d) an annual budget as approved by the Board at least 45 days prior to the beginning of each fiscal year and (e) an up-to-date capitalization table of the Company, certified by the principal financial or accounting officer of the Company, within 30 days after the end of each quarter.

In addition, each Major Investor (any owner of at least 300,000 Common or Preferred Units will have inspection and visitation rights.  These provisions will terminate upon a Qualified IPO. |
| Right of First Refusal and Co-Sale Applicable to Common Units: | No holder of Common Units may sell or transfer any Units (other than to immediate family members or in trust for the benefit of such holder or such holder's immediate family members) without offering such Units on a pro-rata basis, first, to the Company, and, then, to the holders of Series A Preferred Units (with a right of over-subscription for Units not purchased by other holders) at the same price and on the same terms as those received in a bona fide third-party offer.  Holders of Series A Preferred Units who decline to purchase such Units shall be entitled to sell into such offer on a pro-rata basis with the selling holder of Common Units.  These rights will terminate upon a Qualified IPO or a sale of the Company. |



| | |
|---|---|
| Drag-Along Applicable to Common Units: | The holders of Common Units shall be required to enter into an agreement with the Investors providing that such holders will vote their Units in favor of and participate in a Deemed Liquidation Event or any other transaction in which 50% or more of the voting power of the Company will be transferred, in each case, that is approved by the Board, and the holders of a majority of the Series A Preferred.  These obligations will terminate upon a Qualified IPO. |
| Board of Managers: | The Board will consist of one nominees of the holders of Common Units, who shall be the person who is appointed as CEO by the Board, two nominees of the holders of Series A Preferred Units (each, an "**Ara Manager**"), both of whom will be designated by Ara so long as it holds any  Series A Preferred Units.  Each committee of the Board shall include the Ara Managers.  Meetings of the Board will be held monthly.  Managers will be indemnified by the Company to the fullest extent allowed by law.   The Company will enter into an indemnification agreement with each Manager at the Closing in a form satisfactory to the Investors.  The indemnification agreement with respect to the Ara Manager will also cover Ara and its affiliates.   The Company will reimburse Ara for the Ara Manager's travel expenses associated with Board meetings.  If the Company merges with another entity and is not the surviving entity, or transfers all or substantially all of its assets, proper provisions shall be made so that each successor of the Company assumes the Company's obligations with respect to indemnification of Managers. |
| Terms of the Unit Purchase Agreement: | The purchase of the Series A Preferred will be made pursuant to a  Unit Purchase Agreement, Amended and Restated LLC Agreement and related documents (the "**Transaction Documents**") drafted by counsel to Ara and acceptable to the Company, which shall contain, among other things, appropriate representations and warranties of the Company, investor indemnification, covenants of the Company reflecting the provisions set forth herein, other provisions customary for such agreements and appropriate conditions of closing, which will include, among other things (some of which are described below), qualification of the Units under applicable Blue Sky Laws, the execution of an Amended and Restated LLC Agreement establishing the rights and preferences of the Series A Preferred and an opinion of counsel of the Company.  The Transaction Documents will be governed by Texas law and be subject to the exclusive jurisdiction of Texas courts. |
| Proprietary Information Agreements | Prior to closing, the Company will have entered into Proprietary Information Agreements with all employees.  The Proprietary Information Agreements will contain provisions satisfactory to Ara with respect to confidentiality and corporate ownership of inventions and innovations during employment, and covenants with respect to non-competition and non-solicitation of employees and customers during and after employment for one year.  Thereafter, each new employee and officer of the Company will enter into a similar agreement. |
| Insurance: | The Company will maintain casualty and liability insurance with coverage and in amounts as set forth in the LLC Agreement, unless otherwise determined by the unanimous vote of the Board.  Ara will be named as an additional insured and loss payee on such insurance policies, with appropriate notice and cancellation provisions.  The Company will also maintain D&O insurance with coverage and in amounts, including non-rescindable Side A coverage, satisfactory to the Board. |

7

Ara Partners

| | |
|---|---|
| Conditions Precedent: | The closing of the financing will be subject to the following conditions: (i) qualification in any state(s) in which the Company is required to be qualified to conduct business; (ii) the business, assets, financial condition, operations, results of operations and prospects of the Company are substantially as have been represented to Ara and no change shall have occurred that, in Ara's sole judgment, is or may be materially adverse to the Company; (iii) the negotiation and execution of definitive Transaction Documents setting forth representations and warranties of the Company, covenants and other provisions consistent with this summary of terms and customary in transactions of this nature; (iv) the completion of due diligence satisfactory to Ara in its sole discretion; (v) the approval of this investment by the Investment Committee of Ara; (vi)  the agreement by Ara and the holders of Common  Units on a 2019 - 2020 business plan including financial plan, marketing and sales strategy, and management recruiting plan; and (vii) the approval of the financing by the current Board and the requisite equity holders of the Company. |

## II.   BINDING PROVISIONS

| | |
|---|---|
| Non-Solicitation: | The Company agrees to work in good faith expeditiously toward a closing.  From the date of acceptance of this summary of terms until the earliest of (a) the consummation of the financing, (b) the agreement of Ara and the Company to terminate negotiations or (c) the expiration of 60 days from the date of acceptance of this summary of terms by the Company (the "Exclusivity Period"), the Company will not directly or indirectly solicit, initiate or participate in any discussions or negotiations with, or encourage or respond to any inquires or proposals by, any person or group other than Investors concerning any financing or the acquisition, sale, lease, license or other disposition of the Company or its subsidiaries or any material part of the equity or assets of the Company or its subsidiaries. |
| | The Company will promptly notify Ara if any person (a) seeks to initiate any discussions or negotiations not contemplated in the immediately preceding paragraph, (b) makes an inquiry or proposal, or (c) requests any information with respect to any proposed financing or the acquisition, sale, lease, license or other disposition of the Company or its subsidiaries or any material part of the equity of the Company or any of its subsidiaries, and the Company will disclose to Ara the terms of any proposal that it may receive in respect of any such proposed financing. |
| Expenses: | The Company and the Investors will each bear their own legal and other expenses with respect to the financing, except that the Company will pay at the closing of the financing the reasonable fees and expenses Vinson & Elkins L.L.P., counsel to Ara. |
| Confidentiality: | The Company shall keep the terms and conditions of this summary of terms, including its existence, confidential and shall not disclose the terms and conditions of this summary of terms, including its existence, to any third party without the consent of Ara, except that the Company may disclose the terms and conditions described in this summary of terms to its officers, Managers, attorneys and other advisers, provided, that such persons agree to the confidentiality restrictions contained herein.  If the Company determines that it is required by law to disclose information regarding this summary of terms, it shall, a reasonable time before making any such disclosure or filing, consult |

8

with Ara regarding such disclosure or filing and seek confidential treatment for such portions of the disclosure or filing as may be requested by Ara.

| | |
|---|---|
| Right to Conduct Activities: | The Company hereby acknowledges that Ara is a venturing entity in the energy sector, and as such invests in numerous portfolio companies, and conducts substantial business in the energy industry, some of which may be competitive with the Company's business. Ara shall not be liable to the Company for any claim arising solely out of, or based upon, (i) the investment by Ara in any entity competitive to the Company, or (ii) actions taken by Ara, any partner, officer or other representative of Ara (other than a representative of Ara who is a member of the Board) to assist any such competitive company, whether or no such action was taken as a board member of such competitive company, or otherwise, and whether or not such action has a detrimental effect on the Company. |
| Governing Law: | This summary of terms shall be governed by the laws of the State of Texas, and the parties hereto irrevocably submit to the state or federal courts having appropriate jurisdiction situated in the State of Texas, for the resolution of any dispute arising out of or in connection with this Memorandum of Terms. |

Ara Partners

This summary of terms shall expire unless signed and accepted by the Company and returned to Ara not later than 5:00 p.m., Central Time, on November 22, 2019.

**ARA PARTNERS, LLC**
**By: Ara Partners Group, LLC, its sole member and manager**

Date: November 22, 2019

By: _____
Name:    Cory Steffek
Title:    Managing Director

**EARTH ENERGY REWNEWABLES, LLC**

Date: November 22, 2019

By: _____
Name:    John Wooley
Title:    CEO

SIGNATURE PAGE TO
SUMMARY OF TERMS
SERIES A PREFERRED UNIT FINANCING

4835-6049-7362.1

Ara Partners

**EXHIBIT A**

**PRE-INVESTMENT AND POST-INVESTMENT**

**CAPITALIZATION TABLES**

[See Attached]

# EXHIBIT F

Execution Version

**EARTH ENERGY RENEWABLES LLC**

**MANAGER'S CERTIFICATE**

January 14, 2020

        Reference is made to that certain Note Purchase Agreement dated as of the date hereof (the "NPA") between Earth Energy Renewables LLC (the "Company") and Ara EER Holdings, LLC (the "Purchaser"). Capitalized definitional terms used herein but not otherwise defined herein shall have the meanings provided in the NPA. The undersigned hereby certifies that the undersigned is the duly elected, qualified and acting Manager of the Company and that, as such, the undersigned is familiar with the facts herein certified and is duly authorized to certify the same and to execute and deliver this Certificate on behalf of the Company. The undersigned hereby further certifies in the undersigned's capacity as Manager of the Company as follows as of the date hereof:

        1.      Attached hereto as Exhibit A is a true, correct and complete copy of resolutions duly adopted by the member(s) of the Company. Such resolutions have not been amended, modified or revoked, and such resolutions have been in full force and effect continuously from the date of their adoption through and including the date hereof. Such resolutions are the only entity proceedings of the Company now in force relating to or affecting the matters referred to therein.

        2.      Attached hereto as Exhibit B is a true, correct and complete copy of the Certificate of Formation of the Company and all amendments thereto as in effect on and as of the date hereof. No other amendment or document relating to or affecting the same has been filed with the applicable governmental authority in the Company's jurisdiction of formation, and no action has been taken by the Company or its officers in contemplation of any such filing. Such documents are in full force and effect on and as of the date hereof.

        3.      Attached hereto as Exhibit C is a true, correct and complete copy of the limited liability company agreement of the Company as in full force and effect on the date of the resolutions referred to in paragraph 1 above and at all times since such date. No amendment or other document relating to or affecting the same has been authorized by the Company or its members, managers or officers, and no action has been taken by the Company or its members, managers or officers in contemplation of any such amendment or document.

        4.      Each person named on Exhibit D is the duly elected, qualified and acting incumbent of the office set forth opposite his or her name of the Company, and the signature at the right of such office is the genuine signature of such individual, and each such individual is duly authorized to execute and deliver on behalf of the Company each of the Loan Documents to which the Company is a party and any certificate or other document to be delivered by the Company pursuant to the Loan Documents to which it is a party.

        5.      Attached hereto as Exhibit E is a certificate from the appropriate governmental official as to the continued existence and good standing of the Company in the State of Texas.

**IN WITNESS WHEREOF**, the undersigned has executed this certificate as of the date first written above.

By: _____

Name:  John C. Wooley

Title:   Manager

4851-9795-4993
4835-6049-7362.1

**EXHIBIT A**

**RESOLUTIONS**

[See attached]

## MANAGERS CERTIFICATE OF RESOLUTION

The undersigned, being a Manager of Earth Energy Renewables LLC (Company) hereby certifies that members owning more than 66.667% of the ownership units of the Company have approved the following:

**RESOLVED**, that the Managers of the Company be, and hereby are, authorized to enter into a borrowing transaction with Ara EER Holdings, LLC in the original principal amount of $440,000.00 and upon such terms as the Managers in the Managers' discretion may determine and are further authorized to execute such documents and take whatever other actions that may be necessary to close the transaction.

_____

Jeffrey J. Wooley Manager

**EXHIBIT B**

**CERTIFICATE OF FORMATION**

[See attached]

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 801674390 10/25/2012
Document #: 449958250002
Image Generated Electronically
for Web Filing**

| Article 1 - Entity Name and Type |
|---|

The filing entity being formed is a limited liability company. The name of the entity is:

## EE-Terrabon Biofuels LLC

| Article 2 – Registered Agent and Registered Office |
|---|

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Jeffrey  J  Wooley**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**2046 Ponderosa    New Braunfels  TX  78132**

| Consent of Registered Agent |
|---|

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

| Article 3 - Governing Authority |
|---|

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **John  C  Wooley**                    Title: **Manager**

Address: **Box 684707    Austin  TX, USA  78768**

Manager 2: **Jeffrey  J  Wooley**                 Title: **Manager**

Address: **Box 2185    Canyon Lake  TX, USA  78133**

| Article 4 - Purpose |
|---|

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

| Supplemental Provisions / Information |
|---|

4835-6049-7362.1

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Jeffrey J. Wooley**          **Box 2185 Canyon Lake, TX 78133**

## Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Jeffrey J. Wooley**

Signature of Organizer

FILING OFFICE COPY

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Rolando B. Pablos
Secretary of State

# Office of the Secretary of State

### CERTIFICATE OF FILING
### OF

### Earth Energy Renewables LLC
801674390

[formerly: EE-Terrabon Biofuels LLC]

The undersigned, as Secretary of State of Texas, hereby certifies that a Certificate of Amendment for the above named entity has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

Dated: 08/05/2018

Effective: 08/06/2018



Rolando B. Pablos
Secretary of State

*Come visit us on the internet at http://www.sos.state.tx.us/*

Phone: (512) 463-5555     Fax: (512) 463-5709     Dial: 7-1-1 for Relay Services
Prepared by: Tiffany Garcia     TID: 10303     Document: 829092730004

**EXHIBIT C**

**LIMITED LIABILITY COMPANY AGREEMENT**

[See attached]

2-2-17                                                          Updated for Closing 6-22-17



# THIRD AMENDED COMPANY AGREEMENT OF
## EE-TERRABON BIOFUELS, LLC,
### a Texas Limited Liability Company

This Third Amended Company Agreement (as may be amended, the "Agreement") of EE-Terrabon Biofuels LLC is made and entered into effective as of the _____31st_____ day of _____July_____, 2017 (the "Effective Date"), by and among the undersigned as listed on Exhibit A as the members (collectively, the "Members" and individually, a "Member"). When fully executed, this Agreement shall be substituted for and replace the Second Amended Company Agreement executed November 14, 2016.

## ARTICLE I
## DEFINITIONS

1.01  **Definitions.**  As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with reference to any person, any other person controlling, controlled by or under direct or indirect common control with such person.

"Agreement" means this Third Amended Company Agreement, as amended from time to time.

"Assignee" means a person who receives a Transfer of all or any Units of a Member, but who has not been admitted to the Company as a Member.

"Bankrupt Member" means (except to the extent a Simple Majority consents otherwise) any Member (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, termination, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a Proceeding of the type described in sub-clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a Proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and one hundred twenty (120) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and ninety (90) days have expired without the appointment's having been vacated or stayed, or ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 2

2-2-17

Updated for Closing 6-22-17

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Summary Business Plan and Budget" means the summary plan and budget for operating the Company during the 2-year period immediately following the Effective Date copy of which is attached hereto as Exhibit "B."

"Capital Account" means a capital account maintained for a Member as provided by Treasury Regulation 1.704-1(b)(2)(iv) of the Regulations of the Internal Revenue Service.

"Capital Contribution" means the amount of money and the Net Value of property other than money contributed to the Company by a Member.

"Capital Commitment" of a Member represents the aggregate amount of capital that such Member has agreed to contribute to the Company.

"Certificate of Formation" means the initial, amended, and restated certificate of formation of the Company.

"Units" means those Units of membership interest in the Company.

"Company" means EE-Terrabon Biofuels, LLC, a Texas limited liability company.

"Convertible Securities" means any obligations, evidences of indebtedness or other securities or interests (other than Options) directly or indirectly convertible or exchangeable into Units or other Equity Securities in the Company.

"Default Interest Rate" means a rate per annum equal to the lesser of (a) ten percent (10%) plus the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Equity Security" means (i) Units or other equity interests in the Company (including other classes or groups thereof having such relative rights, powers and duties as may from time to time be established by the Company in accordance with this Agreement, including rights, powers and/or duties junior, pari passu or senior to existing classes and groups of Units and other equity interests of the Company), (ii) stock appreciation rights, phantom stock rights or other rights with equity features, (iii) Options or warrants to acquire Units or other equity interests in the Company, and (d) Convertible Securities.

"Former Member" means any person who had executed this Agreement, as of the date of this Agreement as a Member, or hereafter admitted to the Company as a Member, as provided in the Agreement, but who is no longer a Member of the Company; however,

2

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                                  Updated for Closing 6-22-17

this term does not include a person who ceases to be a Member as a result of bankruptcy, default or expulsion.

"Fundamental Business Transaction" has that meaning assigned to it by the definitions in the TBOC, as may be amended from time to time, and includes (a) a merger, (b) an interest exchange, (c) a conversion, or (d) a sale of all or substantially all of an entity's business including, but not limited to, either (i) the sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the business or assets of the Company or (ii) a transaction or series of transactions (including by way of merger, consolidation, recapitalization, reorganization or transfer or issuance of stock, and including but not limited to via an initial public offering), the result of which is that the Members immediately prior to such transaction (or their affiliates or ancestors, descendants, siblings or spouses or trusts for the benefit of any of such members and/or any of the foregoing) are, after giving effect to such transaction, no longer, in the aggregate, the "beneficial owners" (as such term is defined in Rule 13d 3 and Rule 13d 5 promulgated under the Securities Exchange Act of 1934, as amended), directly or indirectly through one or more intermediaries, of more than fifty percent (50%) of the voting power of the units or other voting securities of the surviving entity of such transaction.

"General Interest Rate" means a rate per annum equal to the lesser of (a) the prime rate published in The Wall Street Journal on the day the rate is determined (or the most recent day on which The Wall Street Journal was published if the paper is not published on the day the rate is determined), or, (b) the maximum rate permitted by applicable law.

"Indebtedness" means at a particular time, without duplication, (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than retainages, trade payables and other current liabilities incurred in the ordinary course of business), (iv) any commitment by which a Person assures a creditor against loss (including contingent reimbursement obligations with respect to letters of credit) and (v) any guarantee of any of the foregoing obligations owed by another Person (other than a wholly-owned subsidiary of the Company).

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, and any successor statute, as amended from time to time.

"Key Holder" shall mean any Member (and not a transferee or other Assignee) holding Units in excess of 500,000 Units.

"Manager" means any person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company

3

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17

Updated for Closing 6-22-17

as provided in this Agreement, but does not include any person who has ceased to be a Manager of the Company.

"Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any person who has ceased to be a Member of the Company.

"Member Loan" means the loan by a Member of funds to the Company.

"Net Value" means, in connection with a Capital Contribution of property, the value of the asset less any Indebtedness to which the asset is subject when contributed.

"Option" means any warrant, option or other right to subscribe for or purchase or acquire Units or other Equity Securities in the Company.

"Person" means any business entity, trust, estate, executor, administrator, or individual.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

"Substituted Member" means a Person approved to become a Member of the Company in accordance with all of the requirements of Section 13.04 hereof.

"Simple Majority" means greater than one-half (1/2) of the Units.

"Super Majority" means greater than two-thirds (2/3) of the Units.

"TBOC" means the Texas Business Organizations Code, including any successor statute, as amended from time to time.

"Transfer" means any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of any Units, whether voluntary or involuntary, whether attempted or completed, and whether during the transferor's lifetime or upon or after the transferor's death, including by operation of law, court order, judicial process, foreclosure, levy or attachment.

Other terms defined herein have the meaning so given them.

## ARTICLE II
## ORGANIZATION

2.01 **Formation.** The Company has been organized as a Texas limited liability company by filing a Certificate of Formation with the Secretary of State of Texas, which may be amended or restated from time to time.

4

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 5

2-2-17                                                     Updated for Closing 6-22-17

2.02 **Name.** The name of the Company is "EE-Terrabon Biofuels, LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

2.03 **Registered Office and Registered Agent.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other person or persons as the Managers may designate from time to time in the manner provided by law.

2.04 **Principal Office and Other Offices.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas. The Company may have such other offices as the Managers may designate from time to time.

2.05 **Purposes.** The primary purposes of the Company shall be any lawful purpose which may be undertaken by the company in accordance with the applicable provisions of the Texas Business Organizations Code.

2.06 **Powers.** The Company shall, subject at all times to the terms of this Agreement, have all powers necessary, suitable or convenient for the accomplishment of the purposes of the Company, including without limitation (a) to make and perform all contracts; (b) to borrow or lend money and secure payment thereof; (c) to engage in all activities and transactions; and (d) to have all powers available to a limited liability company under (i) the TBOC, (ii) any other laws in the State of Texas, and (iii) the laws of any other jurisdiction where the Company conducts business.

2.07 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Managers, each Member shall immediately execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.08 **Term.** The Company will commence as provided in the Certificate of Formation for the Company filed with the Secretary of the State of Texas, and will continue until the Company terminates under the terms of this Agreement.

2.09 **Mergers and Exchanges.** The Company may be a party to a merger, an exchange, or acquisition under the TBOC, subject to the requirements of this Agreement.

5

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 6

2-2-17                                                                 Updated for Closing 6-22-17

2.10 **No State-Law Partnership.** The Members intend that the Company not be a partnership, a limited partnership, or a joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

2.11 **Summary Business Plan and Budget.** The Company has adopted a Summary Business Plan and Budget and each Member hereby acknowledges that a Material Change to the same is controlled by this Agreement.

## ARTICLE III
## MEMBERSHIP

3.01 **Initial Members, Capital Commitments, and Units.** The membership interests in the Company shall be represented by Units, which shall have the rights, preferences, powers, qualifications, limitations and restrictions set forth in this Agreement and, subject to the restrictions set forth in Article VI and elsewhere in this Agreement. The persons listed on Exhibit A have each been admitted to the Company as a Member, effective as of or prior to the Effective Date of this Agreement. Set forth opposite the name of each Member listed on Exhibit A is such Member's Capital Contribution and/or outstanding Capital Commitment, as well as the number of Units, held by such Member. Exhibit A may be amended from time to time to reflect changes in or additions to the membership of the Company in accordance with the requirements of this Agreement. Any such amended Exhibit A shall (a) supersede all prior Exhibit A's, (b) become part of this Agreement, and (c) be kept on file at the principal office of the Company. Each Member represents that the Member has acquired and/or is acquiring such Member's Units of the Company for the account of such Member and not with a view to distribution thereof within the meaning of the Securities Act of 1933, as amended, or any state securities laws. No Member will transfer any Units or any interest therein in contravention of that act or any applicable state or federal securities laws.

3.02 **Additional Members.** Additional persons may be admitted to the Company as Additional Members only on such terms and conditions as shall be determined and consented to in writing by those Members holding a Simple Majority of the Units. The terms of admission or issuance must specify the Units and the Capital Commitments applicable thereto. The terms of admission or issuance may also provide for the creation of different classes or groups of Members having different rights, powers, and duties, if and to the extent consented to in writing by those Members holding a Simple Majority of the Units.

3.03 **Member Rights Specified in Agreement.** Except as otherwise specifically provided in this Agreement, no Member shall have the right (a) to sell, transfer or assign its interest in the Company; (b) to require partition of the property of the Company; (c) to compel the sale of Company assets; or (d) to cause the winding up of the Company.

3.04 **No Authority.** Except as otherwise specifically provided in this Agreement, no Member (other than a Manager or an officer) has the authority or power to (a) transact business in the name of or on behalf of the Company, (b) bind or obligate the Company, or (c) incur any expenditures on behalf of the Company.

6

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                            Updated for Closing 6-22-17

3.05 **Liability to Third Parties.** No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.06 **No Right to Withdraw.** No Member is entitled to withdraw from the Company prior to the Company's dissolution pursuant to Article XVI of this Agreement. Without limiting the generality of the foregoing, prior to the Company's dissolution pursuant to Article XVI of this Agreement, no Member shall be entitled to: (i) withdraw any part of the amounts in its Capital Account from the Company; (ii) demand a return of the amounts in its Capital Account; or (iii) receive property other than cash in return for the amounts in its Capital Account.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.01 **Initial Contributions.** Prior to or contemporaneously with the execution of this Agreement, each Member has made the Capital Contributions set forth such Member's name on <u>Exhibit A</u> to this Agreement.

4.02 **No Further Contributions.** No Member shall be required to make any additional Capital Contributions other than those specifically described by this Agreement (to restore a negative Capital Account balance or otherwise), unless agreed to in writing by the contributing Member or required by the TBOC.

4.03 **Return of Contributions.** No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unpaid Capital Contribution is not a liability of the Company or of any Member.

4.04 **Members Loans.** Member Loans shall not be considered Capital Contributions and if any Member shall make a Member Loan pursuant to this Agreement, the making of such loan shall not result in any increase in the amount of the Capital Account of such Member. The amount of any Member Loan shall be a debt of the Company to the Member making such Member Loan and shall be payable or collectible in accordance with such commercially reasonable terms and conditions as agreed to by the Member making the Member Loan and the Company. Any Member Loan bears interest at the General Interest Rate from the date of the advance until the date of payment.

4.05 **Capital Accounts.** A Capital Account shall be established and maintained for each Member. The Capital Account of each Member:

(a) shall consist of (i) the amount of money contributed by that Member to the Company, and (ii) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to Section 752 of the Internal Revenue Code);

(b) shall be increased by allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in

7

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                    Updated for Closing 6-22-17

Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation § 1.704-1(b)(4)(i); and

(c) shall be decreased by (i) the amount of money distributed to that Member by the Company, (ii) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Internal Revenue Code), (iii) allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code, and (iv) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treasury Regulation § 1.704-1(b)(2)(iv)(g), but excluding items described in clause (c)(iii) above and loss or deduction described in Treasury Regulation § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii).

The Capital Account of each Member also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation § 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treasury Regulation §1.704-1(b)(2)(iv)(g). A Member that has more than one membership interest (including Units of multiple classes) shall have a single Capital Account that reflects all its membership interests, regardless of the class of membership interests owned by that Member and regardless of the time or manner in which those membership interests were acquired. On the transfer of all or part of a membership interest, the Capital Account of the transferor Member that is attributable to the transferred membership interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation § 1.704-1(b)(2)(iv)(l).

### 4.06 Preemptive Rights.

(a)     Except for Excluded Issuances (as defined below), if the issuance of any Equity Securities is authorized pursuant to the terms of this Agreement following the Effective Date, the Company shall, not less than twenty (20) days prior to any issuance, offer, by written notice (an "Issuance Proposal Notice"), to sell to each Member, a portion of such Equity Securities equal to the quotient determined by dividing (i) the number of Units then held by such Member by (ii) the number of all issued and outstanding Units (the "Ratable Portion"). The Issuance Proposal Notice shall describe the terms of the offering in reasonable detail, including the Equity Securities offered, the price and other terms of sale, the identity of the proposed purchasers, and such Member's Ratable Portion. Each Member shall be entitled to purchase such Equity Securities at the price and on the terms set forth on the Issuance Proposal Notice.

(b)     In order to exercise its purchase rights hereunder, a Member must deliver a written notice to the Company (which notice the Company shall promptly deliver to each other Members) describing its irrevocable election hereunder within thirty (30) days after receipt of the Issuance Proposal Notice from the Company, provided, however, that any such election may be subject to the consummation of the sale of the Equity Securities described in the Issuance Proposal Notice on the terms set forth therein.

\*

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 9

2-2-17                                                          Updated for Closing 6-22-17

(c)     Upon the expiration of the offering period described above, the Company shall be entitled to sell such Equity Securities which the Members have not elected to purchase during the one hundred eighty (180) calendar days following such expiration at a price not less, and on other terms and conditions no more favorable to the purchasers thereof than that offered to the Members. Any Equity Securities offered or sold by the Company after such 180-day period must be reoffered to the Members pursuant to the terms of this Section 4.06.

(d)     For purposes of this Section 4.06, "Excluded Issuances" means (i) issuances of Equity Securities pursuant to an acquisition of another corporation or business (whether by merger, purchase of assets or equity, recapitalization or reorganization) approved pursuant to Article VI, and (ii) Equity Securities issued in connection with any split, unit dividend, or reclassification of Units; (iii) each authorized or planned issuance of Equity Securities described in Exhibit B "Summary Business Plan and Budget" attached hereto and in Article VI.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.01A  **Allocations of Profits and Losses**.  Profits and losses of the Company shall be determined annually.  Except as otherwise expressly provided herein, profits and losses of the Company shall be allocated and shared between or among the Members and transferees in accordance with their relative Units.

5.01  **Allocations.**

(a) Except as may be required by Section 704(c) of the Internal Revenue Code and Treasury Regulation § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Units.

(b) All items of income, gain, loss, deduction, and credit allocable to any Units that are transferred during a calendar year shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning those Units, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the regulations thereunder.

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, items of the Company's income and gain shall be specially allocated as a qualified income offset to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 5.01(c) shall be made only if and to the extent that such Member has an Adjusted Capital Account Deficit after all other allocations provided for in this Article have been tentatively made as if this Section 5.01(c) were not in this Agreement.

9

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 10

2-2-17                                                                  Updated for Closing 6-22-17

### 5.02 Distributions.

(a)      **Tax Distributions.** To the extent cash flow permits and as permitted under any contracts in respect of Indebtedness to which the Company is a party, and as reasonably determined by the Managers, the Company shall make annual cash distributions to Members, on a pro rata basis in accordance with their Units, in amounts no less than the approximate federal and state income tax liability attributable to the Company's taxable income for the subject tax year. Notwithstanding the foregoing, Member distributions shall only be paid to the extent allowed by law. Distributions required to be made under this Section 5.02(a) shall be made prior to, and irrespective of whether, any distributions under Section 5.02(b) and/or 5.02(c) are made. Notwithstanding anything else in this Section 5.02, no distributions under this Section 5.02(a) are required to be made to any Member with respect to any allocated or allocable taxable income or gain (including for this purpose any guaranteed payments on capital not treated as an allocated item of income or gain) arising in connection with a Fundamental Business Transaction or a Sale of the Company.

(b) **Distribution of Excess Cash.** From time to time (but at least once a year) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve. If such an excess exists, the Managers shall cause the Company to distribute to the Members, in accordance with their Units, an amount in cash equal to that excess.

(c) **Other Distributions.** From time to time the Managers also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Units and may be made subject to existing liabilities and obligations. Immediately prior to such a distribution, the Capital Accounts of the Members shall be adjusted as provided in Treasury Regulation § 1.704-1(b)(2)(iv)(f).

### 5.03 Distributions on Liquidation or Fundamental Business Transaction.

With respect to any distribution in connection with or following an event resulting in the liquidation and winding up of the Company pursuant to Article XVI or a Fundamental Business Transaction, or any distribution of cash, securities or other assets pursuant to a Fundamental Business Transaction (whether pursuant to the terms of a merger or consolidation, unit purchase or otherwise), such distribution shall be made in the following order of priority:

(a)      To Company creditors, including Members, transferees and Managers who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company, whether by payment or by the making of reasonable provision for payment, other than liabilities to Members for distributions under Section 101.207 of the TBOC;

(b)      To Members, transferees and former Members in satisfaction of liabilities for distributions under Section 101.207 of the TBOC;

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                                 Updated for Closing 6-22-17

(c)     Between or among the Members and transferees in accordance with the relative balances of their positive Capital Accounts until the Capital Accounts of all of the Members and transferees have been reduced to zero; and

(d)     Any remaining distributions, if any, between or among the Members and transferees in accordance with their relative Units.

Notwithstanding the foregoing sentence, such distributions shall in all events be made in accordance with Treasury Regulations § 1.704-1(b)(2)(ii)(b)(2). For purposes of this Section 6.2, the Capital Accounts shall be determined after allocating all profits and losses under this Agreement through the date of the distribution. Furthermore, notwithstanding the foregoing, in no event shall any distributions (other than distributions pursuant to 5.02(a)) be made to any unvested Units or other unvested Equity Securities of the Company pursuant to this Section 5.03. Whenever a distribution provided for in Sections 5.02 or 5.03 shall be payable in property other than cash, the value of such property shall be deemed to be the fair market value of such property.

## ARTICLE VI
## MANAGEMENT

6.01 **Management by Managers.** Except for situations in which the approval of the Members is required by this Agreement or by nonwaivable provisions of applicable law, and subject to the provisions of Sections 6.02, 6.03, and 6.04 of this Agreement and other provisions hereof providing for approval rights of the Members, the Managers shall have the sole and exclusive control of the management, business and affairs of the Company, and the Managers shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

(a) entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

(b) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(c) maintaining the assets of the Company in good order;

(d) collecting sums due the Company;

(e) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f) acquiring, utilizing for Company purposes, and disposing of any asset of the

Company;

11

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 12

2-2-17                                          Updated for Closing 6-22-17

(g) borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

(h) selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

(i) obtaining insurance for the Company;

(j) determining distributions of Company cash and other property as provided in Section 5.02 of this Agreement;

(k) establishing a seal for the Company; and

(l) designating one or more committees, each of which shall be comprised of one or more Managers, to exercise any authority of the Managers in the management, business and affairs of the Company.

6.02 **Certain Restrictions.** Notwithstanding the provisions of Section 6.01 of this Agreement, the Managers may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

(a) enter into a Fundamental Business Transaction, without complying with the applicable procedures set forth in the TBOC regarding approval by the Members (unless such provision is rendered inapplicable by another provision of applicable law);

(b) do any act in violation of this Agreement;

(c) admit a Member, except as expressly permitted by this Agreement;

(d) do any act which requires the prior approval of the Members;

(e) possess Company property or assign rights in Company property, other than for a Company purpose; or

(f) amend this Agreement, except as expressly permitted by this Agreement.

6.03 **Matters Requiring Consent of Super Majority of Units**. Notwithstanding anything contained herein to the contrary, the Company shall not undertake any of the following actions, or commit to undertake any of the following actions (directly or indirectly, including by operation of merger), without the special vote of or written consent by those Members holding a Super Majority of the Units:

(a)     voluntary (i) filing of bankruptcy proceedings or (ii) commencement of any liquidation, dissolution or winding up of the Company;

(b)     amend any provision of this Agreement;

12

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 13

2-2-17                                                        Updated for Closing 6-22-17

(c)    incur or permit the Company to incur any (i) Indebtedness (other than any Indebtedness incurred in the ordinary course of business (including trade payables), or (ii) Indebtedness by means of a Member Loan;

(d)    authorize or create or issue or obligate itself to issue any securities or rights to participate in the equity or ownership of the Company (other than the Units issued and outstanding as of the Effective Date of this Agreement plus additional units at $2.56 or more per unit to complete the Summary Business Plan and other issuances identified in 3.3 (a) of the Schedule of Exception and for purposes described in section 3.3 (a) of the Schedule of Exceptions);

(e)    issuance of any distributions to any Members of the Company, other than distributions pursuant to Section 5.02(a);

(f)    approve or consummate or otherwise undertake or obligate the Company to undertake a Fundamental Business Transaction;

(g)    approve or consummate any sale or exclusive license of a material portion of the Company's assets;

(h)    acquire or agree to acquire any material business, whether by purchase of assets, merger, consolidation or otherwise; or

(i)    modify the number of Managers of the Company.

6.04 **Matters Requiring Unanimous Consent of the Key Holders: 80 Percent of the Key Holders.** Notwithstanding Section 6.03 or any other provision contained herein to the contrary, the Company shall not undertake or commit to undertake any of the following actions without: (i) on or before the first anniversary of the Effective Date, the unanimous affirmative vote of or written consent of the Key Holders; or (ii) following the first anniversary and on or before the second anniversary of the Effective Date, the unanimous affirmative vote of or written consent of 80 percent of the Key Holders:

a. A Material Change to the Summary Business Plan and Budget. A "Material Change" shall mean any change, action or development that, individually or together with any other event change, development, or occurrence, could result in an additional financial outlay or other commitment of the Company equal to 10% of the total of all budgetary items identified on the Summary Business Plan and Budget (attached hereto) as of the Effective Date. For the avoidance of doubt, if the Company approves or consummates any sale or exclusive license of a material portion of the Company or the Intellectual Property, it will be considered a Material Change. The parties agree that if

13

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-3-17                                                                 Updated for Closing 6-22-17

    b.  Voluntary (i) filing of bankruptcy proceedings or (ii) commencement of any liquidation, dissolution or winding up of the Company; or

    c.  Approve or consummate or otherwise undertake or obligate the Company to undertake a Fundamental Business Transaction

    d.  Issuance of warrants at strike prices of less than $2.56 per unit in excess of the number indicated in section 3.3 (a) of the Schedule of Exceptions.

    e.  Sell or license a material part of the business assets of intellectual property.

    **6.05 Conflicts of Interest.** Each Manager, Member and officer of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member. Manager or officer the right to participate therein. The Company may transact business with any Manager, Member, officer or Affiliate thereof, provided the contract or transaction is fair to the Company as of the time it is authorized or ratified by Managers or Members, as the case may be.

    **6.06 Number of Managers and Term of Office.** The number of Managers of the Company as of the Effective Date of this Agreement shall be three (3) subject to change from time to time by resolution of the Managers with the prior written consent of those Members holding a Super Majority of the Units; provided, however, that no decrease in the number of Managers that would have the effect of shortening the term of an incumbent Manager may be made by the Managers. Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal. Managers need not be Members or residents of the State of Texas. The names of the Managers as of the Effective Date of this Agreement are set forth on Exhibit C attached hereto.

    The Managers shall be elected by cumulative voting as follows: each Member shall have a number of votes equal to their Units multiplied by the number of Managers to be elected at the meeting; each Member shall be entitled to cumulate his votes and give all thereof to one nominee or to distribute his votes in such a manner as the Member determines among any or all of the nominees. The nominees receiving the highest number of votes, up to the total number of Managers to be elected at the meeting shall be the successful nominees.

    **6.07 Vacancies; Removal; Resignation.** Any Manager position to be filled by reason of an increase in the number of Managers or other reason may be filled by election at an annual or special meeting of Members called for that purpose. A Manager elected to fill a vacancy occurring other than by reason of an increase in the number of Managers shall be elected for the unexpired term of his predecessor in office. At any meeting of Members at which a quorum of Members is present called expressly for that purpose, or pursuant to a written consent adopted pursuant to this Agreement, any Manager may be removed, with or without cause, by a Super Majority of the Units. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the

14

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

remaining Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

6.08 **Compensation**.  For their services in the management of the Company and its operations, the Managers may receive such compensation, if any, as may be designated from time to time by a Simple Majority of the Members

6.09 **Reimbursement**.  The Managers are not required to advance any funds to pay costs and expenses of the Company.  However, in the event the Managers advance such funds, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities.

6.10 **Meetings.**

(a) Unless otherwise required by law or this Agreement, two Managers shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers.  At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. The Company shall allow a designated representative of a Member that holds in excess of 500,000 Units (a Key Holder) to attend meetings of the Managers in a nonvoting capacity and, in connection therewith, to receive notices of the same (the "Observer's Right"); provided, however, the Company reserves the right to exclude each such representative from access to any material or meeting or portion thereof if the Company believes upon advice of counsel that such exclusion is reasonably necessary to preserve the attorney-client privilege, to protect highly confidential information or for similar confidentiality or strategic purposes. The decision of the Managers with respect to the privileged or confidential nature of such information shall be final and binding.

(c) In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold their first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members.  Notice of such meeting at such time and place shall not be required.

15

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                                                  Updated for Closing 6-22-17

(d) Regular meetings of the Managers shall be held at such times and places as shall be designated from time to time by resolution of the Managers. Notice of such regular meetings shall not be required.

(e) Special meetings of the Managers may be called by any Manager on at least 48 hours' notice to each other Manager and the Members. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate of Formation or this Agreement. Notice of special meetings may be given by facsimile or electronic message (e-mail).

6.11 **Approval or Ratification of Acts or Contracts by Members.** The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract. Any act or contract that shall be approved or be ratified by a majority of the Managers shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.12 **Action Without Meeting.** Any action permitted or required by the TBOC, the Certificate of Formation or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers. Every written consent shall bear the date of signature of each Manager who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Manager, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Manager for purposes of this Section. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

6.13 **Action by Telephone Conference or Other Remote Communications Technology.** Subject to the requirements of the TBOC, the Certificate of Formation or this Agreement for notice of meetings, unless otherwise restricted by the Certificate of Formation, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each Manager entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each Manager participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

16

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                                 Updated for Closing 6-22-17

## ARTICLE VII
## CONFIDENTIAL INFORMATION

7.01 **Confidential Information.** Each Member acknowledges that its right to access information and records of the Company shall be limited to the extent required pursuant to Sections 101.501 or 101.502 of the TBOC. Each Member further acknowledges and agrees that the Company holds trade secrets, intellectual property, business plans, design plans, financial information, and other information that is highly confidential ("Confidential Information"), the release of which may be damaging to the Company or a person with which it does business. The Managers may from time to time elect to disclose Confidential Information to the Members and each Member agrees that its receipt of Confidential Information (including any information reasonably understood to be proprietary, confidential or designated as such or that has been identified as being proprietary and/or confidential or that by the nature of the circumstances surrounding the disclosure or receipt ought to be treated as confidential), if any, shall be held in strict confidence and each Member further covenants that he, she or it shall not disclose the Confidential Information to any person, except for disclosures (i) compelled by law, but the Member must notify the Managers in advance of such disclosure so as to provide the Company adequate opportunity to review and contest and otherwise seek protective order of the same in connection therewith, (ii) to professional advisors of the Member but only if the recipients have agreed to be bound by the provisions of this Section and only for the limited purpose of providing tax planning or legal advice to the Member, or (iii) of information that has become generally available to the public through no act or omission of the Member. Managers may condition any disclosure of Confidential Information to a Member on the Member's execution and delivery to the Company of a commercially reasonable non-disclosure agreement and otherwise establish protocols on a case by case basis with respect to disclosing Confidential Information. For the avoidance of doubt, the Confidential Information shall at all times remain the sole and exclusive property of the Company.

7.02 **Specific Performance.** The Members acknowledge that breach of the provisions of Section 7.01 of this Agreement may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of Section 7.01 of this Agreement may be enforced by specific performance.

## ARTICLE VIII
## MEETING OF MEMBERS

### 8.01 Meetings.

(a) A quorum shall be present at a meeting of Members of the holders of a Simple Majority of the Units; are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of the Units is required by the TBOC or this Agreement, the affirmative vote of the holders of a Simple Majority of the Units at a meeting of Members at which a quorum is present shall be the act of the Members, except as provided by another specific provision in this Agreement.

17

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 18

2-2-17                Updated for Closing 6-22-17

(b) All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or outside the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to Section 8.06 of this Agreement.

(c) Notwithstanding the other provisions of the Certificate of Formation or this Agreement, the chairman of the meeting or the holders of a Super Majority of the Units shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Super Majority of the Units. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d) An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, shall be held at such place, within or outside the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred.

(e) Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Units of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f) Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at his address on the voting list provided for in Section 8.02 of this Agreement, with postage thereon prepaid.

(g) The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

8.02  **Voting List**. The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Units held by each. For a period of ten (10) days prior to such meeting, such list shall be kept on file at the registered office or

18

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 19

2-2-17                                                          Updated for Closing 6-22-17

principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

8.03 **Voting Power**. For purposes of any votes and/or consents of the holders of the Units required pursuant to this Agreement, the TBOC or other applicable law, each Unit shall be entitled to one (1) vote; provided, however, that a transferee shall have no voting interest whatsoever in the Company (unless and until such transferee is duly admitted as a Substituted Member pursuant to this Agreement).

8.03 **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.

8.05 **Conduct of Meetings**. All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Manager (or representative thereof) designated by those Members holding a Simple Majority of the Units represented at the meeting. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion.

8.06 **Action by Unanimous Written Consent Without Meeting**.

(a) Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, by unanimous written consent of the Members or committee members, as the case may be, setting

19

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                              Updated for Closing 6-22-17

forth the action so taken. No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, the signed consent or consents are delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers. Every written consent shall bear the date of signature of each Member who signs the consent, and the consent may be in one or more counterparts. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section. The signed consent or a signed copy of the consent shall be kept on file at the principal office of the Company.

(b) The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers.

(c) If any action by Members is taken by written consent, any articles or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the TBOC and that any written notice required by the TBOC has been given.

**8.07 Action by Telephone Conference or Other Remote Communications Technology.** Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear each other. Or, another suitable electronic communications system may be used including video-conferencing technology or the Internet, but only if each member entitled to participate in the meeting consents to the meeting being held by means of that system and the system provides access to the meeting in a manner or using a method by which each member participating in the meeting can communicate concurrently with each other participant. Participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

### ARTICLE IX
### OFFICERS

**9.01 Qualification.** The Managers may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Texas, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular officers. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific

20

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 21

2-2-17                                                                    Updated for Closing 6-22-17

delegation of authority and duties made to such officer by the Managers pursuant to this Section. Each officer shall hold office until his successor shall be duly designated and qualify for such office, until his death, or until he shall resign or shall have been removed in the manner hereinafter provided. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Managers. Any number of offices may be held by the one person.

9.02. **Compensation**. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers. However, election or appointment of an officer or agent shall not of itself, nor shall anything in this Agreement, create contract rights.

9.03. **Resignation**. Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.

9.04. **Removal**. Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed.

## ARTICLE X
## INDEMNIFICATION

10.01 **Right to Indemnification**. Subject to the limitations and conditions as provided in this Article, each person who was or is made a party or is threatened to be made a party to or is involved in any Proceeding, or any appeal in such a Proceeding, or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a Member or Manager of the Company or while a Member or Manager of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the TBOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorney's fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article shall be deemed contract rights, and no amendments, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceeding arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

21

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                    Updated for Closing 6-22-17

10.02 **Advance Payment.** The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under Section 10.01 of this Agreement who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such person of his or her good faith belief that s/he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article or otherwise.

10.03 **Indemnification of Officers, Employees and Agents.** The Company, by adoption of a resolution of the Managers, may indemnify and advance expenses to an officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article; and, the Company may indemnify and advance expenses to persons who are not or were not Managers, officers, employees, or agents of the Company but who are or were serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Managers under this Article.

10.04 **Appearance as a Witness.** Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by a Member or Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

10.05 **Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right which a Member or Manager or other person indemnified pursuant to Section 10.03 of this Agreement may have or hereafter acquire under any law (common or statutory), provision of the Certificate of Formation or this Agreement, agreement, vote of disinterested Managers or otherwise.

10.06 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is a Member or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article.

22

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                        Updated for Closing 6-22-17

10.07 **Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Member or Manager in accordance with this Article shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the twelve month period immediately following the date of the indemnification or advance.

10.08 **Savings Clause.** If this Article or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member or Manager or any other person indemnified pursuant to this Article as to costs, charges, and expenses (including attorney's fees), judgments, fines and amounts paid in settlement with respect to any action, suit or Proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE XI
## TAXES

11.01 **Tax Returns.** The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section 11.02 of this Agreement. Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

11.02 **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

(a) to adopt the calendar year as the Company's fiscal year;

(b) to adopt the cash method of accounting for keeping the Company's books and

records;

(c) if a distribution of Company property as described in Section 734 of the Internal Revenue Code occurs or if a transfer of Units as described in Section 743 of the Internal Revenue Code occurs, on written request of any Member, to elect, pursuant to Section 754 of the Internal Revenue Code, to adjust the basis of Company properties;

(d) to elect to amortize the organizational expenses of the Company and the startup expenditures of the Company under Section 195 of the Internal Revenue Code ratably over a period of sixty (60) months as permitted by Section 709(b) of the Internal Revenue Code; and

(e) any other election the Managers may deem appropriate and in the best interest of the Members.

23

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

Neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Internal Revenue Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

11.03 **"Tax Matters Partner."** By the consent of the holders of a Simple Majority of the Units, the Members shall designate a "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Internal Revenue Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. Any Member who is designated "tax matters partner" may not take action contemplated by Sections 6222 through 6232 of the Internal Revenue Code without the consent of a Simple Majority, but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Internal Revenue Code.

## ARTICLE XII
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

12.01 **Maintenance of Books.** The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Article IV of this Agreement. The calendar year shall be the accounting year of the Company.

12.02 **Accounts.** The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

## ARTICLE XIII
## TRANSFERS

13.01 **Limited Right to Transfer.** No Member or Assignee shall make any Transfer of all or any of its Units, whether now owned or hereafter acquired, except (a) with the consent of the holders of a Simple Majority of the Units; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by Subsection 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by Section 16.03 of this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company

24

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17

other than as specifically provided by this Agreement shall be, and is hereby declared, null and void *ab initio*. Notwithstanding the foregoing, a Member may collaterally assign any or all of the Member's rights and interests under this Operating Agreement to one or more lenders (or to an agent on behalf of such lenders) of the Member or any of its affiliates without the prior written consent of the Company or its Mangers or Members; provided, however, that any such Member that collaterally assigns its rights and interests under this Operating Agreement shall remain liable for the performance of all of the Members' obligations under this Operating Agreement.

(a) For the avoidance of doubt, in no event shall the pledgee or other Assignee of Units have access to the Confidential Information;

(b) Each Member shall at all times: keep the Confidential Information in its possession (or provided to the Member), if any, in an isolated and secure location and immediately notify the Company of any default of the obligations collateralized by the Units or exercise by the Member's pledgee or any other secured lender of foreclosure or other remedies against collateral; keep written record of and, upon demand by Company, identify for the Company the location of the Confidential Information; and, upon demand, immediately deliver to the Company all Confidential Information in its possession (or provided to the Member) and cooperate in all respects with the Company in protecting the Confidential Information from any unauthorized disclosure, access to, transfer or use of, and return to the Company of, the Confidential Information.

### 13.02 **Rights of an Assignee.**

(a) Unless and until an Assignee becomes a Substituted Member of the Company as provided in this Agreement, the Assignee shall be entitled only to (i) allocation of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled to the extent these items were assigned, and (ii) reasonable information or account of transactions of the Company and to make reasonable inspection of the books and records of the Company. The Units of the Assignee shall not be considered in the voting requirements of the Company, and the Assignee shall have no right to participate in the operations or management of the Company.

(b) In the event that a Member has an outstanding but unpaid Capital Commitment and such Member's Units become held by an Assignee, the assignor-Member and its Assignee shall be jointly and severally liable for the outstanding but unpaid Capital Commitment (together with interest accrued thereon) in connection with the Units held by Assignee. If the assignor-Member or Assignee does not make such the Capital Contribution to satisfy such Capital Commitment in accordance with the provisions of this Agreement, then the assignor-Member and Assignee shall be treated as being in Default. In the event that one or more new Members are admitted into the Company, or one or more existing Members receive additional Units, no consent or other action on the part of such Assignee shall be required, except that admissions of new Members and issuances of additional Units shall nonetheless remain subject to the approval rights of the holders of a Super Majority of the Units as set forth in Section 6.03 of this Agreement.

13.03 **Legal Opinion**. For the right of a Member to transfer any Units or of any Person to be admitted to the Company in connection therewith to exist or be exercised, the Company must

25

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 26

2-2-17                                                                    Updated for Closing 6-22-17

receive an opinion from legal counsel acceptable to a majority of the Managers that states (a) the Transfer is exempt from registration under federal and state securities laws, (b) the Transfer will not cause the Company to be in violation of federal and state securities laws, (c) the Transfer will not adversely affect the status of the Company as a partnership under the Internal Revenue Code or Treasury Regulations, and (d) the Transfer will not result in the Company's being considered to have terminated within the meaning of the Internal Revenue Code or Treasury Regulations. The Managers, by majority consent, however, may waive the requirements of this Section.

13.04  **Admission as Substituted Member.**  An Assignee has the right to be admitted to the Company as a Substituted Member with the Units and the Capital Commitment so transferred to such person, in the event that:

(a)  the Member making such Transfer grants the Assignee the right to be so admitted;

(b)  such Transfer is consented to by the holders of a Simple Majority of the Units; and

(c) a written, signed and dated instrument evidencing the Transfer has been filed with the Company in form and substance reasonably satisfactory to the Managers, and said instrument contains (i) the agreement by the Assignee to be bound by all of the terms and provisions of this Agreement, (ii) any necessary or advisable representations and warranties, including that the Transfer was made in accordance with all applicable laws, regulations, and securities laws, (iii) the Units and the Capital Commitments after the Transfer of the Member effecting the Transfer and the person to which the Units of part thereof is transferred (which together must total the Units and the Capital Commitment of the Member effecting the Transfer before the Transfer) and (iv) the name, address and any other pertinent information necessary for amended Exhibit A and to make distributions.

13.05  **Transfer to Existing Member.**  In the event of a Transfer to an existing Member that is approved pursuant to the Terms of this Article XIII, the existing Member shall be automatically deemed to be a Substituted Member with respect to the Units (and associated Capital Commitments) acquired pursuant to such Transfer.

13.06  **Third Party Offer.**  In the event a Member desires to sell all or any portion of its Units to another Person (including but not limited to another existing Member), the selling Member shall first offer to sell the Units to the other existing Members. Upon the receipt of an offer from a Third Party to purchase such Units, the selling Member shall promptly deliver a copy of the Third Party offer to all other Members. Each Member will have thirty (30) days from the date of receipt of the Third Party offer to notify the selling Member in writing that the other Member intends to purchase the Units upon the terms and conditions of the Third Party offer. If more than one other Member desires to purchase the Units, each of the purchasing Members shall purchase a portion of the Units that is proportional to such purchasing Member's Units as compared to the aggregate Units held by all purchasing Members. If none of the other Members give notification within thirty (30) days of an intention to purchase the Units, then the selling Member shall be

26

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

permitted to sell the Units to the Third Party upon the terms and conditions of the Third Party offer.

13.07 **Reasonable Expenses**. The Member effecting a Transfer and the Substituted Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the admission of the Substituted Member (including, without limitation, the legal fees incurred in connection with the legal opinions referred to in Section 13.03 of this Agreement) on or before the tenth (10th) day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the person owing the amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

### ARTICLE XIV
### BUYOUT OF A MEMBER'S UNITS

14.01 **Termination of Marital Relationship.**

(a) If the marital relationship of a Member who is a natural person is terminated by death or divorce and such Member does not succeed to all of such Member's spouse's community or separate interest, if any, in the Units (such spouse is referred to hereafter in this Article as the "Assignee Spouse"), either as outright owner of such Units or as a trustee of a trust holding such Units, whether or not such Member is a beneficiary of such trust, then such Member shall have the option to purchase at Fair Value (determined as of the date of the death or divorce of the Member) the Assignee Spouse's interest in the Units to which such Member does not succeed. Such option must be exercised within ninety (90) days after the death of the Member or the Member's divorce from the Assignee Spouse. Should the Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Units at Fair Value for a period of ninety (90) days after the lapse of the initial 90-day period.

(b) Any Units of the Company held by a Member as a trustee of a trust as a result of the death of or the Member's divorce from the Assignee Spouse shall be treated as owned by such Member for purposes of this agreement. If such Member ceases to act as trustee of such trust for any reason, then such Member shall have the option to purchase all of the Units at Fair Value held in such trust. Such option must be exercised within ninety (90) days after such Member ceases to act as trustee of such trust. Should such Member fail to exercise such option within such 90-day period, then the Company shall have the option to purchase such Units for a period of ninety (90) days after the lapse of the initial 90-day period.

14.02 **Death of Member.** Commencing upon the death of a Member that is a natural person, the surviving Members shall for a period of ninety (90) days have the option to purchase all or any portion of the deceased Member's Units at Fair Value (determined as of the date of the death of the Member); provided, however, the exercise of said option shall require the approval of the holders of a Simple Majority of the Units. Upon the expiration of ninety (90) days after the death of a Member, the Company shall be obligated to purchase all, and not less than all, of the deceased Member's Units at Fair Value which the surviving Members do not elect to purchase pursuant to the option granted in the preceding sentence. The Assignee (which may include spouse

27

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for FDR.pdf - Page 28

2-2-17                                                    Updated for Closing 6-22-17

and executors or administrators of the deceased Member) shall sell all of the deceased Member's Units to the Company and/or the other Members in accordance with the option or obligation established by this Section.

14.03  **Bankruptcy of Member.** If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the one hundred eightieth (180th) day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to purchase all or any portion of the Bankrupt Member's Units at Fair Value (determined as of the date that notice of the exercise of such option is given by the Managers); provided, however, the exercise of said option shall require the approval of the holders of a Simple Majority of the Units. In the event that notice of the exercise of such option is given by the Managers to the Bankrupt Member (or its representative), the Bankrupt Member shall sell its Units to the Company as provided by this Article.

14.04  **Insufficient Surplus.** If the Company shall not have sufficient surplus to permit it lawfully to purchase the Units under Sections 14.01, 14.02 or 14.03 of this Agreement at the time of the closing, the other Members may take such action to vote their respective Units to reduce the capital of the Company or to take such other steps as may be appropriate or necessary in order to enable the Company lawfully to purchase such Units.

14.05  **Option by Other Members.** If the Company fails or declines to exercise an option to purchase Units of a Member as provided by this Agreement within the period of time specified for such option, then the other Members shall have the option for a period of ninety (90) days thereafter to purchase such Units in such proportions as they mutually agree or in proportion to their respective Units as compared to the Units held by all Members for the same price and upon the same terms available to the Company.

14.06  **Exercise of Option.** Any option to purchase Units as provided by this Agreement shall be deemed exercised at the time the purchasing party delivers to the selling party written notice of intent to exercise such option along with an initial payment in the form of a certified or cashier's check in the amount of ten percent (10%) of the estimated purchase price anticipated by the purchaser, in person or by United States registered mail, properly stamped and addressed to the last known address of the selling party.

14.07  **Determination of Fair Value.** For purposes of this Article XIV, the "Fair Value" of Units shall be the amount that would be distributable to the Member holding such Units in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to the holders of all Units pursuant to this Agreement. In the event that the Fair Value of any Units is to be determined under this Agreement, the Managers shall select a qualified independent appraiser to make such determination, and the Managers shall make the books and records available to the appraiser for such purpose. The determination of Fair Value made by such appraiser shall be final, conclusive, and binding on the Company, all Members, and all Assignees of Units.

28

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

14.08 **Fees and Expenses of Appraiser**. In the case of a purchase and sale of Units under Section 14.01 or 14.02 of this Agreement (in the event of death or divorce of a Member), the fees and expenses of such appraiser shall be paid by the Company. In the case of a purchase and sale of Units under Section 14.03 or 15.01 (in the event of the bankruptcy or default of a Member), the fees and expenses of such appraiser shall be paid by the Bankrupt Member or Defaulting Member, by deducting at closing such fees and expenses from the purchase price to be paid to such Bankrupt Member or Defaulting Member, and remitting the same to the Company. Otherwise, the fees and expenses of such appraiser shall be shared equally by the purchaser and seller.

14.09 **Right to Withdraw Option**. In the event that a Member has exercised an election to purchase Units under this Agreement and Fair Value has been determined as provided by Section 14.07 of this Agreement, such Member may elect to terminate its right to purchase within fifteen (15) days following its receipt of the determination of Fair Value, by delivery of written notice to the Company and to the Assignee. In such an event, the initial payment shall be returned to the Member withdrawing the option, and the other Members may elect to purchase the Units (or portion thereof) in such proportions as they mutually agree or in proportion to their Units as compared to the total number of Units held by all such Members.

14.10 **Terms of Purchase**.

(a) The closing date for any sale and purchase made pursuant to this Article shall be the later of (i) thirty (30) days after the notice of the exercise of option has been received by the selling party, or (ii) thirty (30) days after the parties have received notice of the Fair Value of the Units.

(b) Payment of the purchase price for the Units may be made by the Company and/or the other Members as follows: (i) a down payment equal to ten percent (10%) of the Fair Value to be made at closing, and (ii) the balance of the purchase price, bearing interest at the General Interest Rate determined on the date of closing, to be paid in twenty-four (24) equal monthly installments, with the first payment due thirty (30) days after the date of closing. Any such purchaser shall have the right to pay all or any part of such obligation at any time or times in advance of maturity without penalty. In the event that the Company becomes a party to a Fundamental Business Transaction, such obligation (or remaining portion thereof) shall be paid in full within thirty (30) days of the date that the Company becomes a party to such transaction.

(c) At the closing, the person selling the Units will transfer the Units free and clear of any liens or encumbrances, other than those which may have been created to secure any Indebtedness or obligations of the Company.

(d) In each event that Units of the Company are purchased as described in this Agreement, upon the execution and delivery of the notes or payment of the cash as required herein, this Agreement shall operate as an automatic transfer to the purchaser of the Units of the Company. The payment to be made to the selling Member, Assignee, or its representative shall constitute complete release, liquidation and satisfaction of all the rights and interest of the selling Member, Assignee, or its representative (and of all persons claiming by, through, or under the selling Member, Assignee, or its representative) in and in respect of the Company, including, without

29

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 30

limitation, any Units, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members.  The parties shall perform such actions and execute such documents that may be reasonably necessary to effectuate and evidence such purchase and sale, and release as provided by this Section.

## ARTICLE XV
## DEFAULT OF A MEMBER

15.01 **Failure to Contribute.**  If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Defaulting Member"), one or more of the following remedies, with the exercise of any particular remedy subject to the prior written approval of the holders of a Simple Majority of the Units (provided that if a Member is the Defaulting Member, the Units shall not be considered in the numerator of the denominator of the calculation for determining whether approval of the holders of a Simple Majority of Units has been reached):

(a) taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Defaulting Member of the portion of the Defaulting Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Defaulting Member;

(b) permitting the other Members on a pro rata basis in proportion to each such Member's Units as compared to the aggregate Units held by all such Members or in such other percentages as they may agree (the "Lending Member", whether one or more), to advance the portion of the Defaulting Member's Capital Contribution that is in default, with the following results:

(i) the sum advanced constitutes a loan from the Lending Member to the Defaulting Member and a Capital Contribution of that sum to the Company by the Defaulting Member pursuant to the applicable provisions of this Agreement,

(ii) the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Defaulting Member,

(iii) the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

(iv) all distributions from the Company that otherwise would be made to the Defaulting Member (whether before or after termination of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

30

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                    Updated for Closing 6-22-17

(v) the payment of the loan and interest accrued on it is secured by a security interest in the Defaulting Member's Units, as more fully set forth in Section 15.02 of this Agreement, and

(vi) the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Defaulting Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Defaulting Member;

(c) exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas; in this regard, each Member grants to the Company a valid security interest upon such Member's Units (whether now or hereafter acquired) and all proceeds therefrom to secure performance of payment of all Capital Contributions due the Company from the Member;

(d) a forced sale of the Defaulting Member's Units at Fair Value and upon the terms of purchase as provided in Article XIV; or

(e) exercising any other rights and remedies available at law or in equity.

15.02 **Compromise or Release.** The obligation of a Defaulting Member or its legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the Defaulting Member in violation of the TBOC or this Agreement may be compromised or released only with the approval of the holders of a Simple Majority of the Units. Notwithstanding the compromise or release, a creditor of the Company who extends credit or otherwise acts in reasonable reliance on that obligation, after the Member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation.

15.03 **Expulsion.** A Member may be expelled from the Company, via forced sale of such Members Units at Fair Value, by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, or (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company. Such a Member shall be considered a Defaulting Member, and the Company or other Members may also exercise any one or more of the remedies provided for in Article 15.01. The Company may offset any damages to the Company or its Members occasioned by the misconduct of the expelled Member against any amounts distributable or otherwise payable by the Company to the expelled Member.

## ARTICLE XVI
## WINDING UP AND TERMINATION

16.01 **Event Requiring Termination.** The Company shall begin to wind up its affairs upon the first of the following to occur:

31

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 32

(a) the execution of an instrument approving the termination of the Company by the holders of a Super Majority of the Units;

(b) the occurrence of any event that terminates the continued membership of the last remaining Member of the Company; provided, however, that the Company is not dissolved if, no later than ninety (90) days after the termination of the membership of the last remaining Member, the legal representative or successor of the last remaining Member, or the legal representative or successor's designee, agrees to continue the Company and to become a Member as of the date of termination of the membership of the last remaining Member;

(c) entry of a decree of judicial dissolution of the Company; or

(d) the occurrence of a nonwaivable event under the terms of the TBOC which requires the Company to be terminated.

16.02 **Business May Be Continued.** Except as provided in Section 16.01(b) of this Agreement, any event that terminates the Company, shall not terminate the Company if the holders of a Simple Majority of the Units agree to continue the business of the Company, within ninety (90) days after the date of termination. If ninety (90) days have expired, the Members must amend the Certificate of Formation during the three (3) year period following the event of termination, to exclude the event of termination, as applicable.

16.03 **Purchase of Former Member's Units.** Upon an event requiring winding up as provided in Section 16.01 of this Agreement where a Simple Majority of the Units agrees to continue the business of the Company pursuant to Section 16.02, the Company's books shall be closed upon the date of such event, so as to determine the value of each Former Member's Units on the date on which each Former Member's financial interest in the Company was terminated. Within one hundred eighty (180) days of such event, the Company shall purchase the Former Member's Units at Fair Value (as determined by Section 14.07 of this Agreement), upon terms of purchase as provided in Article XIV of this Agreement. For purposes of this Section 16.03, "Former Member" shall mean any Member that seeks a judicial dissolution of the Company and prevails in receiving a final, binding judicial order of dissolution.

16.04 **Liquidation.** As soon as possible following an event requiring termination of the Company, the Managers shall act as liquidator or may appoint one or more Managers or Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Managers. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after such event and again after final liquidation, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the termination occurs or the final liquidation is completed, as applicable;

32

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 33

2-2-17                                                          Updated for Closing 6-22-17

          (b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be delivered to each known claimant against the Company;

          (c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation and any advances described in Section 4.04 of this Agreement) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

          (d) all remaining assets of the Company shall be distributed to the Members as follows:

          (i) the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

          (ii) with respect to all Company property that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

          (iii) Company property shall be distributed among the Members in accordance with Section 5.03(a).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section. Upon completion of all distributions to the Member, such distribution shall constitute a complete return to the Member of its Capital Contributions and release all claims against the Company. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

     16.05  **Deficit Capital Accounts.**  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members on a pro rata basis in proportion to their respective Units as compared to all outstanding Units, upon termination of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

     16.06  **Certificate of Termination.**  On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other person or persons

33

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 34

2-2-17                                                                 Updated for Closing 6-22-17

as the TBOC may require or permit) shall execute, acknowledge and cause to be filed a Certificate of Termination, at which time the Company shall cease to exist as a limited liability company.

## ARTICLE XVII
## AMENDMENT OR MODIFICATION

17.01 **Amendment or Modification.** Subject to Section 17.02 below, this Agreement may be amended or modified from time to time only with a written instrument executed by the holders of a Super Majority of the Units.

17.02 **Special Provisions for Certain Amendments or Modifications.**

(a) An amendment or modification increasing a Member's Capital Commitment is effective only with that Member's consent.

(b) An amendment or modification reducing the required percentage of Units or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the percentage of Units or other measure theretofore required.

(c) An amendment or modification made solely to reflect the admission or withdrawal of a Member (such as to Exhibit A) need not be approved by any Member if the requirements set forth in this Agreement with respect to the admission or withdrawal of the Member are otherwise satisfied.

(d) An amendment or modification of the Observer's Right set forth at Section 6.10(b) shall be effective only with the consent or vote of the Members entitled to such right.

## ARTICLE XVIII
## GENERAL PROVISIONS

18.01 **Construction.** Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. In the event there is only one Member, then references to Members in the plural should be construed as singular; likewise, in the event there is only one Manager, then references to Managers in the plural should also be construed as singular.

18.02 **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

18.03 **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the person. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or such other address as that Member may specify by notice to the other

34

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 35

2-2-17                                                                 Updated for Closing 6-22-17

Members. Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address:

> Box 2185
> Canyon Lake, TX 78133

Whenever any notice is required to be given by law, the Certificate of Formation or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**18.04 Entire Agreement; Supersedes Other Agreements.** This Agreement includes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

**18.05 Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**18.06 Binding Effect.** Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns. However, unless and until properly admitted as a Member, no Assignee will have any rights of a Member beyond those provided expressly set forth in this Agreement or granted by the TBOC to assignees.

**18.07 Governing Law.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

**18.08 Severability.** If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

**18.09 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

35

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

18.10 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

18.11 **Indemnification.** To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) that may incur on account of any breach by that Member of this Agreement.

18.12 **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

18.13 **Waiver of Jury Trial Rights.**
EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY AND ANY LEGAL PRODCEEDING (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT.

## ARTICLE XIX
## NOTICES AND DISCLOSURES

19.01 **Compliance with Regulation D of the Securities Act of 1933.** THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THE INTERESTS MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, TRANSFERRED, OR OTHERWISE DISPOSED OF UNTIL THE HOLDER THEREOF PROVIDES EVIDENCE SATISFACTORY TO THE MANAGERS (WHICH, IN THE DISCRETION OF THE MANAGERS, MAY INCLUDE AN OPINION OF COUNSEL) THAT SUCH OFFER, SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION WILL NOT VIOLATE APPLICABLE FEDERAL OR STATE SECURITIES LAWS. THE OWNERSHIP INTERESTS THAT ARE THE SUBJECT OF THIS COMPANY AGREEMENT ARE SUBJECT TO RESTRICTIONS ON THE SALE, PLEDGE, TRANSFER, OR OTHER DISPOSITION AS SET FORTH IN THIS COMPANY AGREEMENT.

19.02 **Notice to Members.** By executing this Agreement, each Member acknowledges that it has actual notice of all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Units set forth in this Agreement, and all of the provisions of the Certificate of Formation. Except as otherwise expressly provided by law, each Member hereby agrees that this Agreement constitutes adequate notice of any notice requirement under Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

19.03 **Limitation of Liability.** Pursuant to Article 581-1 *et seq.* of the Texas Revised Civil Statutes (the "Texas Securities Act"), the liability under the Texas Securities Act of a lawyer,

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                              Updated for Closing 6-22-17

accountant, consultant, the firm of any of the foregoing, and any other person engaged to provide services relating to an offering of securities of the Company ("Service Providers") is limited to a maximum of three times the fee paid by the Company or seller of the Company's securities, unless the trier of fact finds that such Service Provider engaged in intentional wrongdoing in providing the services. By executing this Agreement, each Member hereby acknowledges the disclosure contained in this Section.

37

4835-6049-7362.1

2-2-17                                                          Updated for Closing 6-22-17

**IN WITNESS HEREOF**, the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                    **MANAGER:**

_____                        _____

John C. Wooley                                 Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**                                     **MEMBER:**

KEMIS INDUSTRIES, INC.                          _____

Printed Name:                                   Printed Name:

_____                        CHRISTOPHER E. NELSON

38

4835-6049-7362.1

2-2-17

Updated for Closing 6-22-17

**IN WITNESS HEREOF,** the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

John C. Wooley

**MANAGER:**

Jeffrey J. Wooley

**MANAGER:**

Graeme Brown

**MEMBER:** SC Ventures LLC

Printed Name:

Steve Robson

**MEMBER:**

Printed Name:

38

4835-6049-7362.1

2-2-17

Updated for Closing 6-22-17

**IN WITNESS HEREOF,** the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**

_____

John C. Wooley

**MANAGER:**

_____

Jeffrey J. Wooley

**MANAGER:**

_____

Graeme Brown

**MEMBER:**

_____

Printed Name:

Steve Robson

**MEMBER:**

_____

Printed Name:

_____

38

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17                                                    Updated for Closing 6-22-17

**IN WITNESS HEREOF,** the Managers have adopted this Company Agreement and the Members have executed this Company Agreement, as of the Effective Date.

**MANAGER:**                                    **MANAGER:**

_____                         _____
John C. Wooley                                  Jeffrey J. Wooley

**MANAGER:**

_____
Graeme Brown

**MEMBER:**                                     **MEMBER:**

_____                         _____
Printed Name:                                   Printed Name:

KEPUT PLANTATION(S) SDN BHD                     Waddell Holding Ltd

38

4835-6049-7362.1

2-2-17

Updated for Closing 6-22-17

# Exhibit B

## Summary Business Plan & Budget

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

1-31-17

## EE-Terrabon Bio-Fuels LLC (EETB)
## 24-Month Business Plan Summary

***Overview:*** The 24-month period following closing the current investment round, EETB will focus on refinement and commercialization of its carboxylate platform technology for conversion of bio-mass to carboxylic acids C-2 through C-8 using its proprietary, methane-inhibited anaerobic digestion, extraction and distillation technologies. Operations will consist of the following major activities: a) development of a fully integrated 30 Kg/day pilot plant, b) continuous operation of the pilot plant, c) process refinement, d) front-end engineering design to support a first commercial carboxylate acid (C-3 through C-8 only) production facility with a 30 short ton per day (TPD) scale (the "first commercial facility"), e) feedstock research & procurement, f) carboxylate acid marketing and sales, g) site selection for the first commercial facility (with a 30 TPD scale), h) organization of all commercial relationships, contracts and financing necessary to support construction of the first commercial facility and i) construction and commissioning of the first commercial facility (with a 30 TPD scale).

***Year One –Fully Integrated Pilot Demonstration Plant & Engineering in Bryan, Texas:*** During approximately the first twelve months after closing the current investment round, EETB will build a newer advanced 30 Kg/day version of its current pilot plant that will be a fully integrated, continuous facility with all of the necessary recycle loops included. After the facility is completed through the acid extraction and solvent recovery steps, it will be operated on a continuous basis for at least 500 hours for data collection and design refinement. The fractionation distillation system will be preliminarily studied with early stage design, but will not be constructed as a component of the pilot.

During this period EETB will also work on all of the business, financial and project development activities necessary to support the development of the first commercial facility. [N.B. J and J—I think it's cleaner to provide a definition of the "first commercial facility" once and then refer to it as that throughout the plan. Let me know if you disagree or have any modifications to the definition.]

***Year Two – Design, Construct & Commission a Full Scale 30 TPD Carboxylic Acid Facility:*** During approximately the second successive twelve month period after closing the current investment round, EETB will design and construct the first commercial facility. In addition to site selection, design and construction, EETB will organize supply contracts and off-take contracts for product sales and the necessary funding for its affiliated Special Purpose Entity (SPE) which will own the first commercial facility and receive a license of the subject technology pursuant and subject to the terms and conditions of that certain Terms Sheet dated **to be filled**

1

4835-6049-7362.1

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2.1.5 EETB 3rd Amended Company Agreement for EDR.pdf - Page 44

1-31-17

**in at closing**], by and between EETB and Kemin Industries, Inc. and its subsidiaries and the final definitive license agreement between EETB and the SPE.

The major components of the 24-month plan are as follows:

| Fully Integrated Pilot Development/Operations |
| --- |
| Pilot Plant Site Preparation |
| Anaerobic Digestion |
| Chemical Clarification |
| Membrane Clarification |
| Reverse Osmosis |
| Ammonia/Phosphate Removal |
| KMPS Engineering Extraction Design |
| Acidification/Extraction |
| Solvent Recovery |
| |
| **Koch Fractionation Train Design** |
| |
| **Select EPC & EPCM Firms** |
| |
| **EPC Engineering Data Assessment** |
| |
| **Full Pilot Operations** |
| |
| **Sample Production, Marketing & Sales** |
| |
| **Pilot Plant Final Report** |
| |
| **Commercialization & Financing Activities** |
| |
| **Commercial Scale Design Engineering 30 TPD** |
| |
| **30 TPD Construction** |
| |
| **30 TPD Start-Up** |

2

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

1-31-17

The Operations Budget Estimate (excluding the capital costs of the first commercial plant) with respect to Year 1 and Year 2 is as follows:

| Uses of Funds | 24 Month Plan (revised) | | | |
|---|---|---|---|---|
| | Pilot & Engineering Year 1 | | Design & Construction Year 2 | |
| Refine Capex Analysis for 30 TPD Facility | In House | | | |
| Engineering Review of Pilot Plant Program | In House | | | |
| Fully Integrated Pilot Plant | | | | |
| Upstream Fermentation, Filtration & RO | $ | 190,000 | | |
| Downstream Extraction Pilot Design & Pilot System | $ | 93,000 | | |
| Downstream Extraction Pilot Design & Pilot System | $ | 667,000 | | |
| Pilot Plant Final Report | In House | | | |
| Commercial Fractionation System Design | | | $ | 80,000 |
| Lab Building - Bryan, Texas Location | | | $ | 250,000 |
| Lab Equipment - Bryan, Texas Location | $ | 25,000 | $ | 25,000 |
| Land Loan, Bridge Loan, Deposits | $ | - | $ | 800,000 |
| 30 TPD Plant Front End Engineering | | | Paid by SPE Licensee | |
| 30 TPD Commercial Plant | | | Paid by SPE Licensee | |
| Staffing & Operations | | | | |
| Lab Expenses | $ | 60,000 | $ | 75,000 |
| Pilot Plant Expenses | $ | 15,920 | $ | 25,000 |
| R&D Team | $ | 378,713 | $ | 425,000 |
| Bryan Facility & Pilot Plant Staff | $ | 297,117 | $ | 315,000 |
| Engineering | $ | 290,900 | $ | 450,000 |
| Technology Commercialization | $ | 1,038,066 | $ | 1,200,000 |
| Office & Admin | $ | 252,553 | $ | 350,000 |
| Travel | $ | 96,000 | $ | 160,000 |
| FDA - GRAS, AAFCO, Kosher & Halal Approvals | $ | 25,000 | $ | 175,000 |
| Legal & Intellectual Property | $ | 50,000 | $ | 150,000 |
| Contingency | $ | 119,481 | $ | 295,000 |
| Interest Reserve | $ | 120,000 | $ | - |
| Legal & Other Transaction Fees | | | | |
| Legal | $ | 25,000 | $ | 25,000 |
| Expenses | $ | 25,000 | $ | 25,000 |
| Deferred Compensation Make-Up | $ | 56,250 | $ | - |
| Transaction Fees - Brokers | $ | 175,000 | $ | 175,000 |
| Sub-Total | $ | 4,000,000 | $ | 5,000,000 |
| Less: License Fee | | | $ | (1,500,000) |
| Various Grants | | TBD | | TBD |
| Total | $ | 4,000,000 | $ | 3,500,000 |

3

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

2-2-17

Updated for Closing 6-22-17

## Exhibit C

### To Third Amended Company Agreement

### Of

### EE-Terrabon Biofuels LLC

| Manager |
|---|
| John C. Wooley |
| Jeffrey J. Wooley |
| Graeme Brown |

43

EER - Dannye Osburn - Foley & Lardner LLP - 1/10/2020 4:24:35 PM - 38.113.129.194

**EXHIBIT D**

**OFFICERS**

| <u>Name</u> | <u>Office</u> | <u>Signature</u> |
|---|---|---|
| John C Wooley | Manager | |
| Jeffrey J. Wooley | Manager | |

**EXHIBIT E**

**GOOD STANDING CERTIFICATE**

[See attached]



# Franchise Tax Account Status

As of : 01/12/2020 15:01:15

**This page is valid for most business transactions but is not sufficient for filings with the Secretary of State**

| EARTH ENERGY RENEWABLES LLC | |
|---|---|
| **Texas Taxpayer Number** | 32049330080 |
| **Mailing Address** | PO BOX 2185 CANYON LAKE, TX 78133-0009 |
| **Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 10/25/2012 |
| **Texas SOS File Number** | 0801674390 |
| **Registered Agent Name** | JEFFREY J WOOLEY |
| **Registered Office Street Address** | 175 MARIPOSA NEW BRAUNFELS, TX 78132 |

# EXHIBIT G

**UNANIMOUS WRITTEN CONSENT OF MANAGERS OF
EARTH ENERGY RENEWABLES, LLC
IN LIEU OF MEETING PURSUANT TO SECTION 6.201
OF THE TEXAS BUSINESS ORGANIZATIONS CODE**

The undersigned, being Managers of Earth Energy Renewables, LLC (the "Company") and being entitled to vote upon the resolutions hereinafter set forth, do hereby consent that the resolutions set forth below are deemed to be adopted to the same extent and to have the same force and effect as if adopted by unanimous consent in a formal meeting of the Managers of the Company duly called and held for the purpose of acting upon a proposal to adopt such resolutions:

"RESOLVED, That the Company may proceed with all actions reasonably necessary to prepare for, file and prosecute a voluntary petition for relief under Chapter 11, Subchapter V of the United States Bankruptcy Code for the Company."

"RESOLVED, That the Company may employ Frank B. Lyon, Attorney at Law, to represent it in such bankruptcy filing.

"RESOLVED, That John Wooley and Jeff Wooley are authorized to sign all documents necessary for and related to such bankruptcy filing.

"RESOLVED, That John Wooley and Jeff Wooley are authorized to communicate with the Company's bankruptcy counsel on all matters related to such bankruptcy filing.

"RESOLVED, That Jeff Wooley and John Wooley are authorized to appear in all court related proceedings, including attendance at the meeting of creditors required by Section 341 of the Bankruptcy Code and all hearing on behalf of the Company.

DATED EFFECTIVE September 30, 2020

_____
Jeff Wooley, Manager of Earth Energy Renewables, LLC

_____
John Wooley, Manager of Earth Energy Renewables, LLC

# EXHIBIT H

For Eric Terry

1.  Corporate governance
a.  Current form of operating agreement, as well as any version dated after July 31, 2017
b.  Current table of membership interest
    i.   For any new equity (including warrants or options) issued since July 31, 2017, include date of transfer and terms of consideration
c.  All minutes of any board or members meetings from July 31, 2017to present
d.  All notices send to members with respect to any EER decision made regarding:
    i.    Issuance of new equity
    ii.   Ara term sheet and Ara loan
    iii.  Granting of any interest (security or otherwise) in any EER intellectual property
    iv.   Filing of the bankruptcy petition
    v.    Transfer of any EER assets


2.  Intellectual Property
a.  List of all patents or patent applications that EER has any interest in
b.  Patent history for all patents
c.  Ownership history of all patents
d.  List of all other parties who have been granted any interest or rights in those patents
    i.    Date of grant of interest
    ii.   Consideration provided for such interest
e.  List of any unpaid fees or annuities for all patents


3.  Financial information
a.  Reconciliation of use of Ara loan proceeds
b.  Disclosure of any other loans and uses since July 31, 2017
c.  Go forward budget for next 120 days, with proposal as to source of proceeds to fund operations during case
d.  Use of any capital contributions (per 1(b) above)


4.  Transfers to Wooleys
a.  Listing of all transfers of any EER assets (money, interest in IP, etc.) from October 1, 2016 through present

# EARTH ENERGY RENEWABLES LLC
## Statement of Cash Flows
### January 14 through September 15, 2020

| 3A ARA Source and Use of Funds | Jan 14 - Sep 15, 20 |
|---|---:|
| **OPERATING ACTIVITIES** | |
| Net Ordinary Income | $ (2,581,044.24) |
| Other Income/Expense | |
| Other Income | |
| Loan Forgiveness | 254,044.00 |
| Total Other Income | 254,044.00 |
| Net Other Income | 254,044.00 |
| Net Income | -2,327,603.24 |
| Adjustments to reconcile Net Income | |
| to net cash provided by operations: | |
| Prepaid Insurance | 42,599.82 |
| Utility deposit | -1,409.30 |
| Accounts Payable | -530,527.14 |
| Accrued Interest | 159,568.30 |
| Accrued Property Tax | 6,000.00 |
| ARA Partners Bridge Loan | 2,837,491.00 |
| EE-TDF Cleveland Interco | -24,317.80 |
| Jeff Wooley Short Term Loan | -77,000.00 |
| Payroll Liabilities | -75,558.55 |
| PPP Loan Proceeds | 0.25 |
| Premium Finance LLC | -34,495.01 |
| **Net cash provided by Operating Activities** | -25,251.67 |
| **INVESTING ACTIVITIES** | |
| 16X Commercial Plant:16 X EQUIPMENT | -6,051.00 |
| 16X Commercial Plant:16X Design Engineering | -140,561.25 |
| 16X Commercial Plant:Civil Works 16X | -55,050.00 |
| 16X Commercial Plant:Site Plan Engineering | -53,226.39 |
| Accumulated Depreciation | 444,800.00 |
| Furniture and Equipment | -3,824.58 |
| Lab Equipment:Lab Equipment Mumford Rd | -38,450.00 |
| **Net cash provided by Investing Activities** | 147,636.78 |
| **Net cash increase for period** | 122,385.11 |
| **Cash at beginning of period** | -87,104.39 |
| **Cash at end of period** | 35,280.72 |

# EARTH ENERGY RENEWABLES LLC
# Profit & Loss
## January through October 2020

|  | Jan 14 - Sep 15, 20 |
| --- | ---: |
| **Ordinary Income/Expense** | |
| **Cost of Goods Sold** | |
| Cost of Goods Sold | 292.50 |
| Freight and Shipping Costs | 8.76 |
| **Total COGS** | 301.26 |
| **Gross Profit** | -301.26 |
| **Expense** | |
| Bank Service Charges | 2,190.05 |
| Computer and Internet Expenses | 27,139.26 |
| **Demo Plant Operating Expense** | |
| Feedstocks | 4,560.95 |
| Maintenance & Repair AD-UFRO | 7,759.44 |
| Supplies Operations | 16,296.34 |
| Waste and Water Disposal | 3,092.50 |
| **Total Demo Plant Operating Expense** | 31,709.23 |
| Depreciation Expense | 444,800.00 |
| Fees and Permits | 1,580.00 |
| **Insurance Expense** | |
| Health Insurance Reimbursement | 107,850.00 |
| Workers Compensation Ins | 2,271.12 |
| Insurance Expense - Other | 41,339.39 |
| **Total Insurance Expense** | 151,460.51 |
| Interest Expense | 168,742.22 |
| **Lab Expense** | |
| Maintenance & Repairs | 13,737.73 |
| Outside Lab Tests | 13,352.00 |
| Supplies Consumeables | 21,405.55 |
| **Total Lab Expense** | 48,495.28 |
| **Labor** | |
| Bryan Facility & Plant Staff | 466,719.12 |
| **Business Ops  Commercialization** | |
| Sales and Marketing | 83,700.00 |
| Business Ops  Commercialization - Other | 332,500.00 |
| **Total Business Ops  Commercialization** | 416,200.00 |
| Engineering | 178,170.87 |
| R & D Science Team | 305,025.00 |
| **Total Labor** | 1,366,114.99 |
| Meals and Entertainment | 293.50 |
| Office Supplies | 6,518.29 |
| Payroll Tax Expenses | 98,008.29 |
| Penalties and Late Fees | 6,557.85 |
| Postage and Freight | 2,702.81 |
| Professional Fees | 136,888.65 |
| Recruiting | 30,126.45 |
| Rent Expense | 25,727.10 |

**EARTH ENERGY RENEWABLES, LLC**

**Profit & Loss**

**January through October 2020**

| | |
|---|---:|
| **Repairs and Maintenance** | 5,844.01 |
| **Safety Materials** | 798.57 |
| **Taxes Other** | 6,067.73 |
| **Telephone Expense** | 924.36 |
| **Travel Expense** | 3,800.91 |
| **Utilities** | 14,855.92 |
| **Total Expense** | 2,581,345.98 |
| **Net Ordinary Income** | -2,581,647.24 |
| **Other Income/Expense** | |
| **Other Income** | |
| **Loan Forgiveness** | 254,044.00 |
| **Total Other Income** | 254,044.00 |
| **Net Other Income** | 254,044.00 |
| **Net Income** | -2,327,603.24 |

# EARTH ENERGY RENEWABLES LLC
## Statement of Cash Flows
### August 1, 2017 through November 11, 2020

**Cash Flow All Sources and Uses Excluding ARA**

3rd Source & Uses Excl ARA
of 293

| | Aug 1, '17 - Nov 11, 20 |
|---|---|
| **OPERATING ACTIVITIES** | |
| **Net Income** | -8,374,204.20 |
| **Adjustments to reconcile Net Income** | |
| **to net cash provided by operations:** | |
| **Prepaid Interest** | -15,349.82 |
| **Utility deposit** | 0.00 |
| **Accounts Payable** | 1,548,262.90 |
| **Accrued Contract Services** | -102,275.08 |
| **Accrued fees** | -37,000.00 |
| **Accrued Interest** | 245,876.20 |
| **Accrued Property Tax** | 3,237.96 |
| **ARA Partners Bridge Loan** | 0.00 |
| **Borel Short Term Loan** | 10,000.00 |
| **Craig Short Term Note** | 25,000.00 |
| **Deferred Comp Jeffrey Wooley** | -109,997.00 |
| **Deferred Comp John Wooley** | -86,330.00 |
| **Edelman Short Term Note** | 100,000.00 |
| **EE-TDF Cleveland Interco** | 89,067.80 |
| **Elf Services 1 LLC** | -275,000.00 |
| **Gersttner Short Term Loan** | 10,000.00 |
| **ICC Loan** | 160,001.00 |
| **John & Jeff Wooley Loan** | 137,000.00 |
| **Karesa Loan** | 298,514.41 |
| **Matt Omearra Short Term Loan** | 10,000.00 |
| **Nalle - Cobb Note Payable** | 207,023.73 |
| **O'Meara Short Term Loan** | 85,000.00 |
| **Payroll Liabilities** | 229,640.36 |
| **Peter Henken Short Term Loan** | 25,000.00 |
| **PPP Loan Proceeds** | 0.00 |
| **Ramsey Short Term Loan** | 1,300.00 |
| **Reihmann Short Term Loan** | 15,000.00 |
| **Robson Short term Bridge Loan** | 250,000.00 |
| **Sauter Short Term Loan** | 10,000.00 |
| **Sunam Convertible Loan** | 30,000.00 |
| **Zahner Short Term Loan** | 5,000.00 |
| | |
| **Net cash provided by Operating Activities** | -5,505,231.74 |
| **INVESTING ACTIVITIES** | |
| **16X Commercial Plant:16 X EQUIPMENT** | 0.00 |
| **16X Commercial Plant:16X Design Engineering** | -1,171.25 |

1:31 PM
11/11/20
EARTH ENERGY RENEWABLES LLC
Statement of Cash Flows
August 1, 2017 through November 11, 2020

20-01780-rbk  Doc#48  Filed 11/19/20  Entered 11/19/20 17:06:40  Main Document  Pg 282
3-bSource & User Excl A2A
of 293

| | |
|---|---:|
| 16X Commercial Plant:Civil Works 16X | -18,410.00 |
| 16X Commercial Plant:Site Plan Engineering | -28,795.00 |
| Accumulated Depreciation | 878,372.00 |
| Furniture and Equipment | 0.00 |
| Lab Equipment:Lab Equipment Mumford Rd | -100,842.80 |
| Pilot Production Equipment:A D System | -32,112.64 |
| Pilot Production Equipment:Chemical Clarification | -28,242.50 |
| Pilot Production Equipment:Extraction Installation | -77,041.07 |
| Pilot Production Equipment:Extraction Installation:Extract Automation | -334,376.50 |
| Pilot Production Equipment:Infrastructure Upgade | -25,905.22 |
| Pilot Production Equipment:KPMS Design Engineering | -61,983.33 |
| Pilot Production Equipment:KPMS Extract | -1,180,429.99 |
| Pilot Production Equipment:NH3, P & ION EX | -29,366.06 |
| Pilot Production Equipment:POME Processing Equipment | -18,502.11 |
| Pilot Production Equipment:Site Prep | -11,087.21 |
| Pilot Production Equipment:TCEQ Permitting | -3,750.00 |
| Pilot Production Equipment:UF & RO | -177,380.00 |
| Accumulated Amortization | 74,384.00 |
| Engineering 30TPD Plant Zeep | -186,917.47 |
| Investment NextBTL | 208,666.00 |
| Net cash provided by Investing Activities | -1,154,891.15 |
| FINANCING ACTIVITIES | |
| 5 Prices LLC Investment | 50,000.00 |
| AG Major Investments | 23,076.00 |
| Borel Investment | 50,000.00 |
| Brendan Kuennen Investment | 76,800.00 |
| CHARLES ROHDE | 25,000.00 |
| Curtis and Anita Mether Invest | 2,560.00 |
| Dharma Susanto Investment | 26,840.00 |
| Ellis Investment | 25,000.00 |
| Gale Cook | 85,006.40 |
| Gary D Edelman | 146,830.00 |
| Gerald Gerstner | 39,000.00 |
| Gorman Investment | 4,999.80 |
| Greg Sundberg Investment | 85,000.00 |
| Guy Wendler | 25,000.00 |
| HENRY ROYER | 25,840.00 |
| Honts Investment | 25,000.00 |
| Iowa Community Capital Investme | 10,001.92 |
| Jack Goralnik Investment | 68,931.00 |
| James V Sauter | 25,000.00 |
| JCW/JJW | -249,531.00 |
| John B F O'Meara | 10,000.00 |
| John Duncan Investment | 2,600.00 |
| Karesa Plantation SDN BHD | 2,407,724.11 |
| Kemin Industries Inc Investment | 2,694,000.00 |

# EARTH ENERGY RENEWABLES, LLC
## Statement of Cash Flows
### August 1, 2017 through November 11, 2020

|  |  |
|---|---|
| **Larry Ramsey Investment** | 3,860.00 |
| **Madekine C O'Meara** | 10,000.00 |
| **Mary Zahner Investment** | 6,500.00 |
| **Molly McCracken Investment** | 20,033.72 |
| **Noell Investment** | 20,000.00 |
| **Paul Fouts Investment** | 43,360.00 |
| **Randall Reihmann** | 50,000.00 |
| **SC Ventures LLC** | 375,000.00 |
| **SunAm Development LLC** | 111,530.74 |
| **SUNAM Properties LC** | 30,030.00 |
| **Ted Bauer** | 85,010.10 |
| **Net cash provided by Financing Activities** | 6,440,002.79 |
| **Net cash increase for period** | -220,120.10 |
| **Cash at beginning of period** | 3,019.67 |
| **Cash at end of period** | **-217,100.43** |

3.C 120 Day Budget

| Budget Detail | November | December | January | February | 4 Month Total |
|---|---|---|---|---|---|
| **Bryan Facility & Pilot/Demo Plant Staff** | | | | | |
| - Plant Manager - Juan Zavala | $ 8,333 | $ 8,333 | $ 8,333 | $ 8,333 | $ 33,332 |
| - Senior Operator - Sean Newton | $ 4,640 | $ 4,640 | $ 4,640 | $ 4,640 | $ 18,560 |
| - Pilot Plant Operators | | | | | |
| Operator - Aaron Thomas | $ 3,672 | $ 3,672 | $ 3,672 | $ 3,672 | $ 14,688 |
| Operator - Aaron Zavala | $ 1,105 | $ 1,105 | $ 1,105 | $ 1,105 | $ 4,420 |
| Operator - Josh Gayle | $ 3,485 | $ 3,485 | $ 3,485 | $ 3,485 | $ 13,940 |
| Operator - Sedrick Thomas | $ 3,672 | $ 3,672 | $ 3,672 | $ 3,672 | $ 14,688 |
| Operator - Wendell Preas | $ 3,700 | $ 3,700 | $ 3,700 | $ 3,700 | $ 14,800 |
| - Electrician - TBD | | | $ 6,667 | $ 6,667 | $ 13,334 |
| - Engineers | | | | | |
| Jake Blasingame | $ 5,500 | $ 5,500 | $ 5,500 | $ 5,500 | $ 22,000 |
| Julius Choi | $ 6,800 | $ 6,800 | $ 6,800 | $ 6,800 | $ 27,200 |
| Addam Rufael | $ 6,250 | $ 6,250 | $ 6,250 | $ 6,250 | $ 25,000 |
| Rifat Mumith | $ 5,200 | $ 5,200 | $ 5,200 | $ 5,200 | $ 20,800 |
| - Fermentation Engineer-Amado Maglinao | $ 6,667 | $ 6,667 | $ 6,667 | $ 6,667 | $ 26,668 |
| - Benefits & Payroll Taxes | $ 12,455 | $ 11,772 | $ 11,772 | $ 11,772 | $ 47,771 |
| **Sub-Total** | **$ 71,479** | **$ 70,796** | **$ 77,463** | **$ 77,463** | **$ 297,201** |
| | | | | | |
| **Pilot/Demo Plant Operating Expense** | | | | | |
| - Consummables - Fermentation & Front End | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 10,000 |
| - Consummables - Extraction & Solvent Recovery | $ 500 | $ 500 | $ 500 | $ 500 | $ 2,000 |
| - Safety | $ 500 | $ 500 | $ 500 | $ 500 | $ 2,000 |
| - Maintenance | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 40,000 |
| - Utilities= BTU, Atmos Energy | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ 10,000 |
| **Sub-Total** | **$ 16,000** | **$ 16,000** | **$ 16,000** | **$ 16,000** | **$ 64,000** |
| | | | | | |
| **Bryan R&D Science Team** | | | | | |
| - CTO - Cesar Granda | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 60,000 |
| - Chief Scientist - Jubo Zhang | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 40,000 |
| - Lab Technician - Matt Cantu | $ 5,250 | $ 5,250 | $ 5,250 | $ 5,250 | $ 21,000 |
| - Lab Technician - Kye White | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 12,000 |
| - Benefits & Payroll Taxes | $ 5,660 | $ 5,660 | $ 5,660 | $ 5,660 | $ 22,640 |
| **Sub-Total** | **$ 38,910** | **$ 38,910** | **$ 38,910** | **$ 38,910** | **$ 155,640** |
| | | | | | |
| **Lab Expense Bryan Facility** | | | | | |
| - Bryan Lab Expense- VWR, Agilent, Praxair | $ 6,667 | $ 6,667 | $ 6,667 | $ 6,667 | $ 26,668 |
| - Third Party Lab Services- Great Plains, Univ of Georgia | $ 5,000 | $ 10,000 | $ 5,000 | $ 5,000 | $ 25,000 |
| **Sub-Total** | **$ 11,667** | **$ 16,667** | **$ 11,667** | **$ 11,667** | **$ 51,668** |
| | | | | | |
| **Engineering Staff** | | | | | |
| - Chief Process Engineer - Wolfgang Verdegaal | $ 11,250 | $ 11,250 | $ 11,250 | $ 11,250 | $ 45,000 |
| -David Alford | $ 5,834 | $ 5,834 | $ 5,834 | $ 5,834 | $ 23,336 |
| - Benefits & Payroll Taxes | $ 2,867 | $ 2,867 | $ 2,867 | $ 2,867 | $ 11,467 |
| **Sub-Total** | **$ 19,951** | **$ 19,951** | **$ 19,951** | **$ 19,951** | **$ 79,803** |
| | | | | | |
| **Commercialization Staff** | | | | | |
| - Chief Commercialization Officer - Mike Bowers | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 80,000 |
| - Feedstock , Other - Tim O'Meara | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ 20,000 |
| - Consultants | | | | | $ - |
| Ken Rasco | $ 12,000 | $ 12,000 | $ 12,000 | $ 12,000 | $ 48,000 |
| Don Short | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 50,000 |
| Tim Cesarek | $ 3,500 | $ 3,500 | $ 3,500 | $ 3,500 | $ 14,000 |
| - Expenses | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 8,000 |
| **Sub-Total** | **$ 55,000** | **$ 55,000** | **$ 55,000** | **$ 55,000** | **$ 220,000** |
| | | | | | |

3.C 120 Day Budget

| Business Operations | | | | | | | | | |
|---|---:|---|---:|---|---:|---|---:|---|---:|
| - CEO - John Wooley | $ | 17,500 | $ | 17,500 | $ | 17,500 | $ | 17,500 | $ | 70,000 |
| - Financial, Accounting & HR - Carl Frampton | $ | 7,500 | $ | 7,500 | $ | 7,500 | $ | 7,500 | $ | 30,000 |
| - Admin Manager - Tara Menard | $ | 3,467 | $ | 3,467 | $ | 3,467 | $ | 3,467 | $ | 13,868 |
| - Benefits & Payroll Taxes | $ | 1,027 | $ | 1,027 | $ | 1,027 | $ | 1,027 | $ | 4,109 |
| **Sub-Total** | **$** | **29,494** | **$** | **29,494** | **$** | **29,494** | **$** | **29,494** | **$** | **117,977** |
| | | | | | | | | | | |
| Legal | | | | | | | | | | |
| - In-House Counsel - Jeff Wooley | $ | 17,500 | $ | 17,500 | $ | 17,500 | $ | 17,500 | $ | 70,000 |
| - Other Professional Fees | $ | 5,000 | $ | 15,000 | $ | 15,000 | $ | 15,000 | $ | 50,000 |
| **Sub-Total** | **$** | **22,500** | **$** | **32,500** | **$** | **32,500** | **$** | **32,500** | **$** | **120,000** |
| | | | | | | | | | | |
| Office Facility & Administration | | | | | | | | | | |
| - Additional Office Space- Wilscot | $ | 900 | $ | 900 | $ | 900 | $ | 900 | $ | 3,600 |
| - Computer, Internet, Software- Teksys, Brazos WIFI | $ | 1,600 | $ | 1,600 | $ | 1,600 | $ | 1,600 | $ | 6,400 |
| - Insurance-First Insurance Funding | $ | 4,000 | $ | 4,000 | $ | 4,000 | $ | 4,000 | $ | 16,000 |
| - Rent & Office Expense-Wilscot | $ | 2,028 | $ | 2,028 | $ | 2,028 | $ | 2,028 | $ | 8,112 |
| - Utilities-BTU, Atmos | $ | 1,000 | $ | 1,000 | $ | 1,000 | $ | 1,000 | $ | 4,000 |
| - Taxes, Other=Office Supplies Property Tax Brazos County | $ | 5,000 | $ | 5,000 | $ | 5,000 | $ | 5,000 | $ | 20,000 |
| **Sub-Total** | **$** | **13,628** | **$** | **13,628** | **$** | **13,628** | **$** | **13,628** | **$** | **54,512** |
| | | | | | | | | | | |
| **Total Monthly Expense Budget** | **$** | **278,629** | | **292,946** | | **294,613** | | **294,613** | **$** | **1,160,801** |

| Summary Sources & Uses of Funds (4 months thru 2.28.21) | | | | | | | | | |
|---|---:|---|---:|---|---:|---|---:|---|---:|
| Sources of Funds | November | | December | | January | | February | | Total | |
| Member loans 11.10.20 | $ | 240,000 | | | | | | | $ | 240,000 |
| Member loans 1.10.21 | | | | | $ | 80,000 | $ | (80,000) | $ | - |
| NREL grant funds | | | | | $ | - | $ | 400,000 | $ | 400,000 |
| Keresa services revenue | $ | 197,500 | $ | 202,000 | $ | 215,000 | $ | 140,000 | $ | 754,500 |
| **Total sources** | **$** | **437,500** | **$** | **202,000** | **$** | **295,000** | **$** | **460,000** | **$** | **1,394,500** |
| | | | | | | | | | | |
| **Uses of Funds** | **$** | **(278,629)** | **$** | **(292,946)** | **$** | **(294,613)** | **$** | **(294,613)** | **$** | **(1,160,801)** |
| | | | | | | | | | | |
| **Net Sources and Uses** | **$** | **158,871** | **$** | **(90,946)** | **$** | **387** | **$** | **165,387** | **$** | **233,699** |
| | | | | | | | | | | |
| Beginning Cash Balance | $ | (58,000) | $ | 100,871 | $ | 9,925 | $ | 10,312 | $ | (58,000) |
| **Ending Cash Balance** | **$** | **100,871** | **$** | **9,925** | **$** | **10,312** | **$** | **175,699** | **$** | **175,699** |

4835-6049-7362.1

**EARTH ENERGY RENEWABLES LLC**

4. AP Jeff and John Wooley
As of October 31, 2020

| Type | Date | Num | Name | Memo | Class | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| **Accounts Payable** | | | | | | | | | | **0.00** |
| Bill | 07/31/2017 | June & July 2017 | John Wooley | | | | Travel Expense | | 9,487.60 | 9,487.60 |
| Bill Pmt -Check | 09/07/2017 | transfer | John Wooley | | | | TB | 9,487.60 | | 0.00 |
| Bill | 09/29/2017 | 9-17 accrual | Jeffery Wooley | | | | Business Ops  Commercialization | | 18,400.00 | 18,400.00 |
| Bill | 09/29/2017 | 9-17 accrual | John Wooley | | | | Business Ops  Commercialization | | 18,400.00 | 36,800.00 |
| Bill Pmt -Check | 10/02/2017 | wire | Jeffery Wooley | | | | TB | 18,399.00 | | 18,401.00 |
| Bill Pmt -Check | 10/02/2017 | wire | John Wooley | | | | TB | 18,400.00 | | 1.00 |
| Bill | 10/31/2017 | October 2017 | Jeffery Wooley | | | | Business Ops  Commercialization | | 18,400.00 | 18,401.00 |
| Bill | 10/31/2017 | October 2017 | John Wooley | | | | Business Ops  Commercialization | | 18,400.00 | 36,801.00 |
| Bill Pmt -Check | 11/01/2017 | wire | Jeffery Wooley | | | | TB | 18,400.00 | | 18,401.00 |
| Bill Pmt -Check | 11/01/2017 | wire | John Wooley | | | | TB | 18,399.00 | | 2.00 |
| Bill | 11/30/2017 | november 2017 | Jeffery Wooley | | | | Business Ops  Commercialization | | 18,399.00 | 18,401.00 |
| Bill | 11/30/2017 | november 2017 | John Wooley | | | | Business Ops  Commercialization | | 18,398.00 | 36,799.00 |
| Bill Pmt -Check | 12/01/2017 | wire | Jeffery Wooley | | | | TB | 18,400.00 | | 18,399.00 |
| Bill Pmt -Check | 12/01/2017 | wire | John Wooley | | | | TB | 18,399.00 | | 0.00 |
| Bill | 12/31/2017 | December 2017 | Jeffery Wooley | | | | Business Ops  Commercialization | | 18,400.00 | 18,400.00 |
| Bill | 12/31/2017 | December 2017 | John Wooley | | | | Business Ops  Commercialization | | 18,400.00 | 36,800.00 |
| Bill Pmt -Check | 01/22/2018 | | Jeffery Wooley | | | | TB | 18,400.00 | | 18,400.00 |
| Bill Pmt -Check | 01/22/2018 | | John Wooley | | | | TB | 18,399.00 | | 1.00 |
| Bill | 01/31/2018 | January 2018 | Jeffery Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 20,001.00 |
| Bill | 01/31/2018 | January 2018 | John Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 40,001.00 |
| Bill Pmt -Check | 02/01/2018 | wire | Jeffery Wooley | | | | TB | 20,000.00 | | 20,001.00 |
| Bill Pmt -Check | 02/01/2018 | wire | John Wooley | | | | TB | 19,999.99 | | 1.01 |
| Bill | 02/28/2018 | February 2018 | Jeffery Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 20,001.01 |
| Bill | 02/28/2018 | February 2018 | John Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 40,001.01 |
| Check | 03/07/2018 | wire | John Wooley | | | | TB | 8,000.00 | | 32,001.01 |
| Check | 03/08/2018 | wire | John Wooley | | | | TB | 1,000.00 | | 31,001.01 |
| Check | 03/08/2018 | wire | John Wooley | | | | TB | 2,000.00 | | 29,001.01 |
| Bill Pmt -Check | 03/14/2018 | wire | Jeffery Wooley | | | | TB | 20,000.00 | | 9,001.01 |
| Check | 03/16/2018 | wire | John Wooley | | | | TB | 9,000.00 | | 1.01 |
| Bill | 03/31/2018 | 03-18 | Jeffery Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 20,001.01 |
| Bill | 03/31/2018 | Exp 03-18 | John Wooley | | | | -SPLIT- | | 802.20 | 20,803.21 |
| Bill | 03/31/2018 | 03-2018 | John Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 40,803.21 |
| Bill Pmt -Check | 04/04/2018 | wire | Jeffery Wooley | | | | TB | 15,000.00 | | 25,803.21 |
| Bill Pmt -Check | 04/25/2018 | Wire | John Wooley | | | | TB | 5,800.00 | | 5,003.21 |
| Bill | 04/30/2018 | April 2018 | Jeffery Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 25,003.21 |
| Bill | 04/30/2018 | April 2018 | John Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 45,003.21 |
| Bill | 05/01/2018 | Best Western | John Wooley | | | | Travel Expense | | 92.72 | 45,095.93 |
| Bill Pmt -Check | 05/15/2018 | debit | John Wooley | | | | TB | 500.00 | | 44,595.93 |
| Bill Pmt -Check | 05/22/2018 | | John Wooley | | | | TB | 4,500.00 | | 40,095.93 |
| Bill Pmt -Check | 05/24/2018 | wire | John Wooley | | | | TB | 15,000.00 | | 25,095.93 |
| Bill Pmt -Check | 05/24/2018 | wire | John Wooley | | | | TB | 10,000.00 | | 15,095.93 |
| Bill | 05/31/2018 | May 2018 | Jeffery Wooley | | | | Business Ops  Commercialization | | 0.00 | 15,095.93 |
| Bill | 05/31/2018 | May 2018 | John Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 35,095.93 |
| Bill | 05/31/2018 | March 2018 expense | John Wooley | | | | Travel Expense | | 114.17 | 35,210.10 |
| Bill | 05/31/2018 | Cedar rapids f05/18 | John Wooley | | | | Travel Expense | | 2,875.10 | 38,085.20 |
| Bill | 05/31/2018 | 2017 expenses confer | John Wooley | | | | Travel Expense | | 8,590.96 | 46,676.16 |
| Bill Pmt -Check | 06/08/2018 | | John Wooley | | | | TB | 2,500.00 | | 44,176.16 |
| Bill Pmt -Check | 06/26/2018 | | John Wooley | | | | TB | 10,500.00 | | 33,676.16 |
| Bill Pmt -Check | 06/30/2018 | | John Wooley | | | | TB | 1,500.00 | | 32,176.16 |
| Bill | 06/30/2018 | June 2018 | Jeffery Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 52,176.16 |
| Bill | 06/30/2018 | June 2018 | John Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 72,176.16 |
| General Journal | 07/02/2018 | 469 | Jeffery Wooley | Jeff Wooley payment on Account | | | Wooley Advance | 6,800.00 | | 65,376.16 |
| General Journal | 07/02/2018 | 470 | John Wooley | John Wooley payment on account | | | Wooley Advance | 6,800.00 | | 58,576.16 |
| Bill | 07/12/2018 | Marriott | John Wooley | | | | Travel Expense | | 126.17 | 58,702.33 |
| Bill Pmt -Check | 07/12/2018 | wire | Jeffery Wooley | | | | TB | 10,000.00 | | 48,702.33 |
| Bill Pmt -Check | 07/12/2018 | wire | John Wooley | | | | TB | 5,000.00 | | 43,702.33 |
| Bill Pmt -Check | 07/17/2018 | wire | John Wooley | | | | TB | 3,000.00 | | 40,702.33 |
| Bill Pmt -Check | 07/24/2018 | wire | Jeffery Wooley | | | | TB | 5,100.00 | | 35,602.33 |
| Bill | 07/31/2018 | July 2018 | Jeffery Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 55,602.33 |
| Bill | 07/31/2018 | July 2018 | John Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 75,602.33 |
| Bill Pmt -Check | 08/17/2018 | debit | John Wooley | | | | ABC Operating Account | 17,000.00 | | 58,602.33 |
| Bill | 08/17/2018 | 1872-8622 | Jeffery Wooley | | | | Computer and Internet Expenses | | 3,200.00 | 61,802.33 |
| Bill Pmt -Check | 08/20/2018 | | Jeffery Wooley | | | | TB | 7,042.98 | | 54,759.35 |
| Bill | 08/31/2018 | August 2018 | Jeffery Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 74,759.35 |
| Bill | 08/31/2018 | August 2018 | John Wooley | | | | Business Ops  Commercialization | | 20,000.00 | 94,759.35 |
| Bill Pmt -Check | 09/04/2018 | Debit | John Wooley | | | | TB | 4,000.00 | | 90,759.35 |
| Bill | 09/05/2018 | 9-5-18 expenses | John Wooley | | | | -SPLIT- | | 3,428.83 | 94,188.18 |
| Bill | 09/30/2018 | Balance September | John Wooley | | | | Business Ops  Commercialization | | 12,000.00 | 106,188.18 |
| Bill | 09/30/2018 | Balance September | Jeffery Wooley | | | | Business Ops  Commercialization | | 5,000.00 | 111,188.18 |
| Bill Pmt -Check | 10/01/2018 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 5,000.00 | | 106,188.18 |
| Bill Pmt -Check | 10/01/2018 | Transfer | John Wooley | | | | ABC Operating Account | 12,000.00 | | 94,188.18 |
| Bill | 10/31/2018 | 10*31*18 | John Wooley | | | | Business Ops  Commercialization | | 7,500.00 | 101,688.18 |
| Bill | 10/31/2018 | 10-31-18 | Jeffery Wooley | | | | Business Ops  Commercialization | | 7,500.00 | 109,188.18 |
| Bill Pmt -Check | 11/02/2018 | wire | Jeffery Wooley | | | | TB | 10,000.00 | | 99,188.18 |
| Bill Pmt -Check | 11/02/2018 | wire | John Wooley | | | | TB | 10,000.00 | | 89,188.18 |
| Bill | 11/06/2018 | Biogas Conference | John Wooley | | | | Travel Expense | | 1,698.92 | 90,887.10 |
| General Journal | 11/06/2018 | 536 | Jeffery Wooley | Payback Wooley Advances | | | Wooley Advance | 14,900.00 | | 75,987.10 |
| Bill Pmt -Check | 11/06/2018 | wire | Jeffery Wooley | | | | TB | 8,500.00 | | 67,487.10 |
| Bill | 11/30/2018 | November 2018 | Jeffery Wooley | | | | Business Ops  Commercialization | | 15,000.00 | 82,487.10 |
| Bill | 11/30/2018 | November 2018 | John Wooley | | | | Business Ops  Commercialization | | 15,000.00 | 97,487.10 |
| Check | 12/05/2018 | Wire | John Wooley | | | | TB | 6,500.00 | | 90,987.10 |
| Bill | 12/11/2018 | Bryan Hotel | John Wooley | | | | Travel Expense | | 103.02 | 91,090.12 |
| Bill | 12/11/2018 | christmas party | John Wooley | | | | Meals and Entertainment | | 837.37 | 91,927.49 |
| Bill | 12/13/2018 | exp report 12-13 | John Wooley | | | | -SPLIT- | | 2,762.82 | 94,690.31 |
| Check | 12/17/2018 | Transfer | John Wooley | | | | ABC Bank 0871 | 2,000.00 | | 92,690.31 |
| Bill | 12/31/2018 | December 2018 | Jeffery Wooley | | | | Business Ops  Commercialization | | 15,000.00 | 107,690.31 |
| Bill | 12/31/2018 | December 2018 | John Wooley | | | | Business Ops  Commercialization | | 15,000.00 | 122,690.31 |
| General Journal | 12/31/2018 | 560 | Jeffery Wooley | Write off Next BTL to Wooley accounts | | | Investment NextBTL | 18,074.50 | | 104,615.81 |
| General Journal | 12/31/2018 | 561 | John Wooley | Write off Next Bit Investment to Wooleys | | | Investment NextBTL | 18,064.50 | | 86,551.31 |
| Bill Pmt -Check | 12/31/2018 | | Jeffery Wooley | QuickBooks generated zero amount transaction for bill payment stub | | | ABC Operating Account | 0.00 | | 86,551.31 |
| Bill Pmt -Check | 12/31/2018 | | John Wooley | QuickBooks generated zero amount transaction for bill payment stub | | | ABC Operating Account | 0.00 | | 86,551.31 |
| Bill | 01/08/2019 | expense Bryan | John Wooley | | | | Travel Expense | | 103.02 | 86,654.33 |
| Bill Pmt -Check | 01/08/2019 | Wire | John Wooley | | | | TB | 2,500.00 | | 84,154.33 |
| Bill Pmt -Check | 01/09/2019 | Wire | John Wooley | | | | TB | 2,500.00 | | 81,654.33 |
| Bill Pmt -Check | 01/14/2019 | wire | John Wooley | | | | TB | 2,500.00 | | 79,154.33 |
| Bill | 01/14/2019 | EXP 01-15 | John Wooley | | | | Travel Expense | | 121.10 | 79,275.43 |
| Bill Pmt -Check | 01/22/2019 | Transfer | Jeffery Wooley | | | | TB | 150.00 | | 79,125.43 |
| Bill Pmt -Check | 01/22/2019 | wire | John Wooley | | | | TB | 7,500.00 | | 71,625.43 |
| Bill | 01/31/2019 | January 2019 | Jeffery Wooley | | | | Business Ops  Commercialization | | 15,000.00 | 86,625.43 |
| Bill | 01/31/2019 | January 2019 | John Wooley | | | | Business Ops  Commercialization | | 15,000.00 | 101,625.43 |
| Bill Pmt -Check | 02/07/2019 | wiret | John Wooley | | | | ABC Bank 0871 | 5,000.00 | | 96,625.43 |
| Bill Pmt -Check | 02/27/2019 | wire | Jeffery Wooley | | | | ABC Bank 0871 | 5,000.00 | | 91,625.43 |
| Bill | 02/28/2019 | February 2019 | Jeffery Wooley | | | | Business Ops  Commercialization | | 15,000.00 | 106,625.43 |
| Bill | 02/28/2019 | February 2019 | John Wooley | | | | Business Ops  Commercialization | | 15,000.00 | 121,625.43 |
| Bill Pmt -Check | 03/08/2019 | Transfer | Jeffery Wooley | | | | ABC Bank 0871 | 5,250.00 | | 116,375.43 |
| Bill Pmt -Check | 03/08/2019 | transfer | John Wooley | | | | ABC Bank 0871 | 5,250.00 | | 111,125.43 |
| Bill Pmt -Check | 03/14/2019 | wire | John Wooley | | | | EETB  Closing Account | 10,000.00 | | 101,125.43 |
| Bill Pmt -Check | 03/14/2019 | Transfer | Jeffery Wooley | | | | ABC Bank 0871 | 5,000.00 | | 96,125.43 |
| Bill Pmt -Check | 03/28/2019 | Transfer | John Wooley | | | | ABC Bank 0871 | 5,525.00 | | 90,600.43 |
| Bill Pmt -Check | 03/28/2019 | transfer | John Wooley | | | | ABC Bank 0871 | 5,525.00 | | 85,075.43 |

5:02 PM
11/09/20
Accrual Basis

**EARTH ENERGY RENEWABLES LLC**

As of October 31, 2020

4. AP Jeff and John Wooley

| Type | Date | Num | Name | Memo | Class | Clr | Split | Debit | Credit | Balance |
|------|------|-----|------|------|-------|-----|-------|-------|--------|---------|
| Bill | 03/31/2019 | March 2019 | John Wooley | | | | Business Ops Commercialization | | 15,000.00 | 100,075.43 |
| Bill | 03/31/2019 | March 2019 | John Wooley | | | | Business Ops Commercialization | | 15,000.00 | 115,075.43 |
| Bill Pmt -Check | 04/09/2019 | Transfer | Jeffery Wooley | | | | ABC Bank 0871 | 10,000.00 | | 105,075.43 |
| Bill Pmt -Check | 04/09/2019 | transfer | Jeffery Wooley | | | | ABC Bank 0871 | 10,000.00 | | 95,075.43 |
| Bill Pmt -Check | 04/18/2019 | Debit | Jeffery Wooley | | | | ABC Bank 0871 | 10,000.00 | | 85,075.43 |
| Bill Pmt -Check | 04/26/2019 | tansfer | Jeffery Wooley | | | | ABC Bank 0871 | 10,000.00 | | 75,075.43 |
| Bill | 04/30/2019 | 04-2019 | John Wooley | | | | Business Ops Commercialization | | 15,000.00 | 90,075.43 |
| Bill | 04/30/2019 | 04-2019 | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 105,075.43 |
| Bill Pmt -Check | 04/30/2019 | transfer | Jeffery Wooley | | | | EETB Closing Account | 300.00 | | 104,775.43 |
| Bill Pmt -Check | 04/30/2019 | transfer | Jeffery Wooley | | | | ABC Bank 0871 | 11,000.00 | | 93,775.43 |
| Bill | 05/31/2019 | May 2019 | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 108,775.43 |
| Bill | 05/31/2019 | May 2019 | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 123,775.43 |
| Bill | 06/30/2019 | June 2019 | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 138,775.43 |
| Bill | 06/30/2019 | June 2019 | John Wooley | | | | Business Ops Commercialization | | 15,000.00 | 153,775.43 |
| Bill | 07/03/2019 | Data Room Expense | Jeffery Wooley | | | | Office Supplies | | 240.00 | 154,015.43 |
| Bill | 07/31/2019 | 7-31-19 | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 169,015.43 |
| Bill | 07/31/2019 | 7-31-19 | John Wooley | | | | Business Ops Commercialization | | 15,000.00 | 184,015.43 |
| Bill | 08/05/2019 | Expenses | Jeffery Wooley | | | | Office Supplies | | 250.66 | 184,266.00 |
| Bill | 08/31/2019 | August 209 | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 199,266.09 |
| Bill | 08/31/2019 | August 2019 | John Wooley | | | | Business Ops Commercialization | | 15,000.00 | 214,266.09 |
| Bill | 09/27/2019 | 10-02-2019 | Jeffery Wooley | | | | Computer and Internet Expenses | | 505.00 | 214,771.09 |
| Bill | 09/30/2019 | 9-30-2019 | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 229,771.09 |
| Bill | 09/30/2019 | 9-30-19 | John Wooley | | | | Business Ops Commercialization | | 15,000.00 | 244,771.09 |
| Bill | 10/24/2019 | 10-24-19 Data Room | Jeffery Wooley | | | | Office Supplies | | 505.00 | 245,276.00 |
| Bill | 10/31/2019 | 10-31-2019 | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 260,276.09 |
| Bill | 10/31/2019 | 10-31-2019 | John Wooley | | | | Business Ops Commercialization | | 15,000.00 | 275,276.09 |
| Bill Pmt -Check | 11/18/2019 | transfer | Jeffery Wooley | | | | ABC Bank 0871 | 11,000.00 | | 264,276.09 |
| Bill Pmt -Check | 11/18/2019 | Transfer | Jeffery Wooley | | | | ABC Bank 0871 | 8,500.00 | | 255,776.09 |
| Bill | 11/30/2019 | Vovember 2019 | John Wooley | | | | Business Ops Commercialization | | 15,000.00 | 270,776.09 |
| Bill | 11/30/2019 | November 2019 | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 285,776.09 |
| Bill | 12/04/2019 | expenses | Jeffery Wooley | | | | Office Supplies | | 505.00 | 286,281.09 |
| Bill Pmt -Check | 12/19/2019 | transfer | Jeffery Wooley | | | | ABC Bank 0871 | 9,000.00 | | 277,281.09 |
| Bill | 12/31/2019 | Decemberl | Jeffery Wooley | | | | -SPLIT- | | 15,505.00 | 292,786.00 |
| Bill | 12/31/2019 | December | Jeffery Wooley | | | | Business Ops Commercialization | | 15,000.00 | 307,786.00 |
| Bill Pmt -Check | 01/07/2020 | transferl | Jeffery Wooley | | | | ABC Operating Account | 1,000.00 | | 306,786.00 |
| Bill Pmt -Check | 01/13/2020 | debit | Jeffery Wooley | | | | ABC Operating Account | 500.00 | | 306,286.00 |
| Bill Pmt -Check | 01/15/2020 | transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 297,536.00 |
| Bill Pmt -Check | 01/15/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 288,786.00 |
| Bill Pmt -Check | 01/29/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 280,036.00 |
| Bill Pmt -Check | 01/29/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 271,286.00 |
| Bill | 01/31/2020 | JANUARY 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 288,786.00 |
| Bill | 01/31/2020 | January 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 306,286.00 |
| Bill Pmt -Check | 02/05/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 10,000.00 | | 296,286.00 |
| Bill Pmt -Check | 02/12/2020 | tansfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 287,536.00 |
| Bill | 02/29/2020 | February 2020 | John Wooley | | | | Business Ops Commercialization | | 17,500.00 | 305,036.00 |
| Bill | 02/29/2020 | February 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 322,536.00 |
| Bill Pmt -Check | 03/03/2020 | transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 313,786.00 |
| Bill Pmt -Check | 03/03/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 305,036.00 |
| Bill Pmt -Check | 03/10/2020 | transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 296,286.00 |
| Bill Pmt -Check | 03/17/2020 | transfer | Jeffery Wooley | | | | ABC Operating Account | 17,000.00 | | 279,286.00 |
| Bill Pmt -Check | 03/25/2020 | transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 270,536.00 |
| Bill | 03/31/2020 | expenses | John Wooley | | | | Travel Expense | | 2,128.76 | 272,664.85 |
| Bill | 03/31/2020 | Metch 2020 | John Wooley | | | | Business Ops Commercialization | | 17,500.00 | 290,164.85 |
| Bill | 03/31/2020 | | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 307,664.85 |
| Bill Pmt -Check | 04/03/2020 | tansfer | Jeffery Wooley | | | | ABC Operating Account | 9,750.00 | | 297,914.85 |
| Bill Pmt -Check | 04/03/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 289,164.85 |
| Bill Pmt -Check | 04/08/2020 | Transfer | John Wooley | | | | ABC Operating Account | 2,628.76 | | 286,536.09 |
| Bill | 04/08/2020 | 2307-6974 | Jeffery Wooley | | | | Computer and Internet Expenses | | 505.00 | 287,041.09 |
| Bill Pmt -Check | 04/16/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 17,500.00 | | 269,541.09 |
| Bill Pmt -Check | 04/20/2020 | Transferl | John Wooley | | | | ABC Operating Account | 17,500.00 | | 252,041.00 |
| Bill Pmt -Check | 04/28/2020 | Transfer | John Wooley | | | | ABC Operating Account | 12,961.21 | | 239,079.88 |
| Bill Pmt -Check | 04/28/2020 | Transfer | John Wooley | | | | ABC Operating Account | 12,961.20 | | 226,118.68 |
| Bill | 04/30/2020 | April 2020 | John Wooley | | | | Business Ops Commercialization | | 17,500.00 | 243,618.68 |
| Bill | 04/30/2020 | April 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 261,118.68 |
| Bill | 05/13/2020 | data room May | Jeffery Wooley | | | | Office Supplies | | 505.00 | 261,623.68 |
| Bill Pmt -Check | 05/28/2020 | transfer | Jeffery Wooley | | | | ABC Operating Account | 17,500.00 | | 244,123.68 |
| Bill | 05/31/2020 | May consulting | John Wooley | | | | Business Ops Commercialization | | 17,500.00 | 261,623.68 |
| Bill | 05/31/2020 | May consulting | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 279,123.68 |
| Bill Pmt -Check | 06/16/2020 | transfer | John Wooley | | | | ABC Operating Account | 17,500.50 | | 261,623.18 |
| Bill | 06/30/2020 | June 2020 | John Wooley | | | | Business Ops Commercialization | | 17,500.00 | 279,123.18 |
| Bill | 06/30/2020 | June 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 296,623.18 |
| Bill Pmt -Check | 07/01/2020 | Debit | Jeffery Wooley | | | | ABC Operating Account | 17,500.00 | | 279,123.18 |
| Bill Pmt -Check | 07/17/2020 | Transfer | John Wooley | | | | ABC Operating Account | 17,500.00 | | 261,623.18 |
| Bill Pmt -Check | 07/17/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 17,500.00 | | 244,123.18 |
| Bill | 07/31/2020 | July 2020 | John Wooley | | | | Business Ops Commercialization | | 17,500.00 | 261,623.18 |
| Bill | 07/31/2020 | July 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 279,123.18 |
| Bill Pmt -Check | 08/12/2020 | transfer | Jeffery Wooley | | | | ABC Operating Account | 17,500.00 | | 261,623.18 |
| Bill Pmt -Check | 08/21/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 17,500.00 | | 244,123.18 |
| Bill | 08/31/2020 | August 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 261,623.18 |
| Bill | 08/31/2020 | August 2020 | John Wooley | | | | Business Ops Commercialization | | 17,500.00 | 279,123.18 |
| Bill Pmt -Check | 09/14/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 17,500.00 | | 261,623.18 |
| Bill Pmt -Check | 09/17/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 252,873.18 |
| Bill | 09/30/2020 | September 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 270,373.18 |
| Bill | 09/30/2020 | September 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 287,873.18 |
| Bill Pmt -Check | 10/16/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 3,000.00 | | 284,873.18 |
| Bill Pmt -Check | 10/19/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 5,750.00 | | 279,123.18 |
| Bill Pmt -Check | 10/19/2020 | Transfer | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 270,373.18 |
| Bill Pmt -Check | 10/19/2020 | 201945 | Jeffery Wooley | | | | ABC Operating Account | 8,750.00 | | 261,623.18 |
| Bill | 10/30/2020 | October 2020 | Jeffery Wooley | | | | Business Ops Commercialization | | 17,500.00 | 279,123.18 |
| Bill | 10/30/2020 | October 2020 | John Wooley | | | | Business Ops Commercialization | | 17,500.00 | 296,623.18 |
| **Total Accounts Payable** | | | | | | | | 992,567.24 | 1,289,190.42 | 296,623.18 |
| **TOTAL** | | | | | | | | 992,567.24 | 1,289,190.42 | 296,623.18 |

10:52 AM
11/19/2
Accrual

EARTH ENERGY RENEWABLES LLC
As of October 31, 2020

4 EER John Wooley Deferred Comp

| Type | Date | Num | Name | Memo | Class | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| **Deferred Comp John Wooley** | | | | | | | | | | 96,330.00 |
| Check | 10/05/2016 | wire | John Wooley | | | | TB | 12,000.00 | | 84,330.00 |
| General Journal | 07/20/2017 | 281 | | John Wooley Advance | | | TB | | 2,000.00 | 86,330.00 |
| Check | 08/16/2017 | wire | John Wooley | | | | TB | 6,500.00 | | 79,830.00 |
| Check | 01/11/2018 | wire | EE-TDF Cleveland LLC | | | | TB | 12,000.00 | | 67,830.00 |
| Check | 01/31/2018 | wire | EE-TDF Cleveland LLC | | | | TB | 3,000.00 | | 64,830.00 |
| Check | 02/13/2018 | wire | EE-TDF Cleveland LLC | | | | TB | 3,500.00 | | 61,330.00 |
| General Journal | 12/31/2018 | 560 | | Write off Next BTL to Wooley accounts | | | Investment NextBTL | 61,330.00 | | 0.00 |
| Total Deferred Comp John Wooley | | | | | | | | 98,330.00 | 2,000.00 | 0.00 |
| **TOTAL** | | | | | | | | 98,330.00 | 2,000.00 | 0.00 |

4835-6049-7362.1

10:49 AM
11/10/20
Accrual Basis

**EARTH ENERGY RENEWABLES LLC**
As of October 31, 2020

4 EER Jeff Wooley Deferred Comp

| | Type | Date | Num | Name | Memo | Class | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Deferred Comp Jeffrey Wooley** | | | | | | | | | | | **109,997.00** |
| | Check | 01/11/2018 | wire | EE-TDF Cleveland LLC | | | | TB | 12,000.00 | | 97,997.00 |
| | Check | 01/31/2018 | wire | EE-TDF Cleveland LLC | | | | TB | 3,000.00 | | 94,997.00 |
| | Check | 02/13/2018 | wire | EE-TDF Cleveland LLC | | | | TB | 3,500.00 | | 91,497.00 |
| | General Journal | 12/31/2018 | 560 | | Write off Next BTL to Wooley accounts | | | Investment NextBTL | 91,497.00 | | 0.00 |
| Total Deferred Comp Jeffrey Wooley | | | | | | | | | 109,997.00 | 0.00 | 0.00 |
| **TOTAL** | | | | | | | | | **109,997.00** | **0.00** | **0.00** |

4835-6049-7362.1

4:57 PM
11/09/20
Accrual Basis

20-51780-rbk  Doc#48  Filed 11/19/20  Entered 11/19/20 17:06:40  Main Document  Pg 290 of 293

EARTH ENERGY RENEWABLES LLC
Transactions by Account
As of October 31, 2020

4.EER Equity Trans Wooleys

| | Type | Date | Num | Name | Memo | Class | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **JCW/IJW** | | | | | | | | | | | **3,041,731.96** |
| | General Journal | 10/04/2016 | 223 | | Wooley Advance | | | TB | | 7,000.00 | 3,048,731.96 |
| | General Journal | 10/04/2016 | 224 | | Wooley Advance | | | TB | | 2,500.00 | 3,051,231.96 |
| | Check | 10/12/2016 | wire | JCW/IJW | | | | TB | 18,000.00 | | 3,033,231.96 |
| | General Journal | 10/17/2016 | 225 | | Wooley Advance | | | TB | | 100,000.00 | 3,133,231.96 |
| | General Journal | 10/18/2016 | 226 | | Wooley Advance | | | TB | | 6,000.00 | 3,139,231.96 |
| | General Journal | 11/01/2016 | 237 | | Advance Wooleys | | | TB | | 27,000.00 | 3,166,231.96 |
| | General Journal | 11/03/2016 | 239 | | Advance Wooleys | | | TB | | 5,000.00 | 3,171,231.96 |
| | General Journal | 11/07/2016 | 240 | | Advance Wooleys | | | TB | | 1,000.00 | 3,172,231.96 |
| | Check | 11/23/2016 | debit | Texas Pyrolysis Group LLC | | | | TB | 30,000.00 | | 3,142,231.96 |
| | Check | 12/12/2016 | debit | JCW/IJW | | | | TB | 24,000.00 | | 3,118,231.96 |
| | General Journal | 01/05/2017 | 250 | | Wooley Advance | | | TB | | 42,500.00 | 3,160,731.96 |
| | Check | 01/12/2017 | debit | JCW/IJW | | | | TB | 24,000.00 | | 3,136,731.96 |
| | Check | 01/19/2017 | debit | JCW/IJW | Transfer 8140 | | | TB | 26,000.00 | | 3,110,731.96 |
| | Check | 02/10/2017 | Transfer | | | | | TB | 8,000.00 | | 3,102,731.96 |
| | Check | 02/13/2017 | Transfer | | 8140 transfer | | | TB | 24,000.00 | | 3,078,731.96 |
| | Check | 02/17/2017 | Transfer | | 8140 | | | TB | 7,500.00 | | 3,071,231.96 |
| | Check | 03/09/2017 | Transfer | JCW/IJW | | | | TB | 8,000.00 | | 3,063,231.96 |
| | Check | 03/14/2017 | Transfer | JCW/IJW | | | | TB | 24,000.00 | | 3,039,231.96 |
| | Check | 03/21/2017 | Transfer | | 8140 | | | TB | 8,000.00 | | 3,031,231.96 |
| | Check | 04/06/2017 | Transfer | JCW/IJW | 8140 | | | TB | 34,000.00 | | 2,997,231.96 |
| | Check | 04/14/2017 | Transfer | JCW/IJW | | | | TB | 15,000.00 | | 2,982,231.96 |
| | General Journal | 05/09/2017 | 268 | | Transfer Wooley 8140 | | | TB | | 2,500.00 | 2,984,731.96 |
| | General Journal | 05/10/2017 | 269 | | Transfer Wooley 8140 | | | TB | | 20,000.00 | 3,004,731.96 |
| | General Journal | 05/11/2017 | 270 | | Transfer Wooley 8140 | | | TB | | 10,000.00 | 3,014,731.96 |
| | General Journal | 05/22/2017 | 271 | | transfer Wooley 8140 | | | TB | | 1,400.00 | 3,016,131.96 |
| | Check | 06/26/2017 | Transfer | JCW/IJW | 8140 | | | TB | 10,000.00 | | 3,006,131.96 |
| | Check | 07/11/2017 | Transfer | JCW/IJW | Account 8140 | | | TB | 7,400.00 | | 2,998,731.96 |
| | Check | 09/11/2017 | Transfer | JCW/IJW | account 7080 | | | TB | 100,000.00 | | 2,898,731.96 |
| | General Journal | 09/30/2017 | 311 | | Investment Jack Goralnik Purchase Wooley Shares | | | ABC Bank 0871 | 19,531.00 | | 2,879,200.96 |
| | General Journal | 11/20/2017 | 333 | | transfer Wooley Shares | | | ABC Bank 0871 | 10,000.00 | | 2,869,200.96 |
| | General Journal | 08/31/2018 | 511 | | 70000 units sold ro Noell, Honts, Ellis | | | -SPLIT- | 70,000.00 | | 2,799,200.96 |
| | General Journal | 09/25/2018 | 508 | | 50000 units sold to Borel | | | -SPLIT- | 50,000.00 | | 2,749,200.96 |
| Total JCW/IJW | | | | | | | | | 517,431.00 | 224,900.00 | 2,749,200.96 |
| **TOTAL** | | | | | | | | | **517,431.00** | **224,900.00** | **2,749,200.96** |

12:01 PM
11/12/20
Accrual Basis

**EARTH ENERGY RENEWABLES LLC**
Transaction Detail by Account
As of October 31, 2020

| Type | Date | Num | Name | Memo | Class | Clr | Split | Debit | Credit | Balance |
|------|------|-----|------|------|-------|-----|-------|-------|--------|---------|
| **Wooley Advance** | | | | | | | | | | 0.00 |
| General Journal | 09/30/2017 | 311 | | Investment Jack Goralnik Purchase Wooley Shares | | | ABC Bank 0871 | | 50,000.00 | 50,000.00 |
| Check | 10/24/2017 | Transfer | JCW/JJW | John and Jeff Payment on shares | | | ABC Bank 0871 | 15,000.00 | | 35,000.00 |
| General Journal | 11/20/2017 | 333 | | transfer Wooley Shares | | | ABC Bank 0871 | | 25,600.00 | 60,600.00 |
| Check | 12/04/2017 | Wire | EE-TDF Cleveland LLC | Wooley stock sale and investment in EE-TDF Cleveland | | | ABC Bank 0871 | 14,000.00 | | 46,600.00 |
| General Journal | 12/12/2017 | 324 | | Transfer to JCW/JJW for investment in TDF | | | -SPLIT- | 24,000.00 | | 22,600.00 |
| General Journal | 12/28/2017 | 334 | | Stock sale proceeds transfer to Jeff account | | | ABC Bank 0871 | 6,000.00 | | 16,600.00 |
| General Journal | 03/07/2018 | 368 | | Wooley Advance AC 8140 | | | TB | | 800.00 | 17,400.00 |
| General Journal | 03/31/2018 | 373 | | Pydown Wooley Advance | | | ABC Bank 0871 | 5,000.00 | | 12,400.00 |
| General Journal | 05/17/2018 | 388 | | John and Jeff Wooley Loan | | | ABC Operating Account | | 22,000.00 | 34,400.00 |
| General Journal | 05/22/2018 | 400 | | Wooley Advance | | | TB | | 5,000.00 | 39,400.00 |
| General Journal | 06/21/2018 | 407 | | Wooley Payback | | | ABC Bank 0871 | 24,000.00 | | 15,400.00 |
| General Journal | 06/25/2018 | 409 | | Payback to Wooleys | | | ABC Bank 0871 | 5,000.00 | | 10,400.00 |
| General Journal | 07/02/2018 | 469 | | Payoff advance | | | -SPLIT- | 17,200.00 | | -6,800.00 |
| General Journal | 07/02/2018 | 470 | John Wooley | John Wooley payment on account | | | Accounts Payable | | 6,800.00 | 0.00 |
| General Journal | 08/03/2018 | 496 | | Wooley Advance | | | ABC Operating Account | | 25,000.00 | 25,000.00 |
| General Journal | 08/13/2018 | 498 | | Transfer from Jeff Wooley | | | ABC Operating Account | | 5,000.00 | 30,000.00 |
| General Journal | 09/14/2018 | 506 | | Repayment Jeff Wooley | | | TB | 7,500.00 | | 22,500.00 |
| General Journal | 09/25/2018 | 508 | | 50000 units sold to Borel @ $1.30 Proceeds | | | JCW/JJW | | 65,000.00 | 87,500.00 |
| General Journal | 09/27/2018 | 509 | | Transfer to Wooleys for further transfer to TDF | | | -SPLIT- | 48,000.00 | | 39,500.00 |
| General Journal | 09/28/2018 | 510 | | Transfer to Wooleys | | | ABC Bank 0871 | 8,600.00 | | 30,900.00 |
| Check | 10/05/2018 | debit | Jeffery Wooley | repay wooley advance | | | ABC Bank 0871 | 6,300.00 | | 24,600.00 |
| General Journal | 11/06/2018 | 536 | | Payback Wooley Advances | | | -SPLIT- | 24,600.00 | | 0.00 |
| **Total Wooley Advance** | | | | | | | | 205,200.00 | 205,200.00 | 0.00 |
| **TOTAL** | | | | | | | | 205,200.00 | 205,200.00 | 0.00 |

4835-6049-7362.1

11:55 AM
11/12/20
Accrual Basis

20-51780-rbk  Doc#48  Filed 11/19/20  Entered 11/19/20 17:06:40  Main Document  Pg 292 of 293

EARTH ENERGY RENEWABLES LLC
As of October 31, 2020

4.EER Wooley Loans

| | Type | Date | Num | Name | Memo | Class | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Jeff Wooley Short Term Loan** | | | | | | | | | | | 0.00 |
| | General Journal | 02/13/2018 | 344 | | short term loan Jeff Wooleyl | | | ABC Operating Account | | 2,000.00 | 2,000.00 |
| | General Journal | 03/05/2018 | 367 | | Jeff Wooley Advance | | | TB | | 22,500.00 | 24,500.00 |
| | Check | 03/14/2018 | wire | Jeffery Wooley | | | | TB | 24,500.00 | | 0.00 |
| | General Journal | 05/10/2019 | 612 | | Jeff wooley Short Term Loan | | | ABC Bank 0871 | | 9,000.00 | 9,000.00 |
| | General Journal | 06/18/2019 | 630 | | Advance Jeffery Wooley Personally | | | ABC Bank 0871 | | 5,000.00 | 14,000.00 |
| | General Journal | 07/11/2019 | 633 | | Transfer in loan from the Wooleys | | | ABC Bank 0871 | | 5,000.00 | 19,000.00 |
| | General Journal | 09/04/2019 | 653 | | Jeff Wooley Short term loan | | | ABC Operating Account | | 5,000.00 | 24,000.00 |
| | General Journal | 09/05/2019 | 664 | | Loan from Jeff Wooley | | | ABC Operating Account | | 7,000.00 | 31,000.00 |
| | General Journal | 09/05/2019 | 665 | | Loan from Jeff Wooley | | | ABC Operating Account | | 40,000.00 | 71,000.00 |
| | General Journal | 09/24/2019 | 668 | | Jeff Wooley Advance | | | ABC Bank 0871 | | 5,000.00 | 76,000.00 |
| | General Journal | 10/22/2019 | 669 | | Jeff Wooley Advance | | | ABC Operating Account | | 20,000.00 | 96,000.00 |
| | General Journal | 10/23/2019 | 672 | | Payback short term advance | | | ABC Operating Account | 20,000.00 | | 76,000.00 |
| | General Journal | 10/28/2019 | 677 | | Payback short term loan | | | ABC Bank 0871 | 2,000.00 | | 74,000.00 |
| | General Journal | 12/11/2019 | 710 | | Jeff Wooley Adavnce short term | | | ABC Operating Account | | 5,000.00 | 79,000.00 |
| | General Journal | 12/27/2019 | 728 | | Account Transfer | | | ABC Bank 0871 | 2,000.00 | | 77,000.00 |
| | General Journal | 01/15/2020 | 731 | | Jeff Wooley Transfer | | | ABC Operating Account | | 1,500.00 | 78,500.00 |
| | General Journal | 01/16/2020 | 732 | | payback Jeff Wooley ST Loan | | | ABC Operating Account | 1,500.00 | | 77,000.00 |
| | General Journal | 02/07/2020 | 738 | | Repayment 2/07 | | | ABC Operating Account | 100,000.00 | | -23,000.00 |
| | General Journal | 02/20/2020 | 739 | | Advance Jeff Wooley | | | ABC Operating Account | | 36,000.00 | 13,000.00 |
| | General Journal | 02/20/2020 | 740 | | Advance Jeff Wooley | | | ABC Operating Account | | 26,000.00 | 39,000.00 |
| | Check | 04/28/2020 | wire | Jeffery Wooley | Pay back trust | | | ABC Operating Account | 39,000.00 | | 0.00 |
| **Total Jeff Wooley Short Term Loan** | | | | | | | | | 189,000.00 | 189,000.00 | 0.00 |
| **TOTAL** | | | | | | | | | 189,000.00 | 189,000.00 | 0.00 |

4835-6049-7362.1

**Loans and Liabilies Personally Guarantied by John & Jeff Wooley**

| | Lender | Maturity Date | $$ Prin | Interest Rate | Accrued Interest |
|---|---|---|---|---|---|
| Robson Note | KDB Finance, LLC | 11/16/2018 | $ 110,000.00 | 40% | TBD |
| Robson Advance* | ??? | NA | $ 150,000.00 | NA | |
| | **Total Robson** | | **$ 260,000.00** | | |

\* Wooley position is that this is not guaranteed but is is conditionally ncluded in total

**Mortgage**

| | | | | | |
|---|---|---|---|---|---|
| Nalle | 6/30/2019 | $ 275,000.00 | 15.00% | TBD | |
| Cobb | | $ 250,000.00 | 12.00% | TBD | |
| Nalle/Cobb (ELF) | | $ 207,023.73 | 18.00% | TBD | |
| **Total Mortgage** | | **$ 732,023.73** | | | |

**IRS Payroll Tax**

| | | | | |
|---|---|---|---|---|
| IRS Employee Trust | 10/31/2020 | $ 174,309.66 | NA | |
| **Total IRS** | | **$ 174,309.66** | | |

| **Total Guaranteed** | **$ 1,166,333.39** | | |
|---|---|---|---|